LAW OFFICE OF DANIEL MARKS
DANIEL MARKS, ESQ.
Nevada State Bar No.: 002003
NICOLE M. YOUNG, ESQ.
Nevada State Bar No. 12659
610 South Ninth Street
Las Vegas, Nevada 89101
Office@danielmarks.net
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

PARNELL COLVIN,

    Plaintiff,

v.

M.J. DEAN CONSTRUCTION, INC,

    Defendant,

_____/

Case No. 2:20-cv-01765-APG-EJY

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY**

*Oral Argument Requested*

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      INTRODUCTION**

    This case is an employment discrimination case involving a construction company that is a contractor on the MSG Sphere project in Las Vegas, Nevada. The evidence produced in discovery shows this construction site was permeated with white supremacy in the form of an environment that allowed a supervisor to call a subordinate a "NIGGER" without any repercussion or action by the company to prevent future use of racial slurs. The evidence shows that after the "NIGGER" incident, racist graffiti was found in the bathroom, including graffiti that states, "Burn all NIGGERS...Trump 2020...White Power." The evidence shows that MJ Dean is not prepared or equipped to prevent or correct race discrimination on its job site. At the end of the day, MJ Dean allowed the supervisor who called his subordinate a "NIGGER" to fire that same employee months later under the guise of a lay off due to COVID-19. The facts show MJ Dean failed to properly train its management how to prevent and correct racism in the workplace, which led to a hostile work environment in violation of Title VII.

1  **II.      FACTUAL BACKGROUND**

2          Plaintiff Parnell Colvin ("Colvin") was hired by Defendant M.J. Dean Construction, Inc.,

3  ("MJ Dean") to work on the MSG Sphere ("Sphere") project on July 23, 2019. (*See* New Hire

4  Package Requirements, attached to Appendix of Exhibits in Support of Plaintiff's Motion for

5  Partial Summary Judgment on Liability ("Appendix Vol. 1") filed concurrently herewith, as

6  Exhibit 3.) His supervisor at the time he was hired was Kevin Gutierrez ("Gutierrez"). (*See*

7  Exhibit 3.) Colvin reported directly to Gutierrez. (*See* Deposition of Parnell Colvin, taken on July

8  15, 2021, attached to Appendix Vol. 1 as Exhibit 10, at 89: 2-4.)

9          Colvin filed his Charge of Discrimination with the EEOC and received a Right to Sue

10  letter, dated June 25, 2020. (*See* Charge of Discrimination, attached to Appendix Vol. 1 as

11  Exhibit 1; and *See* Notice of Right to Sue, attached to Appendix Vol. 1 as Exhibit 2.) Colvin

12  filed his Complaint in this action on September 22, 2020. (*See* ECF Doc. 1.) Accordingly, this

13  suit is timely.

14          **A.      MJ Dean's involvement on the MSG Sphere Project**

15          The Sphere project began construction in November/December of 2018. (*See* Deposition

16  of John Thomason, taken on July 29, 2021, attached to Appendix Vol. 2 as Exhibit 14, at 8:21-

17  23.) At that time, its expected time table for completion was 2019 to 2023. (*See* Exhibit 12, at

18  15:4-8.) MJ Dean's role on the Sphere project is as the concrete subcontractor, in a joint venture

19  with AECOM Hunt as a minority partner. (*See* Exhibit 12, at 15:9-17.)

20          John Thomason ("Thomason") was the concrete superintendent on site and has been the

21  Director of Field Operations for MJ Dean for the past four years. (*See* Exhibit 12, at 5:14-16 &

22  15:21-23.) He was the top MJ Dean executive on the project, owning a 4% share in MJ Dean.

23  (*See* Exhibit 12, at 8:5-10 & 16:14-20.) Thomason has worked in management for MJ Dean for

24  the past 25 years. (*See* Exhibit 12, at 5:24 to 6:9.) Thomason chose Gutierrez as General Foreman

25  for the project, overseeing concrete (*See* Deposition of Kevin Gutierrez, taken on July 29, 2021,

26  attached to Appendix Vol. 2 as Exhibit 11, at 7:1-3.)

27  / / / /

28  / / / /

1    Paul Rosequist ("Rosequist") has been the Project Safety Manager on the Sphere project

2  since construction began. (*See* Deposition of Paul Rosequist, taken on August 6, 2021, attached

3  to Appendix Vol. 2 as Exhibit 13, at 8:11-21.) Rosequist oversees OSHA compliance and is head

4  of Safety at the Sphere project. (*See* Exhibit 13, at 9:5-14 & 12:8-10.)

5    MJ Dean does not have a department dedicated to Human Resources. (*See* Exhibit 12, at

6  22:15-16.) Instead, Tommy Glidewell performs both the company's human resource and

7  information technology functions. (See Exhibit 12, at 22:15-19.)

8    **B.    MJ Dean's anti-discrimination, harassment, and termination policies**

9    MJ Dean's Office Policy Manual states on its first page that "[t]he policies and procedure

10  are intended to be guides to management and are merely descriptive of suggested procedures to

11  be followed." (*See* MJ Dean Office Policy Manual Excerpt, attached to Appendix Vol. 1 as

12  Exhibit 4, at APP 008.) That manual also includes a letter from the President of the company,

13  Michael Dean, stating, "We...hope that you find your association with the company to be an

14  enriching and engaging work experience." (See Exhibit 4, at APP 009.) MJ Dean commits itself

15  to "providing an excellent work environment" for its employees and claims "zero tolerance" for

16  workplace violence. (*See* Exhibit 4, at APP 010 and 012.) MJ Dean claims it "strives to maintain

17  an environment free from discrimination and harassment," including racial slurs as a form of

18  harassment[1]. (*See* Exhibit 4, at APP 014.) If an employee is subjected to harassment or

19  discrimination, the employee is directed to inform his/her supervisor or may go to Human

20  Resources. (*See* Exhibit 4, at APP 015.)

21  / / / /

22  / / / /

23  / / / /

24  / / / /

25

26    [1] The Anti-Harassment and Discrimination Policy contained in the Office Policy Manual
27  is identical to the policy included in the MJ Dean Code of Safe Practices & Anti-Drug and
   Harassment Policies. (*See* MJ Dean Code of Safe Practices & Anti-Drug and Harassment
28  Policies excerpt, attached to Appendix Vol. 1 as Exhibit 5, at APP 018-019.)

Gutierrez claims he is familiar with the anti-harassment policy and admits it is part of his job to enforce those policies. (*See* Exhibit 11, at 21:3-13.) Gutierrez acknowledges that if he heard racial slurs on the job he would report it to Rosequist in safety. (*See* Exhibit 11, at 22:15-25 & 23:11-17.) Gutierrez did not report any racial or discriminatory comments to Rosequist from 2019 through the date of his deposition on July 29, 2021. (*See* Exhibit 11, at 23:21-25.)

Its "Termination Processing Procedures" requires the employee's supervisor to notify Human Resources of the termination. (See Exhibit 4, at APP 013.) Human Resources then conducts an exit interview with the employee and provides the employee his/her final check at the time of the exit interview. (See Exhibit 4, at APP 013.)

**C.    Gutierrez was openly hostile to Colvin from the beginning.**

Beginning Colvin's first day of work, Gutierrez's treatment of Colvin was terrible. (*See* Exhibit 10, at 94:10-13.) When Colvin would greet Gutierrez in the morning, Gutierrez "would roll his eyes" and look at Colvin like he "was a piece of shit." (*See* Exhibit 10, at 95:2-4.) Colvin began complaining to Gutierrez about this treatment in August of 2019. (*See* Exhibit 10, at 142:13-21.) Colvin complained to Tony in Safety about Gutierrez's hostility, to which Tony responded that Gutierrez is a despicable person that he wanted to get rid of. (*See* Exhibit 10, at 149:19 to 150:1.) Colvin also complained to Superintendent Dave McGrandy ("McGrandy") in August of 2019. (*See* Exhibit 10, at 150:21-23.)

Gutierrez put Colvin in various situations that were designed to ensure Colvin's failure. (*See* Exhibit 10, at 95:5-9.) On approximately eight occasions, Gutierrez assigned Colvin multiple tasks throughout the day that did not allow for the completion of those tasks. (*See* Exhibit 10, at 95:10-6 and 158:3-5.) Gutierrez would have Colvin go work with other crews only to have the people working on those crews ask why he was sent over because all the work was already covered. (*See* Exhibit 10, at 95:19-21.) In September of 2019, Colvin confronted Gutierrez on this issue and asked, "Why am I the only laborer that you constantly pick on and send to work with other departments? And then when I get there, they don't even know why you sent me there." (*See* Exhibit 10, at 145:16-19 & 146:1-13.) Gutierrez had no response to Colvin.

/ / / /

1   (*See* Exhibit 10, at 148:1-5.) Colvin then complained to McGrandy about Gutierrez. (*See* Exhibit

2   10, at 148:6-10.) McGrandy told Colvin to "just keep your head down" and work. (*See* Exhibit

3   10, at 148:17-23.)

4        Shortly after Colvin began his employment Gutierrez prevented him from working

5   overtime. (*See* Exhibit 10, at 110:3-22.) One weekend, Gutierrez notified the laborers who would

6   get overtime that weekend. (*See* Exhibit 10, at 110:3-22.) Gutierrez would not give Colvin

7   overtime, claiming he has to give it to the laborers who started before him. (*See* Exhibit 10, at

8   110:17-18.) Colvin soon learned, however, that hispanic laborers who started after him were

9   given overtime, including Ricardo Flores ("Ricky"). (*See* Exhibit 10, at 110:19 to 111:5.) Even

10   when McGrandy gave Colvin overtime, Gutierrez continued to have a problem with it based on

11   his treatment of Colvin. (*See* Exhibit 10, at 112:17 to 113:15.)

12        On another occasion, Colvin and other laborers were cleaning up materials, including

13   nails, screws, and bolts. (*See* Exhibit 10, at 98:17 to 99:11.) Laborers typically use a wand with a

14   magnet on the end to pick up those materials. (*See* Exhibit 10, at 98:20-22.) Gutierrez

15   approached Colvin while he was using the wand and told him he would be fired for cleaning up

16   the materials that way, forcing Colvin to get down on his hands and knees to finish the clean-up.

17   (*See* Exhibit 10, at 98:24 to 99:8.) After Gutierrez left, the other laborers told Colvin that

18   everyone uses the wands and that Colvin was being singled out. (*See* Exhibit 10, at 99:8-11.)

19        Colvin does not believe that Gutierrez was properly trained based on his outward hostility

20   to Colvin. (*See* Exhibit 10, at 228:1-8.) Gutierrez did not treat Colvin like a human being or show

21   him any amount of respect like is expected from a leader. (*See* Exhibit 10, at 228:1-12.)

22        Gutierrez admits he never disciplined Colvin and admits Colvin was an "okay" employee

23   in terms of the work Colvin performed. (*See* Exhibit 11, at 24:17-23.) Gutierrez never wrote

24   Colvin up for his work performance. (*See* Exhibit 11, at 25:1-2.)

25   / / / /

26   / / / /

27   / / / /

28   / / / /

1
2

**D.    Gutierrez's hostility toward Colvin escalated on November 14, 2019, when Gutierriez called Colvin a "NIGGER," evidencing his racial hatred toward Colvin.**

3    Colvin was supervised by Gutierrez up until an incident that occurred on November 14,

4    2019. (*See* Exhibit 13, at 15:16-22.) On that date, early in the morning, Gutierrez approached

5    Colvin asking him to work in a different area. (*See* Exhibit 10, at 126:21-22.) Colvin said, "Okay

6    Kevin. No problem." (*See* Exhibit 10, at 126:22.) Colvin then asked, "But why am I the only

7    laborer I know that you always come to move around? . . .We only have three laborers. And

8    every crew you send me on, they have 10, 12 laborers working there. And when I get there" they

9    ask "why did Kevin send you here?" (*See* Exhibit 10, at 126:23 to 127:3.) Colvin told Gutierrez

10   that he was making Colvin look bad in front of the other laborers for sending him to do work that

11   was already covered by other laborers. (*See* Exhibit 10, at 127:3-5.) Gutierrez's constant re-

12   assignments to work somewhere else on the job site, only to be turned away, caused Colvin to

13   walk around the whole job site, which made him look bad in front of the superintendents. (*See*

14   Exhibit 10, at 127:3-5.) Colvin realized this was a pattern with Gutierrez because it is what

15   foremans do when they want to get rid of a laborer. (*See* Exhibit 10, at 127:6-7.) Gutierrez

16   wanted Colvin to walk around the job site all day chasing Gutierrez's futile tasks to make Colvin

17   look like a laborer who was not pulling his weight. (*See* Exhibit 10, at 127:8-11.) Gutierrez was

18   setting Colvin up for failure. (*See* Exhibit 10, at 127:12.)

19   Instead of giving Colvin a rationale response, Gutierrez exploded in anger. He began

20   yelling, threw his hands in the air, and screamed, "I'M NOT FUCKING DOING THIS, YOU

21   FUCKING NIGGER!" (*See* Exhibit 10, at 127:13-15.) Gutierrez also exclaimed, "I AM GIVING

22   YOU TWO CHECKS," meaning he was firing Colvin for objecting to Gutierrez's hostility. (*See*

23   Exhibit 10, at 16-18.) In response, Colvin exclaimed, "I'm tired of you harassing me. Man,

24   you've been harassing me from day one. ... I'm here just to work like you to take care of my

25   family. You've been picking on me, harassing. I don't even know you, so I don't know what the

26   problem is. I'm just trying to work." (*See* Exhibit 10, at 128:2-7.)

27   / / / /

28   / / / /

Page 6 of  24

1    Colvin then went directly to the MJ Dean trailer to report this incident. (*See* Exhibit 10, at

2    129:6-9.) On his way there, he ran into George and Jim Lampley from AECOM Hunt, who asked

3    him what was wrong. (*See* Exhibit 10, at 102:1-14.) Colvin told them what happened with

4    Gutierrez, including that Gutierrez called him a "NIGGER." (*See* Exhibit 10, at 102:4-14.)

5    George then went with Colvin to the MJ Dean trailer to notify John Thomason. (*See* Exhibit 10,

6    at 102:15-20; and *See* Exhibit 12, at 18:17-23.) Colvin told Thomason what happened with

7    Gutierrez. (*See* Exhibit 10, at 131:9-13.) Thomason called over Rosequist from Safety to handle

8    Colvin's written report. (*See* Exhibit 10, at 159:18 to 160:2.) Colvin then typed out the Employee

9    Incident Investigation Report given to him to document the incident. (*See* Employee Incident

10   Investigation Report, attached to Appendix Vol. 1 as Exhibit 6.) Tony from Safety was also

11   present while Colvin reported the incident. (*See* Exhibit 10, at 130:17-20.) While he was filling

12   out the report, Thomason introduced Colvin to his new supervisor, Superintendent Dave Muti

13   ("Muti"). (*See* Exhibit 10, at 131:17-23.) Thomason reassigned Colvin's supervision because

14   George told him that Gutierrez should no longer supervise or have any dealings with Colvin. (*See*

15   Exhibit 10, at 132:1-13.) After Colvin finished writing his report, Rosequist submitted it to

16   various people in the Safety department, including Rosequist, Jeff Kent (Safety Director), and

17   others on the "safety team." (*See* Exhibit 13, at 12:11-22.)

18   Rosequist completed the investigation regarding this incident. (*See* Exhibit 13, at 13:5 to

19   14:21.) Gutierrez denied calling Colvin a "NIGGER." (*See* Exhibit 11, at 43:9-14; and *See*

20   Exhibit 13, at 13:23-25.) After the investigation was completed, Rosequist went to Thomason

21   who discussed moving people around even though Thomason already moved Colvin while he

22   was writing his report. (*See* Exhibit 10, at 131:17-23; and *See* Exhibit 13, at 14:18-25.)

23   Colvin later requested to stay under the supervision of Superintendent MGrandy instead

24   of being moved. (*See* Text Messages between John Thomason and Parnell Colvin, attached to

25   Appendix Vol. 1, as Exhibit 7, at APP028.) Thomason and the superintendents still decided to

26   move Colvin, instead of moving Colvin's harasser, Gutierrez. (*See* Exhibit 13, at 15:16-22.)

27   / / / /

28   / / / /

1   George and Lampley followed-up with Colvin regarding Gutierrez, asking if he was still

2   bothering Colvin, and said that if he had any further problems to let them know because

3   Gutierrez was not supposed to have any dealings with Colvin. (*See* Exhibit 10, at 103:1-5.) They

4   followed up with Colvin approximately six times in passing. (*See* Exhibit 10, at 104:1-5.)

5   Gutierrez was still harassing Colvin through other black laborers telling them that Colvin was

6   talking about him. (*See* Exhibit 10, at 104:18-21.) This resulted in Colvin being contacted at

7   home by these laborers who told him that Gutierrez still had a vendetta against Colvin even

8   though he no longer supervised Colvin. (*See* Exhibit 10, at 104:18-25.)

9      **E.      MJ Dean allowed racist graffiti in the bathrooms.**

10     On December 24, 2019, Colvin used a bathroom at the job site and found graffiti that

11  states: "BLACK LABORERS = LAZY!" (*See* Photos of Racist bathroom Graffiti, attached to

12  Appendix Vol. 1 as Exhibit 8, at APP033; and Exhibit 10, at 173:18-25.) This graffiti was found

13  in a bathroom about 50 yards away from the bathroom near his assigned area. (*See* Exhibit 12, at

14  168:5-10 & 174:3-5.) Colvin reported this graffiti to Tony and Julian from Safety. (*See* Exhibit

15  10, at 174:13-15.) Colvin does not know if they reported the graffiti to their boss Paul Rosequist,

16  who handled the investigation for Gutierrez's "NIGGER" comment. (*See* Exhibit 10, 174:16-19.)

17  Colvin believed that by reporting this issue to management the issue would be corrected. (*See*

18  Exhibit 10, at 175:8-13.) Colvin does not know if this graffiti was ever cleaned off because it was

19  not the bathroom he typically used. (*See* Exhibit 10, at 175:14-21.

20     On January 3, 2020, Colvin used a bathroom near the yard, where he was assigned, and

21  discovered the graffiti issue escalated and was now more alarming. The top of the graffiti states:

22  "burn all NIGGERS." (*See* Exhibit 8, at APP032.) Directly under where it says "burn" is an

23  inverted swastika. (*See* Exhibit 8, at APP032.) Under the inverted swastika, is a drawing of a

24  penis and testicles with rudimentary "SS bolts," reminiscent of Nazi Germany. (*See* Exhibit 8, at

25  APP032.) Coming out of the penis are two large droplets stating, "Trump 2020." (*See* Exhibit 8,

26  at APP032.) Under the testicles, it states, "White Power." (*See* Exhibit 8, at APP032.)

27  / / / /

28  / / / /

Page 8 of 24

Colvin immediately complained to Julian and Tony from Safety and physically showed Julian the graffiti. (*See* Exhibit 10, at 168:11-15 & 169:7-11, 20-25.) The area was then Carson taped off. (*See* Exhibit 10, at 170:12-13.) After Tony looked at the graffiti, he commented to Colvin, "That's some fucked up shit." (*See* Exhibit 10, at 170:14-17.) Colvin and Ricky cleaned the graffiti off. (*See* Exhibit 10, at 170:18-23.) Colvin believed that his reports of the graffiti to Tony was sufficient because he was a supervisor in Safety, who was also present during his report of Gutierrez's "NIGGER" comment. (*See* Exhibit 10, at 130:17-20 & 230:23 to 231:8.)

Before Colvin saw the "Burn all NIGGERS...Trump 2020...White Power" graffiti, he had heard a lot of comments about white power and Trump on the job site. (*See* Exhibit 10, at 228:25 to 229:9.) The types of comments he heard included, "all Blacks need to go back to Africa" and "[a]ll Mexicans need to go back to Mexico." (*See* Exhibit 10, at 229:10-20.) Colvin believes MJ Dean tolerated an atmosphere of white supremacy at the job site in late 2019/early 2020. (*See* Exhibit 10, at 230:6-10.) Rosequist admits "there were people that support Trump on the job site." (*See* Exhibit 13, at 20:22-23.)

Gutierrez admits he has seen racist graffiti in the bathrooms on the project throughout his time on the job. (*See* Exhibit 11, at 31:17-21.) Gutierrez claims he reported it to safety, but does not remember who he reported it to. (*See* Exhibit 11, at 31:22 to 32:1.) Gutierrez has seen racist graffiti in the bathrooms on 200 occasions since he started on the project in 2019. (*See* Exhibit 11, at 33:8-18.) He claims that racist graffiti in the bathrooms is on "ongoing thing in construction." (*See* Exhibit 11, at 33:15-18.) While Gutierrez did not personally see the "Burn all NIGGERS...Trump 2020...White Power" graffiti, he admits that the graffiti he has seen is like this. (*See* Exhibit 8, at APP 032; and *See* Exhibit 11, at 35:14 to 36:18.) He has also seen graffiti such as the "BLACK LABORERS = LAZY!" off and on, claiming its ongoing. (*See* Exhibit 11, at 39:9-21.)  The racist graffiti Gutierrez has seen is also in reference to Hispanics and Caucasians. (*See* Exhibit 11, at 37:7-8.) He claims it gets reported to safety and just gets cleaned off. (*See* Exhibit 11, at 37:9-11.)

////

////

**F.      MJ Dean fails to enforce its anti-discrimination and anti-harassment policies.**

Colvin does not believe MJ Dean handled this situation correctly. (*See* Exhibit 10, at 172:1-4.) Colvin believes this issue should have been raised in the weekly meetings, with the management stating that this type of racism will not be tolerated. (*See* Exhibit 10, at 172:6-10.) MJ Dean never raised the issue of racist graffiti in the bathrooms at the weekly meeting. (*See* Exhibit 10, at 172:11-14.) MJ Dean never stated in any of those meetings that the graffiti was intolerable. (*See* Exhibit 12, at 231:9-14.) MJ Dean did not have any anti-harassment or diversity discussions or trainings to prevent future racist graffiti. (*See* Exhibit 10, at 231:15-19.) MJ Dean took no action, despite the fact the pro-Trump white supremacy comments permeated the workplace. (*See* Exhibit 10, at 231:24 to 232:2.)

Thomason claims MJ Dean has "zero tolerance" for harassment and discrimination in its workplace, but he qualified that tolerance to only if there is "proof" that it happened. (*See* Exhibit 12, at 19:9-16.) In actuality, MJ Dean's policy does not state there is "zero tolerance" for harassment or discrimination. (*See* Exhibit 4, at APP 014-15; and *See* Exhibit 5, at APP 018-019.) MJ Dean only has "zero tolerance" for workplace violence. (*See* Exhibit 4, at APP 012.)

Thomason claims that he is on site five to six days per week and ten hours each day. (*See* Exhibit 12, at 23:2-8.) He claims he is not aware of any racist comments on site because he has never heard such comments. (*See* Exhibit 12, at 24:5-17.) He claims he has not seen or heard about any racist graffiti in the bathrooms. (*See* Exhibit 12, at 24:18 to 25:8.)

He claims that such issues would be addressed in the weekly safety meetings, but he does not attend those meetings. (*See* Exhibit 12, at 25:9-17.) Thomason does not know if the use of racial slurs or racist graffiti was ever discussed in those meetings after Colvin's various complaints. (*See* Exhibit 12, at 25:18-21.)

The first time Thomason ever heard about the racist graffiti was during his deposition on July 29, 2021. (*See* Exhibit 12, at 26:2-6.) Thomason does acknowledge that the racist graffiti violates MJ Dean's anti-discrimination policy. (*See* Exhibit 12, at 28:2-4.) Gutierrez never told

/ / / /

/ / / /

1   Thomason about the white supremacy comments on site. (*See* Exhibit 12, at 44:1-7.) Thomason

2   claims that if he heard of saw racism on site that he would immediately address it with AECOM

3   Hunt's safety personnel. (*See* Exhibit 12, at 30:21 to 31:10.)

4        Rosequist claims he has not seen racist graffiti in the bathrooms at the project, but he

5   does not use the on-site bathrooms; he uses the one in the office. (*See* Exhibit 13, at 15:10-15.)

6   He claims that if he saw such graffiti he would have it immediately removed. (*See* Exhibit 13, at

7   16:10 to 17:3.) The first time he saw such graffiti was during his deposition on August 6, 2021.

8   (*See* Exhibit 13, at 20:10-13.) Rosequist claims he has not seen or heard white supremacist

9   comments, including use of the word "NIGGER," in the two years he has been on the project.

10  (*See* Exhibit 13, at 15:23 to 16:4.) Rosequist admits he never sent Colvin's report regarding

11  Gutierrez calling him a "NIGGER" to Human Resources. (*See* Exhibit 13, at 17:23-25.)

12       Rosequist admits he provides the topics and information discussed at the weekly safety

13  meetings even though he does not attend those meetings. (*See* Exhibit 13, at 18:12-16.) He

14  admits that racist graffiti has not been a topic at those meetings. (*See* Exhibit 13, at 18:17-20.)

15  Regarding the anti-discrimination policy, Rosequist claims it is "possible" it was discussed, but

16  does not know whether it was before or after Colvin's complaints. (*See* Exhibit 13, at 19:5-18.)

17       Gutierrez claims the anti-discrimination policy is discussed at the weekly safety meetings,

18  but he does not remember the last time it was discussed or how many times it was discussed (*See*

19  Exhibit 11, at 40:9-20.) Gutierrez admits there was white supremacy talk on the job site relating

20  to Trump's reelection. (*See* Exhibit 11, at 40:21-25 & 41:8-10.) Instead of reporting these

21  comments to his supervisor, safety, or human resources, Gutierrez just let it go "in one ear and

22  out the other." (*See* Exhibit 11, at 41:19 to 42:2.) Gutierrez admits he did not do anything to

23  report those comments. (*See* Exhibit 11, at 42:11-16.) The last time he saw anti-black graffiti in

24  the bathrooms at the project was two months ago. (*See* Exhibit 11, at 42:18-21.)

25  ////

26  ////

27  ////

28  ////

1

2

### G.   MJ Dean directed Gutierriez, Colvin's harasser, to terminate Colvin's employment in April of 2020.

3    On or about April 6, 2020, Gutierriez personally terminated Colvin's employment.

4  Gutierrez told Colvin he was being laid off and was giving him his final check. (*See* Exhibit 10,

5  at 182:23-25.) Gutierrez attempts to minimize his involvement in Colvin's termination claiming

6  he was "the one that brought the checks," but he admits he is the one who told Colvin he was laid

7  off. (*See* Exhibit 11, at 44:5-10.) However, Gutierriez did not give Colvin his final check and

8  ultimately told him he could pick-up his check the next day. (*See* Exhibit 11, at 182:25 to 183:3.)

9    Colvin did not understand why he was being laid off because there was work to be done

10  in his area. (*See* Exhibit 10, at 183:8-12.) Muti, his direct supervisor, even told him on that day

11  he would be working in that area by himself the rest of the week because Muti and a few other

12  laborers would be at the other yard. (*See* Exhibit 10, at 190:8-12.)

13    After Gutierrez fired him, Colvin called Muti to find out what was going on. (*See* Exhibit

14  10, at 193:8-12.) Muti said, "No, Parnell, you're not supposed to get laid off. You're working

15  there by yourself for the rest of the week, and you the only guy that's for the yard." (*See* Exhibit

16  10, at 193:16-18.) Muti did not understand why Gutierrez laid Colvin off. (*See* Exhibit 10, at

17  193:19-21.) Colvin was never given the Termination Notice, dated April 6, 2020, that was signed

18  by Gutierrez. (*See* Exhibit 10, at 204:5-7; and *See* Termination Notice, attached to Appendix Vol.

19  1 as Exhibit 9, at APP 035.) It is clear Gutierrez did not follow the Termination Policy included

20  in the Office Policy Manual because he was not Colvin's supervisor, nor did he follow the exit

21  interview portion with Human Resources to ensure Colvin timely received his last paycheck. (*See*

22  Exhibit 4, at APP 013.)

23    When Colvin came back the next day to pick up his check, he noticed that other laborers

24  were assigned to do his work. (*See* Exhibit 10, at 186:3-7 & 188:4-6.) One of the people that

25  replaced him was hired after him. (*See* Exhibit 10, at 186:3-16.) Colvin does not believe the

26  reason listed for his termination is true because the job never actually shut down completely. (*See*

27  Exhibit 10, at 205:12-19.) While certain areas were affected, the yard was not because it had to

28  ////

1  be maintained at all times because it is where the trucks bring in all the material for the project.

2  (*See* Exhibit 10, at 205:12-19.)  The other laborers immediately assigned to the yard shows

3  Colvin was replaced. (*See* Exhibit 10, at 186:3-7 & 188:4-6.)

4

5          **H.**    **MJ Dean shutdown its operations on the Sphere project for one week due to COVID-19.**

6        While MJ Dean claims the job site shutdown because of COVID-19, it was only a one-

7  week shutdown and laborers were then called back. (*See* Exhibit 10, at 185:4-15; and *See* Exhibit

8  12, at 32:25 to 33:1.) Despite the one week shutdown, a portion of construction continued during

9  that week for MJ Dean. (*See* Exhibit 12, at 33:2-10.) The week pause on construction occurred in

10  mid-April of 2020. (*See* Exhibit 12, at 35:3-8.) Thomason decided who to lay off for the

11  shutdown. (*See* Exhibit 12, at 36:17-19.) Even though they were directed to haul and store

12  everything stored in the yard off-site, Thomason admits they never did. (*See* Exhibit 12, at 37:7-

13  18.)

14        MJ Dean brought approximately 200 people back to work at the Sphere after the COVID-

15  19 shutdown. (*See* Exhibit 12, at 35:9-17.) Thomason admits there was no effort to ensure a

16  diverse workforce was brought back to work on the project after the shut down. (*See* Exhibit 12,

17  at 47:15-18.) Thomason does not know why Colvin was not brought back. (*See* Exhibit 12, at

18  42:14-17.) As of July of 2021, MJ Dean was still doing construction on the Sphere project, and

19  Gutierrez is still the general foreman. (*See* Exhibit 12, at 35:18-22 & 43:23-25.)

20        In April of 2020, 5% of the MSG Sphere was completed, which can be compared to the

21  20% of completion in July of 2021. (*See* Exhibit 12, at 33:11-18.) The project is still expected to

22  be completed in 2023, which is the original completion year contemplated for the project. (*See*

23  Exhibit 12, at 15:4-8 & 34:6-8.)

24  **III.**    **STATEMENT OF UNDISPUTED FACTS**

25        1.    Racist graffiti has appeared in the bathrooms at the Sphere project 200 different

26                times. (*See* Exhibit 11, at 33:8-18.)

27        2.    Racism at the Sphere project is an ongoing issue. (*See* Exhibit 11, at 33:15-18.)

28  ////

3.  Gutierrez reported the 200 instances of racist bathroom graffiti he saw at work to Safety. (*See* Exhibit 11, at 31:22 to 32:1.)

4.  Gutierrez never reported the white supremacist comments he heard at work. (*See* Exhibit 11, at 40:21-25, 41:8-10, & 41:19 to 42:2.)

5.  Gutierrez admits he is supposed to report racial slurs and racist graffiti to Rosequist in Safety. (*See* Exhibit 11, at 22:15-25, 23:11-17, & 42:11-16.)

6.  Gutierrez was initially Colvin's supervisor. (*See* Exhibit 3; and *see* Exhibit 10, at 89:2-4.)

7.  Gutierrez is MJ Dean's General Foreman. (*See* Exhibit 11, at 7:1-3.)

8.  Thomason never conducted meetings or trainings regarding MJ Dean's anti-discrimination and harassment policies. (*See* Exhibit 12, at 25:9-17.)

9.  Thomason does not know whether any meetings or trainings occurred following Colvin's complaints regarding the racially hostile work environment. (*See* Exhibit 12, at 25:18-21.)

10. Rosequist never conducted meetings or trainings regarding MJ Dean's anti-discrimination and harassment policies. (*See* Exhibit 13, at 18:12-16 & 19:5-18.)

11. While Rosequist decides what information is discussed at weekly safety meetings, he does not know if he had the anti-discrimination and harassment policies discussed. (*See* Exhibit 13, at 18:12-16 & 19:5-18.)

12. Rosequist does not attend weekly safety meetings. (*See* Exhibit 13, at 18:12-16.)

13. MJ Dean did not discuss the anti-discrimination and harassment policies at the weekly safety meetings following Colvin's complaints. (*See* Exhibit 12, at 25:18-21; and *see* Exhibit 13, at 19:5-18.)

14. Rosequist never submitted Colvin's complaint regarding Gutierrez calling him a "nigger" to Human Resources. (*See* Exhibit 13, at 17:23-25.)

15. Neither Tony nor Julian from Safety reported the numerous instances of racist bathroom graffiti to Rosequist. (*See* Exhibit 13, at 15:10-15, 16:10 to 17:3, & 20:10-13.)

16.   MJ Dean tolerates racism in its workplace. (*See* Exhibit 12, at 25:18-21; and *see* Exhibit 13, at 17:23-25, 18:12-20, & 19:5-18.)

17.   MJ Dean did not follow its termination policy when it had Gutierrez terminate Colvin, instead of Muti, Colvin's supervisor. (*See* Exhibit 4, at APP013.)

18.   MJ Dean did not follow its termination policy when it allowed Gutierrez to terminate Colvin without providing him his final check. (*See* Exhibit 4, at APP013.)

19.   MJ Dean directed Colvin be terminated by Gutierrez who called Colvin a "NIGGER" five months earlier. (*See* Exhibit 12, at 36:17-19.)

20.   Colvin was terminated three months after he complained of racist bathroom graffiti. (*See* Exhibit 10, at 168:11-15& 169:7-11, 20-25; and *see* Exhibit 9, at APP035.)

21.   MJ Dean's claim Colvin was "laid off" because the project shutdown is pretextual. (*See* Exhibit 10, at 186:3-16, 188:4-6, & 205:12-19.)

22.   The Sphere project was only shut down for one week. (*See* Exhibit 12, at 32:25 to 33:10 & 37:7-18.)

23.   During the shutdown, some work continued. (*See* Exhibit 12, at 33:2-10.)

24.   MJ Dean replaced Colvin. (*See* Exhibit 10, at 186:3-7 & 188:4-6.)

## IV.   LEGAL ARGUMENT

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact that would preclude summary judgment as a matter of law. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir.1996); Fed.R.Civ.P. 56(c). The materiality of a fact is based upon the substantive law of the underlying claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986).

The moving party bears the burden of proving there is no genuine issue of material fact, through the use of authenticated evidence, to show that they are entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *See Orr v. Bank of America*, 285 F.3d 764 (9th Cir.2002). The burden then shifts to the nonmoving party, to survive summary

1    judgment, to establish that there are specific material facts in dispute through use of authenticated

2    evidence. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986); *see Orr*,

3    285 F.3d at 773.

4        Here, Colvin seeks summary judgment on his claims of (1) Negligent Training and

5    Supervision and (2) Retaliation in violation of Title VII. There are no genuine issues of material

6    fact regarding M.J. Dean's liability for these claims, which are discussed below.

7
           **A.**     **M.J. Dean failed to properly train its management how to remedy and**
8                     **prevent a racially hostile work environment.**

9        Title VII prohibits discrimination "against any individual with respect to his

10   compensation, terms, conditions, or privileges of employment, because of such individual's . . .

11   race." 42 U.S.C. § 2000e-2(a)(1). "This prohibition encompasses the creation of a hostile work

12   environment, which violates Title VII's guarantee of 'the right to work in an environment free

13   from discriminatory intimidation, ridicule, and insult." *McGinest v. GTE Serv. Corp.*, 360 F.3d

14   1103, 1112 (9th Cir. 2004) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct.

15   2399 (1986)). "Courts have long recognized that a workplace in which racial hostility is

16   pervasive constitutes a form of discrimination." *Id.* (quoting *Woods v. Graphic Communications*,

17   925 F.2d 1195, 1200 (9th Cir. 1991).)

18       The determination of whether a hostile work environment exists considers whether the

19   harassment is "sufficiently severe and pervasive to alter the conditions of the victim's

20   employment and create an abusive work environment" in light of "all the circumstances." *Id.* at

21   1112-13 (internal citations omitted). If the hostile conduct at issue "pollutes the victim's

22   workplace, making it more difficult for [him] to do [his] job, to take pride in [his] work, and to

23   desire to stay on in [his] position," then a hostile work environment exists. *Id.* at 1113.

24       "The omnipresence of race-based attitudes and experiences in the lives of black

25   Americans [may cause] even nonviolent events to be interpreted as degrading, threatening, and

26   offensive." *Id.* at 1116. This is why "Title VII tolerates no racial discrimination, subtle or

27   otherwise." *Id.* The Ninth Circuit has analyzed the use of the word "nigger" in relation to a

28   hostile work environment, stating:

> It is beyond question that the use of the word 'nigger' is highly offensive and demeaning, evoking a history of racial violence, brutality, and subordination. This word is 'perhaps the most offensive and inflammatory racial slur in English...a word expressive of racial hatred and bigotry.

*Id.* "No word in the English language is as odious or loaded with a terrible history." *Id.* (quoting *Daso v. The Grafton School, Inc.*, 181 F.Supp.2d 485, 493 (D. Md. 2002).

"Employers are liable for failing to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known." *McGinest*, 360 F.3d at 1119. To avoid liability, the employer must take "remedial measures reasonably calculated to end the harassment." *Id.* at 1120 (internal quotations omitted). "Inaction constitutes a ratification of past harassment, even if such harassment independently ceases." *Id.* "[R]emedial actions must be designed not only to prevent future conduct by the harasser, but also by other potential harassers." *Id.* at 1121.

An "employer has a duty to use reasonable care in the training, supervision, and retention of his or her employees to make sure that the employees are fit for their positions." *Hall v. SSF, Inc.*, 930 P.2d 94, 99 (Nev. 1996). "The tort of negligent training and supervision imposes direct liability on the employer if (1) the employer knew that the employee acted in a negligent manner, (2) the employer failed to train or supervise the employee adequately, and (3) the employer's negligence proximately caused the plaintiff's injuries." *Helle v. Core Home Health Servs. of Nev.*, 124 Nev. 1474, 238 P.3d 818, 2008 WL 6101984, at *3 (Nev. 2008) (internal footnotes omitted) (citing *Hall*, 930 P.2d at 99; *Oehler v. Humana, Inc.*, 775 P.3d 1271, 1272 (Nev. 1989)).

Here, MJ Dean failed to properly train its management (including Thomason, Rosequist, Gutierrez, and Tony and Julian of Safety) how to remedy a racially hostile work environment. Those managers did nothing to remedy the use of racial slurs and the racist graffiti in the bathrooms. While they allude to the possibility that such issues could be addressed during the weekly safety meetings, the evidence is clear that the racial hostility on the jobsite was never directly addressed by MJ Dean.

/ / / /

/ / / /

1    Gutierrez is a great example. After he called Colvin a "NIGGER," Thomason and/or

2    Rosequist should have discussed MJ Dean's supposed "zero tolerance" for racial slurs with

3    Gutierrez and all other employees on site. From Rosequist's testimony, it is clear that once

4    Gutierrez denied the comment, Rosequist ended the discussion.

5         Additionally, as a General Foreman, Gutierrez was required to report all racial comments

6    and graffiti to his supervisor. Gutierrez admits he heard white supremacist comments on site and

7    saw racist graffiti in the bathrooms on approximately 200 occasions since he started on the

8    project in 2019. (*See* Exhibit 11, at 33:8-18 and 42:11-16.) That's an average of eight separate

9    instances of racist graffiti per month. Gutierrez admits he never reported these issues. The last

10   time he saw anti-black graffiti was in approximately May of 2021. (*See* Exhibit 11, at 42:18-21.)

11        It is clear that MJ Dean does nothing to prevent or remedy its racially hostile work

12   environment. Even its Office Policy Manual aknowledges that the directives in the are only a

13   guide for management and "are merely descriptive of suggested procedures." (*See* Exhibit 4, at

14   APP 008.) While the manual claims MJ Dean commits itself to "providing an excellent work

15   environment," the company has failed to properly train its management how to prevent and

16   remedy a racially hostile work environment. (*See* Exhibit 4, at APP 010.) Gutierrez's admission

17   of hearing white supremacist comments and seeing racist graffiti is a far cry from the "excellent

18   work environment" MJ Dean commits to in its manual. Gutierrez should have reported the

19   racism he saw and heard.

20        Regarding Colvin's complaints, Thomason and Rosequist should have properly counseled

21   Gutierrez, instead of simply taking him at this word. Their duty is to prevent future racism, which

22   also required them to address the use of racial slurs at a meeting or training. There is no evidence

23   they did either.

24        Regarding the racist graffiti, Tony and Julian from Safety should have reported it to

25   Thomason and Rosequist. It appears the graffiti was never reported, by Tony or Julian to

26   Rosequist, and MJ Dean never did anything to try to stop the graffiti. As Gutierrez testified, the

27   graffiti is an ongoing issue, with anti-black graffiti appearing in the bathrooms as recent as May

28   of 2021. (*See* Exhibit 12, at 24:5 to 25:8; and *See* Exhibit 13, at 15:10 to 16:14.)

1    Thomason and Rosequist's claims that the have never seen or heard racism on the job site

2    shows they were fully in the dark or simply do not care.

3    While it is clear that Colvin and Gutierrez did not historically see eye to eye, they do

4    agree about one thing: the racist graffiti on the Sphere job site is out of control. The prevalance of

5    this graffiti, including the recent anti-black graffiti in May of 2021, shows MJ Dean has

6    completely failed to use reasonable care in training and supervising its employees regarding its

7    anti-discrimination and harassment policies. By allowing this racial hostility to continue for two

8    years, MJ Dean knew it was acting in a negligent manner. They claim "zero tolerance," yet their

9    actions show that they willingly tolerate racism, in violation of their policies and Title VII. The

10   manuals show MJ Dean knows better.

11   MJ Dean's tolerance of racism in the workplace shows none of its employees and

12   supervisors were actually trained regarding the anti-discrimination and harassment policies. Even

13   if there was training, it is clear there was a failure to supervise, wherein those policies would be

14   enforced. As a result, Colvin was subjected to a racially hostile environment that he opposed. MJ

15   Dean ignored his compliants, in favor of its tolerance for racism in the workplace.

16   Because there are no facts in dispute regarding MJ Dean's failure to train and supervise,

17   this Court may grant Colvin summary judgment on liability for Colvin's Negligent Training and

18   Supervision cause of action.

19
        **B.      M.J. Dean retaliated against Colvin after he complained of being called a**
20      **"nigger" by his supervisor and seeing racist graffiti in the bathroom.**

21   An employer may not retaliate against an employee because that employee has opposed

22   an unlawful employment practice. 42 U.S.C. § 2000e-3(a). Conduct is discriminatory when its

23   rejection by an employee, "is used as the basis for employment decisions" that affect the

24   employee. 29 C.F.R. § 1604.11(a). To engage in a protected activity, the employee must have "an

25   objectively, reasonable belief, in good faith, that the activity he opposes is unlawful under Title

26   VII." *Clark County School District v. Breeden*, 532 U.S. 268, 271 (2001).

27   / / / /

28   / / / /

Page 19 of  24

To establish a *prima facie* case of retaliation under Title VII, the plaintiff must show that he "engaged in a protected activity, [was] subsequently subjected to an adverse employment action, and that a causal link exists between the two." *Dawson v. Entek Int'l.*, 630 F.3d 928, 936 (9th Cir. 2011). "The antiretaliation provision of Title VII prohibits any employer action that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Thompson v. North American Stainless, LP*, 562 U.S. 170, 131 S.Ct. 863, 868 (2011).

In order to prove retaliation, the employee must be able to show causation in fact. *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 133 S.Ct. 2517, 2524-25 (2013). This standard requires the employee "to show that the harm would have occurred in the absence of– that is, but – for the defendant's conduct." *Id.* at 2525 (internal quotations omitted). This causation standard is not the same as the standard used for claims based on status-based discrimination. *Id.* at 2533. In cases where an adverse employment action is taken "within a reasonable period of time" after the plaintiff engages in a protected activity, "retaliatory intent may be inferred." *Passantino v. Johnson & Johnson Consumer Products, Inc.*, 212 F.3d 493, 507 (9th Cir. 2000).

Here, Colvin was terminated three months after his last complaint regarding the racist bathroom graffiti. MJ Dean's retaliatory motive is derived from the fact that it allowed Gutierrez (the General Foreman that called Colvin a "nigger" five months earlier) to personally terminate Colvin's employment. The Office Policy Manual's termination provision shows MJ Dean did not follow that policy for this termination because the supervisor does the terminations. At the time of Colvin's termination, Muti was his supervisor, not Gutierrez.

This breach of policy, coupled with allowing Colvin's termination by his harasser shows MJ Dean's retaliatory motive that Colvin was being terminated because he complained about being called a "nigger" by Gutierrez and the racist bathroom graffiti. MJ Dean picked sides, and it sided with Gutierrez, the person that did not report 200 instances of racist bathroom graffiti and let white supremacy comments "go in one ear and out the other."

/ / / /

1    Because MJ Dean had Gutierrez (Colvin's harasser) terminate Colvin, instead of his
2    supervisor (Muti), this Court may grant Colvin summary judgment on liability on his Retaliation
3    cause of action because there are no material facts in dispute.

4    **V.     CONCLUSION**

5         For the foregoing reasons, this Court should grant Colvin's Motion for Partial Summary
6    Judgment on Liability on his claims of (1) Negligent Training and Supervision and (2)
7    Retaliation in violation of Title VII.

8         DATED this _____ day of October, 2021.

9                                         LAW OFFICE OF DANIEL MARKS

10

11                                        DANIEL MARKS, ESQ.
                                          Nevada State Bar No. 002003
12                                        NICOLE M. YOUNG, ESQ.
                                          Nevada State Bar No. 12659
13                                        610 South Ninth Street
                                          Las Vegas, Nevada 89101
14                                        Attorneys for Plaintiff

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF NICOLE M. YOUNG, ESQ.

NICOLE M. YOUNG, ESQ., hereby declares under penalty of perjury, under the law of the State of Nevada:

1. That I am an attorney representing the plaintiff in this proceeding. I have personal knowledge of and am competent to testify to the facts set forth herein.

2. That appended as Exhibit 1 is a true and correct copy of the Charge of Discrimination that was filed with the EEOC and produced by Plaintiff in this case.

3. That appended as Exhibit 2 is a true and correct copy of the Notice of Right to Sue Plaintiff received by the EEOC, dated June 25, 2020, which was produced by Plaintiff in this case.

4. That appended as Exhibit 3 is a true and correct copy of the New Hire Package Requirements produced by Defendant in this case.

5. That appended as Exhibit 4 is a true and correct copy of an excerpt from the MJ Dean Office Policy Manual produced by Defendant in this case.

6. That appended as Exhibit 5 is a true and correct copy of an excerpt of the MJ Dean Code of Safe Practices & Anti-Drug and Harassment Policies produced by Defendant in this case.

7. That appended as Exhibit 6 is a true and correct copy of the Employee Incident Investigation Report prepared by Parnell Colvin, dated November 14, 2019, which was produced by Defendant in this case.

8. That appended as Exhibit 7 is a true and correct copy of the Text messages between John Thomason and Parnell Colvin that were produced by Defendant in this case.

9. That appended as Exhibit 8 is a true and correct copy of the Photos of Racist Bathroom Graffiti that were taken by Parnell Colvin and produced by Plaintiff in this case.

////

10. That appended as Exhibit 9 is a true and correct copy of the Termination Notice, dated April 6, 2020, which was produced by Defendant in this case.

11. That appended as Exhibit 10 is a true and correct copy of the Deposition of Parneel Colvin, taken on July 15, 2021, authenticated by the Court Reporter at APP 253.

12. That appended as Exhibit 11 is a true and correct copy of the Deposition of Kevin Gutierrez, taken on July 29, 2021, authenticated by the Court Reporter at APP301.

13. That appended as Exhibit 12 is a true and correct copy of the Deposition of John Thomason, taken on July 29, 2021, authenticated by the Court Reporter at APP352.

14. That appended as Exhibit 13 is a true and correct copy of the Deposition of Paul Rosequist, taken on August 6, 2021, authenticated by the Court Reporter at APP383.

DATED this _____ day of October, 2021.

NICOLE M. YOUNG, ESQ.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I am an employee of the LAW OFFICE OF DANIEL MARKS, and that on the _____ day of October, 2021, I did serve a true and correct copy of the above and foregoing **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY** by way of Notice of Electronic Filing provided by the court mandated ECF filing service, upon the Defendant at the following:

    Robert Rosenthal
    Howard & Howard Attorneys Pllc
    3800 Howard Hughes Parkway, Suite 1000
    Las Vegas, Nevada 89169
    Attorneys for Defendant

                                                        _____
                                              An employee of the
                                              LAW OFFICE OF DANIEL MARKS