1  LAW OFFICE OF DANIEL MARKS
   DANIEL  MARKS, ESQ.
2  Nevada State Bar No.: 002003
   NICOLE M. YOUNG, ESQ.
3  Nevada State Bar No. 12659
   610 South Ninth Street
4  Las Vegas, Nevada 89101
   Office@danielmarks.net
5  *Attorneys for Plaintiff*

6

7                    UNITED STATES DISTRICT COURT

8                        DISTRICT OF NEVADA

9  PARNELL COLVIN,                    Case No. 2:20-cv-01765-APG-EJY

10         Plaintiff,

11 v.                                 **APPENDIX OF EXHIBITS IN SUPPORT
                                      OF PLAINTIFF'S PARTIAL MOTION FOR**
12 M.J. DEAN CONSTRUCTION, INC,       **SUMMARY JUDGMENT ON LIABILITY**
                                      **(Volume One)**
13         Defendant,
                                  /
14 _____

15

| Exhibit | Description | Page Numbers |
|---------|-------------|--------------|
| 1 | Charge of Discrimination | APP 001-2 |
| 2 | Notice of Right to Sue | APP 003-4 |
| 3 | New Hire Package Requirements | APP 005-6 |
| 4 | MJ Dean Office Policy Manual Excerpt | APP 007-15 |
| 5 | MJ Dean Code of Safe Practices & Anti-Drug and Harassment Policies Excerpt | APP 016-19 |
| 6 | Employee Incident Investigation Report | APP 020-24 |
| 7 | Text Messages between John Thomason and Parnell Colvin | APP 025-30 |
| 8 | Photos of Racist Bathroom Graffiti | APP 031-33 |
| 9 | Termination Notice | APP 034-35 |
| 10 | Deposition of Parnell Colvin, taken on July 15, 2021 | APP 036-253 |

27  / / / /

28  / / / /

1    DATED this ___8th___ day of October, 2021.

2                 LAW OFFICE OF DANIEL MARKS

3

4                 /s/ Nicole M. Young
                 DANIEL MARKS, ESQ.
                 Nevada State Bar No. 002003

5                 NICOLE M. YOUNG, ESQ.
                 Nevada State Bar No. 12659

6                 610 South Ninth Street
                 Las Vegas, Nevada 89101

7                 Attorneys for Plaintiff

8

9                <u>**CERTIFICATE OF SERVICE**</u>

10       I hereby certify that I am an employee of the LAW OFFICE OF DANIEL MARKS, and that

11  on the ___8th___ day of October, 2021, I did serve a true and correct copy of the above and foregoing

12  **APPENDIX OF EXHIBITS IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL**

13  **SUMMARY JUDGMENT ON LIABILITY (Volume One)** by way of Notice of Electronic Filing

14  provided by the court mandated ECF filing service, upon the Defendant at the following:

15       Robert Rosenthal
         Howard & Howard Attorneys Pllc

16       3800 Howard Hughes Parkway, Suite 1000
         Las Vegas, Nevada 89169

17       Attorneys for Defendant

18

19

20                 /s/ Rayne Hall
                 An employee of the

21                 LAW OFFICE OF DANIEL MARKS

22

23

24

25

26

27

28

# EXHIBIT 1

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 487-2020-01310 |

| Nevada Equal Rights Commission | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mr. Parnell Colvin | (503) 490-6564 | 1969 |

| Street Address | City, State and ZIP Code |
|---|---|
| 6681 Tara Ave, Las Vegas, NV 89146 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| MJ DEAN CONSTRUCTION INC. | 15 - 100 | (702) 873-1947 |

| Street Address | City, State and ZIP Code |
|---|---|
| 5055 W Patrick Lane, Suite 101,  Las Vegas, NV 89118 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|

| Street Address | City, State and ZIP Code |
|---|---|

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| | Earliest    Latest |

| ☒ RACE | ☐ COLOR | ☐ SEX | ☐ RELIGION | ☐ NATIONAL ORIGIN | 07-14-2019 | 04-04-2020 |
|---|---|---|---|---|---|---|
| ☒ RETALIATION | ☒ AGE | ☐ DISABILITY | ☐ GENETIC INFORMATION | | | |
| ☐ OTHER (Specify) | | | | | ☐ CONTINUING ACTION | |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

On or about July 17, 2019, I was hired by MJ DEAN CONSTRUCTION INC. as a Concrete Laborer.  My last position with the company was a Journeyman Laborer.  From in or around July 2019 to in or around April 2020, I was harassed by General Foremen Kevin Gutierrez.  For example, but not limited to, Mr. Gutierrez making a racially offensive comment to me by calling me a N****r, threatening my employment, and spreading false rumors about me.  I informed the company of the hostile work environment.  Subsequently, on or about April 4, 2020, I was laid off from work.  I believe I was discriminated against due to my race, Black, and retaliated against for engaging in protective activity, in violation of Title VII of the Civil Rights Act of 1964, as amended.  I believe I was discriminated against because of my age, over age 40, and retaliated against for engaging in protective activity, in violation of the Age Discrimination in Employment Act of 1967, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

| Date | Charging Party Signature |
|---|---|

COLVIN 00003

# EXHIBIT 2

EEOC Form 161-B (11/16)  U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

To: Parnell Colvin
6681 Tara Ave
Las Vegas, NV 89146

From: Las Vegas Local Office
333 Las Vegas Blvd South
Suite 5560
Las Vegas, NV 89101

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 487-2020-01310 | Brian Gorecki,
Investigator | (702) 388-5099 |

(See also the additional information enclosed with this form.)

NOTICE TO THE PERSON AGGRIEVED:

Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA): This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

☐ More than 180 days have passed since the filing of this charge.

☒ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

Age Discrimination in Employment Act (ADEA): You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the paragraph marked below applies to your case:

☒ The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

Equal Pay Act (EPA): You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Tamara M. West
Digitally signed by Tamara M. West

Tamara West,
Local Office Director

(Date Mailed)

Enclosures(s)

cc: Mike Dean
Owner/Manager
MJ DEAN CONSTRUCTION INC.
5055 W Patrick Lane, Suite 101
Las Vegas, NV 89118

COLVIN 00004

# EXHIBIT 3



# M.J. Dean
### CONSTRUCTION, INC.

## New Hire Package Requirements

Employee Name: *PARUEll COlViN*

Trade: *LABOR*                    Hire Date: *7/23/2019*

Supervisor: *KEVIN G*            Employee # _____

1. Employee <u>and</u> supervisor signatures must be on <u>all</u> sheets where applicable;
2. Supervisor must fill out, complete and sign Section 2 of I-9;

**The following documents need to be turned into the main office along with the New Hire Package:**

___✓___ Copy of Social Security Card

___✓___ Copy of Driver's License or ID

_____ Copy of OSHA 10 or 30 card

_____ Union Dispatch

_____ Drug Test Documentation (Chain of Custody, etc.)
  If you are using an out of state clinic for drug testing, make sure the clinic or lab is
  aware that the results should only be emailed to Janette Cavaliere –
  jcavaliere@mjdean.net

_____ Please indicate which division the employee will be working in:

  _____ (2) Doors
  ___✓___ (3) Concrete
  _____ (other) _____

If the employee is rehired after being unemployed by M.J. Dean for two weeks or more, a New Hire Package will need to be completed and a new Union Dispatch will need to be obtained.  A new drug test is required if 30 days or more have passed since the last clean drug test.

### Notes

_____

_____

_____

_____

_____

_____

5055 West Patrick Lane, Suite 101 • Las Vegas, Nevada 89118 • (702) 873-1947 • Fax (702) 873-7857
www.mjdeanconstruction.com

Rev 7/18

DEF 00018

# EXHIBIT 4



# Office Policy Manual

M.J. Dean Construction, Inc.
www.mjdeanconstruction.com

The policies and procedures in this manual are not intended to be contractual commitments by M.J. Dean Construction, Inc., and employees shall not construe them as such.

The policies and procedures are intended to be guides to management and are merely descriptive of suggested procedures to be followed. M.J. Dean Construction, Inc. reserves the right to revoke, change or supplement guidelines at any time without notice.

No policy is intended as a guarantee of continuity of benefits or rights. No permanent employment or employment for any term is intended or can be implied from any statements in this manual.

5055 West Patrick Lane
Las Vegas, Nevada 89118
(Main) 702-873-1947, (Fax) 702-873-7857

DEF 0009:

# Our Company

## Letter from the President

Welcome to M.J. Dean Construction, Inc.

We are pleased to have you as an employee of M.J. Dean Construction, Inc. and hope that you find your association with the company to be an enriching and engaging work experience.

This manual is your guide to our policies. Of course, this manual cannot cover every eventuality that may arise. Its purpose is to summarize or highlight current policies and practices for staff members. All policies are subject to change. If you have questions or would like more information, your supervisor is your most immediate source.

We invite you to share with us your questions and thoughts about work life at M.J. Dean Construction, Inc. Please feel free to call upon any member of the Human Resources Department to assist you in any matter that concerns you and your job at M.J. Dean Construction, Inc.

Sincerely,

Michael Dean
President, M.J. Dean Construction, Inc

## Company History

Founded in 1989, the M.J. Dean name has become synonymous with Las Vegas' most recognizable landmarks. Names like Mandalay Bay, the Luxor, Circus Circus and the Hard Rock are just a few. We've managed billions of dollars in contracts and have overseen the construction of some of the most recognizable, high-profile mega-resorts and high rise condominiums in Las Vegas, and we were named 2004 Contractor of the Year by the Nevada Contractors Association, the highest honor a Nevada contractor can achieve. One reason we operate at this level is because of our vast resources. With more than 1800 local employees and a core management staff of some of the best in the business, M.J. Dean is the dependable choice for precision construction services.

M.J. Dean has been able to build one of the largest teams of reliable employees, sub-contractors and vendors in the Las Vegas area. We have established successful working relationships with labor unions, key governmental building departments and regulatory agencies, ensuring smooth communication throughout our projects. These factors, along with our experience base, are why we are the contractor of choice in Las Vegas.

## Company Objectives/Mission

Through our commitment to excellence and a dedication to professionalism, M.J. Dean Construction, Inc. will continue to exceed industry standards by developing strong partnerships with clients, suppliers and employees, completing projects with professionalism and ingenuity, and maintaining the highest level of integrity known in the business. We will exceed expectations by:

- Developing and building innovative and challenging projects,
- Maintaining the highest level of safety standards, and
- Conducting all business in an honest and reliable manner.

With this commitment, M.J. Dean Construction, Inc. has established itself as the leader in the building community and will continue to be known as the contractor of choice.

## Statement of Commitment to Employees

M.J. Dean Construction, Inc. recognizes that its staff is its most important asset and therefore is committed to providing an excellent work environment, opportunities for self-development and growth, and monetary and non-monetary rewards for hard work and commitment to M.J. Dean Construction, Inc. The employee benefits of M.J. Dean Construction, Inc. have been designed to promote loyalty and longevity, and the company's philosophy is to "promote from within" whenever possible.

## Confidentiality Policy

Information that pertains to M.J. Dean Construction, Inc.'s business, including all nonpublic information concerning the Company, its vendors and suppliers, is strictly confidential and must not be given to people who are not employed by M.J. Dean Construction, Inc.

Please help protect confidential information - which may include, for example, trade secrets, customer lists and company financial information - by taking the following precautionary measures:

- Discuss work matters only with other M.J. Dean Construction, Inc. employees who have a specific business reason to know or have access to such information.
- Do not discuss work matters in public places.

Employee Policy Manual for M.J. Dean Construction, Inc.

DEF 00100

- Monitor and supervise visitors to M.J. Dean Construction, Inc. to ensure that they do not have access to company information.
- Destroy hard copies of documents containing confidential information that is not filed or archived.
- Secure confidential information in desk drawers and cabinets at the end of every business day.

Your cooperation is particularly important because of our obligation to protect the security of our clients' and our own confidential information. Use your own sound judgment and good common sense, but if at any time you are uncertain as to whether you can properly divulge information or answer questions, please consult a M.J. Dean Construction, Inc. officer.

## Continuity of Policies - Right to Change or Discontinue

The policies and procedures in this manual are not intended to be contractual commitments by M.J. Dean Construction, Inc. and employees shall not construe them as such. They are intended to be guides to management and merely descriptive of suggested procedures to be followed.

M.J. Dean Construction, Inc. reserves the right to revoke, change, or supplement guidelines at any time without notice. No policy is intended as a guarantee of continuity of benefits or rights. No permanent employment or employment for any term is intended or can be implied by statements in this book.

## Return to Work after Serious Injury or Illness

As a joint protection to the employee and the company, employees who have been absent from work because of serious illness or injury are required to obtain a doctor's release specifically stating that the employee is capable of performing his or her normal duties or assignments. A serious injury or illness is defined as one that results in the employee being absent from work for more than two consecutive weeks or one which may limit the employee's future performance of regular duties or assignments.

M.J. Dean Construction, Inc. management shall ensure that employees who return to work after a serious injury or illness are physically capable of performing their duties or assignments without risk of re-injury or relapse.

If the cause of the employee's illness or injury was job-related, the employee's supervisor will make every reasonable effort to assign the returning employee to assignments consistent with the instructions of the employee's doctor until the employee is fully recovered. A doctor's written release is required before recovery can be assumed. In the event there is any conflict between this provision and any government regulation such as FMLA or ADA, the federal regulations will govern.

## Vendor Gifts

Employees of M.J. Dean Construction, Inc. may not offer to give, or accept a gift, cash, trip or any other item of value, including personal service from an existing or prospective customer, supplier, subcontractor, consultant or a representative of either in pursuance of business or in conjunction with negotiating business on behalf of this company.

Expenses for meals as part of a seminar, convention, or business meeting are not within the definition of gratuities for purposes of this policy. However, such seminar, conventions and business meetings must be approved prior to attending. Invitations extended by a customer or supplier to participate in any program or activity, such as a party, sporting event, or company sponsored vacation (trip) must be approved in advance by an OFFICER of the COMPANY. Approval forms may be obtained from the human resources department.

Any violation of this policy will constitute grounds for immediate termination.

## Zero Tolerance for Workplace Violence

M.J. Dean Construction, Inc. has a zero-tolerance policy concerning threats, intimidation and violence of any kind in the workplace either committed by or directed to our employees. Employees who engage in such conduct will be disciplined, up to and including immediate termination of employment.

Employees are not permitted to bring weapons of any kind onto company premises or to company functions. Any employee who is suspected of possessing a weapon will be subject to a search at the company's discretion. Such searches may include, but not be limited to, the employee's personal effects, desk and workspace.

If an employee feels he or she has been subjected to threats or threatening conduct by a coworker, vendor or customer, the employee should notify his or her supervisor or another member of management immediately. Employees will not be penalized for reporting such concerns.

# Termination

Terminations are to be treated in a confidential, professional manner by all concerned. The supervisor, department manager, and personnel department must assure thorough, consistent, and evenhanded termination procedures. This policy and its administration will be implemented in accordance with the company equal opportunity statement.

Either the employee or employer can terminate the employment relationship with the company at any time and for any reason. The company subscribes to the policy of employment at will. Continued employment with the company is at the sole and exclusive option of company management. Permanent employment or employment for a specific term cannot be guaranteed or promised in the absence of a specific written contract of employment between an employee and the company.

Employment with the company is normally terminated through one of the following actions:

**Resignation** - voluntary termination by the employee;

**Dismissal** - involuntary termination for substandard performance or misconduct; or

**Layoff** - termination due to reduction of the work force or elimination of a position

**Termination Processing Procedures**

The supervisor must immediately notify the Human Resources Department of the termination so that a termination checklist can be initiated. The Human Resources Department will direct and coordinate the termination procedure.

All outstanding advances charged to the terminating employee will be deducted from the final paycheck by the payroll department.

On the final day of employment, the Human Resources Department must receive all keys, and company property from the employee.

The Human Resources Department may conduct an exit interview with the employee.

The employee will pick up his or her final payroll check from the Human Resources Department at the time of the exit interview. The final check shall include all earned pay and any expenses due the employee.

# Timekeeping

Accurate record keeping of time worked is the responsibility of every M.J. Dean Construction, Inc. employee. Federal and state laws require the company to keep an accurate record of time worked in order to calculate employee pay and benefits. Time worked is all the time actually spent on the job performing assigned duties. Employees submitting timesheets to the payroll department must include job numbers and cost codes on all timesheet documentation forms.

Altering, falsifying, tampering with time records, or recording time on another employee's time record may result in disciplinary action, up to and including termination of employment.

## Anti-Harassment and Discrimination Policy

M.J. Dean Construction, Inc. strives to maintain an environment free from discrimination and harassment, where employees treat each other with respect, dignity and courtesy. This policy applies to all phases of employment, including but not limited to recruiting, testing, hiring, promoting, demoting, transferring, laying off, terminating, paying, granting benefits and training.

### Prohibited Behavior

M.J. Dean Construction, Inc. does not and will not tolerate any type of harassment of our employees, applicants for employment, or our customers. Discriminatory conduct or conduct characterized as harassment as defined below is prohibited.

The term harassment includes, but is not limited to, slurs, jokes, and other verbal or physical conduct relating to a person's gender, ethnicity, race, color, creed, religion, sexual orientation, national origin, age, disability, marital status, military status or any other protected classification that unreasonably interferes with a person's work performance or creates an intimidating, hostile work environment.

Sexually harassing behavior in particular includes unwelcome conduct such as: sexual advances, requests for sexual favors, offensive touching, or other verbal or physical conduct of a sexual nature. Such conduct may constitute sexual harassment when it:

1   is made an explicit or implicit condition of employment
2   is used as the basis for employment decisions
3   unreasonably interferes with an individual's work performance, or
4   creates an intimidating, hostile or offensive working environment.

The types of conduct covered by this policy include, but are not limited to, demands or subtle pressure for sexual favors accompanied by a promise of favorable job treatment or a threat concerning employment.

Specifically, it includes sexual behavior such as:

1   repeated unwanted requests for dates
2   unwelcome sexual jokes or teasing
3   unwelcome discussion of sexual conduct
4   questions or comments about another's sex life
5   making sexually offensive statements
6   spreading sexual statements or rumors about an employee
7   displaying lewd photographs
8   showing pornographic materials in the workplace
9   inappropriate sexual looks or gestures
10  touching that makes another uncomfortable
11  implicit and explicit demands for sexual acts

Such conduct may constitute sexual harassment regardless of whether the conduct is between members of management, between management and staff employees, between staff employees, or directed at employees by nonemployees conducting business with the Company, regardless of gender or sexual orientation.

## Avoiding Harassment

Since the best way to stop any offensive conduct is to simply tell the person of your objection to it, M.J. Dean Construction, Inc. encourages you to do so. Even if no one has told you that your conduct is offensive, you are still subject to discipline, including discharge, for engaging in harassing conduct. You must exercise your own good judgment to avoid engaging in conduct that violates this Policy Statement. To help avoid risk of engaging in such conduct, you should keep the following guidelines in mind: (1) a co-worker may consider touching to be unwelcome or offensive, (2) racial, religious, ethnic, and sexual jokes and epithets have no place in the work environment, (3) compliments to other employees should be kept general, as more specific compliments may be perceived as sexually suggestive, and (4) do not behave in a way that you would not want your spouse, significant other, or children to see.

Employees are strongly discouraged from seeking a romantic or amorous relationship with another employee. Under no circumstance may an employee, after refusal, repeatedly ask another employee to date, apply pressure to have a relationship, or retaliate in any way due to an employee's decision not to date or have a relationship.

## Harassment by Nonemployees

M.J. Dean Construction, Inc. will also endeavor to protect employees, to the extent possible, from reported harassment by nonemployees in the workplace, including customers, clients and suppliers.

## Complaint Procedure and Investigation

If you believe you are the subject of any harassment or discrimination, or witness any harassment or discrimination in the workplace, you should immediately inform your supervisor. If your supervisor is not available, does not respond to your satisfaction, or you do not wish to contact your supervisor, you should contact the Human Resources Department. In addition, if you have any questions regarding harassment or discrimination, you are encouraged to discuss them with your supervisor or the Human Resources Department.

M.J. Dean Construction, Inc. will conduct a prompt investigation as confidentially as possible under the circumstances. Employees who raise concerns and make reports in good faith can do so without fear of reprisal; at the same time employees have an obligation to cooperate with M.J. Dean Construction, Inc. in enforcing this policy and investigating and remedying complaints.

Any employee who becomes aware of possible sexual harassment or other illegal discrimination against others should promptly advise their supervisor, Human Resource Director or any other appropriate member of management.

Anyone who is found, after investigation, to have engaged in harassment or discrimination will be subject to appropriate sanctions, up to and including termination, even for the first offense. An employee who has made a complaint or report will be notified of the outcome of the investigation and any disciplinary action taken.

## Retaliation

Any employee who files a complaint of sexual harassment or other discrimination in good faith will not be adversely affected in terms and conditions of employment and will not be retaliated against or discharged because of the complaint. In addition, we will not tolerate retaliation against any employee who, in good faith, cooperates in the investigation of a complaint. Anyone who engages in such retaliatory behavior will be subject to appropriate discipline, up to and including termination.

DEF 00131

# EXHIBIT 5



# Code of Safe Practices
# & Anti-Drug and
# Harassment Policies

M.J. Dean Construction, INC.
www.mjdeanconstruction.com

This Employee Safety Handbook is intended for all M.J. Dean Construction, Inc. employees, full time and part time, regular and temporary, and all other Company employment categories, i.e., student interns, etc.

The Handbook has been developed to provide employees with answers to general questions concerning health and safety in the workplace. It is important, however, that you and your supervisor discuss site-specific safety policies and programs for your department. Your supervisor must inform you of the safety procedures and required training you will need to do your job.

Please familiarize yourself with these safety practices and adhere to them at all times. M.J. Dean Construction, Inc.'s policies, procedures, manuals, and many other safety resources may be obtained from the Human Resource or Safety Departments. Should you have any questions or concerns regarding these practices, please do not hesitate to contact the Safety Department.

5055 West Patrick Lane
Las Vegas, Nevada 89118
702-873-1947, Fax 702-873-7857

DEF 00166

# Anti-Harassment and Discrimination Policy

M.J. Dean Construction, Inc. strives to maintain an environment free from discrimination and harassment, where employees treat each other with respect, dignity and courtesy. This policy applies to all phases of employment, including but not limited to recruiting, testing, hiring, promoting, demoting, transferring, laying off, terminating, paying, granting benefits and training.

## Prohibited Behavior

M.J. Dean Construction, Inc. does not and will not tolerate any type of harassment of our employees, applicants for employment, or our customers. Discriminatory conduct or conduct characterized as harassment as defined below is prohibited.

The term harassment includes, but is not limited to, slurs, jokes, and other verbal or physical conduct relating to a person's gender, ethnicity, race, color, creed, religion, sexual orientation, national origin, age, disability, marital status, military status or any other protected classification that unreasonably interferes with a person's work performance or creates an intimidating, hostile work environment.

Sexually harassing behavior in particular includes unwelcome conduct such as: sexual advances, requests for sexual favors, offensive touching, or other verbal or physical conduct of a sexual nature. Such conduct may constitute sexual harassment when it:

1  is made an explicit or implicit condition of employment
2  is used as the basis for employment decisions
3  unreasonably interferes with an individual's work performance, or
4  creates an intimidating, hostile or offensive working environment.

The types of conduct covered by this policy include, but are not limited to, demands or subtle pressure for sexual favors accompanied by a promise of favorable job treatment or a threat concerning employment.

Specifically, it includes sexual behavior such as:

1  repeated unwanted requests for dates
2  unwelcome sexual jokes or teasing
3  unwelcome discussion of sexual conduct
4  questions or comments about another's sex life
5  making sexually offensive statements
6  spreading sexual statements or rumors about an employee
7  displaying lewd photographs
8  showing pornographic materials in the workplace
9  inappropriate sexual looks or gestures
10  touching that makes another uncomfortable
11  implicit and explicit demands for sexual acts

Such conduct may constitute sexual harassment regardless of whether the conduct is between members of management, between management and staff employees, between staff employees, or directed at employees by nonemployees conducting business with M.J. Dean Construction, Inc., regardless of gender or sexual orientation.

## Avoiding Harassment

Since the best way to stop any offensive conduct is to simply tell the person of your objection to it, M.J. Dean Construction, Inc. encourages you to do so. Even if no one has told you that your conduct is offensive, you are still subject to discipline, including discharge, for engaging in harassing conduct. You must exercise your own good judgment to avoid engaging in conduct that violates this Policy Statement. To help avoid risk of engaging in such conduct, you should keep the following guidelines in mind: (1) a co-worker may consider touching to be unwelcome or offensive, (2) racial, religious, ethnic, and sexual jokes and epithets have no place in the work environment, (3) compliments to other employees should be kept general, as more specific compliments may be perceived as sexually suggestive, and (4) do not behave in a way that you would not want your spouse, significant other, or children to see.

Employees are strongly discouraged from seeking a romantic or amorous relationship with another employee. Under no circumstance may an employee, after refusal, repeatedly ask another employee to date, apply pressure to have a relationship, or retaliate in any way due to an employee's decision not to date or have a relationship.

## Harassment by Nonemployees

M.J. Dean Construction, Inc. will also endeavor to protect employees, to the extent possible, from reported harassment by nonemployees in the workplace, including customers, clients and suppliers.

## Complaint Procedure and Investigation

If you believe you are the subject of any harassment or discrimination, or witness any harassment or discrimination in the workplace, you should immediately inform your supervisor. If your supervisor is not available, does not respond to your satisfaction, or you do not wish to contact your supervisor, you should contact the Human Resources Department. In addition, if you have any questions regarding harassment or discrimination, you are encouraged to discuss them with your supervisor or the Human Resources Department.

M.J. Dean Construction, Inc. will conduct a prompt investigation as confidentially as possible under the circumstances. Employees who raise concerns and make reports in good faith can do so without fear of reprisal; at the same time employees have an obligation to cooperate with M.J. Dean Construction, Inc. in enforcing this policy and investigating and remedying complaints.

Any employee who becomes aware of possible sexual harassment or other illegal discrimination against others should promptly advise their supervisor, Human Resource Director or any other appropriate member of management.

Anyone who is found, after investigation, to have engaged in harassment or discrimination will be subject to appropriate sanctions, up to and including termination, even for the first offense. An employee who has made a complaint or report will be notified of the outcome of the investigation and any disciplinary action taken.

## Retaliation

Any employee who files a complaint of sexual harassment or other discrimination in good faith will not be adversely affected in terms and conditions of employment and will not be retaliated against or discharged because of the complaint. In addition, we will not tolerate retaliation against any employee who, in good faith, cooperates in the investigation of a complaint. Anyone who engages in such retaliatory behavior will be subject to appropriate discipline, up to and including termination.

# EXHIBIT 6



# Employee Incident
# Investigation Report

## Basic Information

| | |
|---|---|
| **Date** | **Name of Injured Person(s)** |
| 11/14/2019 | |
| **Time** | **First Aid Provided?** |
| 07:28 AM | Yes |
| **Project** | **Any Visible Injuries?** |
| MSG | No |
| **Person Filling Completing Report** | **Emergency Contact Notified?** |
| Parnell Colvin | No |

**Incident Summary**

Since I been employed labor general foreman (Kevin) made it clear to me during our phone conversation that he don't like people that he don't hire directly and I better walk fucking lightly around the job site or he would get rid of my ass in a heartbeat. I said I only wanted to work . I knew from my conversation with Kevin general foreman that I would be working under a very stressful environment but my attitude is positive and i work .But from day one Kevin has been picking on me for no reason. About two weeks ago i was on deck d cleaning as I usually do and work and i was caught up so I started to get wire out of the beams when Kevin came over and said what was i do i explained to Kevin that i am multitasking since i was caught up . I said Kevin you
   en here for just five minutes i been on the deck for over 3 hours cleaning if you would have asked to instead of assuming i would have informed you.  At this time i told Kevin that you
Have been picking on me and making it hard for me to work since i been here and I don't no why you be picking on me all the time. The next day Kevin came to me and apologized and said we would start over . But a few days later Kevin was back at his same tactics i was on the deck cleaning it is only two restrooms on the deck so i went to the restrooms on the ground i am gone for no more than 7 minutes and most of that was from walking to use the restroom. When i can back Kevin was standing there he said where was i and i replied that I went downstairs to use the restroom because the ones on the deck was being used Kevin said the guys said i am gone along time i said Kevin i was gone no more than 7 minutes and most of that was from walking to the restroom. Yesterday morning i was on the deck cleaning prior to that foreman Juan told me that it was only going to be me hector, and himself cleaning the deck because Kevin was not going to send no help. As i am cleaning Kevin comes over to me and says there is 9 guys on the deck and go work with another foreman named Ricky please keep in mind that this was my area that i work in with the carpenters for the last 3 months but Kevin only singles me out every time no other labor on my crew keeps getting switched around .now i no that we do get moved around to to help other crews but this is a tactic I believe Kevin uses to mess with me. But has not work i just do my job so  as Kevin talked to me i said this is my area he says i am the fucking boss

jkent@mjdean.net
prosquist@mjdean.net

ered by gocanvas                          www.gocanvas.com

DEF 00024



# Employee Incident
# Investigation Report

you do what i say do i said Kevin he you go again Kevin said he was not fucking doing this and he would give me my two fucking checks i said why you be messing with me  Kevin threw his hands up and said he was done and called me a nigger and left the area. There are many other incidents this is just a few .

jkent@mjdean.net
prosquist@mjdean.net

powered by gocanvas                    www.gocanvas.com

DEF 00025



# Employee Incident
# Investigation Report

| Report | | |
| --- | --- | --- |

Name of Supervisor

Direct Cause of Injury

Who Treated Injuries?
EMT, Safety Personnel, Clinic,
Hospital
How Were Injuries Treated?

Describe Injuries
Body Parts, Nature of Injury
What was the Employee Doing Just Prior to Accident
job task, include any tools or machinery used
Comments

Attach Scene Diagram or Design in the
ιt Screen

Hospitalized?
No

Authorities Notified?
No

Photos Taken?
No

Describe Property /  Equipment Damage

Was PPE being utilized?
Yes

Weather Conditions at Time of Accident

Visibility / Lighting
Poor, Work Lights, Sunlight

Type and Condition of Floor Surface
Concrete, Dirt, Wet, Dry

jkent@mjdean.net
prosquist@mjdean.net

ered by gocanvas

www.gocanvas.com

DEF 00026



# M.J. Dean
## CONSTRUCTION, INC.

## Employee Incident
## Investigation Report

### Witness #1 Information

**Witness #1 Name**

Ricky foreman

**Phone Number**

7025763860

### Witness #2 Information

**Witness #2 Name**

### Other Information

Police Information                                     Badge

Name

                                                      Case #

### Corrective Actions

Recommended Corrective Actions          Corrective Actions Completed?

                                        Yes

### Signatures

| Name | Signature | Position |
|------|-----------|----------|
| Parnell Colvin | *Parnell Colvin* | |

jkent@mjdean.net
prosquist@mjdean.net

powered by gocanvas

DEF 00027

# EXHIBIT 7

iMessage
Jun 10, 2019, 1:55 PM

Please call me tomorrow morning around 8:00 am. I have meetings all day

Hello John this is Parnell we talked last Thursday you said you was in Utah and to call you Monday about hopefully helping me get employment with mj Dean I have tried to leave you a message but it is full hopefully you will get my text I would really appreciate it if you can help me thanks

Please call me back in the morning

Ok thanks

Jun 26, 2019, 9:14 AM

Hello John how you doing this Parnell i talked to the foreman at the sphere he said he had guys I tried calling but couldn't not leave a voicemail for him Can you please put me in touch with someone that might be able to help me I am going to be putting my name back on the office list again thanks

DEF 00088

Jul 22, 2019, 9:40 AM

 

Kevin Gutteriz

Please give Kevin a call, sorry it took so long

Ok I will and again thank you so much John

Please text me your full name so I can have Jim set you up for orientation.  Thanks

Parnell Colvin

Jul 24, 2019, 5:06 PM

Hello John this is Parnell I just wanted to say thanks again for the opportunity to work for mj dean !



DEF 00089

Thu, Nov 14, 4:17 PM

Hello this is Parnell sir I wanted to ask can I continue to work for superintendent Dave Grundy I have been assigned to his crew I been working great with him and the carpenters for the last 3 months no issues and it is a wonderful crew and that's where I sign in with every morning.

The laborers that work for Dave McGrandy work for and under Kevin. Dave Muti is taking care of the site and it's the only way on that job that I can get you off of his (Kevin's) crew. The other option could be the yard once that comes into play.

Ok thank you sir

DEF 00090

Fri, Nov 29, 2:38 PM

Hello I hope you had a wonderful thanksgiving and I want to thank you and mj dean for the opportunity to work and for the gift card I am very grateful for the opportunity you gave me and I show up everyday ready to work never been late or missed a day of work again thanks for the opportunity.

Sat, Nov 30, 5:56 AM

Thank you, I hope you are having a wonderful thanksgiving also. Enjoy your weekend
John T

Sat, Nov 30, 10:58 AM

You enjoy as well sir

Wed, Dec 25, 7:24 AM

Merry Christmas to you and your family enjoy

Wed, Dec 25, 8:55 AM

Merry Christmas, thank you

Read 12/25/19

DEF 00091

Wed, Dec 25, 7:24 AM

Merry Christmas to you and your
family enjoy

Wed, Dec 25, 8:55 AM

Merry Christmas, thank you

Read 12/25/19

You welcome

Wed, Jan 1, 11:03 AM

Happy new year and thanks for the
opportunity you gave  me I am very
great full

Thu, Apr 16, 9:09 AM

Gm John this is Parnell I no you are
extremely busy I wanted to ask you
if you will bring me back to work the
yard or any task I been there about
5 months by myself In the yard and
9 months on the job site  I never
been late to work never called in I
was committed and dedicated you
gave me a chance and I wanted to
show my appreciation by working
professional and doing the best job I
could thanks

DEF 00092

# EXHIBIT 8



COLVIN 00005



COLVIN 00006

# EXHIBIT 9

# M.J. Dean

### CONSTRUCTION, INC.

## LICENSE #32338 - #33625

### Termination Notice

Date: _04/06/2020_

Name: _PARMEJI COLVIN_

Employee # _6880_

Social Security #: _____

(Please complete this form and submit it to the main office for each terminaton )

Reason for terminaton :    Quit : _____    Discharge: _____

Laid Off, Reduction in force: _____X_____

Give full detail below :

LAID OFF LACK OF WORK M.S.G. SHUT DOWN

Submitted by: _____KEVIN GUTIERREZ_____

Please Print: _____

Title: _____GENERAL FOREMAN_____

5055 West Patrick Lane , Ste. 101 Las Vegas , Nevada 89118 (702) 873-1947 Fax (702)873-7857

DEF 00019

# EXHIBIT 10

UNITED STATES DISTRICT COURT FOR

THE DISTRICT OF NEVADA


PARNELL COLVIN,                )
                              )
            Plaintiff,         )
                              )
vs.                           )CASE NO. 2:14-CV-00761-JCM-PAL
                              )
M.J. DEAN CONSTRUCTION,        )
INC.                          )
                              )
            Defendant.         )
_____)


VIDEORECORDED DEPOSITION OF PARNELL COLVIN

Las Vegas, Nevada

July 15, 2021
10:00 a.m. (PST)


REPORTED BY:
MICHAEL A. BOULEY, RDR
NVCCR #960



```
 1              VIDEORECORDED DEPOSITION OF PARNELL COLVIN, was

 2   taken on July 15, 2021, at 10:00 a.m. at Howard & Howard,

 3   3800 Howard Hughes Parkway, Suite 1000, Las Vegas,

 4   Nevada, before Michael A. Bouley, RDR, Nevada Certified

 5   Court Reporter No. 960.

 6

 7   APPEARANCES:

 8   On Behalf of the Plaintiff

 9           LAW OFFICE OF DANIEL MARKS, LTD.
             By:  Mr. Daniel Marks, Esq.
10           610 S. Ninth Street
             Las Vegas, Nevada  89101
11           (702) 386-0536
             office@danielmarks.net
12

13   On Behalf of the Defendant

14           HOWARD & HOWARD ATTORNEYS, PLLC
             By:  Mr. Robert L. Rosenthal, Esq.
15           3800 Howard Hughes Parkway, Suite 1000
             Las Vegas, Nevada  89169
16           (702) 257-1483
             rlr@h2law.com
17

18

19   Also Present:

20   Abdul Alotaibi, legal videographer

21   Kevin Gutierrez

22   Tommy Glidewell

23

24

25
```



```
1                          INDEX

2    WITNESS                                      PAGE

3    PARNELL COLVIN

4    Examination by Mr. Rosenthal ...................    5

5    Examination by Mr. Marks .......................  225

6    Examination by Mr. Rosenthal ...................  238

7

8

9

10                        EXHIBITS

11   NUMBER            DESCRIPTION              PAGE

12   A       First Amended Complaint...................    9

13   B       Text Messages ...........................   51

14   C       Dispatch Referral .......................   63

15   D       Employment Documents ....................   65

16   E       Code of Safe Practices & Anti-Drug and

17           Harassment Policies .....................   71

18   F       Office Policy Manual ....................   75

19   G       Benefits document  ......................   79

20   H       Employee Incident Investigation Report ...  117

21   I       Photograph ..............................  166

22   J       Photograph ..............................  173

23   K       Email ...................................  199

24   L       Termination Notice ......................  203

25   M       Email from T. Glidewell  ................  207
```



 1          THE VIDEOGRAPHER:  We are now on the record in

 2   the matter of Parnell Colvin versus M.J. Dean

 3   Construction.  Today's date is July 15th of 2021.  The

 4   time is now 10:15 a.m.

 5          This is the videorecorded deposition of Parnell

 6   Colvin.  We are located at the offices of Howard and

 7   Howard, Wells Fargo Tower, Suite 1000, 3800 Howard Hughes

 8   Parkway, Las Vegas, Nevada, 89169.

 9          My name is Abdullah Alotaibi, legal video

10   specialist, in association with Worldwide Litigation

11   Services.

12          For the record, would counsel please introduce

13   themselves and who they represent?

14          MR. ROSENTHAL:  Robert Rosenthal on behalf of

15   defendant, M.J. Dean.

16          MR. MARKS:  Daniel Marks on behalf of the

17   plaintiff.

18          Could we, for the record, just have the

19   gentlemen be identified so when we get the transcript, we

20   know who is there?

21          MR. ROSENTHAL:  Sure.  With me today are

22   employees of M.J. Dean, Tommy Glidewell and Kevin

23   Gutierrez.

24          THE VIDEOGRAPHER:  The court reporter will now

25   swear in the witness.



```
 1                      PARNELL COLVIN,

 2  having been first duly sworn, testified as follows:

 3                      EXAMINATION

 4  BY MR. ROSENTHAL:

 5      Q.   Could you state and spell your name for the

 6  record, please?

 7      A.   Yes.  My name is Parnell, first name.  Colvin's

 8  the last name.  First name spelled P-A-R-N-E-L-L.  Last

 9  name is Colvin, C-O-L-V, like in Victor, I-N.

10      Q.   And are you a junior or a second or a third?

11      A.   Senior.

12      Q.   Okay.  So would that be a third?

13      A.   No.

14      Q.   Parnell Colvin the third or --

15      A.   Just Parnell Colvin, Sr.

16      Q.   What is your date of birth?

17      A.   4-20-69.

18      Q.   And what's your current address?

19      A.   6681 Tara, T-A-R-A, Avenue, Las Vegas, Nevada.

20  Zip code is 89146.

21      Q.   Mr. Colvin, have you ever had your deposition

22  taken before?

23      A.   No.

24      Q.   Have you ever testified in court before?

25      A.   Yes.
```



 1   Dean, I just want to go over some of your employment

 2   history before then.  Okay?

 3       A.   **Okay.**

 4       Q.   Where did you work before -- the job right

 5   before M.J. Dean?

 6       A.   **The union sent me to a demo job, Red Rock.**

 7       Q.   What was the name of the employer?

 8       A.   **I believe it was Clause Construction.**

 9       Q.   Can you spell that?

10       A.   **C-L-A-U-S-E Construction.**

11       Q.   And that was at Red Rock?

12       A.   **Yeah, demo.**

13       Q.   The casino?

14       A.   **No.  I guess out towards -- I guess when you're**

15   **traveling out towards Red Rock.**

16       Q.   Okay.  Actual -- the actual Red Rock?

17       A.   **Yes.**

18       Q.   Okay.

19            MR. MARKS:  The national land --

20       A.   **Yes.**

21            MR. MARKS:  -- Red Rock?

22   BY MR. ROSENTHAL:

23       Q.   Was that for residential construction?

24       A.   **It was -- I guess there's four buildings out**

25   **there.  Been out there for a long time, and we just went**



1    out there to demo it.

2        Q.   How long was that job?

3        A.   Well, I left early from that job.

4        Q.   So what were your dates of employment there?

5        A.   I would be guessing.  But I would say--

6        Q.   Can you give me an estimate?

7        A.   I would probably say I was there maybe a month.

8    My employment with M.J. Dean started, I think, July 17th.

9    So I believe my last day there was July the 16th.   I

10   believe.

11           MR. MARKS:  Do you want to give the year?

12       A.   2019.

13   BY MR. ROSENTHAL:

14       Q.   So did you work for Clause Construction in the

15   same year that you worked -- that you started working for

16   M.J. Dean?

17       A.   Yes.

18       Q.   Okay.  And how long was the job itself?

19       A.   I'm not sure.

20       Q.   Was it more than a month?

21       A.   Possible.

22       Q.   But you don't know at all?

23       A.   I don't know.

24       Q.   Could have been less?

25       A.   Yes.



1    Q.   Was it more than six months?

2    **A.   No.**

3    Q.   Okay.  And what did you do for Clause

4    Construction?

5    **A.   Demolition of the buildings.  Hauling material.**

6    Q.   Were you working as a laborer for that?

7    **A.   Yes.**

8    Q.   And that was referred by Local 872.  Correct?

9    **A.   Yes.**

10   Q.   Had you put your name on a list -- on the union

11   list?

12   **A.   Yes.**

13   Q.   And that's how you got the job?

14   **A.   Yes.**

15   Q.   Were you ever disciplined at all when you worked

16   at Clause Construction?

17   **A.   No.**

18   Q.   Were you terminated?

19   **A.   No.**

20   Q.   And so why did you leave Clause Construction?

21   **A.   Prior to that, I was in contact with John**

22   **Thomason of M.J. Dean, and he finally called me and said,**

23   **I'm going to put you on that Sphere project.  So I**

24   **notified the superintendent there that I would be**

25   **leaving.**



1    Q.   So while you communicated with John Thomason,

2    you were still -- you were actually still working for

3    Clause Construction at that time.  Is that right?

4    A.   Yes.

5    Q.   Did you know Mr. Thomason from before?

6    A.   **We met.  He called me in his office -- we met**

7    **prior to me going to that job.**

8    Q.   When was the first time you met John Thomason?

9    A.   **Rough guess, I would probably say --**

10   Q.   Again, I don't want you to guess.  But you do

11   understand between an estimate and a guess.  Right?

12   A.   **Yes.**

13   Q.   Okay.  So can you give me an estimate as to when

14   you first met John Thomason?

15   A.   **Probably -- I would say May.  May of 2019.**

16   Q.   Now, I just want to go back for a second to all

17   of those lawsuits that we talked about.  Do you recall

18   those?

19   A.   **Yes.**

20   Q.   Did you ever testify in court for any of those?

21   A.   **No.**

22   Q.   So, never testified in court for any of the

23   eviction cases?

24   A.   **Yes.**

25   Q.   You did?



1    A.   Yes.

2    Q.   How many?

3    A.   I want to say all of them that went to court.

4    Q.   Okay.  Because just a minute ago you said you

5    never testified in court.  Now you're saying you

6    testified in all of the eviction cases in court.

7    A.   When you're saying lawsuits, now I'm clarifying

8    eviction.  So if it's eviction court, the answer would be

9    yes.

10   Q.   You testified in all of them?

11   A.   Yes.

12   Q.   Did you testify in court with respect to Tako,

13   LLC?

14   A.   Yes.

15   Q.   That wasn't an eviction case.  Right?

16   A.   But what?  I mean, you are using the names, but

17   now what case --

18   Q.   You sued for a slip-and-fall on the property.

19   Right?

20   A.   Yes.  That case is still pending.

21   Q.   Okay.  But that wasn't an eviction case.  Right?

22   A.   Correct.

23   Q.   But you testified you did testify in court, you

24   said.  Right?

25   A.   Not in that case, no.



1      Q.   Did you -- were you deposed in that case?

2      A.   No.

3      Q.   Did you testify in court against AHP realty?

4      A.   Well, I need clarification, because some of

5   these cases started in state court, and then they moved

6   to federal court.  So if you're speaking of state court,

7   then yes.  If you're speaking of federal court, the

8   answer is no.

9           MR. MARKS:  I think he just means any court --

10  Any court --

11     A.   Yes.  Yes.

12          MR. MARKS:  -- you did testify.

13     A.   Yes.

14  BY MR. ROSENTHAL:

15     Q.   Who did you report to at Clause Construction?

16     A.   Superintendent.

17     Q.   Who was that?

18     A.   I don't remember his name.

19     Q.   Do you have any records that would show who that

20  person's name is or was?

21     A.   No.

22     Q.   And you said you were never disciplined when you

23  worked at Clause.  Right?

24     A.   Correct.  Correct.

25     Q.   Were you ever promoted when you worked there?



1      A.    No.

2      Q.    Do you know if you're eligible to be rehired at

3  Clause?

4      A.    Yes.

5      Q.    Yes, you are eligible?

6      A.    Yes.

7      Q.    Where did you work before Clause?

8      A.    Penhall Construction.

9      Q.    Here in Las Vegas?

10     A.    Yes.

11     Q.    How long did you work for Penhall?

12     A.    About 19 months.

13     Q.    When did you start working for Penhall?

14     A.    2017.

15     Q.    Do you remember when in 2017?

16     A.    No.

17     Q.    Do you remember if it was the beginning of 2017

18  or towards the end?

19     A.    Towards the beginning.

20     Q.    Do you remember when you stopped working for

21  Penhall Construction?

22     A.    No.

23     Q.    And tell me again how many months you think you

24  worked for Penhall?

25     A.    About 18 months.



1    Q.   What was your job?

2    A.   **Labor.**

3    Q.   Did Local 872 refer you to that job?

4    A.   **Yes.**

5    Q.   Again, you put your name on the list?

6    A.   **Yes.**

7    Q.   Who was your supervisor when you worked at

8    Penhall?

9    A.   **Jeff Shore.**

10   Q.   Can you spell the last name?

11   A.   **S-H-O-R-E.**

12   Q.   Were you ever promoted when you worked for

13   Penhall?

14   A.   **No.**

15   Q.   Were you ever disciplined?

16   A.   **No.**

17   Q.   Did you ever complain against anybody when you

18   worked at Penhall?

19   A.   **No.**

20   Q.   Did you ever complain against anybody when you

21   worked for Clause?

22   A.   **No.**

23   Q.   What was your job title when you worked for

24   Penhall?

25   A.   **General labor.**



1      Q.   And what was your reason for leaving Penhall?

2      A.   **Lack of work.**

3      Q.   So were you laid off?

4      A.   **Yes.**

5      Q.   Did you ever re-apply to Penhall?

6      A.   **Yes.**

7      Q.   When?

8      A.   **Well, I wouldn't know if you would call it**

9   **rehire.  Just when the lack of work -- they would just**

10   **keep us on call pretty much, and as soon as a job come**

11   **up, they would just call us back to work.**

12      Q.   Did you ever get called back?

13      A.   **Yes.**

14      Q.   When was that?

15      A.   **I don't recall.**

16      Q.   So when you worked for Penhall, you said for

17   about 18 months, was that a continuous stretch for 18

18   months, or were you laid off, then came back during that

19   18-month period?

20      A.   **Laid off, and then came back in that 18 months.**

21      Q.   And how long were you off work?  Do you

22   remember?

23      A.   **At one point, several months.**

24      Q.   How many times were you laid off and returned

25   when you worked for Penhall?



1      A.   About five times.

2      Q.   Okay.   And the longest stretch you were off was,

3  you said, about two months?

4      A.   Yes.

5      Q.   What was the longest stretch you worked for them

6  continuous?

7      A.   I believe it was eight months.

8      Q.   Do you believe that you were ever discriminated

9  against or treated unfairly when you worked for Penhall?

10     A.   No.

11     Q.   Do you believe you were ever discriminated

12  against or treated unfairly when you worked for Clause?

13     A.   No.

14     Q.   Where did you work before Penhall?

15          Actually, let me stop there for a second.

16  Sorry.

17          Do you recall how long you were out of work

18  between the time that you left Penhall and began working

19  for Clause?

20     A.   I don't.

21     Q.   Was it more than six months?

22     A.   I don't remember.

23     Q.   Did you collect unemployment benefits between

24  the time that you worked at Penhall and Clause?

25     A.   Yes.



1    Q.   Were you awarded any uninsured benefits between

2    that time?  You applied for, but did you receive

3    unemployment?

4    A.   Yes.

5    Q.   And what was the job immediately before Penhall?

6    A.   TEAM Construction.

7    Q.   Where was that located?

8    A.   In Las Vegas.

9    Q.   What did you do for TEAM Construction?

10   A.   General labor.

11   Q.   And was that another assignment through Local

12   872?

13   A.   Yes.

14   Q.   How long did you work for TEAM Construction?

15   A.   If I can clarify, the company merged with

16   another company prior to becoming TEAM Construction, and

17   I just don't remember the name prior to that.  But --

18   Q.   Okay.  So how long did you work for -- we'll

19   call both companies TEAM.  Okay?

20   A.   Okay.

21   Q.   So how long did you work for both?

22   A.   I would say six months.

23   Q.   As a general laborer?

24   A.   Yes.

25   Q.   Do you remember where you worked?



1      A.   Yes.

2      Q.   Where is that?

3      A.   We did the demolition at the Luxor and Excalibur

4  casinos.

5      Q.   What demolitions were those?

6      A.   Well, I think the magician, Chris Angel, I think

7  he had a stage -- I believe it was at the Luxor.  And so

8  we were demoing his -- his, I guess, showroom to, I

9  guess, update everything.

10     Q.   And what was at the Excalibur?

11     A.   Just, like, some rooms.  Tenant improvement type

12 of demolition.

13     Q.   Do you remember who you reported to at TEAM

14 Construction?

15     A.   Yes.

16     Q.   Who was that?

17     A.   Sal.

18     Q.   Sal?  Last name?

19     A.   I don't remember his last name.

20     Q.   Did you always report to Sal during the time

21 that you worked for TEAM?

22     A.   Yes.

23     Q.   Were you ever disciplined when you worked for

24 TEAM Construction?

25     A.   No.



1       Q.    Were you fired from TEAM Construction?

2       **A.    No.**

3       Q.    Did you ever lodge any complaints for any reason

4    when you worked at TEAM Construction?

5       **A.    No.**

6       Q.    Did you ever file any grievances when you worked

7    -- with your union when you worked at TEAM Construction?

8       **A.    No.**

9       Q.    And did you ever file any grievances with Local

10   872 when you worked at Penhall?

11      **A.    No.**

12      Q.    Did you ever file any grievances with Local 872

13   against Clause when you worked for Clause?

14      **A.    Let me back up.**

15         **With Penhall, I think I informed my business**

16   **agent that I didn't get all the pay that I was entitled**

17   **to.  So he did have a discussion with Penhall.**

18      Q.    Do you recall if you filed a formal written

19   grievance with your union against Penhall?

20      **A.    I don't believe I did.**

21      Q.    You don't recall ever submitting anything in

22   writing?

23      **A.    No, I don't remember submitting anything in**

24   **writing.**

25      Q.    What was the outcome of your complaint against



1   Penhall?

2       A.   **They, I guess, gave me all the money that was**

3   **owed to me.**

4       Q.   Okay.  So, would you say it was resolved

5   successfully in your favor?

6       A.   **Yes.**

7       Q.   Did you ever feel that you were discriminated

8   against or treated unfairly when you worked at TEAM

9   Construction?

10      A.   **No.**

11      Q.   Why did you leave TEAM Construction?

12      A.   **Lack of work.**

13      Q.   Did you apply for unemployment insurance

14  benefits when you left TEAM?

15      A.   **I believe my existent claim is still in effect.**

16  **So I was able to continue collecting unemployment.**

17      Q.   Are you saying you collected unemployment

18  insurance benefits during the time that you worked at

19  TEAM and after?

20      A.   **No, during -- once I got laid off, I was able to**

21  **collect unemployment.**

22      Q.   Okay.  For how long?

23      A.   **I don't recall.**

24      Q.   Do you recall approximately how much time there

25  was between the time that you worked for TEAM and the



1    time that you began working at Penhall?

2         A.    I don't.

3         Q.    You don't recall how long you were out of work?

4         A.    I don't.

5         Q.    Was it more than six months?

6         A.    Not sure.

7         Q.    Do you know if you worked at TEAM and Penhall in

8    the same year?

9         A.    I'm not sure.

10        Q.    Do you recall, did you ever work for anybody

11   else before TEAM Construction?  Did you have a job right

12   before that?

13        A.    Yes.

14        Q.    Who did you work for immediately before TEAM

15   Construction?

16        A.    I don't recall.

17        Q.    Was it here in Las Vegas?

18        A.    Yes.

19        Q.    Was it through your union?

20        A.    Yes.

21        Q.    Do you recall if you worked as a general

22   laborer?

23        A.    Yes.

24        Q.    But you don't know the name of the company?

25        A.    Yes, correct.



1      Q.   Do you know where you worked?

2      **A.   It was -- it was here in Las Vegas, behind the**

3   **-- I think The Wynn during the roadwork there.**

4      Q.   Do you know if Local 872 would have a record of

5   all the places or jobsites that you were assigned since

6   you moved here?

7      **A.   Yes.**

8      Q.   So if I wanted to find out where you worked at

9   before TEAM, you think Local 872 would have a record of

10   that?

11      **A.   Yes.**

12      Q.   Okay.  Is that something you could easily obtain

13   as a union member?

14      **A.   Yes.**

15          MR. ROSENTHAL:  Okay.  All right.  We've been

16   going an hour.  Let's take a brief break.

17          MR. MARKS:  Sure.

18          MR. ROSENTHAL:  Five, ten minutes or so?  Is

19   that all right?

20      **A.   Yes.**

21          THE VIDEOGRAPHER:  Okay.  We are going off the

22   record at 11:10 a.m.

23          (Recess.)

24          THE VIDEOGRAPHER:  We are back on the record at

25   11:23 a.m.



BY MR. ROSENTHAL:

Q.   And Mr. Colvin, I just want to remind you that you're still under oath.  Okay?

A.   **Yes.**

Q.   And every time we take a break and come back on the record, obviously you would still be under oath.  Do you understand that?

A.   **Yes.**

Q.   Okay.  So, I just want to go back a second.

And so would it be fair to say that during the time that you worked at Clause that you found out that there was work to be had at M.J. Dean?

A.   **Yes.**

Q.   Who did you find that out from?

A.   **Well, previously to the Sphere starting, I did work --**

Q.   I'm sorry?  From what?

A.   **Previously before the Sphere project started, I was working at Resorts World.  And that's also an M.J. Dean project.  So once I was working, I was talking about with one of the superintendents over there, and he just let me know, Parnell, we're going to start the Sphere project.  So when you're done with Penhall, get ahold of us, and we'll see about bringing you over to the Sphere project.**



1      Q.   So when you were working at Resorts World, who

2   were you working for at that time?

3      A.   Penhall.

4      Q.   And someone at Penhall talked to you about M.J.

5   Dean.  Right?

6      A.   No.  It was -- M.J. Dean sent one of the

7   superintendents.

8      Q.   Okay.  Who was that?

9      A.   I don't remember his name, but I know one of the

10  -- one of the -- one was Tony, and he actually left from

11  Resorts World.  I seen him again at the Sphere project.

12     Q.   And when you worked for Clause, you also talked

13  to John Thomason.  Is that correct?

14     A.   Yes.

15     Q.   Who worked for M.J. Dean.  Is that right?

16     A.   Yes.

17     Q.   And did there come a time when you and John

18  Thomason exchanged text messages about working at M.J.

19  Dean?

20     A.   Yes.

21     Q.   And was that in June 2019?

22     A.   Just the text messages?

23     Q.   Yeah.

24     A.   Yes.

25          MR. ROSENTHAL:  I'd like to have this next



```
1   document marked as Defense Exhibit B.

2              (Exhibit B identified.)

3              MR. MARKS:  It's two pages, counsel?

4              MR. ROSENTHAL:  That's correct.

5   BY MR. ROSENTHAL:

6       Q.   I'd like to show you what's been marked as

7   Defense Exhibit B, which has Bates numbers -- Bates

8   numbers are the little numbers at the bottom -- marked

9   DEF00088.

10             And on the second page, DEF00089.  Do you see

11  those little numbers at the bottom?

12      A.   Yes.

13      Q.   And, together, these two documents make up

14  Exhibit B.  Okay?

15      A.   Yes.

16      Q.   Do you recognize the text messages that are

17  contained in Exhibit B?

18      A.   Yes.

19      Q.   And are those text messages between you and John

20  Thomason?

21      A.   Yes.

22      Q.   How did you get John Thomason's cell phone

23  number?

24      A.   Secretary at M.J. Dean's office.

25      Q.   Do you know who that was?
```



1     **A.   Yes.  Jan.**

2     Q.   When did you first contact Jan?

3     **A.   Late April.**

4     Q.   So, about working at M.J. Dean?

5     **A.   Yes.**

6     Q.   Had you sent Mr. Thomason any text messages

7   before June 10, 2019?

8     **A.   I don't recall.**

9     Q.   Had you ever talked to John Thomason before June

10   10, 2019, about working at M.J. Dean?

11     **A.   Yes.**

12     Q.   When was the first time you talked to John

13   Thomason about working at M.J. Dean?

14     **A.   May.  May of 2019.**

15     Q.   Did John Thomason tell you to apply to work

16   there?

17     **A.   No.**

18     Q.   What did he tell you?

19     **A.   Give him my name, last four of my social, and he**

20   **would set me up for orientation.**

21     Q.   So did Mr. Thomason say -- indicate to you that

22   you were going to be hired?

23     **A.   Yes.**

24     Q.   When did he tell you that?

25     **A.   When I had my first meeting with him.**



1    Q.   Do you remember when that was?

2    A.   **May.  May 2019.**

3    Q.   Do you have anything in writing between you and

4    Mr. Thomason regarding the job other than these text

5    messages?

6    A.   **No.**

7    Q.   So did he ever offer you a job in writing in May

8    2019?

9    A.   **No.**

10   Q.   It was just a conversation between the two of

11   you?

12   A.   **Yes.**

13   Q.   So I'm looking at the second text message on the

14   first page of Exhibit B.  It says, Hello, John.  This is

15   Parnell.

16        Do you see that?

17   A.   **Yes.**

18   Q.   So that text message, that block there, that's

19   you.  Right?

20   A.   **The blue one or --**

21   Q.   No.

22   A.   **-- the gray?**

23   Q.   Yeah.

24   A.   **Yes.**

25   Q.   The one in gray is you.  Right?



1      **A.    Yes.**

2      Q.    And in blue, that's Mr. Thomason's response.

3    Right?

4      **A.    Yes.**

5      Q.    Okay.  Let's go to the text message in gray at

6    the bottom on the first page.  And it says, Hello, John,

7    how are you doing?  How are you doing?  This is Parnell.

8    I talked to the foreman at the Sphere.

9          Do you see that?

10     **A.    Yes.**

11     Q.    Who was the foreman at the Sphere?

12     **A.    Kevin Gutierrez.**

13     Q.    All right.  And when did you first talk to Kevin

14   then?

15     **A.    I would say May.  May 2019.**

16     Q.    Did you ever talk to Kevin Gutierrez at any time

17   before May 2019?

18     **A.    No.**

19     Q.    Had you ever met him before?

20     **A.    No.**

21     Q.    Had you ever heard anything about him before

22   that time?

23     **A.    Yes.**

24     Q.    What did you hear about him before that time?

25     **A.    He was not a good foreman to work for.**



```
1      Q.   When did you first hear that?

2      A.   When we were at the Neon project.  I believe

3  Kevin was lead man, or foreman, there.

4      Q.   When was that?

5      A.   20- -- I think 2018.

6      Q.   Who told you in 2018 when you worked on the Neon

7  project that Kevin Gutierrez was not a good foreman to

8  work for?

9      A.   John Stevenson and other laborers.

10     Q.   What other laborers?

11     A.   Don't remember the names.  They just had

12  orientation with me that day.

13     Q.   Were there more than -- was there more than one

14  person --

15     A.   Yes.

16     Q.   -- who told you that?

17     A.   Yes.

18     Q.   And again, you don't remember any names.  Right?

19     A.   Except for John Stevenson.

20     Q.   Nobody else.  Right?

21     A.   Correct.

22     Q.   Were you given any more details about Kevin

23  Gutierrez at that time about why he wasn't a good foreman

24  to work for?

25     A.   Yes.
```



1    Q.   What details were those?

2    **A.   That he just is a bad guy to work for,**

3    **hotheaded.  Don't like Blacks.**

4    Q.   And you heard this from John Stevenson and

5    others, but, again, you don't recall who those other

6    people were.  Right?

7    **A.   Correct.**

8    Q.   They all told you the same thing?

9    **A.   Yes.**

10   Q.   They all told you that Kevin Gutierrez doesn't

11   like Blacks?

12   **A.   That specifically came from John Stevenson.**

13   Q.   Do you recall hearing that from anybody else

14   other than John Stevenson?

15   **A.   No.**

16   Q.   Do you remain in contact with John Stevenson?

17   **A.   No.**

18   Q.   You don't know where he lives right now?

19   **A.   No.**

20   Q.   You don't have a phone number?

21   **A.   No.**

22   Q.   When's the last time you spoke to Mr. Stevenson?

23   **A.   At that orientation, 2000 -- 2018.**

24   Q.   So going back to your conversation with Kevin

25   Gutierrez in May 2019, was that in -- on the phone?



1    **A.    Yes.**

2    Q.    Did you meet with him in person at all before

3    you began working for M.J. Dean?

4    **A.    No.**

5    Q.    Did you only have one telephone call with Kevin

6    Gutierrez before you began working at M.J. Dean?

7    **A.    No.**

8    Q.    How many phone calls did you have with Kevin

9    Gutierrez before you began working at M.J. Dean?

10   **A.    Two.**

11   Q.    When was the first one?

12   **A.    May 2019.**

13   Q.    And did you call him, or did he call you?

14   **A.    I called him.**

15   Q.    How did you get his number?

16   **A.    John Thomason gave it to me.**

17   Q.    What were you calling Mr. Gutierrez about?

18   **A.    John Thomason saying that he was hiring, and he**

19   **was the general foreman, and to give Kevin Gutierrez a**

20   **call.**

21   Q.    Why did he tell you to give Mr. Gutierrez a

22   call?

23   **A.    I'm not sure.**

24   Q.    What was the purpose of your call to

25   Mr. Gutierrez?  Why were you calling him?



1     A.   Because John Thomason give me his number and,

2  Call Kevin.

3     Q.   You didn't know what for?

4     A.   Yeah.  Employment.

5     Q.   Okay.  So you did know.

6          What was -- what did you talk about with

7  Mr. Gutierrez during that call?

8     A.   Well, I called him.  It was about coming on

9  board, coming to work at Sphere.

10     Q.   Okay.  How long was your conversation?

11     A.   About five minutes.

12     Q.   Was he rude at all to you during the call?

13     A.   No.

14     Q.   Did he swear at you?

15     A.   No.

16     Q.   Call you any names?

17     A.   No.

18     Q.   Were you polite to him?

19     A.   Yes.

20     Q.   What did he say to you during the call -- that

21  first call about working at M.J. Dean?

22     A.   Said he's not looking for nobody right now and

23  he would call me back.

24     Q.   Did you tell him that Mr. Thomason had said that

25  there was a job for you?



1    **A.    Yes.**

2    Q.    But he said there were no openings?

3    **A.    Correct.**

4    Q.    Did Mr. Thomason ever promise you a job?

5    **A.    I don't know if he used the word promise, but he**

6    **he let me know that he would hire me.**

7    Q.    Did he tell you a specific time when work would

8    start for you?

9    **A.    No.**

10   Q.    Did he say that you would have to go through the

11   union to be hired at M.J. Dean?

12   **A.    No.**

13   Q.    Did Mr. Gutierrez tell you or suggest to you to

14   call back again later to see if there was an opening?

15   **A.    Yes.**

16   Q.    What did he say?

17   **A.    Basically call him back, stay in touch with him.**

18   Q.    Okay.  Did he say anything else that you

19   remember?

20   **A.    No.**

21   Q.    Did you say anything else during that first

22   call?

23   **A.    No.**

24   Q.    When was your next telephone call with

25   Mr. Gutierrez before you began working at M.J. Dean?



1    **A.    About five days after my initial call with him.**

2    Q.    I beg your pardon?

3    **A.    About five days after my initial call with him.**

4    Q.    Did you call him, or did he call you?

5    **A.    I called him.**

6    Q.    What was the purpose of your call?

7    **A.    To follow up with him about employment.**

8    Q.    And so what did you say to him during the call?

9    **A.    He never answered his phone.**

10   Q.    Did you get voice mail?

11   **A.    Yes.**

12   Q.    Did you leave a message?

13   **A.    Yes.**

14   Q.    Did Mr. Gutierrez call you back?

15   **A.    No.**

16   Q.    Okay.  So you actually -- you didn't have a

17   conversation with Mr. Gutierrez during the second call,

18   though.  Correct?

19   **A.    Correct.**

20   Q.    And just to make sure I have this right, so

21   about five days after your first telephone conversation

22   with Mr. Gutierrez, you called him back to follow up

23   about a job, to see if there was an opening, and you got

24   his voice mail and you left a message.  Is that right?

25   **A.    Correct.**



1      Q.   What was your message?

2      A.   Kevin, this is Parnell.  Just trying to reach

3  out to you, follow up with you, see about coming aboard.

4  Please give me a call back.  And I left my number and

5  told him I look forward to hearing from him.

6      Q.   Was that in May 2019 or June?

7      A.   I'm not sure.

8      Q.   First telephone call was in May.  Correct?

9      A.   Yes.

10     Q.   So, following your first telephone call with

11 Mr. Gutierrez, that's when you and Mr. Thomason exchanged

12 these text messages in -- on -- in June 2019.  Is that

13 correct?

14     A.   Yes.

15          Can I just state something just to make sure

16 that --

17     Q.   Please.

18     A.   -- I'm understanding everything correctly?

19          I know my first conversation with Gutierrez

20 would have been the same date that I met with

21 Mr. Thomason, because Mr. Thomason called Kevin in front

22 of me and told Kevin that Parnell's going to be calling

23 you, and so make sure you look out for him.

24     Q.   Did you actually hear Mr. Gutierrez on that

25 call?



1     **A.     No.**

2     Q.     So you didn't have him on speaker phone?

3     **A.     Correct.**

4     Q.     Take a look at the second page of <mark>Exhibit B</mark>.

5            Do you see the second text message?  It says,

6     Please give Kevin a call.  Sorry it took so long.

7            Do you see that?

8     **A.     Yes.**

9     Q.     So, did you call -- and that's dated July 22,

10    2019.  Right?

11    **A.     Yes.**

12    Q.     So, were you already employed by M.J. Dean at

13    that point?

14    **A.     No.**

15    Q.     When did you begin working?

16    **A.     Oh, excuse me.**

17            **No, that's correct.  I was not employed.  That's**

18    **correct.**

19    Q.     You were not?

20    **A.     Yes.**

21    Q.     When did you begin working for M.J. Dean?  What

22    was your first -- what was your start date?

23            May I refresh your recollection?  I believe you

24    started July 23, 2019.  Does that ring a bell?

25    **A.     I'm not sure.**



1      Q.   Okay.  Do you recall speaking -- or calling

2   Kevin Gutierrez after Mr. Thomason told you to give him a

3   call?

4      A.   Yes.

5      Q.   Did you actually speak to him on the phone at

6   that time?

7      A.   Is that Kevin?

8      Q.   Yeah.

9      A.   No.

10     Q.   Did you get voice mail again?

11     A.   Yes.

12     Q.   Do you remember if you called him the same day

13  as the text message here, which would have been July

14  22nd?

15     A.   Possible.

16     Q.   You don't know though?

17     A.   No.

18        MR. ROSENTHAL:  I'd like to have this next

19  document marked as Defense Exhibit C.

20        (Exhibit C identified.)

21  BY MR. ROSENTHAL:

22     Q.   Have you ever seen what's been marked as Exhibit

23  C before today?

24     A.   Yes.

25     Q.   Can you tell me generally what Exhibit C is?



1    **A.    It's a dispatch referral from the union hall.**

2    Q.    For what?

3    **A.    Employment with M.J. Dean.**

4    Q.    And it's dated July 23, 2019.  Correct?

5    **A.    Yes.**

6    Q.    So were you, in fact -- did you, in fact, go

7    through your union hall to gain employment at M.J. Dean?

8    **A.    Yes.**

9    Q.    There's a number at the -- toward the top of the

10   page.  It says Number 6800.  Do you know what that is?

11   **A.    No.**

12   Q.    Do you have a union number?

13   **A.    Yes.**

14   Q.    Do you know what that number is?

15   **A.    No.**

16   Q.    And take a look at the block area about the

17   middle of the page.  It says, Dispatch Class.  It says,

18   Mud cutter.

19          Do you see that?

20   **A.    Yes.**

21   Q.    Do you know what a mud cutter is?

22   **A.    Yes.**

23   Q.    What is that?

24   **A.    Somebody that cuts concrete.**

25   Q.    And next to that, looks like either a G or a 6,



1    then a 3 and an A.

2            Do you see that?

3    **A.    Yes.**

4    Q.    Do you know what that is?

5    **A.    No.**

6    Q.    So, would it be fair to say that this was the

7    referral for you to begin -- from your union, 872, for

8    you to begin working at M.J. Dean on July 23, 2019?

9    **A.    Yes.**

10   Q.    And you were to be paid a base rate of $29.66 an

11   hour.  Right?

12   **A.    Yes.**

13   Q.    And that's -- that was set by the union.

14   Correct?

15   **A.    Yes.**

16   Q.    That's part of a collective bargaining

17   agreement.  Right?

18   **A.    Yes.**

19   Q.    Prior to working at M.J. Dean, did you

20   communicate with anybody at Local 872 about the job at

21   the Sphere and working at M.J. Dean?

22   **A.    No.**

23           MR. ROSENTHAL:  Let's mark this next document as

24   Defendant's Exhibit D.

25           (Exhibit D identified.)



1          (Discussion held off the record.)

2   BY MR. ROSENTHAL:

3      Q.   Do you see that what's been marked as <mark>Exhibit D</mark>

4   in front of you?

5      A.   Yes.

6      Q.   Take a brief look through these.  And I just

7   want to ask you as a general question first, do these

8   appear to be onboarding documents that you were given

9   when you began working at M.J. Dean?

10     A.   Yes.

11     Q.   And I just want to go through some of these

12  pages briefly.  And just for the record, <mark>Exhibit D</mark>

13  contains Bates numbers, DEF00001 through DEF00017.  Okay?

14     A.   Okay.

15     Q.   So looking at the first page, which is Bates

16  numbered DEF00001, is all the handwriting on that page

17  yours?

18     A.   Yes.

19     Q.   Is all the handwriting on the second page yours,

20  except anywhere where it says James Portese?

21          Let me ask it -- let me simplify it, Mr. Colvin.

22          Is the handwriting at the top of the page yours?

23     A.   I don't think so.

24     Q.   Okay.  Do you believe that someone at M.J. Dean

25  filled out the top -- filled out all the handwriting on



1    this page?

2         A.   Yes.

3         Q.   All right.  Let's go to the fifth page marked

4    DEF00005.

5              Is that handwriting yours?

6         A.   Yes.

7         Q.   Let's go to the next page marked DEF00006.

8              Is that handwriting yours?

9         A.   Yes.

10        Q.   Let's go to the following page, I will just

11   state the last number on the Bates number is 7.  So it's

12   Drug Testing Procedure at the top.

13             Is that handwriting yours?

14        A.   Yes.

15        Q.   Let's go to the next page, with a Bates number

16   last number of 8, Consent for Drug Testing.

17             Is that handwriting yours on that page?

18        A.   Yes.

19        Q.   The next page is -- last number is 9, as part

20   of, again, Exhibit D.  The title at the top is

21   Authorization for Release of Medical Information.

22             Is the handwriting yours?

23        A.   Yes.

24        Q.   Next page, Bates number 10, Employee

25   Responsibilities.



1        Handwriting where it says, Employee Name,

2   Employee Signature, is that yours?

3        **A.   Yes.**

4        Q.   And, the first date of 7-23-2019, is that your

5   handwriting?

6        **A.   Yes.**

7        Q.   Let's go to the next page, Bates Number 11 as

8   part of D.  Top of the page says, Code of Safe Practices.

9   Do you see that?

10        **A.   Yes.**

11        Q.   Is all of the handwriting on that page yours?

12        **A.   Yes.**

13        Q.   And looking at that page, middle of the page

14   there's -- there are numbers 1 through 4 in parentheses.

15   Do you see that?

16        **A.   Yes.**

17        Q.   And Number 1 says that M.J. Dean expected you to

18   comply with proscribed job procedures and instructions of

19   supervisors.  Right?

20        **A.   Yes.**

21        Q.   So you knew that you were -- you had to follow

22   job procedures and instructions from your supervisors.

23   Right?

24        **A.   Yes.**

25        Q.   Let's go to the next page, marked 12, Bates



1    Number 12 as part of D.

2              Is the handwriting yours?

3        **A.    Yes.**

4        Q.    Let's go to the next page, Bates numbered 13.

5    And the title of that page is Acknowledging Policy and

6    Safety Manuals.

7              Is the handwriting yours?

8        **A.    Yes.**

9        Q.    So on that page you were acknowledging that you

10   received M.J. Dean's policy and safety manual.  Correct?

11       **A.    Yes.**

12       Q.    And that was -- so the office policy manual --

13   just to be clear, you received copies of the office

14   policy manual and the safety manual.  Correct?

15       **A.    Yes.**

16       Q.    Let's go to the next page, marked DEF00014 as

17   part of ==Exhibit D==.  And the title of the page is

18   Anti-harassment/Discrimination Policy Statement.

19             Is the handwriting yours?

20       **A.    Yes.**

21       Q.    And on that page, you were acknowledging that

22   you had been given a copy of M.J. Dean's policy on

23   harassment and discrimination; that you reviewed the

24   policy; understood all of the sections of the policy,

25   including what acts constituted violation of policy, and



1  what the consequences were.  Correct?

2      **A.    Yes.**

3      Q.    Next page is Bates Number 15, entitled Substance

4  Abuse Policy.  Is the handwriting yours?

5      **A.    Yes.**

6      Q.    Next page is 17, entitled Training Session on

7  MSDS sheets for Hazard Communications.

8          Is the handwriting yours?

9      **A.    Yes.**

10     Q.    And, finally, Bates Number 17, entitled

11  Acknowledging Receipt of Policy and Safety Manual.

12          Is the handwriting at the bottom of the page

13  yours?

14     **A.    Yes.**

15     Q.    And towards the -- well, the second-to-last

16  paragraph on that page, you were acknowledging that you

17  understood, as an employee, that you had a duty to comply

18  with the safety rules of M.J. Dean and assist in

19  maintaining the hazard-free environment, report any

20  accidents or injuries, including breaches of safety, and

21  to report any unsafe equipment, working conditions,

22  process or procedure at once to a supervisor.  Right?

23     **A.    Yes.**

24     Q.    So you understood that you had that obligation

25  -- those obligations.  Correct?



1      **A.    Yes.**

2           MR. ROSENTHAL:  I'd like to have this next

3    document marked as Defense Exhibit E.

4           (Exhibit E identified.)

5    BY MR. ROSENTHAL:

6      Q.    Mr. Colvin, I'm showing you what's been marked

7    as Defense Exhibit E, which is entitled Code of Safe

8    Practices and Anti-drug and Harassment Policies.  Do you

9    see that?

10     **A.    Yes.**

11     Q.    And is this a copy of -- did you receive a copy

12   of these Code of Safe Practices and Anti-drug and

13   Harassment Policies when you began working at M.J. Dean?

14     **A.    Yes.**

15     Q.    I'd like you to take a look at Exhibit E.  Bates

16   Number DEF000176.

17          And do you see where it's marked, top of the

18   page, Anti-harrassment and Discrimination Policy?

19     **A.    Yes.**

20     Q.    You received a copy of this Anti-harrassment and

21   Discrimination Policy.  Correct?

22     **A.    Yes.**

23     Q.    And you understood that M.J. Dean would not

24   tolerate any type of harassment or discrimination to its

25   employees, applicants, or customers.  Correct?



1      **A.    Yes.**

2      Q.    And you also understood that Harassment

3  included, but was not limited to, slurs, jokes, and other

4  verbal or physical conduct relating to a person's gender,

5  ethnicity, race, color, creed, religion, sexual

6  orientation, national origin, age, disability, marital

7  status, military status, or any other protected

8  classification that unreasonably interferes with a

9  person's work performance or creates an intimidating,

10  hostile work environment.  Correct?

11     **A.    Yes.**

12     Q.    You didn't have any questions about M.J. Dean's

13  anti-harassment discrimination policy at any time during

14  your employment.  Correct?

15     **A.    No.**

16     Q.    Take a look at the next page, Bates number

17  DEF00177, part of ==Exhibit E==.  Do you see that page?

18     **A.    Yes.**

19     Q.    And at the top of page, it says, Avoiding

20  Harassment.

21         Do you see that?

22     **A.    Yes.**

23     Q.    First sentence says, Since the best way to stop

24  any effective -- offens- -- start over.

25         Since the best way to stop any offensive conduct



1   is to simply tell the person of your objecting to it,

2   M.J. Dean Construction encourages you to do so.

3          Do you see that?

4   **A.    Yes.**

5   Q.    And so you understood that that was an

6   obligation of yours to let someone know if you sound --

7   if you found someone's conduct to be offensive.  Correct?

8   **A.    Yes.**

9   Q.    And let's go down to the third heading.  It

10  says, Complaint Procedures and Investigation.

11         Do you see that?

12  **A.    Yes.**

13  Q.    And so you understood, correct, that if you

14  believe you were the subject of any harassment or

15  discrimination or witnessed any harassment or

16  discrimination in the workplace, you should immediately

17  inform your supervisor.  Correct?

18  **A.    Yes.**

19  Q.    And you also knew that if your supervisor was

20  not available, didn't respond to your satisfaction, or

21  you didn't wish to contact your supervisor, you were to

22  contact the human resources department.  Right?

23  **A.    Yes.**

24  Q.    And, finally, you knew that if you had any

25  questions regarding harassment or discrimination, you



1    were encouraged to discuss those questions with your

2    supervisor or the human resources department.  Correct?

3        **A.   Yes.**

4        Q.   And let's go down two more paragraphs, where it

5    says, Any employee becomes aware.  Do you see that, that

6    paragraph?

7        **A.   Yes.**

8        Q.   So, you were aware at that time, throughout your

9    employment, actually, that -- at M.J. Dean, that any

10   employee who became aware of possible sexual harassment

11   or any other illegal discrimination had an obligation to

12   promptly advise a supervisor, human resources department,

13   or other appropriate member of management.  Correct?

14       **A.   Yes.**

15       Q.   And, finally, you knew that M.J. Dean would not

16   tolerate retaliation of any kind.  Correct?

17       **A.   Yes.**

18       Q.   Turn to page DEF00180, please, of ==Exhibit E==.

19       **A.   Read that again?**

20       Q.   Yeah.  DEF00180.  Do you see that that page?

21       **A.   Yes.**

22       Q.   And it's entitled Housekeeping at the top of the

23   page.  Right?

24       **A.   Yes.**

25       Q.   You were aware, were you not, throughout your



1    employment, of all of M.J. -- your obligations to M.J.

2    Dean regarding housekeeping.  Correct?

3        A.    Yes.

4        Q.    And so that included all of numbers 1 through 9

5    on Bates Number 00180.  Right?

6        A.    Yes.

7            MR. ROSENTHAL:  This is the next document.

8    We'll mark it as Defense Exhibit F.

9            (Exhibit F identified.)

10   BY MR. ROSENTHAL:

11       Q.    I'd like to show you what's been marked as

12   Defense Exhibit F, which is M.J. Dean's Office Policy

13   Manual.  Do you see that?

14       A.    Yes.

15       Q.    And does this appear to be the same office

16   policy manual that you received at the beginning of your

17   employment?

18       A.    I don't remember receiving this.

19       Q.    You don't remember receiving the office policy

20   manual?

21       A.    If this is the office policy manual, no.

22       Q.    Let's take a look again at Exhibit E.

23       A.    Okay.

24       Q.    Sorry.  Exhibit D.  Take a look at the last page

25   of Exhibit D, which is numbered at the bottom, DEF00017.



1    Do you see that?

2        A.    Yes.

3        Q.    And at top of the page, first paragraph, it

4    says, I have received a copy -- my copy of the M.J. Dean

5    Construction Inc., Policy Manual.  And above that, it

6    says Office Policy Manual.

7            Do you see that?

8        A.    Yes.

9        Q.    And it's your -- that's your signature, that's

10   your handwriting at the bottom.  Right?

11       A.    Yes.

12       Q.    So let's go back to Exhibit F.

13       A.    Okay.

14       Q.    Entitled Office Policy Manual.  Right?

15       A.    Yes.

16       Q.    Does this appear to be the copy of the Office

17   Policy Manual that you received at the beginning of your

18   employment at M.J. Dean?

19       A.    Yes.

20       Q.    Take a look at Bates Number DEF00102 in Exhibit

21   F.

22       A.    Can you repeat that number again, please?

23       Q.    Yeah.  102.

24           Do you see that?

25       A.    Yes.



1        Q.   The second-to-last paragraph is entitled

2   Grievance Procedure.  Do you see that?

3        **A.   Yes.**

4        Q.   And so you were aware, were you not, when you

5   began working at M.J. Dean, Inc., and throughout the rest

6   of your employment that you were encouraged to bring

7   concerns, problems, and grievances to the attention of

8   your supervisor and/or human resources department.

9   Right?

10        **A.   Yes.**

11        Q.   You also knew throughout your employment that

12   you were obligated to report any wrongdoing of which you

13   become aware to your supervisor, or, if the situation

14   warranted, any M.J. Dean construction officer.  Right?

15        **A.   Yes.**

16        Q.   Please turn to page DEF00130 in ==Exhibit F==.  Page

17   130 at the bottom.

18        **A.   Okay.**

19        Q.   So you received another copy of M.J. Dean's

20   Anti-harrassment Discrimination Policy.  Right?

21        **A.   Yes.**

22        Q.   And this is the same policy that was in Exhibit

23   E.  Correct?

24        **A.   Yes.**

25        Q.   And let's turn to the next page, please.  Page



```
 1    131.  And these are the same -- these are same policies

 2    and procedures on page 131 in Exhibit F that are in

 3    Exhibit E.  Correct?

 4              MR. MARKS:  Are you asking him to compare the

 5    documents, or just telling him you think they are --

 6              MR. ROSENTHAL:  No.  Feel free to compare.

 7              MR. MARKS:  So you're going to have to tell him

 8    where each thing is and how to compare, I guess, if

 9    that's what you're trying to establish.

10    BY MR. ROSENTHAL:

11        Q.  Turn to page 177 in Exhibit E.

12        A.  Okay.

13        Q.  Does the content of page 177 in Exhibit E appear

14    to be identical to page 131 in Exhibit F?

15        A.  Yes.

16        Q.  Okay.  And it was your obligation, as an

17    employee of M.J. Dean, to make sure that you were aware

18    of all of the company's policies and procedures and

19    understood their contents.  Right?

20              MR. MARKS:  Object to the form.

21    BY MR. ROSENTHAL:

22        Q.  You can still answer the question.

23        A.  Yes.

24              MR. ROSENTHAL:  Let's mark this next document as

25    Defendant's Exhibit G.
```



```
1                    (Exhibit G identified.)

2    BY MR. ROSENTHAL:

3        Q.    Have you ever seen what's been marked as

4    Defendant's Exhibit G before today?

5        A.    Yes.

6        Q.    You've seen this before today?

7        A.    Yes.

8        Q.    When did you first see that document?

9        A.    Online.

10       Q.    How long ago?

11       A.    About a month ago.

12       Q.    Why were you looking at that?

13       A.    Because I like to be knowledgeable of what our

14   benefits and other responsibilities that members are

15   entitled to.

16       Q.    Did you look at it because of this lawsuit?

17       A.    No.

18       Q.    Why were you -- why did you decide to look at it

19   a month ago?

20       A.    Because members should be informed what they are

21   entitled to, and a lot of members don't.  They just get a

22   job and take the union's word for it.  So I wanted to

23   make sure that I'm getting everything I'm entitled to.

24   So I wanted to inform myself, so I went online and

25   reviewed this document.
```



1    Q.   Did you have any concerns at that time that you

2   weren't getting what you were entitled to?

3    **A.   Yes.**

4    Q.   What did you believe about a month ago, which

5   was June 2021, that you weren't receiving that you were

6   entitled to?

7    **A.   I just wanted to follow up with my charges I**

8   **have against the union and the National Labor Relations**

9   **Board.  So --**

10   Q.   So that was my question.  So you looked at it,

11  really, because of your unfair labor practice charges

12  that were filed with the NLRB.  Right?

13   **A.   And to be informed.**

14   Q.   Okay.  Did you ever interview with anybody at

15  M.J. Dean prior to starting work there?

16   **A.   Yes.**

17   Q.   Who did you interview with?

18   **A.   John Thomason.**

19   Q.   When was your interview?

20   **A.   May of 2019.**

21   Q.   Did you come into M.J. Dean's offices to

22  interview?

23   **A.   Yes.**

24   Q.   Was anybody else present --

25   **A.   No.**



1      Q.    -- during your interview?

2      **A.    No.**

3      Q.    How long was your interview?

4      **A.    Twenty minutes.**

5      Q.    Did Mr. Thomason tell you what was going to be

6  expected of you with the job?

7      **A.    Yes.**

8      Q.    What did he tell you?

9      **A.    That just basically be on time and do a good**

10  **job, and he would give me an opportunity, because he seen**

11  **how hard I was trying to get on this project.**

12      Q.    What were your job duties going to be?

13      **A.    He didn't tell me.**

14      Q.    Did you have a general understanding what your

15  job duties would be?

16      **A.    No.**

17      Q.    Did anybody ever tell you what your job duties

18  would be?

19      **A.    No.**

20      Q.    As a laborer, did you have an understanding of

21  what your job duties would be at the Sphere?

22      **A.    Yes.**

23      Q.    What were your -- what was your expectation of

24  what your job duties would be?

25      **A.    It can range from general labor work to hauling,**



1   packing, demoing, concrete.  Just depends on what they

2   need you to do.

3       Q.   Did you have a job title?

4       A.   Yes.

5       Q.   What was your job title?

6       A.   Mud cutter.

7       Q.   And what were your job duties -- as a mud

8   cutter, what do you expect your job duties to be?

9       A.   Well, if I can just back a little bit.  I was --

10  a little bit different than in Oregon.  They call a mud

11  cutters, there we call it mucking.  So when I transferred

12  out here, and they said you'd be mud cutting.  At the

13  time, I didn't know what the difference is.  But once I

14  got on the job and -- seen that basically mud cutting and

15  mucking is basically the same thing.

16      Q.   Which is what?

17      A.   Just when there's a -- concrete comes out of the

18  truck, and you kind of just spreading it around, make

19  sure that it's leveled off and goes to the right areas.

20  Forms, columns, beams, stuff of that nature.

21      Q.   You weren't a concrete pourer, were you?

22      A.   No.

23      Q.   Were you assigned to work on a concrete crew?

24      A.   At times, yes.

25      Q.   Where were you mostly assigned?



1      A.    General labor.

2      Q.    Were you told during your interview what your

3    hours of work would be?

4      A.    Yes.

5      Q.    What were you told?

6      A.    Ten -- six days a week, ten hours a day.

7      Q.    Six days a week?

8      A.    Yes.  Monday -- they said contract's Monday to

9    Saturday.

10     Q.    And what hours -- I know you said 10 hours, but

11   what as -- I guess what was your shift -- your assigned

12   shift?

13     A.    Six to 4:30.

14     Q.    Did that ever change throughout your employment?

15     A.    Yes.

16     Q.    But that was your assigned shift when you

17   started?

18     A.    Yes.

19     Q.    When did your assigned shift change?

20     A.    I would just say throughout the course of work,

21   because it can vary from week to week, month to month as

22   far as the hours.

23     Q.    And you understood that when you started working

24   for M.J. Dean.  Correct?

25     A.    Yes.



1      Q.    Did you have a problem that your hours of work

2   and work schedule could change week to week, day to day?

3      **A.    No.**

4      Q.    Did you only have the one interview with

5   Mr. Thomason?

6      **A.    Yes.**

7      Q.    What did you think at that time about the job?

8      **A.    Thought it was going to be a great opportunity**

9   **for me.**

10     Q.    You were pleased with the offer to work at M.J.

11  Dean?

12     **A.    Yes.**

13     Q.    Did you like Mr. Thomason?

14     **A.    Yes.**

15     Q.    Did you have any issues with him personally?

16     **A.    None.**

17     Q.    So you began working at M.J. Dean about two

18  months after your interview with Mr. Thomason.  Is that

19  correct?

20     **A.    Yes.**

21     Q.    Because you interviewed with him in May --

22  sometime in May, and you began working late July for M.J.

23  Dean.  Right?

24     **A.    Yes.**

25     Q.    And when you interviewed with Mr. Thomason, you



1  understood that you would be working on the Sphere

2  project.  Right?

3      **A.   Yes.**

4      Q.   Did he tell you during your interview -- strike

5  that.

6          Did Mr. Thomason tell you during your interview

7  that you would be reporting to Kevin Gutierrez?

8      **A.   No.**

9      Q.   Did you have an understanding at that time as to

10  who your direct report would be?

11      **A.   No.**

12      Q.   Did you have an understanding at that time that

13  -- during your interview -- who your foreman would be?

14      **A.   Yes.**

15      Q.   Who were you told?

16      **A.   That Mr. Gutierrez was the foreman.**

17      Q.   Do you know the name -- I think the name's Juan

18  Juarez?

19      **A.   Not sure.**

20      Q.   Weren't you assigned to a foreman Juan Juarez

21  when you began working and that Mr. Gutierrez was the

22  general foreman?

23      **A.   Well, that's kind of tricky, because originally**

24  **at that area I was working at, there was no foreman**

25  **assigned there.  I worked directly for the**



1   **superintendent, Dave McGrandy.  And some point later on**

2   **down the line, Mr. Gutierrez was -- appointed Juan to be**

3   **the foreman.  When I originally got that area, Juan was**

4   **not my foreman, nor did I report to him.**

5       Q.   Be fair to say that Dave McGrandy was above

6   Mr. Gutierrez in the chain of command?

7       **A.   As to that area, he was.**

8       Q.   What area was that?

9       **A.   I think he was in area D, I believe.**

10      Q.   Were you assigned to area D throughout your

11  employment?

12      **A.   No.**

13      Q.   Were you assigned to a particular area at

14  various points during your employment?

15      **A.   Yes.**

16      Q.   Which areas?

17      **A.   The yard.**

18      Q.   And was it your understanding that your assigned

19  work area could change day to day, week to week?

20      **A.   Yes.**

21      Q.   And M.J. -- and that M.J. Dean had the right to

22  assign you to work in a particular area wherever it

23  wanted?

24      **A.   Yes.**

25      Q.   And M.J. Dean also had the right to change your



 1    assigned work area throughout your employment.  Is that

 2    correct?

 3         **A.    Yes.**

 4         Q.    You didn't have a problem with that, did you?

 5         **A.    None.**

 6         Q.    Were you ever given a raise during the time that

 7    you worked at M.J. Dean?

 8         **A.    I believe so, yes.**

 9         Q.    Do you remember when that was?

10         **A.    I want to say June or July.**

11         Q.    You started working in July 2019?

12         **A.    Yes.**

13         Q.    So you got a raise immediately?

14         **A.    Well, we get a yearly raise.  And I'm not sure,**

15    **in fact, if it came in June or July.  But we have a**

16    **five-year contract, so we get the raise.**

17         Q.    And that's my error.

18               So that raise was assigned through your union.

19    Correct?

20         **A.    Yes.**

21         Q.    Okay.  So that wasn't a raise given arbitrarily,

22    I guess, by M.J. Dean.  That was through the union?

23         **A.    Yes.**

24               MR. ROSENTHAL:  Okay.  I think it's a natural

25    break point for lunch, so why don't we take an hour.



1          MR. MARKS:  Yeah, that's fine.

2          Are they -- did they close all the places?  I

3     saw --

4          MR. ROSENTHAL:  Let's go off the record.

5          THE VIDEOGRAPHER:  Yeah.  We are going off the

6     record.  The time is 12:18 p.m.

7          (Noon recess.)

8          THE VIDEOGRAPHER:  We are back on the record at

9     1:24 p.m.

10    BY MR. ROSENTHAL:

11       Q.   I know I asked this of you before, but I just

12    want to revisit the question, which is, so do you

13    remember working with a Juan Juarez at all when you were

14    working at M.J. Dean?

15       **A.   It's possible.**

16       Q.   But I'm not asking for it's possible.  I'm

17    asking if you remember.

18       **A.   No.**

19       Q.   Okay.  And -- but you do remember working with

20    Dave McGrandy.  Is that correct?

21       **A.   Yes.**

22       Q.   He was the superintendent?

23       **A.   Yes.**

24       Q.   Was he the superintendent during the entire time

25    that you worked at M.J. Dean?



1     A.    Yes.

2     Q.    And when you began working at M.J. Dean, you

3  reported directly to Kevin Gutierrez.  Is that right?

4     A.    Yes.

5     Q.    You had never worked directly with Kevin before

6  that time.  Had you?

7     A.    No.

8     Q.    And your communications or contact with Kevin

9  Gutierrez prior to your first day of work at M.J. Dean

10  was limited to one telephone conversation and one

11  telephone message.  Right?

12     A.    No -- yes, that's correct.

13     Q.    Let me just make sure I -- we got it correctly.

14     A.    Okay.

15     Q.    So your communication or contact with Kevin

16  Gutierrez before you actually began working at M.J. Dean

17  was limited to one telephone conversation with him and

18  one telephone message which you left for him.  Right?

19     A.    No, two.

20     Q.    Two telephone messages?

21     A.    Or two -- two phone calls.

22     Q.    Okay.  One of those phone calls, he actually

23  picked up the phone, and you spoke for about five

24  minutes.  Right?

25     A.    Yes.



1    Q.   And the other phone call was where you left a

2    voice mail message for him.  Correct?

3    **A.   No.  Would have been when John Thomason**

4    **contacted me to get my last four social, I talked to**

5    **Kevin, and he gave me the hours and days of the job.**

6    Q.   So you -- you spoke to Kevin during this

7    conversation?

8    **A.   Yes.**

9    Q.   Okay.  Do you remember when that took place?

10   And let me back up, because I'm just -- I'm

11   still not clear, then.

12   You left a voice mail message for Kevin

13   Gutierrez before you began working at M.J. Dean.  Right?

14   **A.   Correct.  Yes.**

15   Q.   You had a five-minute conversation with Kevin

16   Gutierrez, which we've already discussed.  Right?

17   **A.   Correct.**

18   Q.   And now you're saying you had an additional

19   telephone conversation with Kevin Gutierrez before you

20   began working at M.J. Dean.  Is that right?

21   **A.   Yes.**

22   Q.   Do you remember approximately when that was?

23   **A.   I would just say July of 2019.**

24   Q.   Was it shortly before you began working?

25   **A.   Yes.**



1    Q.   Okay.  What was the sum and substance of that

2    telephone call with Kevin Gutierrez in July 2019?

3    **A.   That was a follow-up call from -- I had with**

4    **John Thomason, and -- when he told me to give him my last**

5    **four digits of my social and name.  So he again referred**

6    **me back to contact Kevin so I can get, you know, when the**

7    **start date is and the hours.**

8         **So at that point, I contacted Kevin and direct**

9    **spoke to him in regards to the hours and the days of**

10   **work.**

11   Q.   Okay.  How long was that conversation?

12   **A.   Probably five minutes.**

13   Q.   Did Mr. Gutierrez say anything during that

14   conversation that you found offensive or threatening?

15   **A.   No.**

16   Q.   Did you say anything to Mr. Gutierrez during

17   that conversation that you would consider to be

18   threatening or offensive?

19   **A.   No.**

20   Q.   So, would it be fair to say you and

21   Mr. Gutierrez had a civil conversation for about five

22   minutes in July 2019 before you started work?

23   **A.   Yes.**

24   Q.   Was it your understanding at that point in time,

25   so before you began working, that you would be directly



1    reporting to Kevin Gutierrez once you began working at

2    M.J. Dean?

3        **A.    Yes.**

4        Q.    Did Mr. Gutierrez tell you during that

5    conversation, or any prior conversation before you

6    started working at M.J. Dean, of what your job duties

7    would be?

8        **A.    No.**

9        Q.    But would it be fair to say that, as a laborer,

10   you knew what was going to be expected of you.  Correct?

11       **A.    Yes.**

12       Q.    And you had been a laborer for how many years?

13       **A.    About 25 years.**

14       Q.    Prior to the time you began working at M.J.

15   Dean?

16       **A.    Yes.**

17       Q.    I assume you were an apprentice at some point.

18   Right?

19       **A.    No.**

20       Q.    You were never an apprentice?

21       **A.    Never.**

22       Q.    Tell me how that worked, then.

23       **A.    Because usually you're going to have tests.  If**

24   **you just join a labor union, if they are not sure about**

25   **your skill qualifications, if you can convince them that**



1  -- like, they say, Hey, Parnell, go out, dig me a trench

2  8 feet deep, 12 feet wide, they see if I use a certain

3  feature, and there's certain things they want you to do,

4  they'll just turn you out right there.  That's what

5  happened with me.

6      Q.  For you, was it a classical test that they gave

7  you and they watch you?

8      A.  Yeah, that can be -- some of the times, they

9  watch you.

10     Q.  Is that the same for you?

11     A.  Yes.

12     Q.  Okay.  That was in Oregon?

13     A.  Yes.

14     Q.  And so they watched what you did, and you were

15  -- you were assigned to be a laborer, not an apprentice.

16  Right?

17     A.  Correct.  Yes.

18     Q.  Okay.  Do you remember what year you became a

19  laborer?

20     A.  I think it was 2006.

21     Q.  Were you living in Oregon at that time?

22     A.  Yes.

23     Q.  Were you ever promoted or given a raise of any

24  kind when you worked at M.J. Dean?

25     A.  No.



1      Q.   But you were given a pay increase through the

2   union.  Correct?

3      **A.   Yes.**

4      Q.   Did you ever receive a performance evaluation

5   when you worked at M.J. Dean?

6      **A.   No.**

7      Q.   So, during the first few months that you worked

8   at M.J. Dean, so starting late July, let's say, through

9   the end of September, how was work?

10     **A.   For me, it was good.  But dealing with Kevin was**

11  **terrible.**

12     Q.   When did that start?

13     **A.   Probably day one.**

14     Q.   The first day of work?

15     **A.   Yes.**

16     Q.   And you had talked to him on two occasions

17  before that time.  Right?

18     **A.   Correct.**

19     Q.   So what happened on the first day of work?

20     **A.   My thing is that, you know, just being a laborer**

21  **as long as I have, one of the things that you learn early**

22  **is always make it a point to get along with your**

23  **superintendents and foremen.  Because if they like you,**

24  **they'll take you to the next jobs.  And basically that's**

25  **what the union is.  It's not based off your skill set,**



1    it's based off who you know.

2         And so I would go to Kevin, try to acknowledge

3    him in the morning.  He would roll his eyes at me, look

4    at me like I was a piece of shit.

5         And this went on pretty much every day.  And I

6    got to the point I just stopped saying good morning to

7    him.  And that's when I think his harassment, comments,

8    strategies, what he was trying to do was put me in a

9    situation so I can fail.  And I'm aware of that, because

10   I've been in the union.  And when you get a person like

11   Mr. Gutierrez, where he don't like you, what they do is

12   they assign you multiple tasks.

13        Now, me being a laborer, I know generally how

14   long it takes for me to get my own tasks done.  He would

15   come get me, assign me to multiple tasks throughout the

16   day.  Then at the end of day:  Parnell, did you get

17   anything done?  I'm, like, Come on, Kevin.  You know you

18   -- you passed me all around.

19        He would have me go work on other crews.  When I

20   get there, they, like, Parnell, we don't need you over

21   here.  I don't know why Kevin's doing that to you.

22        So it was just -- it was just hard, you know,

23   trying to deal with him.  But I was just trying to make

24   the best out of the situation, because I'm trying to work

25   to support my family.  And, you know, it's unfortunate,



1    **but he should have never been a foreman.**

2        Q.   I want you to take a look at what's -- what was

3    marked previously as Exhibit B, please.  The text

4    messages.

5            Do you see those?

6            MR. MARKS:  B as in boy, yeah.

7        **A.   Yes.**

8    BY MR. ROSENTHAL:

9        Q.   Take a look at the first page of Exhibit B.  And

10   at the bottom of the page in gray, that's -- that's a

11   text message from you to John Thomason.  Correct?

12       **A.   Yes.**

13       Q.   And it's dated June 26, 2019, at 9:14 a.m.

14   Correct?

15       **A.   Yes.**

16       Q.   And you say there in your text to John Thomason,

17   Hello, John.  How are you doing?  This is Parnell.  I

18   talked to the foreman at the Sphere.

19           Who are you referring to there when you say that

20   you talked to the foreman?

21       **A.   Kevin Gutierrez.**

22       Q.   Okay.  And do you know whether that was your

23   first or second telephone call with Kevin?

24       **A.   First.**

25       Q.   So you said that your relationship with Kevin



1   was not good starting on day one of your employment at

2   M.J. Dean.  Is that right?

3       A.    **Correct.**

4       Q.    So did Kevin Gutierrez say anything to you on

5   the first day of work that you found to be offensive?

6       A.    **Just his tone of how he interacted with me.**

7       Q.    Okay.  Did he -- other than his tone of voice,

8   did Kevin say anything to you that you found to be

9   offensive?

10      A.    **No.**

11      Q.    Did he say anything to you that you found to be

12  racially discriminatory?

13      A.    **No.**

14      Q.    Did he threaten you in any way?

15      A.    **No.**

16      Q.    And, during the -- strike that.

17            You filed an internal complaint with M.J. Dean

18  on November 14, 2019.  Is that correct?

19      A.    **I know it was in November.  Not sure of the**

20  **exact date.**

21      Q.    But you remember filing an internal complaint.

22  Right?

23      A.    **Yes.**

24      Q.    So, at any time prior to you filing that

25  internal complaint, did Kevin Gutierrez ever physically



1    threaten you?

2         A.    No.

3         Q.    Did Kevin Gutierrez ever threaten your

4    employment prior to you filing that complaint?

5         A.    Yes.

6         Q.    How many times?

7         A.    Several.

8         Q.    How many times?

9         A.    I would say two.

10        Q.    When was the first time that Kevin Gutierrez

11   threatened your employment?

12        A.    Within two weeks of me first coming on board

13   with M.J. Dean.

14        Q.    What did he say to you that made you feel like

15   he was threatening your employment within the first two

16   weeks of working at M.J. Dean?

17        A.    Well, what we do is, when we're cleaning off

18   decks, because we have iron workers and other carpenters,

19   what they do is they drop a lot of nails, screws, bolts

20   behind.  And typically the practice is you have what's

21   called a magnet, which is like a little stem.  It has a

22   magnet and some kind of, like, a wand waver to pick all

23   this up, because there's no way you can do it by hand.

24             So, Mr. Gutierrez seen me and about 10 other

25   laborers do it.  And so Mr. Gutierrez came over to me and



1    said, Parnell, what are you doing?  I said, Well, I'm

2    cleaning up.  I'm picking up the materials up from the

3    ground.  He said, You got to put that wand up because

4    John Thomason's coming out here.  He'll fire you for

5    doing that.

6         And so I put that down, and I had to get on my

7    hands and knees with some knee pads to finish picking up

8    the nails.  And when he left, all the other laborers came

9    to me, was like, basically that's crap what he is doing

10   to you.  Everybody's using wands, so we don't know why

11   he's singling you out.

12   Q.   But Kevin Gutierrez didn't threaten to fire you,

13   did he?  He said that John Thomason would fire you if he

14   saw that.  Right?

15   A.   Correct.

16   Q.   But Kevin Gutierrez didn't threaten to fire you

17   then.  Right?

18   A.   Correct.

19   Q.   Mr. Gutierrez didn't discipline you at that

20   time.  Right?

21   A.   Correct.

22   Q.   Did Kevin Gutierrez ever discipline you at all?

23   A.   No.

24   Q.   Did anybody at M.J. Dean ever issue written

25   discipline to you?



1      **A.    No.**

2      Q.    Did anybody at M.J. Dean ever discipline you in

3   any way, shape, or form during your employment at M.J.

4   Dean?

5      **A.    No.**

6      Q.    Did anybody from the union ever discipline you

7   in any way when you worked at M.J. Dean?

8      **A.    No.**

9      Q.    Do you know -- have you ever heard a company

10  called AECOM Hunt?

11     **A.    Yes.**

12     Q.    That's A-E-C-O-M Hunt?

13     **A.    Correct.  Yes.**

14     Q.    Was that the general manager in charge of the

15  Sphere during the time that you worked at --

16     **A.    General contractor.**

17     Q.    Right.  Sorry about that.

18     **A.    It's okay.**

19     Q.    So AECOM Hunt was the general contractor during

20  the time that you worked at M.J. Dean.  Right?

21     **A.    Correct.**

22     Q.    Do you know if AECOM Hunt is still the general

23  contractor for the Sphere?

24     **A.    I'm not sure.**

25     Q.    Did you ever communicate with anyone at AECOM



1    Hunt to complain about anybody at M.J. Dean?

2        A.   Yes.

3        Q.   Who is that?

4        A.   I believe it's -- AECOM Hunt, I think he is the

5    superintendent for the whole project.

6        Q.   Who was that?

7        A.   I think his name is Jim Lampley.  I might got

8    his name wrong, but --

9        Q.   Did you complain to him in writing?

10       A.   No.

11       Q.   How did you complain to him?

12       A.   Talked to him and had a conversation with him,

13   explain to him what was taking place.

14       Q.   When did you speak to Mr. Lampley?

15       A.   November 14th.

16       Q.   That was the same day you submitted your written

17   complaint?

18       A.   Yes.

19       Q.   Just so we make the record clear, that was the

20   same day you submitted your written complaint internally

21   to M.J. Dean?

22       A.   Correct.

23       Q.   Okay.  Did you call Mr. Lampley?

24       A.   No.

25       Q.   How did you contact him to complain?



1    A.    As I was walking to the M.J. Dean job trailer to

2  make my complaint, I had knew him previously, and so I

3  walked over to him.  And he is, like, Parnell, what's

4  wrong?  You look erratical [sic].  And then I told him

5  Kevin called me a nigger.  And I kind of explained to him

6  what happened.

7         And so he had another employee next to him named

8  George.  George is the same worker from AECOM Hunt who

9  does the orientation.  So when I explained to -- I'm

10  going to say I might have his name incorrect -- Jim

11  Lampley, explain to him what happened, he said, Well, you

12  go on in and tell M.J. Dean what happened.  And he said,

13  If they don't take care of you, he said, I'll take care

14  of it for you.  And I said okay.

15         He instructed George to walk with me over to

16  M.J. Dean's office.  Went in the office.  He walked up to

17  the superintendent's, said, Looking for John Thomason.

18  Found John Thomason.  Told John Thomason, You need to

19  come out here.  He said, Parnell, you tell John Thomason

20  what happened.

21         So that's how that interaction took place.

22    Q.    Did you ever follow up with either George or

23  Mr. Lampley following your submission of the internal

24  complaint to M.J. Dean on November 14, 2019?

25    A.    No.



1    Q.   Did they ever follow up with you in any way?

2    **A.   Well, they just asked me, Kevin still bothering**

3  **me, stuff like that.  But that was pretty much it.  If I**

4  **had any further problems with Kevin, make sure I let them**

5  **know, because he is not to have any dealings with.**

6    Q.   Okay.  So they followed up with you after your

7  internal complaint.  Correct?

8    **A.   Yes.**

9    Q.   And you told -- after you submitted your

10 internal complaint to M.J. Dean on November 14, 2019, you

11 told Jim Lampley and George that Kevin wasn't bothering

12 you anymore.  Correct?

13   **A.   On November 14th?**

14   Q.   Yeah.  After November 14th, you told Jim Lampley

15 and George, when they would ask you how you were doing,

16 that you're doing fine and that Kevin Gutierrez wasn't

17 bothering you anymore?

18       MR. MARKS:  Object to the form.

19   **A.   No.  Actually, he still was bothering me.**

20 BY MR. ROSENTHAL:

21   Q.   Okay.  Then I misunderstood you.  So when they

22 -- George and Jim both followed up with you after your --

23 you submitted your internal complaint on November 14,

24 2019.  Right?

25   **A.   Correct.**



1      Q.   How many times did they follow up with you to

2   see how you were doing?

3      **A.   I don't know.  Six, seven times.**

4      Q.   And that was all just in passing?  In person?

5      **A.   Yeah, just in passing.**

6      Q.   Not on the phone?

7      **A.   No, not on the phone.**

8      Q.   Not in writing?

9      **A.   No, not in writing.**

10      Q.   And did you complain to them at all about any

11   working conditions when they followed up with you?

12      **A.   Yes.**

13      Q.   And what did you say to them on the first time

14   they followed up with you?

15      **A.   The first time that I -- followed up with me, I**

16   **just made -- asked me how was Kevin doing.  And what**

17   **Mr. Gutierrez did, the -- when they moved me from under**

18   **his supervision and placed me under Dave Muti, what Kevin**

19   **did was he contacted the Black other laborers on the**

20   **jobsite, and he was telling the other Black laborers that**

21   **I was talking about him.  So when I get home, I got all**

22   **the Black laborers on the jobsite calling me. Like,**

23   **Parnell, I don't know what you were doing.  This is**

24   **Kevin's bullshit again.  And he was going around saying**

25   **-- he was talking about us to him.  And they said, Well,**



1    we know you're not built like that.

2          So -- and I went back the next day at work, and

3    I explained to the safety for M.J. Dean -- what was his

4    name? -- Tony, he's the safety director, right up under

5    Paul Renquist [sic], I believe, and, Julian.  And they

6    said, Okay, Parnell.  We're going to document, put in

7    your file.  Yeah, man, I got these laborers calling me,

8    and this is what Kevin is doing.  So after they separated

9    us, Kevin was now starting to indirectly harass me

10   through the other Black laborers on the jobsite.

11       Q.   So you said all of that to George and Jim

12   Lampley during your first conversation after November 14,

13   2019.  Is that correct?

14       A.   No.

15       Q.   That's what I asked you, though.

16       A.   Oh, no.

17       Q.   So I want to know -- my question was, what did

18   you say to Jim and George the first time that they asked

19   you how you were doing following your internal complaint

20   that you submitted to M.J. Dean on November 14, 2019?

21       A.   That I was doing okay.

22       Q.   And the second time that they asked you how you

23   were doing following your internal complaint, how did you

24   respond?

25       A.   I was doing okay.



1      Q.   How about the third time?

2      **A.   That's when the incident prior to me explaining**

3   **to you with the black laborers that came up, and I**

4   **explained that to Julian, safety, and also Tony from**

5   **safety from M.J. Dean.**

6      Q.   And so am I correct in saying that it was during

7   your third conversation with George and Jim from AECOM,

8   following the submission of your internal complaint on

9   November 14, 2019, that you complained about Kevin

10  Gutierrez talking about you to the other Black laborers?

11     **A.   Correct.**

12     Q.   Anything else that you told them in that third

13  conversation?

14     **A.   No.**

15     Q.   What did you say to them in the fourth

16  conversation that you had with them?

17     **A.   I was doing okay.**

18     Q.   Did you say anything in the fifth conversation

19  to them?

20     **A.   No.**

21     Q.   Did you tell them that you were doing okay?

22     **A.   Yes.**

23     Q.   Didn't complain at all?

24     **A.   No.**

25     Q.   What about the seventh time that you spoke to



1   George and Jim, did you complain at all?

2      A.   Yes.

3      Q.   The seventh time?

4      A.   Yes.

5      Q.   What did you complain about to George and Jim

6   the seventh time?

7      A.   That's when Kevin had, I guess, made an incident

8   about me that he's making my job hard.  Because Black

9   laborers were still contacting me.  And they said that

10  they would have a talk with him.  And they said they

11  would put it in my file so they would know.  And they

12  said, Just keep letting us know, you know, anything he

13  does so we can keep documenting it.

14     Q.   Do you know if George and Jim ever documented

15  them?

16     A.   I'm not sure.

17     Q.   Did you ever ask?

18     A.   No.

19     Q.   Did you ever complain to anybody at M.J. Dean at

20  any point in time about Kevin Gutierrez talking about you

21  to the other Black laborers?

22     A.   Yes.

23     Q.   You did?  When was that?

24     A.   It was May.  May 2015 [sic].

25     Q.   You weren't working for M.J. Dean in May 2019.



1      A.   Oh, I'm sorry.  I want to say September 2019.

2      Q.   That's before you submitted your written

3   complaint.  Correct?

4      A.   Yes.

5      Q.   Did you ever complain in writing to M.J. Dean at

6   any time about Kevin Gutierrez talking about you to other

7   Black laborers?

8      A.   No.

9      Q.   And are you saying that you complained to M.J.

10  Dean orally?  Are you saying that you complained to M.J.

11  Dean orally in September 2019 about Kevin Gutierrez

12  talking to other Black laborers about you?

13     A.   Not that particular incident, but just the

14  conduct that I was having encounters with him.  I brought

15  that to M.J. Dean's attention.

16     Q.   Did you ever complain to anybody orally at M.J.

17  Dean at any time about Kevin Gutierrez talking to other

18  Black laborers about you?

19     A.   No.

20     Q.   Did you ever follow up with anybody at AECOM

21  Hunt about Kevin Gutierrez talking about you to other

22  Black laborers?

23     A.   No.

24     Q.   Did you ever complain to your union, Local 872,

25  about Kevin Gutierrez talking about you to other Black



1    laborers?

2         A.   No.

3         Q.   So, again, let's talk about your work prior to

4    you submitting your internal complaint on November 14,

5    2019.  Okay?

6         A.   Okay.

7         Q.   What -- did you have any issues with Kevin

8    Gutierrez, other than what you've already mentioned,

9    during that time period?

10        A.   Can you rephrase that question again?

11        Q.   Did you have any problems with Kevin during that

12   time period?

13        A.   Which time period are we speaking of?

14        Q.   From the time you started work until the time

15   you submitted your written complaint.

16        A.   Yes.

17        Q.   Okay.  And let's go through what those issues

18   were for you.  Okay?

19        A.   Okay.

20        Q.   So, what did you have a problem with?

21        A.   The first complaint that I would have is that --

22   if you recall that when I got Kevin's number from

23   Mr. Thomason, I got the hours to work and schedule

24   because I wanted to know what I was scheduled so I would

25   have my kids and everything balanced out.  Kevin told me



1   we would work six days a week, ten hours a day.  Great

2   for me for overtime.

3           So I get there, and Friday comes -- and usually

4   anything after eight hours for us is overtime.  Saturday

5   is overtime, 11 hours.  Sunday is double pay all day.

6           So when Friday comes, he's telling everybody who

7   is coming in Saturday for overtime.  He -- I asked him,

8   Kevin, why I can't come in?  Oh, no, Parnell, you can't

9   come in.  Why not?  Company will fire me if I don't give

10  overtime to the guys that were here before you.  I said,

11  Okay.  No problem.

12          Following week go by.  Same thing again.  He's

13  calling people in who he's going to give overtime to.

14  I'm, like, Kevin, can I get some overtime?  You told me I

15  was going to work six days a week, ten hours a day, and,

16  you know, I can't get no overtime.

17          Oh, No, Parnell.  I can't give it to you.  I got

18  to give it to the guys before you again.

19          But, now, this time, people came to work after

20  me.  And so now I'm seeing them firsthand where he's

21  giving the overtime to people that came after me, after

22  alleging that I can't give it to you.

23      Q.   Like who?

24      A.   Ricky.

25      Q.   Ricky.  What is his last name?



1    A.    Well, his name was Ricardo, but I know him by

2    Ricky.  Kevin made him a foreman.  And he was there with

3    me, and cried and pouted to Kevin.  And Kevin -- and

4    Ricky walked off.  And Kevin called him back, said, Okay,

5    Ricky. You can come in and work.

6    Q.    Are you saying Ricky started working for M.J.

7    Dean after you?

8    A.    Yes.

9    Q.    Do you know Ricky's last name?

10    A.    I don't.

11    Q.    Do you know how much overtime Ricky received

12    when you got none?

13    A.    I don't.

14    Q.    Do you know if Ricky, in fact, worked overtime?

15    A.    Yes.

16    Q.    How do you know that?

17    A.    Because every time Ricky would get overtime and

18    request me to come work in -- come to work early, we come

19    to work early.  Say our shift starts at 6 o'clock, and

20    they might -- might get called in at 4 o'clock in the

21    morning.  Well, that's two hours of overtime from 4 to 6.

22    And then from 6 to, say, 2:30, or 8 hours, we'd go back

23    to regular pay.  Then if you work past 2:30, now you're

24    back to time-and-a-half.

25          And so Ricky, who was a foreman and I worked for



1   **him, would always say, Parnell, you want to work**

2   **overtime?  I said, Yeah, man, you know I want overtime.**

3   **He'd says, Okay. Come in in the morning.**

4          (Reporter interruption)

5   BY MR. ROSENTHAL:

6       Q.    Let me just ask this:  Do you know for a fact

7   Ricky ever worked overtime?

8       **A.    Yes.**

9       Q.    How do you know that?

10      **A.    Because I talked to him, and he would tell me he**

11  **worked overtime.**

12      Q.    Okay.  Were you ever assigned overtime during

13  the time that you worked at M.J. Dean?

14      **A.    Yes.**

15      Q.    When did that start?

16      **A.    Maybe my fourth week there.**

17      Q.    And when you were assigned overtime, it was

18  Kevin that assigned you to work overtime.  Correct?

19      **A.    No.**

20      Q.    Who assigned you to work overtime?

21      **A.    Dave McGrandy.**

22      Q.    But you worked under Kevin Gutierrez' authority,

23  too.  Correct?

24      **A.    Yes.**

25      Q.    Was Kevin aware -- do you know whether Kevin was



```
 1   aware that you were assigned to work overtime?

 2           MR. MARKS:  Object to the form.

 3       A.   No.

 4   BY MR. ROSENTHAL:

 5       Q.   Do you know whether Kevin Gutierrez ever saw you

 6   working overtime?

 7       A.   Yes.

 8       Q.   So if Kevin Gutierrez saw you working overtime,

 9   then he was aware that you worked overtime.  Right?

10       A.   Well, he asked me.

11       Q.   And you told him you worked overtime.  Right?

12       A.   Correct.  Yes.

13       Q.   Did he have a problem with you working overtime?

14           MR. MARKS:  Object to the form.

15       A.   It seemed like he did.

16   BY MR. ROSENTHAL:

17       Q.   Did Kevin ever tell you that he had a problem

18   with you working overtime?

19       A.   No.

20       Q.   Did Kevin ever tell you, at any point during

21   your employment, that he had a problem with you working

22   overtime?

23           MR. MARKS:  Object to the form.

24       A.   No.

25           MR. MARKS:  Object to the form.  Asked and
```



1   answered.

2       A.   No.

3   BY MR. ROSENTHAL:

4       Q.   Did you ever complain in writing to anybody at

5   M.J. Dean about not getting overtime that you thought you

6   deserved?

7       A.   No.

8       Q.   Did you ever complain in writing to anybody at

9   M.J. Dean, at any point during your employment, regarding

10  overtime any in any way, anything having to do with

11  overtime?

12      A.   No.

13      Q.   Did you ever complain to your union about

14  overtime?

15      A.   No.

16      Q.   Did you ever complain to anybody at AECOM about

17  overtime?

18      A.   No.

19      Q.   So you said that you began working overtime

20  after about the fourth week of work at M.J. Dean.  Right?

21      A.   Yes.

22      Q.   Were you assigned overtime periodically

23  throughout the rest of your employment at M.J. Dean?

24      A.   Yes.

25      Q.   Were -- was that overtime pretty regular?



1      **A.    Yes.**

2      Q.    How much overtime would you generally work

3      during -- from the fourth week on until you stopped

4      working at M.J. Dean?

5      **A.    It was -- it was regular.**

6      Q.    Like, every week?

7      **A.    Throughout the week.  Like, Some days would be 8**

8      **hours, 10, 12 hours.  Following week might be 10.  And**

9      **then we went from 8 hours to 10 hours.  Some days might**

10     **be 12 hours a day.**

11     Q.    Did you ever have any issues or problems with

12     the overtime that you were assigned?

13     **A.    No.**

14     Q.    So you never told anybody, Hey, it's not enough

15     overtime?

16     **A.    No.**

17     Q.    All right.  So, we've discussed the overtime

18     issue, but I asked you to give me sort of the issues --

19     or issues that you had with Mr. Gutierrez from the time

20     you started work until the time you submitted your

21     complaint.  Right?

22     **A.    Yes.**

23     Q.    We talked about overtime.  What else?

24         MR. MARKS:  Now you're going back to all his

25     issues?



```
 1              MR. ROSENTHAL:  Yes.

 2              MR. MARKS:  So give him a moment to kind of

 3   collect his thoughts.

 4   BY MR. ROSENTHAL:

 5       Q.   Do you understand the question?

 6       A.   Can you repeat it, please?

 7       Q.   Yeah.  So I'm just trying to get an

 8   understanding of your list of issues that you had with

 9   Mr. Gutierrez from the time you started work until the

10   time you submitted your internal complaint on November

11   14, 2019.  Okay?

12       A.   Okay.

13       Q.   Do you understand that?

14       A.   Yes.

15       Q.   So that's the only time period I'm looking at

16   right now.

17       A.   Yes.

18       Q.   So you said you had the issue with the overtime.

19       A.   Correct.

20       Q.   What else?

21       A.   Him calling me a nigger.

22       Q.   Okay.  When was that?

23       A.   November 4, 2019.  Excuse me.  14th, I believe

24   it is.

25       Q.   Okay.  We'll get to that in a moment.
```



```
 1              Did you have any other complaints or issues

 2   concerning Kevin Gutierrez before that time?

 3        A.   No.

 4        Q.   Okay.  So let's move to November 14th.

 5        A.   Okay.

 6        Q.   Are you sure that Mr. Gutierrez called you the

 7   N-word on the 14th, or was it the day before?

 8        A.   Possibly could have been the day before.

 9              MR. ROSENTHAL:  Let's mark this next document as

10   Defendant's Exhibit H.

11              (Exhibit H identified.)

12   BY MR. ROSENTHAL:

13        Q.   Do you recognize what's been marked as

14   Defendant's Exhibit H?

15        A.   Yes.

16        Q.   Is that a copy of the internal complaint that

17   you submitted to M.J. Dean?

18        A.   Yes.

19        Q.   Take a look at the top left-hand corner, and the

20   date says 11-14-2019.  Do you see that?

21        A.   Yes.

22        Q.   And just for the record, Exhibit H is -- has

23   Bates numbers DEF0024 and 0025.

24              And let's look at again at the top of -- the top

25   left-hand side of the page, underneath the date says,
```



1    Time 7:28 a.m.  Do you see that?

2        A.   Yes.

3        Q.   What it be fair to say that you submitted your

4    investigation report, or your complaint, on November 14,

5    2019, at around 7:30 in the morning?

6        A.   Yes.

7        Q.   And so the incident that -- the N-word incident

8    that you're talking about here, that occurred the day

9    before, though.  Right?

10       A.   No.  Same day.

11       Q.   The same day?

12       A.   Correct.

13       Q.   What time did that happen?  Do you remember?

14       A.   6:00, 6:30 in the morning.

15       Q.   So you complained right away, then?

16       A.   Correct.

17       Q.   Okay.  Where were you when Mr. Gutierrez called

18   you the N-word?

19       A.   On the deck, working.

20       Q.   What area?

21       A.   Area D, I believe.  It's called area D.

22       Q.   Is -- there's multiple areas at that work site.

23   Right?

24       A.   Yes.

25       Q.   A, B, C, and D?



1    **A.    Correct.  Yes.**

2    Q.    And so is it your testimony that you were in

3    Area D at the time that he called you the N-word?

4    **A.    Yes.  That's my assigned work area.**

5    Q.    And he called you the N-word about 6:30 in the

6    morning?

7    **A.    Yes.**

8    Q.    Had Mr. Gutierrez ever called you any racial

9    names prior to that time?

10   **A.    No.**

11   Q.    Did you ever hear Mr. Gutierrez call anybody the

12   N-word other than the one time against you?

13   **A.    No.**

14   Q.    Did Mr. Gutierrez ever call you the N-word

15   again?

16   **A.    No.**

17   Q.    Did you -- did anybody employed by M.J. Dean

18   call you the N-word other than the one time by

19   Mr. Gutierrez?

20   **A.    No.**

21   Q.    Obviously, you were upset by that.  Correct?

22   **A.    Yes.**

23   Q.    Did anybody tell you to complain about what

24   happened?

25   **A.    No.**



1      Q.   And is it your testimony that on the way to

2   complain, that is when you ran into George and Jim?

3      **A.   Yes.**

4      Q.   Okay.  So you were at the Sphere website --

5   jobsite.  And when you went to complain, where did you

6   go?

7      **A.   Rephrase that.  Say that question again.**

8      Q.   So you went to complain about what happened.

9   Right?

10     **A.   Yes.**

11     Q.   Where did you go to complain at?

12     **A.   M.J. Dean's office, trailer office.**

13     Q.   On site?

14     **A.   On the jobsite.  Yes, sir.**

15     Q.   On the site?

16     **A.   Yes.**

17     Q.   Okay.  Where in the jobsite was it?  Do you

18   remember?

19     **A.   As soon as you come through the gate, you're**

20   **coming through the gates, it would be right to the -- to**

21   **the right.**

22     Q.   How far of a walk was it from where the incident

23   happened?

24     **A.   It was almost half a mile, maybe.**

25     Q.   So was it a fair walk?



1      **A.    Yes.**

2      Q.    Did you go into M.J. Dean's trailer?

3      **A.    Yes.**

4      Q.    Who did you see or who did you talk to when you

5  entered the trailer?

6      **A.    Well, George from AECOM Hunt was there, and he**

7  **was the one actually looking for somebody in charge.  And**

8  **he said the person in charge was John Thomason.**

9      Q.    Was he in the trailer at that time?

10     **A.    Yes.  He was with me.**

11     Q.    So you didn't run into Jim and George outside

12  the trailer -- strike that.

13          You first saw them outside, and they walked you

14  to the trailer.  Correct?

15     **A.    Correct.  Yes.**

16     Q.    Both of them?

17     **A.    No.  Just George.**

18     Q.    Okay.  Did George walk you inside the trailer?

19     **A.    Yes.**

20     Q.    And was it your intention to see somebody or

21  talk to somebody from M.J. Dean to complain?

22     **A.    Yes.**

23     Q.    Did you know who you were going to complain to

24  before you got into the trailer?

25     **A.    Yes.**



1      Q.   Who were you intending to complain to?

2      **A.   John Thomason.**

3      Q.   Did George tell you to complain to John

4   Thomason?

5      **A.   No.**

6      Q.   Did anybody tell you to complain to John

7   Thomason?

8      **A.   No.**

9      Q.   How did you know to complain to him, then?

10     **A.   Because when I was at the Resorts World working,**

11  **and I was still trying to get on with Sphere, I had**

12  **explained to one of the laborers that I had John**

13  **Thomason's number.  And that's when I was told -- they**

14  **said, Oh, you got John Thomason's number.  You got the**

15  **man's number.  Says, John Thomason runs all the jobs for**

16  **M.J. Dean.**

17          **And I knew that John Thomason was the one that**

18  **hired me, so financially he was the person I was going to**

19  **look for.**

20     Q.   And let's step back a bit in time.

21          So on the morning of November 14, 2019, did you

22  have a run-in with Mr. Gutierrez, or what happened such

23  that he called you the N-word?

24     **A.   Well, it was comments that every time I'm**

25  **working, he would always come find me.  And he was**



1    always, like -- like I say, when I was using a magnet to

2    pick up something -- he always had something negative to

3    say.

4            So I was on the deck again working, and then he

5    had approached me.

6            Now, if I can back up again.  Days before that,

7    he had confronted me again, screaming and yelling.  So by

8    this time, me and him had a real serious talk.

9    Q.   Okay.  Let's stop there.  I don't want to cut

10   you off.  I want you to tell your story.  But since you

11   brought that up now, what happened a few days before?

12   A.   As usual, I was working on the deck.  Here comes

13   Kevin screaming again, Come on, can't use the magnet.

14   John Thomason's going to fire you.

15           (Reporter interruption for clarification.)

16           MR. MARKS:  There was something about a magnet

17   or something.

18   A.   Yes, sir.

19           MR. MARKS:  He didn't get that.

20   A.   Okay.  And so once again, it's a common tool

21   that laborers use, which is a magnet.  And basically,

22   like I said, it might be four or five feet, little pole,

23   magnet on it.  And that's used to pick up nails, screws,

24   bolts that is just too hard to do just on your hands and

25   knees.



1      So, up and to that point, I had numerous run-ins

2  with Kevin.  He seen me on the deck, and this time he

3  came over, and he said, Parnell, let's talk.  I said,

4  What's up, Kevin?  He's, like, Man, I'm sorry.  I said

5  for what?  He said, I'm sorry for everything I've been

6  doing to you.  He said, Man, I'm -- this is my first time

7  being a general foreman.  I'm new to this, man.  So can

8  we just start over?  So we shook hands.  And I -- okay.

9  This ends up a new start, but --

10  BY MR. ROSENTHAL:

11     Q.  And that was several days before the N-word.

12  Right?

13     A.  Yes.  Yes.

14     Q.  And during that conversation, are you saying

15  that -- is that when Mr. Gutierrez said that if John

16  Thomason finds you working with the magnet in that way,

17  you'll get fired?

18     A.  That was another incident prior to that one.

19     Q.  When?

20     A.  I'd say that probably was August of 2019.

21     Q.  Because the -- I thought -- I thought you said

22  that it was just a day or two before Kevin said, Let's

23  just start -- start over that he was yelling at you and

24  saying if John Thomason catches you using a magnet in

25  that way, you're going to get fired?



```
 1       A.    No.

 2       Q.    Am I wrong?

 3       A.    Yes.

 4       Q.    Okay.  So when did that happen?

 5       A.    The magnet situation was pretty much when I

 6   first started working.

 7       Q.    Okay.

 8       A.    So that had to be around August.  I don't have a

 9   specific date in August.  But that incident occurred in

10   August.

11       Q.    John Thomason never threatened to fire you.  Did

12   he?

13       A.    Correct.

14       Q.    And, again, Kevin Gutierrez never threatened to

15   fire you.  Right?

16       A.    Correct.

17       Q.    Do you know if anyone was ever fired from M.J.

18   Dean for using a magnet like you were?

19       A.    I don't know.

20       Q.    And when do you believe that -- or when do you

21   recall that Kevin Gutierrez talked to you and said, Let's

22   just start over?

23       A.    I want to probably say November 2019.

24       Q.    Was it a couple of weeks before he called you

25   the N-word?
```



1      A.    Yes.

2      Q.    So let's go to that incident itself.

3            So when Kevin Gutierrez said, Let's just start

4   over, how were things for the next week or so?

5      A.    They was okay.

6      Q.    Was everything pretty much calm and cool until

7   the date of the incident on November 14th?

8      A.    Yes.

9      Q.    So let's talk about what happened on the 14th.

10  Okay?

11     A.    Okay.

12     Q.    So you said that you had a run-in with Kevin at

13  around 6:30 in the morning on November 14th.  Right?

14     A.    Correct.

15     Q.    So tell me what happened again.  Okay?

16     A.    I'm working my assigned area.  I believe that

17  area to be Area D.  I'm doing my regular routine,

18  cleaning up work.  And then Kevin comes over to me

19  because he had a habit of always moving me around from

20  job area to job area.  And so I'm up there working.

21           He's, like, Parnell, I need you to go over to

22  this other area.  I said, Okay, Kevin.  No problem.  I

23  says, But why am I the only laborer I know that you

24  always come to move around?  And I said, We only have

25  three laborers.  And every crew you send me on, they have



1  10, 12 laborers working there.  And when I get there,

2  they -- they looking at me, Well, why did Kevin send you

3  here?  So I said, Then you make me look bad.  The

4  superintendent's looking -- watching Parnell walking

5  around the whole jobsite.

6          Obviously that's a pattern.  That was what

7  foremens do when they want to get rid of you.  I've been

8  a laborer a long time.  I know that tactic.  So when

9  foremens and superintendants see you walking around at

10  the end of day, they say, Kevin, why is Parnell -- I have

11  been seeing him walking around all day.

12          So basically he was setting me up to fail.  So

13  that's where the conversation started from.  Then he

14  starts screaming and yelling and throws his hands up,

15  Said, I'm not fucking doing this, you fucking nigger.

16  I'm giving you two checks.  Once the union -- two checks

17  meaning they're firing you.  And so they got to give you

18  all your hours, everything right then.

19          So when I -- when he did that, that's what led

20  me to go down there.  First I went and talked to Dave

21  McGrandy.  I told him what Kevin was doing and what

22  happened.

23    Q.   Did you raise your voice to Kevin Gutierrez at

24  all during that incident?

25    A.   Yes.



Parnell Colvin  -  7/15/2021

Case 2:20-cv-01765-APG-EJY   Document 44-1   Filed 10/08/21   Page 139 of 255

Parnell Colvin vs. M.J. Dean Construction, Inc.

```
 1        Q.   What did you say in response to him?

 2        A.   I was, like, Man, you know, I'm tired of you

 3   harassing me.  Man, you've been harassing me from day

 4   one.  I was, like, I'm here just to work like you to take

 5   care of my family.  You've been picking on me, harassing.

 6   I don't even know you, so I don't know what the problem

 7   is.  I'm just trying to work.  So --

 8        Q.   Did you swear at him?

 9        A.   No.

10        Q.   Did you ever use any swear words at Kevin?

11        A.   No.

12        Q.   Did you ever use any swear words at any

13   employees during the time that you worked at M.J. Dean?

14        A.   No.

15        Q.   Never used the F-word?  Never said fuck on the

16   worksite?

17        A.   No.

18        Q.   Did you hear other employees ever swear on the

19   worksite?

20        A.   Yes.

21        Q.   I assume that was fairly regular?

22        A.   Yes.

23        Q.   But you didn't?

24        A.   Correct.

25        Q.   Were there any witnesses to the incident on
```



1   November 14, 2019, between you and Kevin Gutierrez?

2       A.   No.

3       Q.   So have you told me everything about the

4   incident?

5       A.   Yes.

6       Q.   And so after the incident with Kevin Gutierrez

7   on November 14, 2019, around 6:30 in the morning, you

8   went over to complain at M.J. Dean's trailer.  Right?

9       A.   Correct.

10      Q.   And eventually you, at some point, submitted a

11  written complaint.  Right?

12      A.   Yes.

13      Q.   Did -- who did you end up meeting with on behalf

14  of M.J. Dean to complain to?

15      A.   John Thomason.

16      Q.   Was he in the trailer when you got there?

17      A.   Yes.

18      Q.   Did either George or Jim Lampley remain in the

19  trailer with you while you complained?

20      A.   Yes.

21      Q.   Throughout the entire complaint?

22      A.   Yes.

23      Q.   Did you personally type up what's been marked as

24  Exhibit H, the Employee Incident Investigation Report?

25      A.   Yes.



1      Q.    Did you use a computer in the trailer to do

2    that?

3      A.    Yes.

4      Q.    Do you know whose computer that was?

5      A.    I don't.

6      Q.    Did someone type it for you, or did you

7    personally type Exhibit H out?

8      A.    I personally typed it.

9      Q.    How long did it take you?

10     A.    I think maybe an hour-and-a-half.

11     Q.    Did John Thomason remain with you the entire

12   time that you typed out the Employee Incident

13   Investigation Report?

14     A.    No.

15     Q.    Were you left alone?

16     A.    No.

17     Q.    Who else was in the trailer then?

18     A.    George from AECOM Hunt remained there and Tony

19   -- I don't know his last name, but he is a safety

20   personnel from M.J. Dean.

21     Q.    Did John Thomason leave at some point while you

22   were typing up the incident report?

23     A.    Yes.

24     Q.    How long did John Thomason remain in the trailer

25   with you?



1     A.    He never came in the trailer.  He just stood

2  outside the trailer.

3          And so I'm clear about this, we went inside the

4  trailer to speak to Mr. Thomason.  The conversation moved

5  outside.

6          I just wanted to be clear for the record that it

7  didn't take place inside the trailer.  It was outside the

8  trailer.

9     Q.    Did you tell Mr. Thomason on the morning of

10 November 14, 2019 -- did you tell him orally what

11 happened between you and Kevin Gutierrez earlier that

12 day?

13    A.    Yes.

14    Q.    And did Mr. Thomason ask you to write out or

15 type out an incident report?

16    A.    Yes.

17    Q.    At what point did Mr. Thomason leave, such that

18 you were left to type out the incident report with

19 George?

20    A.    He left after he introduced me to my new super-

21 -- supervisor, Dave Muti.  And after Mr. Muti came to the

22 trailer, as I was writing my report, and Mr. Thomason

23 introduced me to him, and that's when Mr. Thomason left.

24    Q.    Did -- prior to filling out or typing out the

25 Employee Incident Investigation Report marked as Exhibit



1    H, did Mr. Thomason tell you that you were to report to

2    Dave Muti and not have to report to Kevin Gutierrez

3    anymore?

4        A.    No.

5        Q.    So when did that happen?

6        A.    **As I told the story and George was there, and**

7    **since AECOM Hunt is the general superintendant, the**

8    **contractor, they are over M.J. Dean.  So it was George**

9    **that told John Thomason that Parnell and Kevin can never**

10   **work together, and Kevin is to have no dealings with**

11   **Mr. Colvin.  And you guys are going to put him in a**

12   **different area.  And that's when John Thomason's, like,**

13   **Okay.  No problem.  That's what I'm going to do.**

14       Q.    So he moved you over to work directly under Dave

15   Muti?

16       A.    **Correct.**

17       Q.    Muti is spelled M-U-T-I.  Correct?

18       A.    **It's possible.**

19       Q.    To the best of your knowledge?

20       A.    **Yes.**

21       Q.    Okay.  When Mr. Thomason told you that you would

22   now be reporting to Dave Muti, had you typed out the

23   incident report at that point?

24       A.    **No.**

25       Q.    Did you have any problems with reporting to Dave



1    Muti instead of Kevin Gutierrez?

2         A.   **Did I have a problem?**

3         Q.   Yeah.

4         A.   **No.**

5         Q.   Did you tell anybody that you didn't want to

6    report to Dave Muti?

7         A.   **No.**

8         Q.   Had you ever worked with Dave Muti before that

9    time?

10        A.   **No.**

11        Q.   Did you know who he was?

12        A.   **No.**

13        Q.   Did you ever have any complaints or concerns

14   about Dave Muti after you submitted the Employee Incident

15   Investigation Report?

16        A.   **None.**

17        Q.   After -- did you return to work after submitting

18   the incident report and actually, in fact, report to Dave

19   Muti?

20        A.   **Yes.**

21        Q.   And you reported to Dave Muti through the

22   remainder of your employment at M.J. Dean.  Right?

23        A.   **Yes.**

24        Q.   Did Dave Muti ever threaten your employment in

25   any way?



```
1        A.    No.

2        Q.    Did Mr. Muti ever threaten you physically in any

3   way?

4        A.    No.

5        Q.    Did Mr. Muti ever swear at you?

6        A.    No.

7        Q.    Did Mr. Muti ever say anything to you that you

8   found to be racially discriminatory?

9        A.    No.

10       Q.    Did Mr. Thomason ever say anything to you that

11  you found to be offensive or discriminatory?

12       A.    No.

13       Q.    Did Mr. Muti ever say anything to you you found

14  to be offensive?

15       A.    No.

16       Q.    Did you return to work that day after submitting

17  the incident report?

18       A.    Yes.

19       Q.    Did you work a complete shift?

20       A.    Yes.

21       Q.    Were you pleased with the resolution that you

22  would no longer have to report directly to Kevin

23  Gutierrez?

24       A.    Yes.

25       Q.    What kind of work did you do for Mr. Muti?
```



1    **A.    I maintained the yard, which consists of when**
2    **the trucks come in to unload materials and load up, I**
3    **stage, organize, clean, band.   That was pretty -- just my**
4    **area to take care of.**
5    Q.    What do you mean by stage?
6    **A.    Things like when a truck would come in, just say**
7    **with 20, 30 pallets -- Julian was another laborer.   He**
8    **was a forklift driver.   So he would unload the pallets.**
9    **And he would come over, say, Parnell, where do want to**
10   **stage at?   I would direct him, Let's put this material**
11   **over here.   Put the other material in a different**
12   **location.**
13   Q.    I've heard the expression packing and stacking.
14   Have you?
15   **A.    Yes.**
16   Q.    So were you packing and stacking when you worked
17   with Dave Muti?
18   **A.    Yes.**
19   Q.    When you worked with Dave Muti, did you ever
20   have to get down on your knees and clean?
21   **A.    No.**
22   Q.    You did before that, though.   Right?
23   **A.    Yes.**
24   Q.    Were there any aspects of the job that you had
25   an issue with when you worked with Dave Muti?



1    **A.**    **None.**

2    Q.    All right.  I think we've been going about an

3    hour.  Let's take a brief break.

4    **A.**    **Okay.**

5    Q.    I still want to get to the rest of this.  Okay?

6    **A.**    **Okay.**

7         THE VIDEOGRAPHER:  We're going off the record at

8    2:18 p.m.

9         (Recess.)

10        THE VIDEOGRAPHER:  We are back on the record at

11   2:30 p.m.

12   BY MR. ROSENTHAL:

13   Q.    Let's go back to your internal complaint, which

14   is marked as ==Exhibit H==.  Okay?

15   **A.**    **Yes.**

16   Q.    And I want to read the first sentence, which

17   says:  Since I've been employed, labor general foreman

18   Kevin made it clear to me during a phone conversation

19   that he don't like people that he don't hire directly and

20   I better walk fucking lightly around the jobsite or he

21   would get rid of my ass in a heartbeat.

22        Do you see that?

23   **A.**    **Yes.**

24   Q.    So did you have a telephone conversation with

25   Mr. Gutierrez where he said that to you?



1    A.    Yes.

2    Q.    When was that?

3    A.    **That was the second phone call, I believe.**

4    Q.    Because you didn't tell me that he said those

5    things in your second phone call.  Right?

6    A.    **Yes, that's correct.**

7    Q.    Why didn't you tell me that earlier when I asked

8    you?

9    A.    **I didn't remember that that had took place at**

10    **that time.**

11    Q.    Okay.  Did Mr. Gutierrez ever say anything like

12    that -- like what you wrote in that first sentence again

13    during your employment?

14    A.    **No.**

15    Q.    Did you ever complain to anybody at M.J. Dean

16    about Mr. Gutierrez saying those things to you?

17    A.    **No.**

18    Q.    Why not?

19    A.    **When you're first getting into the job, you**

20    **know, you kind of got to pick the bruises of battles**

21    **because, you know.  You're new to this.  And me being**

22    **around the union and start making waves, first thing**

23    **they'll do is try to get rid of you.  So you can't**

24    **complain about every little thing.  So that was something**

25    **that I hoped would eventually work itself out.**



1       Q.   You didn't complain to the union about that

2   second telephone conversation with Mr. Gutierrez.  Did

3   you?

4       **A.   No.**

5       Q.   Did you believe that Mr. Gutierrez' comment to

6   you in that second telephone conversation that he didn't

7   like people he didn't hire directly and you better walk

8   fucking lightly around the jobsite or he will get rid of

9   your ass in heartbeat was racially motivated?

10      **A.   I don't know what his intentions was.**

11      Q.   Okay.  So you didn't know whether that comment

12  was racially motivated or not.  Correct?

13      **A.   Can you repeat that question again?**

14      Q.   You didn't know whether Kevin Gutierrez' comment

15  to you that he didn't like people that he didn't hire

16  directly and you had better walk fucking lightly on the

17  jobsite or he'd get rid of your ass, you don't know if

18  that was racially motivated, do you?

19      **A.   No.**

20      Q.   He didn't say anything to you that was racially

21  discriminatory or offensive to you during that

22  conversation, did he?

23      **A.   No.**

24      Q.   Other than Mr. Gutierrez calling you N-word one

25  time on November 14, 2019, he didn't ever say anything



1   else to you that you found to be racially discriminatory

2   or offensive.  Correct?

3        **A.   Correct.**

4        Q.   Let's look at the second sentence.  And it says:

5   I knew from my conversation with Kevin, general foreman,

6   I would be working under a very stressful environment,

7   but my attitude is positive and I work.

8        Do you see that?

9        **A.   Yes.**

10       Q.   How did you know that the working environment

11   would be very stressful?

12       **A.   This was for the -- my complaint, just for the**

13   **comment he made prior to that; that I don't like to hire**

14   **-- I don't like people working for me that I don't hire.**

15   **That's pretty common in union.  Employers like to hire**

16   **their own people.**

17       **So I knew from the tone of his voice that I'm**

18   **probably going to be walking into a hostile work**

19   **environment.**

20       Q.   Not based upon your race, though.  Right?

21       **A.   No.**

22       Q.   Okay.  Just a stressful work environment?

23       **A.   Correct.**

24       Q.   Did you have any reason to believe that you

25   would be harassed based upon your race based upon your



1  second conversation with Mr. Gutierrez?

2      A.   No.

3      Q.   Had any other bosses of yours from other jobs

4  that you worked at ever told you that they like to

5  hire -- you know, they only want to hire people they hire

6  directly?

7      A.   **Yes.**

8      Q.   That's common.  Right?

9      A.   **Correct.**

10     Q.   That's common as a laborer.  Correct?

11     A.   **It's common in the union.**

12     Q.   Right.  So, you weren't really surprised when

13  Mr. Gutierrez said that to you.  Were you?

14     A.   **Yes.**

15     Q.   You were surprised?

16     A.   **Yes.**

17     Q.   Why?

18     A.   **Because that sets a tone.  And when you -- any**

19  **person -- I've been a foreman myself.  And whether I hire**

20  **you or not, I'm not going to tell you, Hey, I don't like**

21  **you.  Because my job is to interact with you, give you**

22  **the tools to do a successful job.  So if I come off as**

23  **ignorant, racist, whatever, that sets a negative tone.**

24  **So of course I would never present myself like that, even**

25  **though other people may do it.**



1      Q.   But you've heard that before?

2      A.   Yes.

3      Q.   Right?

4      A.   Correct.

5      Q.   And yet you were still surprised when Kevin said

6   that to you.  Is that right?

7      A.   Yes.

8      Q.   Okay.  Let's look a little further down on

9   Exhibit H.  And can you see the sentence in the first

10  paragraph says, At the time I told Kevin that you had

11  been picking on me and making it hard for me to work

12  since I've been here, and I don't know why you've been

13  picking on me all this time.

14          MR. MARKS:  Could you identify where you are?

15  Because there is one paragraph.

16          MR. ROSENTHAL:  Sure.  Yep.  Yep.  Let me --

17          MR. MARKS:  How many lines down?

18          MR. ROSENTHAL:  Do you see the break, actually?

19  Looks like two paragraphs on that first page.

20          MR. MARKS:  Yeah.

21  BY MR. ROSENTHAL:

22      Q.   So the last line right before the break --

23      A.   That says, At this time?

24      Q.   Correct.  Do you see that?

25      A.   Yes.



1      Q.   Okay.  So let me reread the sentence to you.

2  Okay?

3      A.   **Okay.**

4      Q.   To make sure we're all reading the same thing.

5           So Mr. Colvin, do you see where it says, At this

6  time I told Kevin that you have been picking on on me and

7  making it hard for me to work since I've been here, and I

8  don't know why you would be picking on me all this -- all

9  the time.

10          Do you see that?

11     A.   **Yes.**

12     Q.   So -- so make sure I have this right.

13          When you said that to Kevin, that You've been

14  picking on me and I don't know why, that was on the

15  morning of November 14, 2019, when you told him that.

16  Correct?

17     A.   **No.  Well, that -- I told him several times**

18  **that.**

19     Q.   When was the first time you said -- you told

20  Kevin that he was picking on you?

21     A.   **August of 2019.**

22     Q.   Was it -- would it be fair to say that it was

23  within the first or second month of work that you told

24  him that?

25     A.   **Yes.**



1    Q.    What did he say in response when you said that

2    to him?

3    A.    **That was when he came and apologized to me.**

4    Q.    That was in -- I thought he apologized to you

5    about two weeks before the incident on November 14th.

6    Correct?

7    A.    **Yes.  You're correct.**

8    Q.    You testified earlier that he wanted a do-over

9    with you, to start over, start fresh, at the beginning of

10   November 2014?

11   A.    **Correct.**

12   Q.    About two weeks before you filed the incident

13   report.  Right?

14   A.    **Yes.**

15   Q.    Okay.  So are you saying that the first time you

16   told Mr. Gutierrez to stop picking on you was sometime in

17   August 2019?

18   A.    **Yes.**

19   Q.    What was his response then?

20   A.    **He didn't have a response.**

21   Q.    Did he admit in any way that he was picking on

22   you?

23   A.    **No.**

24   Q.    He said nothing at all?

25   A.    **Correct.**



1    Q.   Did you complain to anybody at M.J. Dean that --

2  at that time that Kevin Gutierrez was picking on you?

3    **A.   Yes.**

4    Q.   Who did you complain to at that time?

5    **A.   Jan.**

6    Q.   Jan.  Who was Jan?

7    **A.   She was a secretary for M.H. -- M.J. Dean.**

8    Q.   Did you complain to any managers or supervisor

9  that you believed Kevin Gutierrez was picking on you

10 before you submitted the incident report --

11   **A.   Yes.**

12   Q.   -- on November 14th?

13   **A.   Yes.**

14   Q.   Who did you complain to in management?

15   **A.   Dave McGrandy.**

16   Q.   When did you complain to Dave McGrandy that

17 Kevin Gutierrez was picking on you?

18   **A.   I want to say in August.  August 2019.**

19   Q.   Did you submit a written report about that?

20   **A.   No.**

21   Q.   Where did you meet Mr. McGrandy to tell him

22 that?

23   **A.   On the deck.**

24   Q.   Were there any witnesses present when you

25 complained to Dave McGrandy in August 2019 about Kevin



 1   Gutierrez?

 2       A.   No.

 3       Q.   Did you complain to anybody in the union that

 4   Kevin Gutierrez was picking on you in August 2019?

 5       A.   No.

 6       Q.   Did you complain to anybody at AECOM Hunt in

 7   August 2019 that Kevin Gutierrez was picking on you?

 8       A.   No.

 9       Q.   And when was the next time that you told Kevin

10   Gutierrez to stop picking on you?

11       A.   I would say -- I don't remember right offhand

12   every month.  But my encounters with him was on a regular

13   basis.  So I know I might sound vague, but I don't know

14   if it was the 18th or 17th.  But our interactions with

15   him was consistent.

16       Q.   Can you give me an estimate as to when the next

17   time was that you complained to Kevin Gutierrez about him

18   picking on you?

19       A.   I'm saying September 2019.

20       Q.   What -- was it a matter of weeks or months after

21   your complaint to him in August 2019 that he was picking

22   on you?

23       A.   I'd say a couple of weeks.

24       Q.   Was -- and how did you feel that Mr. Gutierrez

25   was picking on you?



```
1       A.    Because he would still send me to -- we had

2    three laborers in our area.  I think it was three of us.

3    And he would come, while I'm in the middle of working,

4    knowing that he would be calling for other help from

5    other departments, and yet he would still send me.  And

6    every day he would come send me to another job area to

7    work.  And I was, like, Kevin, you know, I don't mind

8    working.  But, you know, we have the least amount of

9    laborers here, and we're always falling behind in the

10   biggest area.  And I says, Why am I the only laborer that

11   you constantly pick on and send to work with other

12   departments?  And then when I get there, they don't even

13   know why you sent me there.

14       Q.    And was that the basis for your second time that

15   you complained to Kevin Gutierrez about him picking on

16   you, and -- or is that the same thing?

17       A.    Repeat the question again.

18       Q.    Was your complaint about Kevin Gutierrez in

19   August, and then your complaint in September 2019, were

20   they about the same -- the same behaviors, the same

21   conduct?

22       A.    Yes.

23       Q.    And that conduct was Mr. Gutierrez sending you

24   to various places when they didn't need you there.

25   Correct?
```



1    **A.   Yes.**

2    Q.   Did you ever observe Mr. Gutierrez send any

3  other employees to places where they weren't needed?

4    **A.   No.**

5    Q.   How do you know that?

6    **A.   It didn't happen in my presence.**

7    Q.   Okay.  But you don't know for certain that it

8  didn't happen, either.  Correct?

9    **A.   Well, you're saying the area that I worked in,**

10  **because that's all I could verify, speak to.  And, no, he**

11  **didn't send anybody in my area except for me.**

12    Q.   Mr. Gutierrez was in charge of areas A, B, C,

13  and D.  Correct?

14    **A.   Well, he's the general foreman, so he probably**

15  **was in charge of all the laborers in every department or**

16  **area.**

17    Q.   Right.  And laborers were spread out throughout

18  the jobsite.  Right?

19    **A.   Yes.**

20    Q.   And those areas were A, B, C, and D.  Correct?

21    **A.   Yes.**

22    Q.   So you don't know if Mr. Gutierrez ever

23  instructed other laborers to go to other areas at the

24  jobsite even though they weren't needed.  Correct?

25    **A.   Correct.**



1      Q.   And did Mr. Gutierrez respond in any way when

2  you complained about him picking on you the second time?

3      **A.   No.**

4      Q.   He said nothing?

5      **A.   He said nothing.**

6      Q.   Did you complain to anybody at M.J. Dean about

7  Kevin Gutierrez picking on you the second time?

8      **A.   Yes.**

9      Q.   Who did you complain to?

10     **A.   Dave McGrandy.**

11     Q.   But not in writing.  Correct?

12     **A.   Correct.**

13     Q.   And you don't remember approximately when in

14  September you complained to Dave McGrandy.  Correct?

15     **A.   Correct.**

16     Q.   What did you say to Dave McGrandy?

17     **A.   I just told him that, you know, Kevin was making**

18  **it hard for me to deal with.  Dave McGrandy said, Just**

19  **keep your head down.  You just work, keep your head down.**

20  **You be at this job until the end of the job with me.  And**

21  **so I said okay.  So I probably had conversations with**

22  **Dave McGrandy about Kevin harassing me and doing other**

23  **things to me.**

24     Q.   But you never complained -- the only complaint

25  that you ever submitted in writing, that would be



1    November 2019.  Right?

2        A.    What date of November?  The original complaint?

3        Q.    The only written complaint that you ever

4    submitted --

5        A.    Yes.

6        Q.    The only written complain ever submitted was

7    November 14, 2019.  Right?

8        A.    Right.  Correct.

9        Q.    Did you ever complain to anybody other than

10   Mr. Thomason and Mr. McGrandy about Kevin Gutierrez?

11       A.    Yes.

12       Q.    Who?

13       A.    Safety personnel Tony, and George, and Julian,

14   who is also safety for M.J. Dean.

15       Q.    Did you complain to Tony in writing?

16       A.    No.

17       Q.    Did you send him a text message at all?

18       A.    No.

19       Q.    What was Tony's response to you when you

20   complained to him?

21       A.    Well, when the first incident happened,

22   actually, Tony was -- I believe he's up under the safety

23   director, Paul Renquist, I believe his last name is.  And

24   his response was that basically Kevin's a piece of shit.

25   And we're getting him -- getting him the fuck out of



1  here.  So, We are going to make sure that he's fired.

2  And so he said, If you have any problems with Gutierrez,

3  keep me informed.

4        And so, once again, I would periodically talk to

5  him.  He would ask me how I was doing.  And that's how

6  our conversation went.

7     Q.  When did that take place?

8     A.  This was after this incident here was filed.

9     Q.  Okay.  So let me back up.

10       When did you complain to Tony?

11    A.  After filing this report.

12    Q.  Did you ever complain to Tony before the filing

13  of this report?

14    A.  No.

15    Q.  Did you ever complain to Paul Rosequist before

16  filing this report?

17    A.  No.

18    Q.  But it's your testimony you complained orally to

19  Dave McGrandy before filing this report.  Correct?

20    A.  Yes.  Correct.

21    Q.  When was the first time you complained to Dave

22  McGrandy?

23    A.  August 2019.

24    Q.  Did you complain again to Dave McGrandy about

25  Kevin Gutierrez?



1    A.    Yes.

2    Q.    When was the next time?

3    A.    September 2019.

4    Q.    And what was Mr. McGrandy's response?

5    A.    The same; that you're a good worker.  Keep your

6    head down.  Keep doing what you're doing.  As long as

7    you're over here working with me, you're going to be

8    okay.

9    Q.    Did you complain again to Mr. McGrandy at any

10   point in time?

11   A.    Yes.

12   Q.    When was the next time?

13   A.    November 14th.

14   Q.    Okay.

15   A.    2019.

16   Q.    You complained directly to Mr. McGrandy --

17   A.    Yes.

18   Q.    -- on November 14th?

19   A.    Yes.

20   Q.    Because I thought you complained to Mr. Thomason

21   on the 14th.

22   A.    Oh, let me clarify so you won't be confused.

23         When I talked to Mr. McGrandy, it wasn't about

24   Kevin calling me a nigger.  It was about Kevin constantly

25   harassing me.  So I was still on my way to go talk to



1    Mr. Thomason in the trailer.

2        Q.   Yeah.

3        A.   So I know that what I tried to insinuate here is

4    that he told me that -- it was George and Mr. -- Jim at

5    AECOM Hunt that I told the story to.  That's true.  But

6    what you understand is there's two facts we're dealing

7    with here.

8            First is that when I left the deck to go talk to

9    Mr. McGrandy, it wasn't to let him know that Kevin called

10   me a nigger.  It was just to let Kevin -- let him know

11   that Kevin still harassing me.  And upon leaving there, I

12   was already -- I wasn't going to tell Dave McGrandy that.

13   I felt like this needs to go to upper management.

14           So as I left there to go to M.J. Dean's trailer,

15   that's where I ran into George and AECOM Hunt, and then

16   that's when the incident of him calling me nigger, that's

17   when that came into play from there.

18       Q.   Mr. McGrandy was a superintendent.  Correct?

19       A.   Correct.

20       Q.   So you didn't think it was important to tell

21   Mr. McGrandy that -- that the foreman, Mr. Gutierrez,

22   called you the N-word?

23       A.   No.

24       Q.   Why not?

25       A.   Because I know at this point this is -- this was



1    **going to be higher -- dealing with somebody higher up or**

2    **management.  So my idea was just to let him know that**

3    **Kevin still harassing me.  But my -- my mentality was,**

4    **I'm going to go let the office know what happened.**

5         Q.   You didn't think it was important enough to be

6    called the N-word to tell the superintendent what had

7    happened.  Is that correct?

8         **A.   Yes.**

9         Q.   Did -- so other than you complaining to

10   Mr. Gutierrez in August and September that he was picking

11   on you, did you ever complain to him again before

12   November 14, 2019, that you thought he was picking on

13   you?

14            We've gone through -- you said you complained to

15   Kevin Gutierrez twice --

16        **A.   Yes.**

17        Q.   -- that he complained -- that he was picking on

18   you.  Right?

19        **A.   Yes.**

20        Q.   Did you ever complain to Mr. Gutierrez again,

21   before November 14, 2019, that he was picking on you?

22        **A.   No.**

23        Q.   Did you ever talk to anybody in management at

24   M.J. Dean prior to November 14, 2019, other than what

25   you've said about Mr. McGrandy, did you ever complain to



1   anyone else in management about Kevin picking on you?

2       A.   No.

3       Q.   That was a horribly-worded question.  Let me ask

4   it again to make it clear.  Okay?

5            So other than complaining twice orally to

6   Mr. McGrandy in August and September 2019 about

7   Mr. Gutierrez picking on you, did you ever complain to

8   anybody else, a manager or a supervisor, at M.J. Dean

9   prior to November 14, 2019, about Mr. Gutierrez picking

10  on you?

11      A.   No.

12      Q.   Did you ever complain to anybody at the union,

13  at any point during your employment at M.J. Dean, about

14  Mr. Gutierrez?

15      A.   No.

16      Q.   You knew that you could.  Right?

17      A.   Yes.

18      Q.   Did there come a point where Mr. Gutierrez

19  accused you of spending too much time in the restroom?

20      A.   Yes.

21      Q.   When was that?

22      A.   August 2000 -- no.  Excuse me.  November 2019.

23      Q.   So within the two-week period before you filed

24  your investigative report --

25      A.   Yes.



1      Q.   -- marked as Exhibit H.  Right?

2      A.   Yes.

3      Q.   What did you say in response?

4      A.   Well, I explained to him that there was about a

5   hundred people working on the deck and two restrooms.  So

6   only way that you can go to the restroom is you have to

7   walk down to the lower level to use what they have, like

8   15, 20 porta potties out there.  So it was going to take

9   5, 10 minutes to get there.  Most of that time is going

10  to the restroom.

11     Q.   When you had that discussion with Mr. Gutierrez

12  about the restroom, were there any witnesses present?

13     A.   I mean, there were people there.  But when you

14  say witnesses present, are you talking about right next

15  --

16     Q.   Do you know if anybody heard the conversation

17  between you and Mr. Gutierrez?

18     A.   No.

19     Q.   And in the conversations that you had with

20  Mr. Gutierrez in September and -- sorry -- in August and

21  September 2019 where you asked him to stop picking on

22  you, was anybody present that heard you ask Mr. Gutierrez

23  to stop picking on you?

24     A.   I'm not sure.

25     Q.   You don't know if there were any witnesses.



1    Correct?

2        A.    When you say witnesses, there were people in the

3    vicinity.  But if you're talking about somebody like

4    close as me and Mr. Marks was, no.  If you're talking

5    about somebody 10, 15 feet away, then yeah.

6        Q.    Do you know if anybody heard you complain to

7    Mr. Gutierrez in September 2019 to stop picking on you?

8        A.    No.

9        Q.    Do you know if anybody heard you complain to

10   Mr. Gutierrez in August 2019 where you asked him to stop

11   picking on you?

12       A.    No.

13       Q.    Do you know whether or not Mr. Gutierrez ever

14   supervised any other African-American laborers other than

15   yourself?

16       A.    You're saying do I know -- can you repeat the

17   question again?

18       Q.    Do you know whether or not Mr. Gutierrez ever

19   supervised any other African-Americans other than

20   yourself during the time that you worked at M.J. Dean?

21       A.    Yes.

22       Q.    Do you know if any other African-Americans other

23   than yourself ever complained about Kevin Gutierrez?

24       A.    No.

25       Q.    Do you know of any employees that have ever



1  complained, at any point in time, at M.J. Dean

2  complaining that Mr. Gutierrez treated them in a

3  discriminatory manner?

4  **A.**  **No.**

5  Q.  Did you ever hear any employees at M.J. Dean

6  call Mr. Gutierrez a racist?

7  **A.**  **No.**

8  Q.  Let me continue on with your Employee Incident

9  Investigation Report.  And further down, you talk about

10  you getting switched and moved around, which is what

11  you've already sort of discussed.  Right?

12  **A.**  **Yes.**

13  Q.  Right?

14  **A.**  **Yes.**

15  Q.  Have you ever been switched from place to place

16  by any other managers or supervisors during the time that

17  you worked at M.J. Dean?

18  **A.**  **No.**

19  Q.  But you understood that Mr. Gutierrez had the

20  right to move you where he thought it was appropriate.

21  Correct?

22  **A.**  **Yes.**

23  Q.  Did you ever see Mr. Gutierrez ever switch any

24  other employees?

25  **A.**  **No.**



1      Q.   Never?

2      A.   No.

3      Q.   Can you give me an estimate as to how many times

4    Mr. Gutierrez asked you to switch places?

5      A.   About eight times.

6      Q.   That's eight times from July 2019 through

7    November 14, 2019.  Correct?

8      A.   Yes.

9      Q.   Did you ever tell Mr. Gutierrez that you were

10   not going to switch?

11     A.   No.

12     Q.   Do you recall who was working with you on the

13   date of the incident, November 14, 2019, when that

14   occurred?  So around 6:30 in the morning.

15     A.   Who was working with me?

16     Q.   Yeah.

17     A.   I was working by myself.

18     Q.   So do you know -- do you know if other employees

19   were working, let's say, 15, 20 feet away?

20     A.   Yes.

21     Q.   Do you know who those people were?

22     A.   No.

23     Q.   Did Mr. Gutierrez ever physically threaten you

24   at any time during your employment?

25     A.   No.



1      Q.   Did Mr. Gutierrez ever threaten you at any time

2   ever?  That would include after the time you were

3   employed.

4      A.   No.

5      Q.   Did Mr. Gutierrez ever threaten to fire you at

6   any time after you submitted your Employee Incident

7   Investigation Report, which is marked as Exhibit H?

8      A.   No.

9      Q.   And nobody else threatened to fire you or

10  discipline you after you submitted your Employee Incident

11  Investigation Report.  Correct?

12     A.   Yes.

13     Q.   That's true.  Correct?

14     A.   Yeah, correct.  That's true.

15     Q.   Did you meet with Paul -- do you know who Paul

16  Rosequist is?

17     A.   Yes.

18     Q.   Did you ever meet with Paul Rosequist regarding

19  your Employee Incident Investigation Report?

20     A.   Yes.

21     Q.   Was that on November 14, 2019?

22     A.   Yes.

23     Q.   What was the purpose of you meeting with

24  Mr. Rosequist?

25     A.   Mr. Thomason said he was going to call his



1  safety director over, and he would be the one to give me

2  the information to file the incident report.

3      Q.   Did you submit the incident report directly to

4  Mr. Rosequist?

5      A.   No.

6      Q.   Did Mr. Rosequist ever meet with you to ask you

7  anything about what had happened between you and

8  Mr. Gutierrez?

9      A.   Yes.

10     Q.   When was that?

11     A.   Day of the incident, November 14, 2019.

12     Q.   Did he ask you questions and you answered those

13 questions?

14     A.   Yes.

15     Q.   How long did you meet with Mr. Rosequist?

16     A.   Maybe 40 minutes.

17     Q.   Was anybody else present during your meeting

18 with Mr. Rosequist?

19     A.   Yes.

20     Q.   Who else was there?

21     A.   Tony, person -- I don't know his last name.

22     Q.   Safety guy.  Right?

23     A.   Yes.

24     Q.   Anybody else?

25     A.   Julian.



1      Q.   Safety guy?

2      A.   **Yes.**

3      Q.   Don't know his last name, either?

4      A.   **Correct.  Yes.**

5      Q.   Anybody else?

6      A.   **Dave Muti came in for a little bit.  And George**

7   **from AECOM Hunt was present.**

8      Q.   Throughout.  Right?

9      A.   **No.  After they had this -- a heated discussion**

10  **about getting rid of Kevin and -- George finally left.**

11  **But he was present for some of it.**

12     Q.   Did you ever demand to anyone at M.J. Dean that

13  Mr. Gutierrez be fired?

14     A.   **No.**

15          **I take that back.  Yes.**

16     Q.   Who?

17     A.   **Paul Renquist.**

18     Q.   Rosequist.  Right?

19     A.   **Yes.**

20     Q.   When did you make that demand of Paul Rosequist?

21     A.   **Sorry.  I'm going back again.**

22          **Actually, the conversation came up, because John**

23  **Thomason said he was going to fire Kevin's ass right**

24  **there on the spot.  So then we went to the trailer**

25  **office, and then came up again, and they asked me,**



1  **Parnell, what do you think we should do?  I said, Anybody**

2  **that would call somebody a nigger and you use that type**

3  **of language deserved to be fired.**

4      **So, yes, that was what Mr. Rosequist asked.**

5  Q.  Were you ever told by anybody at M.J. Dean that

6  Mr. Gutierrez denied ever calling you the N-word?

7  **A.  No.**

8  Q.  Nobody ever told you that?

9  **A.  Nobody except for I think Mr. -- this gentleman**

10  **here sent me an email.  I believe he said they did an**

11  **internal investigation, and apparently no witnesses**

12  **corroborates the story.**

13  Q.  And you said this gentleman here.  You're

14  talking about Tommy Glidewell.  Right?

15  **A.  Yes.**

16  Q.  But that was true; there was no one standing

17  close by to you when the incident happened.  Right?

18  **A.  Yes.**

19  Q.  So -- so that day, though, right away you were

20  moved to work with David Muti.  Right?

21  **A.  Correct.**

22  Q.  Do you know whether M.J. Dean conducted an

23  internal investigation into your complaints concerning

24  Mr. Gutierrez?

25  **A.  Do I know, did they do an investigation?**



1    Q.   Yeah.

2    A.   Actually, no, but they said they did.  Through

3 an email.

4    Q.   Do you have any reason to doubt that?

5    A.   Yes.

6    Q.   Why?

7    A.   Because like John Thomason said after this

8 incident happened, he said, basically, I don't care about

9 you, Parnell, or Kevin Gutierrez.  My loyalty is to

10 protect the owner of the company.

11        So that kind of let me know right then that he

12 -- his position is that he is going to do whatever he has

13 to do to protect the company.  So if saying that they did

14 an internal investigation to make me go away is something

15 they need to do, then they're going to tell you that.

16 But factually, I don't know if they actually did one.

17    Q.   Did you ever ask anybody in management at M.J.

18 Dean whether the company conducted an internal

19 investigation?

20    A.   No.

21    Q.   Why not?

22    A.   Because I was going to file my complaint and

23 pursue another avenue anyway.

24    Q.   What complaint was that?

25    A.   Through the EEOC.



1      Q.   So you had always intended to file a complaint

2   with the EEOC right away?

3      A.   Yes.

4      Q.   So on November 14th, no matter what happened,

5   you had always intended to complain to the EEOC, file a

6   complaint?

7      A.   Yes.

8      Q.   Why?

9      A.   Because I felt that when John Thomason said he

10   was going to fire Kevin's ass, and it didn't happen,

11   again, the statement he gave to me where he said, My

12   loyalty is not with you or Kevin.  Basically I could care

13   less.  My loyalty is with the company and protect the

14   owner.  So I know I would never get no justice for a

15   hearing.  Any investigation they did was going to be --

16   it's like the police investigating themselves.  You can

17   have no faith and trust in that.  So I was always going

18   to file an EEOC complaint.

19      Q.   Did anybody ever prevent you from doing your job

20   after you submitted your complaint on November 14, 2019?

21      A.   No.

22      Q.   You were able to do your job without any issues.

23   Right?

24      A.   Correct.

25      Q.   And you had no problem doing your job duties for



1   the remainder of your employment following November 14,

2   2019.  Right?

3        A.   **Correct.**

4        Q.   No one ever harassed you after that point?

5        A.   **What point are you speaking of?**

6        Q.   November one ever harassed after November 14,

7   2019?

8        A.   **Correct.**

9        Q.   After you were assigned to work under Mr. Muti,

10  was your job title the same?

11       A.   **Yes.**

12       Q.   And after you were assigned to Mr. Muti, your

13  job duties changed, but you were a -- you were packing

14  and stacking then.  Right?

15       A.   **Yes.**

16       Q.   And you didn't have any complaints or problems

17  being a packer and stacker.  Right?

18       A.   **No.**

19       Q.   Did you feel that that was a demotion at all?

20       A.   **No.**

21       Q.   You had the same job benefits after moving to

22  Mr. Muti.  Right?

23       A.   **Yes.**

24       Q.   Did you continue to work the same general hours

25  of work every week after moving to Mr. Muti?



1      **A.   I mean, they fluctuate.  Little time here,**

2   **little time there.  But I would at least get my 40 hours**

3   **a week.**

4      Q.   Generally the same hours after moving to

5   Mr. Muti.  Right?

6      **A.   Yes.**

7      Q.   And you had no interaction with Mr. Gutierrez

8   after moving under Mr. Muti's supervision.  Right?

9      **A.   Correct.**

10      Q.   Have we gone over all of your complaints and

11   issues that you had with Mr. Gutierrez at any point

12   during your employment?

13      **A.   Yes.**

14         MR. ROSENTHAL:  I'd like to have this next

15   document marked as Defendant's Exhibit I.

16         (Exhibit I identified.)

17   BY MR. ROSENTHAL:

18      Q.   Do you recognize what's been marked as

19   Defendant's Exhibit I?

20      **A.   Yes.**

21      Q.   Is that a picture you took?

22      **A.   Yes.**

23      Q.   When did you take this picture?

24      **A.   I don't know the exact date.**

25      Q.   Can you give me an approximation?



1      A.    Possibly -- I'm not sure when I took that

2   picture.

3      Q.    So you don't know if you took this picture

4   marked as Exhibit I -- strike that.

5            Do you know whether you took the picture marked

6   as Exhibit I during your employment at M.J. Dean?

7      A.    Yes.

8      Q.    How do you know that?

9      A.    Because I used my phone to take the picture.

10      Q.    Is that the same phone that you have currently?

11      A.    Yes.

12      Q.    Do you still have it on your phone?

13      A.    Yes.

14      Q.    Can you see the picture on your phone directly?

15      A.    Yes.

16      Q.    And it will show a date?

17      A.    Sorry.  I got a lot of pictures.

18      Q.    That's okay.  Take your time.

19      A.    There you go, sir.

20      Q.    May I?

21      A.    Yes.

22      Q.    Okay.  So, at the top of the screen, it says

23   January 3, 2020 at 7:14 a.m.  Is that correct?  Can you

24   confirm that?

25      A.    Yes.



1    Q.   I'd ask that you not delete that picture.  Okay?

2    **A.   Yes.**

3    Q.   Where did you take the picture?

4    **A.   Jobsite.**

5    Q.   Which jobsite?

6    **A.   Sphere.**

7    Q.   Where at the Sphere?

8    **A.   This is the restroom adjacent to the yard where**

9    **I was working at.  So this would be the restroom that I**

10   **would use.**

11   Q.   Did you complain about this picture to anybody

12   at M.J. Dean?

13   **A.   Yes.**

14   Q.   Who?

15   **A.   Safety; Tony and Julian.**

16   Q.   Do you know if there's a record of your

17   complaining about this picture to anybody at M.J. Dean?

18        MR. MARKS:  Object to the form.

19   **A.   I'm not sure.**

20   BY MR. ROSENTHAL:

21   Q.   Did you observe either Tony or Julian take any

22   handwritten notes about the picture that you took on

23   January 3, 2020?

24   **A.   No.**

25   Q.   Did you give either Tony or Julian a copy of



1    this picture that you took on January 3, 2020?

2        A.   No.

3        Q.   Why not?

4        A.   I figured they were safety, so they walk around

5    with cameras.  So I feel that when they went in there,

6    they was free to take their own picture.

7        Q.   Did you show either Tony or Julian where you

8    took this picture?

9        A.   Yes.

10       Q.   You took them to the restroom?

11       A.   Yes.

12       Q.   And what time was that at?

13       A.   Believe -- I don't recall the time.

14       Q.   Did you show Julian the picture marked as

15   Exhibit I on January 3, 2020?

16       A.   Are you saying did I show him the picture in my

17   phone?

18       Q.   Yes.

19       A.   No.

20       Q.   Did you show Julian what's marked as Exhibit I,

21   did you take him to the restroom where you saw this on

22   January 3, 2020?

23       A.   Yes.

24       Q.   So you showed him the same day?

25       A.   Yes.



1    Q.   Did you show Tony what you saw on the restroom

2    on January 3, 2020?

3    A.   No.

4    Q.   When did you show Tony what you saw in the

5    restroom?

6    A.   I never showed Tony.

7    Q.   So you only showed Julian?

8    A.   Yes.

9    Q.   Why didn't you show Tony?

10   A.   Because Tony was just walking by, and I just

11   said, You need to go look at what was -- what's in the

12   restroom.  And they did that, and they -- Carson taped it

13   off.

14   Q.   How do you know that Tony went to look at what

15   was in the restroom?

16   A.   Because he came back to me and said, That's some

17   fucked up shit.

18   Q.   Do you know if anything was done about it?

19   A.   Yes.

20   Q.   What was done?

21   A.   They was cleaning it.

22   Q.   Who is they?

23   A.   Me and Ricky.

24   Q.   Do you know if the person or persons who wrote

25   what's contained on Exhibit I that was in the restroom



1  area, if the people or person who did this was an M.J.

2  Dean employee?

3       A.   I don't know.

4       Q.   So it could have been an AECOM employee or

5  somebody else from a different company.  Right?

6       A.   Possible.

7       Q.   There were other employees on the jobsite other

8  than M.J. Dean employees.  Correct?

9       A.   Yes.

10      Q.   Again, you don't know who wrote these things on

11  Exhibit I.  Right?

12      A.   Right.  I don't know.

13      Q.   Do you know if, as a result of your complaints

14  to Tony and Julian about what was written in the restroom

15  that's marked as Exhibit I, that it was -- this was

16  resolved to your satisfaction?

17      A.   I don't know.

18      Q.   You don't know whether it was resolved to your

19  satisfaction?

20      A.   I just reported it.

21      Q.   Okay.  Do you feel it was resolved -- were you

22  happy with the result that it was removed?

23      A.   Yes.

24           MR. MARKS:  Object to the form.

25  BY MR. ROSENTHAL:



1    Q.   Do you believe that M.J. Dean should have done

2  something else as a -- in response to you bringing what's

3  marked as <mark>Exhibit I</mark> to the attention of Julian and Tony?

4    **A.   Yes.**

5    Q.   What should they have done?

6    **A.   Well, usually when things like this occur on**

7  **jobsites -- we have usually weekly meetings.  And usually**

8  **superintendents or anybody got any issues to bring up.  I**

9  **think this should have been brought out that this racism**

10  **slur, stuff like this won't be tolerated.**

11       **So I think they should have got up like they do**

12  **on the Monday mornings when we have our meetings, and all**

13  **employees are required to be there, I think this should**

14  **have been the subject of that meeting, and it wasn't.**

15    Q.   Do you know whether the contents of what was the

16  picture that you took, which is marked as <mark>Exhibit I</mark>, was

17  ever discussed between supervisors and managers at M.J.

18  Dean?

19    **A.   I don't know.**

20    Q.   Do you know whether or not the contents of

21  <mark>Exhibit I</mark> was ever brought to the owner of M.J. Dean's

22  attention?

23    **A.   I don't know.**

24    Q.   Let's take a look at --

25       MR. ROSENTHAL:  Let's have this next document



1    marked as Defendant's Exhibit J.

2             (Exhibit J identified.)

3    BY MR. ROSENTHAL:

4        Q.   Do you recognize what's been marked as Exhibit

5    J?

6        A.   **Yes.**

7        Q.   Is that a picture you took?

8        A.   **Yes.**

9        Q.   Is that on your phone?

10       A.   **Yes.**

11       Q.   Could you haul out your phone again?

12       A.   **Yes.**

13       Q.   Thank you.

14       A.   **You're welcome.**

15            **There you go, sir.**

16       Q.   Thank you,

17       A.   **You're welcome.**

18       Q.   And the photo that I see on your phone, which is

19   a copy of Exhibit J, indicates that picture was taken on

20   December 24, 2019.  Is that correct?

21       A.   **Yes.**

22       Q.   Where did you take this picture?

23       A.   **Sphere project.**

24       Q.   Where?

25       A.   **Restroom.**

1     Q.   Same restroom as Exhibit I?

2     **A.   No.**

3     Q.   Where was this restroom?

4     **A.   Possibly 50 yards away from the first restroom**

5     **incident.**

6     Q.   Did you complain to anybody on December 24,

7     2019, about what you saw in the restroom?

8     **A.   Yes.**

9     Q.   When did you complain to anybody?

10    **A.   Same day.**

11    Q.   Okay.  December 24th?

12    **A.   Yes.**

13    Q.   Who did you complain to?

14    **A.   Julian, Tony -- and Tony.  I don't know their**

15    **last names.  Safety personnel from M.J. Dean.**

16    Q.   Do you know if Julian or Tony ever took a report

17    or made a report in writing to anybody about the picture

18    which is marked as Exhibit J?

19    **A.   I don't know.**

20    Q.   Did you ever submit anything in writing

21    complaining about the pictures that you took on January

22    3, 2020, and December 24, 2019?

23    **A.   No.**

24    Q.   Why not?

25    **A.   I reported it to safety.**



1  Q.  Why didn't you submit anything in writing to

2  anybody?

3  A.  I didn't -- just didn't submit any.

4  Q.  But you knew you could submit something in

5  writing because you did so earlier on November 14, 2019.

6  Right?

7  A.  Yes.

8  Q.  And, so why didn't you submit anything in

9  writing about the pictures that you took at -- on

10  December 24, 2019, and January 3, 2020?

11  A.  I feel my job was to notify management, and I

12  did.  And from that point, it's up to them to take

13  corrective action.

14  Q.  Do you know if the writing, the handwriting,

15  marked on Exhibit J was ever removed from the restroom?

16  A.  I don't know.

17  Q.  Did you ever go back to that restroom?

18  A.  No.

19  Q.  Why not?

20  A.  Because the restroom that I use is one where it

21  says, Burn all niggers.  White power Trump 2020.

22  Q.  So why did you go to that restroom -- different

23  restroom on December 24, 2019?

24  A.  Because sometimes when you in one area, you

25  might have to go to another area to get materials or to



1  **get something.  So it's the closest restroom.  So you go**

2  **into the closest restroom.  At that time, that was the**

3  **closest restroom.**

4      Q.   So you never went back to that restroom for the

5  next four months of your employment.  Is that correct?

6      A.   **Correct.**

7      Q.   And so you don't know if M.J. Dean took any

8  action in response to your oral complaints to Julian and

9  Tony about <mark>Exhibit J</mark>.  Right?

10     A.   **Correct.**

11     Q.   You don't know who wrote the contents of what's

12  in <mark>Exhibit J</mark>.  Right?

13     A.   **I don't know.**

14     Q.   You don't know if the person who wrote Black

15  laborers equals lazy with an exclamation mark was an M.J.

16  Dean employee or somebody else.  Right?

17     A.   **Correct.**

18     Q.   Now, the photographs marked as Exhibits I and J

19  were only disclosed during this litigation to me on May

20  21st, 2021.  Do you know why that -- why that is?

21     A.   **Well, prior counsel, I think you like know this,**

22  **but they informed me that -- well, actually, I read your**

23  **pleading online, so I was able to see that you guys had**

24  **requested that you were -- it would be photos at the last**

25  **minute.**



1          But in reality, I gave these photos to my

2    previous attorney almost a year ago.  So they have been

3    in existence for a while.

4       Q.   So were you surprised to learn that I only found

5    out about these in May?

6       A.   Yes.

7       Q.   But it's your testimony that you disclosed these

8    to your prior counsel at least a year ago.  Correct?

9       A.   Correct.

10      Q.   Did you bring up the photographs to the EEOC

11   when you submitted your complaint?

12      A.   No.

13      Q.   Why not?

14      A.   Because I immediately had seeked counsel, and

15   they instructed me that I needed to drop my EEOC

16   complaint.

17      Q.   You complained to the EEOC.  Correct?

18      A.   Correct.

19      Q.   Did you discuss the photographs marked as

20   Exhibits I and J to the EEOC investigator?

21      A.   I'm not sure.

22      Q.   You've read the Amended Complaint and, I'm sure,

23   the initial Complaint that was filed on your behalf by

24   your prior attorney.  Right?

25      A.   Yes.



1      Q.   And you know that these photographs marked as

2  Exhibits I and J are not discussed anywhere in either

3  Complaint.  Right?

4           MR. MARKS:  Counsel, I'm not sure what you mean

5  by Complaint.

6      Q.   Okay.  The Complaint that was filed --

7           MR. ROSENTHAL:  Thank you.

8  BY MR. ROSENTHAL:

9      Q.   The Complaint that was filed in federal court on

10  your behalf by your prior attorneys.

11     **A.   Okay.**

12     Q.   Let's look at Exhibit A from today.

13          MR. MARKS:  You're asking him whether these

14  photos are mentioned in that Complaint?

15          MR. ROSENTHAL:  I'm going to get there.

16          MR. MARKS:  I object to the form.

17     **A.   A?**

18  BY MR. ROSENTHAL:

19     Q.   Do you not have it?

20          MR. MARKS:  It's right here.  You can use mine

21  if you want.

22          MR. ROSENTHAL:  Let's find the one that's

23  actually marked.

24          MR. MARKS:  Well, it's the same --

25          MR. ROSENTHAL:  I know, but I just want to make



1    sure that we have it for the end of the day.

2         MR. MARKS:  It's probably under the stack,

3    because it's the first --

4         MR. ROSENTHAL:  Here it is.

5         MR. MARKS:  I assume you have the same thing you

6    handed him.

7    BY MR. ROSENTHAL:

8    Q.   So, I'm just going to cut to the chase.  Okay?

9         I'm going to represent to you that the

10   photographs are not discussed at all in the First Amended

11   Complaint, which is marked as <mark>Exhibit A</mark> in front of you.

12   Okay?

13   **A.   Okay.**

14   Q.   And do you know why -- did you consider -- do

15   you consider the photographs marked as Exhibits I and J

16   important?

17   **A.   Yes.**

18   Q.   Do you believe that they were important enough

19   to discuss in your Complaint filed in federal court?

20        MR. MARKS:  Counsel, I'm going to object to

21   that.  That calls for attorney/client work product.  He

22   would have no idea what to put in a Complaint.  That's

23   totally an unfair question.  That's not a legitimate

24   question.  It's attorney work product.

25        He has no idea why his attorneys --



```
 1   BY MR. ROSENTHAL:

 2       Q.   Did you ever --

 3            MR. MARKS:  -- put something in or not.

 4   BY MR. ROSENTHAL:

 5       Q.   Did you ever discuss Exhibits I and J with

 6   anybody other than Tony and Julian at M.J. Dean?

 7            MR. MARKS:  Okay.  You can't -- first of all,

 8   you can't try to backdoor attorney/client privilege.

 9            MR. ROSENTHAL:  I'm not trying to do that.

10            MR. MARKS:  So you can --

11            MR. ROSENTHAL:  I'm not trying to do that at

12   all.  I'm talking about M.J. Dean.

13            Let me be clear about this.  Okay?

14            MR. MARKS:  Just be clear.

15   BY MR. ROSENTHAL:

16       Q.   Did you ever discuss the photographs, which are

17   marked as Exhibits I and J, with anybody at M.J. Dean

18   other than Julian and Tony?

19       A.   No.

20       Q.   Why not?

21       A.   I feel my job was to report it.  Once I reported

22   it to management, it was their responsibility to remedy

23   the situation.

24       Q.   Did you ever discuss the photographs marked as

25   Exhibits I and J with anybody at AECOM?
```



1    **A.    No.**

2    Q.    Did you ever discuss the exhibits marked as I

3    and J with anybody in the union?

4    **A.    No.**

5    Q.    And you didn't discuss Exhibits I and J with

6    anybody at the EEOC.  Correct?

7          MR. MARKS:  I'm going to object to that as --

8    **A.    I don't recall.**

9          MR. ROSENTHAL:  That's not privileged.

10          MR. MARKS:  I know it's not privileged.  But you

11   don't talk to the people at - you don't even talk to the

12   people at the EEOC.  You're assuming facts not in

13   evidence.  You're assuming they do an investigation.

14          MR. ROSENTHAL:  Okay.  Let me -- let me back up.

15          MR. MARKS:  You're assuming a lot of stuff we

16   don't know is true.

17          MR. ROSENTHAL:  Let me -- let me back up.

18   BY MR. ROSENTHAL:

19   Q.    Did you meet with an investigator at the EEOC

20   when you filed your complaint?

21   **A.    No.**

22   Q.    Did you submit a charge of discrimination to

23   anybody at the EEOC?

24   **A.    Yes.**

25   Q.    So you never met with an actual investigator?



1    A.    No.

2    Q.    Did you ever talk to an investigator?

3    A.    Yes.

4    Q.    Did -- do you know who that investigator was?

5    A.    No.

6    Q.    Did you ever talk to the investigator about the

7    photos that you took, which are marked as Exhibits I and

8    J?

9    A.    I don't recall.

10   Q.    But you believe that these pictures that you

11   took were important.  Right?

12   A.    Yes.

13   Q.    Were you laid off from M.J. Dean on April 6,

14   2020?

15   A.    5.  April 6.

16   Q.    By whom?

17   A.    Kevin Gutierrez.

18   Q.    He fired you personally?

19   A.    Yes.

20   Q.    Did he say anything to you on April 6, 2020?

21   A.    Yes.

22   Q.    What did he say to you?

23   A.    He said he's laying me off and giving me my

24   check.  And he said I would be -- he said he was getting

25   my check today.  So he got rid of me today, but I guess



1  the office that processes checks was unavailable to get

2  the check out to me.  So he said, I'm laying you off now.

3  Come tomorrow and get your check.

4      Q.   Did you say anything in response to

5  Mr. Gutierrez?

6      A.   Yes.

7      Q.   What did you say?

8      A.   I said, Kevin, I know what you're doing.  You're

9  laying me off, and you know there's work in my area.  My

10 area was never affected by COVID.  And all you're going

11 to do is bring somebody -- your other laborers from other

12 areas to do my work.

13     Q.   So were you aware on April 6th, and before that

14 time, that there were layoffs due to COVID on the Sphere

15 project?

16     A.   Yes.

17     Q.   So you knew that M.J. Dean employees were being

18 laid off because of COVID.  Right?

19     A.   Yes.

20     Q.   And weren't quite a few other employees laid off

21 the same time as you on April 6, 2020?

22     A.   Well, let me backtrack that.

23          I don't want to say for certain.  I know people

24 were laid off with COVID, but people was quitting anyway

25 because hours got cut.  People were -- didn't want to



1   **bring COVID to their families.  So I'm not going to agree**

2   **to the notion that I'm -- personally know that for a fact**

3   **that people got laid off because of COVID.**

4   Q.   Did you see -- on April 6, 2020, did you see

5   other employees being laid off?

6   **A.   No.**

7   Q.   Are you aware, as you sit here today -- are you

8   aware that on April 2020, 300 or so other M.J. Dean

9   employees were laid off?

10  **A.   No.**

11  Q.   Did you know around April 2020 that many M.J.

12  Dean employees were being laid off?

13  **A.   No.**

14  Q.   Did you know in April, May -- April and May 2020

15  that the Sphere project was being shut down due to COVID?

16  **A.   Can you say that again?**

17  Q.   Did you know in either April or May 2020 that

18  the Sphere project was being shut down because of COVID?

19  **A.   No.**

20  Q.   So you were not aware in either May -- in

21  neither April or May 2020 that construction was being

22  stopped on the Sphere project because of COVID?

23  **A.   Well, let me back up.**

24  **The same day that I made my complaint -- no.**

25  **Same day I got laid off, I wanted to go speak to**



1  **Mr. Thomason about it.**

2      Q.   I'm going to stop you.  That's not what I'm

3  asking.  Okay?

4          I'm asking you, did you know in April or May

5  2020 that construction on the Sphere project was being

6  shut down because of COVID?

7          MR. MARKS:  And he answered.  He answered it.

8  BY MR. ROSENTHAL:

9      Q.   You can answer.

10     **A.   My answer to that, no.  Workers were being**

11  **called back, and the job never shut down.  So that's my**

12  **answer.**

13     Q.   So you never saw construction shut down?  Never

14  actually saw that?

15     **A.   No.  Not while I was there, no.**

16     Q.   And you never heard -- did you ever hear from

17  anybody that M.J. Dean employees were being laid off

18  because of COVID?

19     **A.   No.**

20     Q.   Nobody ever told you that ever?

21     **A.   No.**

22     Q.   Okay.  Do you know who at M.J. Dean decided to

23  terminate your employment?

24     **A.   No.**

25     Q.   Do you know if after you were let go on April 6,



1   2020, anyone was hired to replace you?

2       A.   Yes.

3       Q.   Who was hired to replace you?

4       A.   **Gilbert, Julian, Andy, Lilow, Eddie.**

5            **As a matter of fact, when I came back the next**

6   **day to pick up my work check, there was already people**

7   **there doing my work.**

8       Q.   I want to back up.  So let's go through the

9   names.

10           Gilbert.  Gilbert who?

11      A.   **I don't know his last name, but he's a laborer.**

12      Q.   Okay.  And Gilbert was assigned to your specific

13  job where you were working?

14      A.   **Yes.**

15      Q.   When was Gilbert hired?

16      A.   **After me.**

17      Q.   When?

18      A.   **I came there July.  Maybe September of 20- --**

19      Q.   '21.  Right?  Sorry.  '20?

20      A.   **Yes.**

21      Q.   And that -- would you agree that that was at

22  least five months after you were let go?

23      A.   **Well, he was always there.  He came to work**

24  **about a month or so after me.**

25      Q.   Okay.  So Gilbert wasn't hired to replace you.



1   Correct?  He was already an employee?

2        A.   Yes.

3        Q.   Okay.  Was -- do you remember Lilow's last name?

4        A.   I don't.

5        Q.   Was Lilow hired to replace you?

6        A.   No.

7        Q.   So Lilow was never let go.  Correct?

8        A.   Yes.  But then he came back.  They called him

9   back, yes.

10       Q.   Well, that means he was let go at some point.

11  Right?

12       A.   Yes.

13       Q.   Okay.  When was Lilow terminated?

14       A.   I'm not sure.

15       Q.   Do you know when Lilow was hired back by M.J.

16  Dean?

17       A.   I don't.

18       Q.   You don't know if it was around the same time

19  that you were let go.  Correct?

20       A.   Correct.

21       Q.   Do you know whether Lilow was hired in the fall

22  of 2020?

23       A.   I don't.

24       Q.   Who else are you claiming was hired to replace

25  you after you were terminated --



1      **A.   Well --**

2      Q.   -- other than Gilbert and Lilow?  You mentioned

3   a bunch of names.

4      **A.   Well, let me rephrase that.  I probably wouldn't**

5   **say they were hired to replace me.  They were taken from**

6   **other areas to replace me.**

7      Q.   So let me ask you again:  Do you know whether

8   any employees were hired by M.J. Dean to replace you?

9      **A.   I don't.**

10      Q.   You were not brought back to the Sphere project

11   after being terminated.  Correct?

12      **A.   Correct.**

13      Q.   And do you have any facts or documents to show

14   that Kevin Gutierrez was responsible for you not being

15   hired back?

16      **A.   Yes.**

17      Q.   What facts or documents do you have to show that

18   Kevin made that decision not to hire you back?

19      **A.   Phone call that I had with Dave Muti.**

20      Q.   When was that?

21      **A.   I got laid off -- probably April, shortly after**

22   **I got laid off.**

23      Q.   You had a telephone conversation with him?

24      **A.   Yes.**

25      Q.   Do you remember the date?



1    A.    No.

2    Q.    Would your phone have a record of when you spoke

3    to Dave Muti?

4    A.    No.  It's over a year ago.

5    Q.    What did Dave Muti say during that telephone

6    call?

7          Let me back up, actually.

8          Did you call Dave Muti or did he call you at

9    that time?

10   A.    I called.

11   Q.    What was the purpose of your call?

12   A.    To get employment again.

13   Q.    And at the time you called Dave Muti, had you

14   already decided to file a claim with the EEOC?

15   A.    Yes.

16   Q.    And yet you still wanted to go back to work at

17   M.J. Dean?

18   A.    Yes.

19   Q.    Why?

20   A.    I mean, it happens all the time.  I got to still

21   live.  And, I mean, there's racism all over.  I mean, I

22   can't quit every job because of racism, so --

23   Q.    But you wanted to go back to the place that you

24   say acted in a discriminatory manner toward you?

25   A.    But I'm working for somebody that's not a racist



1  like Kevin.  So I wouldn't be dealing with Kevin.  I'd be

2  dealing with Dave Muti.  So that's a good fit for me.

3      Q.   So when you spoke to Dave Muti a couple of weeks

4  after you were let go in April 2020, did you ask him if

5  you could be rehired by M.J. Dean?

6      A.   Yes.

7      Q.   What was his response?

8      A.   He said I was never supposed to get hired --

9  fired.  He said because when he left that day to go to

10  the other yard, he said, Parnell, you're going to be here

11  working for yourself for the rest of the week.  Me,

12  Julian, and Gilbert are going to the other yard.

13          So that's my supervisor.  So if I wasn't going

14  to get laid off because of COVID or any other thing, I'm

15  quite sure my direct supervisor would have told me that.

16  So when I contacted David Muti, he said, Parnell, I'm

17  trying to get you back.  He said, But Kevin won't let me

18  bring you back.  It's Kevin that's keeping you from

19  getting hired.

20      Q.   And how did you respond to that?

21      A.   I wasn't surprised.

22      Q.   Did Dave Muti say anything to you at any point

23  in time that Kevin didn't want to hire you back because

24  of your race?

25      A.   No.



1      Q.   Did anybody at M.J. Dean ever tell you, at any

2    point in time, that they didn't want you back at M.J.

3    Dean because of your race?

4      A.   No.

5      Q.   Did anybody ever tell you at M.J. Dean, at any

6    point in time, that you were terminated on April 6, 2020,

7    because of your race?

8      A.   No.

9      Q.   Did you tell me everything about the

10   conversation that you had with Dave Muti a couple of

11   weeks after you were let go?

12     A.   Well, I had several follow-up calls with Dave,

13   because he is like -- he was my supervisor, so --

14     Q.   So let's stop there.

15          So was the first conversation after you were let

16   go a couple of weeks after your termination?

17     A.   Yes.

18     Q.   That was the first?

19     A.   Yes.

20     Q.   And are you saying that you had several?

21     A.   Let me back up.

22          I actually contacted Dave Muti the same time

23   Kevin came to tell me he was laying me off.

24     Q.   Okay.  So you spoke to him by phone that day?

25     A.   Yes.



1      Q.   On April 6, 2020.  Is that correct?

2      **A.   Yes.**

3      Q.   The day you were let go?

4      **A.   Yes.**

5      Q.   And had you already been terminated at the time

6  that you spoke to Dave Muti on April 6, 2020?

7      **A.   No.**

8      Q.   What was the purpose of your call, then, to Dave

9  Muti if you didn't know that you were being let go?

10     **A.   Well, I knew I was being let go, because a**

11 **couple hours after Mr. Muti went to another project,**

12 **Kevin came over to me and told me, so I had advance**

13 **notice that Kevin was going to lay me off.  And that's**

14 **what generated me to make a call to Dave Muti and find**

15 **out what was going on.**

16     Q.   You say you had advance notice?

17     **A.   Yes.**

18     Q.   From whom?

19     **A.   Kevin.**

20     Q.   So he told you a couple hours before you were

21 actually let go that you were going to be let go.  Is

22 that correct?

23     **A.   Yes.**

24     Q.   All right.  Did Kevin Gutierrez say anything

25 else at the time that he gave you that two-hours advance



1    notice?

2         A.   No.

3         Q.   And so between the time that Mr. Gutierrez gave

4    you that advance notice and the time that he formally

5    gave you notice that you were being let go, that's the

6    time you spoke to Dave Muti.  Is that correct?

7         A.   Correct.

8         Q.   What did you say to Dave Muti during that

9    telephone call?

10        A.   I say -- I asked Dave, What's going on? I'm

11   getting laid off.  He said, What do you mean you're

12   getting laid off?  I said, Yeah, Kevin just came over --

13             (Reporter interruption for clarification.)

14        A.   Okay.  I talked to Dave, and I told him, I said,

15   Dave, what's going on?  I said, Kevin just laid me off.

16   And he said, No, Parnell, you're not supposed to get laid

17   off.  You're working there by yourself for the rest of

18   the week, and you the only guy that's for the yard.  And

19   the yard needs someone to always manage it, so I don't

20   know why Kevin is laying you off.  And that was pretty

21   much the conversation.

22        Q.   So that was the first conversation you had with

23   Mr. Muti about being terminated.  Correct?

24        A.   Yes.

25        Q.   And you had another one about two weeks later.



1    Right?

2        A.    Yes.

3        Q.    Did you have any other telephone calls or

4    discussions with Dave Muti other than the two that you've

5    talked about regarding your termination?

6        A.    Yes.

7        Q.    When was the next one?

8        A.    **About two weeks after the second phone call.**

9        Q.    So about a month after you had been let go.

10   Right?

11       A.    **Yes.**

12       Q.    Did you call Mr. Muti or did he call you?

13       A.    **I called him.**

14       Q.    What was the purpose of your call?

15       A.    **To seek employment again.**

16       Q.    And what did you say to him?

17       A.    **I said, Dave, I know that laborers has been**

18   **brought back.  And he again said, I know, Parnell.  He**

19   **said, I'm trying to get you back on the job.  He said,**

20   **but Kevin won't let me bring you back.**

21            **And basically Gilbert, who was another laborer,**

22   **he actually got on the phone with me and said, Yeah,**

23   **Parnell.  He said, I witnessed Dave call Kevin and ask**

24   **Kevin to bring you back, and Kevin's response was, I'm**

25   **not bringing that guy back.**



1      Q.   Do you know whether or not it was Kevin's

2  ultimate decision who to bring back to the jobsite or was

3  it somebody else?

4      **A.   I don't know.**

5      Q.   Did you ever communicate with anybody other than

6  Mr. Muti about returning to work at M.J. Dean after you

7  had been let go on April 6, 2020?

8      **A.   Yes.**

9      Q.   Who?

10     **A.   John Thomason.**

11     Q.   And before we get to your discussion with John

12  Thomason, did you have any other telephone calls or

13  meetings with Dave Muti other than the three you've told

14  me about?

15     **A.   No.**

16     Q.   When did you speak to John Thomason about

17  returning to work at M.J. Dean?

18     **A.   Within a week of me being laid off.**

19     Q.   Did you call him?

20     **A.   Yes.**

21     Q.   Tell me about that conversation.  What did you

22  say?  What did he say in response?

23     **A.   He didn't answer his phone.  I just got the**

24  **voice mail.**

25     Q.   Did he return your call?



1      A.    No.

2      Q.    Did you ever talk to anybody other -- or leave a

3   voice mail to anybody other than Dave Muti and John

4   Thomason at M.J. Dean after you were laid off or

5   terminated?

6      A.    No.

7      Q.    Did you ever submit another application or

8   anything like that to M.J. Dean for employment after

9   April 6, 2020?

10      A.    No.

11      Q.    Was -- do you know whether your name was on the

12   list with the laborers so that you were eligible to be

13   hired?

14      A.    No.

15      Q.    Did you ever follow up with the union to see if

16   you could return to work at M.J. Dean?

17      A.    No.

18      Q.    Why not?

19      A.    Because when you're like me, most of our work

20   comes from -- use the word hustling or soliciting work.

21   So the job I got at M.J. Dean myself.  The union didn't

22   refer me to that job.  That was my consistently going to

23   their office three or four times a week for months.

24   That's how I got the job.

25            So normally, it'd be word of mouth.  I'd call



1    the laborer that's working there and say, Hey, Mike --

2    for example -- you guys willing to hire me?  They say,

3    Yeah.  Call the superintendent.

4         I get my work by soliciting.  I don't really get

5    too much work from sitting at home waiting for a dispatch

6    call from the union.  I go out to look for work.

7    Q.   Or you would be waiting forever.  Right?

8    A.   There you go.  You got 4-, 500 people out of

9    work, might be sitting on the list two, three years.

10   Q.   Do you know -- well, you said you didn't know

11   whether anybody else was terminated from M.J. Dean other

12   than yourself.  Is that correct?

13   A.   Yes.

14   Q.   Did you talk to anybody at AECOM Hunt about

15   returning to work at M.J. Dean after you were terminated

16   on April 6, 2020?

17   A.   Yes.

18   Q.   Who did you talk to?

19   A.   AECOM Hunt safety director, Jack.  I don't know

20   his last name, though.

21   Q.   What did you say to Jack?

22   A.   I said, Jack, I got laid off from M.J. Dean, and

23   I know AECOM Hunt is the general contractor, and so they

24   do have laborers that work for them.  So I was trying to

25   come aboard with -- with him through AECOM Hunt to get



1    back at the Sphere project.

2        Q.   Was your communication with AECOM Hunt just

3    limited to the one conversation?

4        A.   I had several phone calls with Jack.

5        Q.   Several?

6        A.   Yes.

7        Q.   When was the first time you spoke to Jack?

8        A.   I want to say the end of April 2020.

9        Q.   When was the next time you spoke to Jack?

10       A.   May 2020.

11       Q.   And was the sum and substance of the

12   conversation the same as it was in April?

13       A.   Yes.

14       Q.   What was Jack's response?

15       A.   He's -- Parnell, he said, we're going to -- if I

16   can't get you back at the Sphere, he said, I just hired

17   some laborers, but I will keep in you mind.

18            But at that time, AECOM Hunt also was doing the

19   Drew.  Formerly known as the Fontainebleau.  They did

20   have that project.  So he said, You can possibly get on

21   that job if that job picks back up again.

22            So periodically I would call Jack, just touch

23   base with him, see if he has any work available.

24       Q.   Did Jack ever have any work available for you?

25       A.   No.



1           MR. ROSENTHAL:  I'd like to have this next

2   document marked as Defendant's Exhibit K.

3           MR. MARKS:  Exhibit K, kid?

4           (Exhibit K identified.)

5   BY MR. ROSENTHAL:

6       Q.   Mr. Colvin, I want to show you what's marked as

7   Defense Exhibit K, and there's an email about halfway

8   down the page, and it's sent to Mike Dean.  Do you see

9   that?

10      A.   Yes.

11      Q.   And the date on that email is April 21, 2020, at

12  2:40 p.m.  Correct?

13      A.   Yes.

14      Q.   It says it's from mikebrownpc681@yahoo.com.  Do

15  you see that?

16      A.   Yes.

17      Q.   Who is Mike Brown?

18      A.   That's my email, but -- just the name that's on

19  the email.  But PC681 is my email.  And somehow Mike

20  Brown is just the name that comes up when I send an email

21  out.  But it's my email.

22      Q.   Are you known as Mike?

23      A.   Nope.

24      Q.   You're not known as Mr. Brown?

25      A.   Nope.  It's been like this for years.



1    Q.   Your wife's last name is Brown.  Right?

2    **A.   Correct.  Yes.**

3    Q.   So is this a family member, Mike?

4    **A.   No.  No.**

5    Q.   Do you know -- I'm just curious.  Do you know

6    why it says Mike Brown, then?

7    **A.   I don't.  I have been trying to change this for**

8    **years.  I just don't want to use my account because I**

9    **have had it so long.**

10   Q.   Okay.  But this was an email that starts about

11   halfway down the page on <mark>Exhibit K</mark>.  That's an email from

12   you to Mr. Dean at M.J. Dean.  Right?

13   **A.   Correct.**

14   Q.   There's also a cc area there.  It says

15   PC681@yahoo.com.  Do you see that?

16   **A.   Yes.**

17   Q.   Do you know whose email that is?

18   **A.   That's mine.**

19   Q.   So you cc'd yourself?

20   **A.   Yes.  Always cc myself.**

21   Q.   Okay.  Did you send this email from home?

22   **A.   Yes.  From home, but from a iPhone.**

23   Q.   So you typed this up on your iPhone?

24   **A.   Yes.**

25   Q.   All right.  And just so there is no

(702) 799-9218 | info@worldwidelit.com
Worldwide Litigation Services



1   misunderstanding here, the email that starts from about

2   halfway down the page, that's an email that you typed up

3   and you sent to Mike Dean at M.J. Dean.  Right?

4       A.  Correct.  Yes.

5       Q.  I want to draw your attention to the last

6   sentence on your email that starts at the highlighted

7   area.  Okay?  Maybe you and I can just exchange exhibits

8   for a moment.  Okay?

9            So I want you to take a look at that --

10  actually, you know what?  Let's do this the right way.

11  I'm going to highlight Exhibit K, what I want you to look

12  at.

13           MR. MARKS:  Can I see it?

14  BY MR. ROSENTHAL:

15      Q.  The second line that's highlighted says, But I

16  am faced with a deadline to file my claim with the EEOC.

17           Right?

18      A.  Yes.

19      Q.  And what deadline were you talking about there?

20      A.  I believe that I only had six months prior to

21  the November date, but I believe I found out it actually

22  was a year.  So I was not correctly informed.

23      Q.  But even if it was six months, you believed it

24  was six months from the date of your internal complaint?

25      A.  No.  From April.



1      Q.   So --

2           MR. MARKS:  He said from November.  He thought

3  he had six months from November.

4           MR. ROSENTHAL:  That's what I'm asking.

5           MR. MARKS:  Yeah, that's what he just said.

6           MR. ROSENTHAL:  So let's be clear.

7           MR. MARKS:  So rephrase it.

8  BY MR. ROSENTHAL:

9      Q.   So did you think you had six months -- did you

10  believe at the time that you send this email to Mr. Dean

11  that you had six months to file a complaint with the

12  EEOC, and that six-months period began at the time you

13  submitted your internal complaint back in November?

14     **A.   Yes.**

15     Q.   Okay.  So you didn't believe that the six-month

16  period began from the date of your termination.  Is that

17  correct?

18     **A.   Correct.**

19     Q.   Okay.  Had you retained an attorney at that

20  point in time?

21     **A.   No.**

22     Q.   So the line underneath that, which isn't

23  highlighted, asked Mr. Dean to intervene and make this

24  situation right.  Do you see that?

25     **A.   Yes.**



1       Q.   What were you asking him to do?

2       **A.   To -- rehire me and let me continue working**

3   **doing the work that I was doing prior to me being fired.**

4       Q.   And was it your intention, then, that if you

5   were rehired, you weren't going a file a claim with the

6   EEOC?

7            MR. MARKS:  Objection to the form.

8       **A.   I was always going to file a complaint.**

9   BY MR. ROSENTHAL:

10      Q.   So even if Mr. Dean rehired you, you would have

11  still proceeded to file a claim with the EEOC at that

12  time.  Correct?

13           MR. MARKS:  Objection.  Calls for speculation.

14      **A.   Yes.**

15  BY MR. ROSENTHAL:

16      Q.   Were you looking for a payout from Mr. Dean when

17  you sent this email?

18           MR. MARKS:  Object to the form.

19      **A.   A payout?**

20  BY MR. ROSENTHAL:

21      Q.   Were you looking for Mr. Dean to pay you money?

22      **A.   No.**

23           MR. ROSENTHAL:  Let's mark this as Defendant's

24  Exhibit L.

25           (Exhibit L identified.)



1    BY MR. ROSENTHAL:

2        Q.    Do you recognize what's been marked as

3    Defendant's Exhibit L?

4        A.    Yes.

5        Q.    So were you given this termination notice, which

6    is Exhibit L, on April 6, 2020?

7        A.    No.

8        Q.    When were -- when did you receive Exhibit L?

9        A.    I personally never received this.

10       Q.    Okay.  By the way, take a look at the third line

11   down where it says Employee Number.  Do you see that?

12       A.    Yes.

13       Q.    There's a 6800 there.

14       A.    Yes.

15       Q.    Do you see that?

16       A.    Yes.

17       Q.    Do you think that answers my question to you

18   from earlier this number when I asked what that number

19   was?

20       A.    Very well could be.  Okay.

21       Q.    Right?

22       A.    Yes.

23       Q.    Do you have any reason to believe that number,

24   6800, was not your employee number?

25       A.    I'm not sure.



1     Q.   Okay.  That's fine.

2          And do you see the fifth line down where it says

3     Reason for termination?

4     A.   Yes.

5     Q.   Then underneath that it says, Laid off,

6     reduction in force, with an X?

7     A.   Yes.

8     Q.   Do you have any reason to believe that the

9     reason listed on <mark>Exhibit L</mark> wasn't true?

10    A.   Yes.  It's not true.

11    Q.   Why?

12    A.   Because the day I came back, the next day, to --

13    and let's just be clear.  You might have had a shutdown,

14    but every area on the jobsite didn't shut down.  The job

15    never shut down completely.  Certain areas were affected.

16    But what I did, work maintaining the yard, the yard is a

17    position that has to be maintained at all times, because

18    that's where the trucks bringing all the material.  So it

19    was never a lack of work for what I was doing.

20    Q.   So you don't know whether or not -- well, let me

21    back up.

22         Do you recall M.J. Dean having about 90 laborers

23    working on the Sphere project?

24    A.   Yes.

25    Q.   Does that sound right?



1    A.    Yes.

2    Q.    And do you recall whether or not about 80 of

3  those 90 laborers were let go in March, April, and May of

4  2020?

5    A.    No.

6    Q.    Do you know whether any of the approximately 90

7  laborers were let go by M.J. Dean in March, April, or May

8  of 2020?

9    A.    No.

10   Q.    Do you believe that you were the only laborer

11 who was terminated in April 2020?

12   A.    I can only speak to my particular situation.  I

13 can't speak for -- all I'm saying to you today is that

14 for what I was doing prior to Mr. Gutierrez calling me a

15 nigger, there was no lack of work for my area.  So if you

16 want to continue to say that 80, 90 laborers left, that

17 might have been true.

18         But what I'm trying to get clear is that had no

19 bearing for area and the work I was assigned to.  The

20 work I was assigned to required somebody to be there at

21 all times.  So lack of work for people working on the

22 deck, yes.  Lack of people -- labors working overnight,

23 yes.  But for what I was doing, Parnell Colvin was doing,

24 the yard, there was no -- no lack of work for that,

25 because the yard requires maintaining at all times.



1      Q.   Bear with me one moment.

2      **A.   Okay.**

3      Q.   Too many pieces of paper.

4           There we go.

5           MR. ROSENTHAL:  All right.  Mark this next

6  document as Exhibit M.

7           (Exhibit M identified.)

8  BY MR. ROSENTHAL:

9      Q.   Do you recognize what's been marked as Exhibit

10 M?

11     **A.   Yes.**

12     Q.   And is Exhibit M an email that was sent by Tommy

13 Glidewell to you on April 29, 2020, in response to your

14 email that you had sent Mr. Dean a week earlier?

15     **A.   Correct.**

16     Q.   And I'd like you to take a look at the second

17 paragraph.  And it says there that, As referenced in your

18 termination notice, you were terminated due to lack of

19 work as a result of the MSG Sphere project being shut

20 down by the project's owner as a response to the COVID-19

21 pandemic, along with over 300 employees.  No other

22 factors were considered in your termination of

23 employment, and M.J. Dean denies the allegations

24 described in your email.

25          Do you see that?



1    A.    Yes.

2    Q.    So, looking at that first sentence of that

3  paragraph, you were aware, were you not, that M.J. Dean

4  had told you that the project had been shut down due to

5  the COVID-19 pandemic.  Right?

6    A.    I don't agree with that.

7    Q.    Well, when I asked you before did anybody ever

8  tell you that the project had been shut down, and you

9  said no. --

10   A.    Well, I said --

11   Q.    -- that wasn't true.  Right?

12   A.    Are you -- are you saying I'm aware of this

13  because the alleged claim in here is that it's on my

14  termination notice?

15   Q.    No.  I'm just saying, asking you, when I asked

16  you earlier did anybody at M.J. Dean ever tell you that

17  you had been let go because the project, the Sphere

18  project, had been shut down, you said no.

19   A.    Correct.

20   Q.    That wasn't true?

21   A.    Correct.  Correct.

22   Q.    Okay.  And here Mr. Glidewell told you that it

23  was shut down to the COVID-19 pandemic, along with 300

24  other employees.  Right?

25   A.    Correct.



1      Q.   Did you respond in any way to Mr. Glidewell's

2  email marked as Exhibit M?

3      A.   I don't believe so.

4      Q.   Why not?

5      A.   Because I was going to file my EEOC complaint.

6      Q.   Did you perform any investigation of your own as

7  to whether or not Mr. Glidewell's comments about the

8  project being shut down due to COVID-19, as to whether or

9  not that was true or not?

10     A.   Yes.

11     Q.   And what kind of investigation did you perform?

12     A.   Well, I spoke with Jack, who was AECOM safety

13 director, who informed me that the project was not going

14 to shut down.  And other laborers that I stay in

15 communication to this day has informed me that they --

16 the project never completely shut down.  So --

17     Q.   Did -- the other employees that you've talked

18 to, did they ever tell you that the project partially

19 shut down?

20     A.   Yes.

21     Q.   Did any employees that you've ever talked to

22 tell you that hundreds of employees had been let go

23 because of the partial shut down?

24     A.   Well, just from this email from Mr. Gliddale --

25 or Glidewell -- sorry about that.  Other than that, no.



1      Q.   So did you ever perform any investigation on

2  your own as to whether or not hundreds of employees had

3  been terminated because the project was partially shut

4  down?

5      **A.   No.**

6      Q.   Do you know whether or not M.J. Dean had any

7  sort of obligation to rehire you after you had been

8  terminated?

9      **A.   No.**

10     Q.   Do you know whether there's any sort of

11 agreement between the union and M.J. Dean which would

12 have put you sort of at the top of the list or made you

13 get rehired at M.J. Dean?

14     **A.   Well, let me back up again.**

15         **The same day that Mr. Gutierrez fired me, I was**

16 **unable to get to John Thomason, but I did run into**

17 **general superintendent Brian Long.  And he said, Parnell,**

18 **the whole job is shutting down.  I'm only going to be**

19 **here, out here for a week.  The 15th will be my last day,**

20 **and then the whole job is shutting down.**

21         **That never happened.**

22         **But he says -- he shook my hand, he says, I**

23 **promise you, once this job is manning up again, I bring**

24 **you back on the board, so just stay in touch.**

25     Q.   Did anybody ever at -- from M.J. Dean ever give



1  you anything in writing promising you that you would have

2  a job upon the job reopening?

3      **A.   No.**

4      Q.   Did anybody, at any point in time, ever promise

5  you employment at M.J. Dean?

6      **A.   Yes.**

7      Q.   What did you receive in writing promising you

8  employment?

9      **A.   Oh, no.   Nothing in writing.**

10     Q.   Okay.  Do you know of any written documents,

11 written documents between the union and M.J. Dean, which

12 would have required M.J. Dean to rehire you after you'd

13 been let go?

14     **A.   No.**

15     Q.   Do you know whether or not M.J. Dean was

16 required to rehire laborers that had been let go based

17 upon seniority?

18     **A.   I don't know.**

19     Q.   Do you know if there are any union documents

20 that would have required M.J. Dean to rehire laborers

21 based upon their seniority?

22     **A.   I don't.**

23          MR. ROSENTHAL:  I think we've been going over an

24 hour, so let's take a -- a last break and --

25          MR. MARKS:  Are you about to wrap up?



1          MR. ROSENTHAL:  You don't even give me a chance,

2   Mr. Marks.  So -- no, I'm almost done

3       **A.   No worries.  No worries.**

4          MR. ROSENTHAL:  Really, and when I say that,

5   hopefully Mr. Marks knows it's true, unlike some other

6   lawyers.

7          Let's take a 5, 10-minute break.

8          THE VIDEOGRAPHER:  We're going off the record at

9   4:05 p.m.

10         (Recess.)

11         THE VIDEOGRAPHER:  We're back on the record at

12   4:23 p.m.

13   BY MR. ROSENTHAL:

14       Q.   All right.  Mr. Colvin, we're in the home

15   stretch.

16       **A.   Yes, sir.**

17       Q.   No more documents, as you see.  No more

18   documents for you today.

19       **A.   Okay.**

20       Q.   All right.  Do you know if Kevin Gutierrez ever

21   received any training for his job from M.J. Dean?

22       **A.   No, I don't.**

23       Q.   Do you know of any facts or documents that would

24   show that Mr. Gutierrez did not receive proper training

25   from M.J. Dean to be a general foreman?



1    **A.    I don't know.**

2    Q.    Do you know whether or not Mr. Gutierrez was

3    supervised by any higher-ups at M.J. Dean?

4    **A.    Yes.**

5    Q.    Who supervised Kevin Gutierrez during the time

6    that you worked at M.J. Dean?  Do you know?

7    **A.    Yes.**

8    Q.    Who?

9    **A.    Brian Long.**

10    Q.    Could you give me the name again?

11    **A.    Yes.  Brian Long.  General superintendent, M.J.**

12    **Dean.**

13    Q.    Do you know if anybody else supervised

14    Mr. Gutierrez during the time that you worked at M.J.

15    Dean?

16    **A.    Yes.**

17    Q.    Who else?

18    **A.    John Thomason.**

19    Q.    I know you told me earlier, but remind me.  What

20    was John Thomason's job title during the time that you

21    worked at M.J. Dean?

22    **A.    Director -- I'd be speculating, but I know it's**

23    **-- the title director is somewhere in the -- his**

24    **description.**

25    Q.    The best guess.  I know I'm asking you to guess.



1    Do you remember?

2         A.    No.

3         Q.    Do you know if Mr. Thomason had the same job

4    title throughout your employment?

5         A.    I don't.

6         Q.    Okay.  Do you know if Mr. Thomason was Kevin

7    Gutierrez's boss throughout the time that you were

8    employed at M.J. Dean?

9         A.    Yes.

10        Q.    Do you know if Brian Long was Kevin Gutierrez's

11   boss throughout the entire time you worked at M.J. Dean?

12        A.    Yes.

13        Q.    Do you know if anybody else supervised Kevin

14   Gutierrez during the time that you worked at M.J. Dean?

15        A.    I don't know.

16        Q.    After you were terminated by M.J. Dean on April

17   6, 2020, did you look for employment elsewhere?

18        A.    Yes.

19        Q.    Where did you look for other employment?

20        A.    AECOM Hunt.

21        Q.    Anywhere else?

22        A.    Yes.  Fisher Industries.  King Construction.

23   Aggregate Industries.

24        Q.    I know you submitted -- recently submitted

25   documents as parts of discovery.  Is that correct?



1      **A.    Yes.**

2      Q.    So I don't want to rehash stuff that's already

3   in front of me in a way.

4           Where -- did you look for employment with other

5   potential employers other than what the documents you

6   produced would show?

7      **A.    No.**

8      Q.    Okay.  So the documents that you produced

9   represents all of the work that you tried to obtain after

10  leaving M.J. Dean.  Is that correct?

11     **A.    Yes.**

12     Q.    Did you ever turn down employment from another

13  employer after leaving M.J. Dean?

14     **A.    No.**

15     Q.    Did -- do you believe that you hustled, as you

16  put it, to look for work after leaving M.J. Dean?

17     **A.    Yes.**

18     Q.    Did you ever communicate orally with any

19  potential employers after leaving M.J. Dean?

20     **A.    Yes.**

21     Q.    Okay.  Because those wouldn't be in the

22  documents.  Right?

23     **A.    Correct.**

24     Q.    So can you tell me who you spoke to about

25  finding another job after leaving M.J. Dean?



1      A.    AECOM Hunt.

2      Q.    Who did you speak to?

3      A.    **Jack, who was safety director.  I don't know his**

4  **last name.**

5      Q.    How many times did you speak to -- did you speak

6  to Jack more than once about finding another job after

7  leaving M.J. Dean?

8      A.    Yes.

9      Q.    I believe you told me about those conversations

10  with Jack after leaving M.J. Dean.  But the context that

11  I asked you about was always about going back to work at

12  M.J. Dean.

13      A.    Yes.

14      Q.    Do you remember that?

15      A.    Yes.

16      Q.    Okay.  So, did you and Jack also talk about

17  going to work for another employer, different employer

18  than M.J. Dean, after you stopped working M.J. Dean?

19      A.    **No.**

20      Q.    So you never spoke to Jack at AECOM about

21  working for a different company after you left M.J. Dean?

22      A.    **Correct.  Yes, correct.**

23      Q.    Okay.  Did you speak to any other potential

24  employers, either in person or by phone, after you

25  stopped working at M.J. Dean?



1      **A.    Yes.**

2      Q.    Who else?

3      **A.    Whiting-Turner.  He was my old foreman.  What**

4  **was his name?  Eddie -- excuse me.  Eddie.  I don't**

5  **remember his last name.**

6      Q.    You said Ed?

7      **A.    Eddie.**

8      Q.    Eddie?

9      **A.    Yes.**

10     Q.    Do you know if Eddie still works out at

11  Whiting-Turner?

12     **A.    I'm not sure.**

13     Q.    Do you know what Eddie's position is at -- or

14  was at Whiting-Turner?

15     **A.    Yes.  General labor foreman.**

16     Q.    Do you know or recall when you spoke to Eddie at

17  Whiting and Turner?

18     **A.    We speak periodically.  My last conversation**

19  **might have been two weeks ago.**

20     Q.    Would you consider Eddie to be a friend of

21  yours?

22     **A.    I just know him from working.  So I wouldn't --**

23     Q.    You don't socialize with him?

24     **A.    Right.  I don't socialize with him.**

25     Q.    Can you give me an estimate as to how many times



1  you've spoken to Eddie about working at Whiting and

2  Turner or elsewhere since you left M.J. Dean?

3      **A.   About seven times.**

4      Q.   Did Eddie ever give you any leads during the

5  seven times that you spoke to him after leaving M.J.

6  Dean?

7      **A.   Yes.**

8      Q.   And none of those leads obviously materialized.

9  Correct?

10     **A.   Correct.**

11     Q.   Because you have not worked for any other

12  employers since you stopped working at M.J. Dean.  Is

13  that correct?

14     **A.   Correct.**

15     Q.   Did you collect unemployment insurance benefits

16  after leaving M.J. Dean?

17     **A.   Yes.**

18     Q.   You applied for unemployment benefits?

19     **A.   Yes.**

20     Q.   How long did those benefits last?  Do you

21  recall?

22     **A.   I'm still getting them.**

23     Q.   Okay.  Can you give me an estimate as to how

24  much money you've received from the unemployment

25  benefits?



1    A.    Maybe 20,000 --

2    Q.    Okay.

3    A.    -- give or take either way.

4    Q.    So, can you generally describe what steps you've

5    taken to find other employment since leaving M.J. Dean?

6    A.    Yes.

7    Q.    I know you submitted those documents, but can

8    you generally describe what steps you've taken to try to

9    hustle and find work?

10    A.    Yes.  Well, one of the things I always did, my

11    employment, like I said, is hustle or solicit work.  And,

12    I still been trying to get back to the Sphere.  So I

13    contacted some laborers that's there -- that's no longer

14    there.  And I would contact them, I ask them, Do you have

15    any leads on any jobs?  And if they give them to me, then

16    I'll try to follow up with that employer.

17          For us, it's not like, you know, we apply at,

18    like, Wal-Mart and go fill out an application.  A lot of

19    work for us is word of mouth.  Kind of like a network

20    situation where sometimes people call me, Hey, Parnell,

21    do you have any work for us?  Do you know anybody that's

22    hiring?  Yeah, no.

23          So that's kind of like the same laborers that I

24    talk to or the foremans I worked for, constantly just

25    calling me up, say, Hey, you know, when you guys going to



1    **start some work?  You guys got anything coming in the**

2    **near future?  And basically keep that cycle -- just keep**

3    **going.**

4         Q.   Have you ever tried to look for work outside of

5    being a laborer?

6         **A.   No.**

7         Q.   So the only work that you've tried to find since

8    leaving M.J. Dean is as a laborer.  Is that correct?

9         **A.   Well, construction in general.  Because a**

10   **laborer can be --**

11        Q.   Let me be clear, then.  Thank you for saying

12   that.

13             So, since leaving M.J. Dean in April 2020, have

14   you only sought employment as a laborer through the

15   union?

16        **A.   Yes.**

17        Q.   You have not tried to find any non-union

18   employment.  Correct?

19        **A.   Yes.**

20        Q.   That's correct.  Right?

21        **A.   Yes.**

22        Q.   And you haven't tried to find any employment

23   doing other types of construction work which is totally

24   separate from being a laborer.  Is that correct?

25        **A.   Correct.**



1      Q.   And you haven't tried to work, let's say, as a
2   -- as an auto repairman or something that's completely
3   different than construction.  Is that correct?

4      **A.   Correct.**

5      Q.   All right.  Other than unemployment benefits,
6   have you received any other types of compensation after
7   leaving M.J. Dean?

8      **A.   No.**

9      Q.   Do you believe that you suffered any type of
10  emotional distress as a result of your being terminated
11  from M.J. Dean?

12     **A.   Yes.**

13     Q.   How so?

14     **A.   Just depression.  I think a lot of people just**
15  **don't know how hard it is, especially for a black**
16  **laborer, to be in the union.  You know, I think we got 25**
17  **members, maybe 20 black laborers.  And the practice is,**
18  **throughout the country -- because I was in Arizona --**
19  **black laborers are always the last to the job, but**
20  **they're always the first to get laid off, no matter how**
21  **good your work is.  So that's why I was really**
22  **disappointed when I got laid off from this job, because I**
23  **put so much effort to try to get there.  So it's --**

24     Q.   Did you ever seek treatment for depression?

25     **A.   No.**



 1      Q.   Any other symptoms as a result of emotional

 2   distress that you say you suffered as a result of your

 3   termination from M.J. Dean?

 4      A.   **Just stress and pressure, depression.  Anxiety.**

 5      Q.   Have you ever sought any form of medical

 6   treatment for anxiety?

 7      A.   **No.**

 8      Q.   Have those symptoms remained the same for the

 9   entire -- since the time that you were terminated until

10   now?

11      A.   **I think it's a little worse now, just the time,**

12   **just trying to get back to work, you know, support the**

13   **family.**

14      Q.   Because you've been unemployed so long.  Is that

15   correct?

16      A.   **Yes.**

17      Q.   Do you recall when you first consulted with an

18   attorney about suing M.J. Dean?

19      A.   **I don't.**

20      Q.   When you filed your charge of discrimination

21   with the EEOC, had you consulted with an attorney at that

22   time?

23      A.   **No.**

24      Q.   Can you give me an estimate as to when it was

25   that you first consulted with an attorney about possibly



1   suing M.J. Dean?

2       A.   I'm not sure.  I don't want to guess.

3       Q.   Can you give me an estimate?

4       A.   Maybe May of 20- -- May of 2020.

5       Q.   So let me put it in context.

6            Would it be fair to say you consulted with an

7   attorney about a month or so after leaving M.J. Dean?

8       A.   Yes.

9       Q.   Was that Mr. Sbaih's office?

10      A.   No.

11      Q.   Who did you consult with?

12      A.   I don't remember her name right offhand, but it

13  was a lady attorney.

14      Q.   Here in town?

15      A.   Yes.

16      Q.   Was it -- was she a single practicing attorney

17  who works by herself, or does she work at a big firm?

18      A.   We never actually met.  It was just phone

19  conversations.

20      Q.   And you don't recall that person's name?

21      A.   No, I don't.

22      Q.   Did you consult with any other attorneys other

23  than that lady about a month after leaving M.J. Dean?

24      A.   No.

25      Q.   At some point, you consulted with Mr. Sbaih's



1    office.  Right?

2        A.    Correct.

3        Q.    Do you remember when that was?

4        A.    I don't.  Not offhand.  I don't.

5        Q.    Was it within a month or two after meeting or

6    talking to the lady?

7        A.    I'm not sure.

8        Q.    Okay.  And other than talking to Mr. Sbaih and

9    people at his office and Mr. Marks, have you consulted

10   with any other lawyers about suing M.J. Dean?

11       A.    No.

12       Q.    Give me about three minutes.  I'm just going to

13   see if I got what I need, because I think we're done.

14   Okay?

15       A.    All right.

16       Q.    Thank you.  Okay.  Let's go off the record for

17   just a couple minutes.

18            THE VIDEOGRAPHER:  We are going off the record

19   at 4:37 p.m.

20            (Recess.)

21            THE VIDEOGRAPHER:  We're back on the record on

22   the 4:34 [sic] p.m.

23            MR. ROSENTHAL:  I don't have any more questions

24   for you at this time, but I may have some follow-up after

25   your counsel asks some questions.  Okay?



1      **A.   Yes.**

2            MR. MARKS:  Usually I do double the cross of the

3      direct, so --

4      **A.   Okay.  All right.**

5

6                           EXAMINATION

7      BY MR. MARKS:

8      Q.   I'm going to show you what's been marked as

9      Exhibit C, which should be the same as in your stack.

10           MR. ROSENTHAL:  Sorry to interrupt, counsel, but

11     are you going to be referring to a bunch of exhibits?

12     Because I left mine in the office.

13           MR. MARKS:  Yeah.

14           MR. ROSENTHAL:  Would you mind -- let's just go

15     off the record.  Just give me a moment.

16           MR. MARKS:  That's fine.

17           (Pause in proceedings.)

18     BY MR. MARKS:

19     Q.   It's not going to be that many exhibits, but

20     starting with Exhibit C, there's a base rate of 29.66 and

21     a bunch of calculations.  Do you see that?

22     **A.   Yes.**

23     Q.   Do you believe that that was your total

24     compensation pursuant to the collective bargaining

25     agreement as of the date of your termination?

1    A.   Yes.

2    Q.   Okay.  And that included not only the base rate,

3  but vacation, paid pension plan, health and welfare

4  contributions, and other miscellaneous items.  Is that

5  correct?

6    A.   Yes.

7    Q.   Okay.  Regarding Exhibit C, this looks like some

8  sort of referral from the union.

9    A.   Correct.

10   Q.   And counsel asked you about that.

11       But did you get the M.J. Dean job through the

12  union, or did you have other steps that allowed you to

13  get the job?

14   A.   I got the job on my own.

15   Q.   Could you explain that briefly?

16   A.   Well, what happens is -- reason why this is

17  dispatched -- and it might be confusing -- because when

18  you go out and look for a job and the contractor hires

19  you, what they do is send the union notification, and

20  then the union will send out the dispatch.

21       So for me, the referral never came from the

22  union.  This was employment that I seeked and

23  accomplished on my own.  And this is just the union

24  sending this over to M.J. Dean letting them know that,

25  you know, Parnell's fringe benefits and salary is this



1    rate.

2         So I know this document can be misleading, but

3    the union didn't refer me to this job, and I didn't get

4    this job through the union.

5    Q.   Okay.  We are going to switch gears to a bunch

6    of questions, jumping around.

7         Regarding your relationship with Mr. Gutierrez,

8    from the beginning of your relationship with him when the

9    job started, did you find him to be hostile to you?

10   A.   Yes.

11   Q.   And could you explain how he was hostile?

12   A.   Well, just for the tone -- the conversation I

13   had with him, and I asked him about the hours, what was

14   the schedule going to be.  Just very unprofessional.  And

15   once I actually met him in person, and having constant

16   dealings with him, he's totally a -- a person that no

17   company should have representing them.  Especially

18   doesn't belong in foreman or any type of supervision

19   role.

20   Q.   Had you been a foreman before?

21   A.   Yes.

22   Q.   Did he admit to you at that point -- at some

23   point on the M.J. Dean job at Sphere he hadn't been a

24   foreman?

25   A.   Correct.



1    Q.   From his interactions with you as a foreman, did

2    you believe he hadn't received proper training in, you

3    know, how to be a good foreman?

4    **A.   Yes.  First thing -- as a foreman, first thing I**

5    **do -- my practice is you treat people as human beings**

6    **with respect.  And the whole idea is treating your crew**

7    **-- because if you treat them with respect, they break --**

8    **they bust their butt for you.**

9    **And so I never got that from Kevin.  And a**

10   **foreman's supposed to be a leader, and he is supposed to**

11   **lead by example.  And Kevin lacked all -- any sense of**

12   **being a foreman at all.**

13   Q.   Is there a reason you didn't complain to the

14   union about Mr. Gutierrez?

15   **A.   Because usually, typically the union, when it**

16   **comes to members against members, they're kind of like a**

17   **neutral party.  They don't -- they don't really get**

18   **involved.  So it's basically up to me to take my**

19   **complaint to the HR of the company and have them do their**

20   **investigation.**

21   Q.   Now, let's move on to ==Exhibit I==.  That's the

22   White Power Trump 2020 --

23   **A.   Yes.**

24   Q.   -- comments.

25   All right.  And prior to you seeing the white



1  Power Trump 2020 in the bathroom on the jobsite, had

2  there been comments about white power and Trump in the

3  workplace?

4      **A.    Yes.**

5      Q.    And were they frequent?

6      **A.    Yes.**

7      Q.    And were they pervasive?  Meaning, was it a lot?

8  Were they happening a lot?

9      **A.    Yes.**

10     Q.    And what type of stuff was being said in the

11 workplace?

12     **A.    That Trump is -- well, basically he is a racist,**

13 **but he is for us, for the white race.**

14     Q.    These are white people saying this?

15     **A.    Yes.  And, basically, all Blacks need to go back**

16 **to Africa.  All Mexicans need to go back to Mexico.  When**

17 **Trump get into office, he's finally going to build the**

18 **wall for all the people that don't belong in the America.**

19 **Basically, get the hell out of here, go back their home**

20 **countries.**

21     Q.    Did you see any -- any Nazi swastika symbols at

22 the jobsite either on tattooed on people or in any other

23 place?

24     **A.    Yes.  There were some tattoos.  Lot of people**

25 **have them on their trucks.  When they drive in, you can**



1   **see the swastika.  A lot of them have them on their**

2   **tattoos.  They tried to cover them up with long-sleeved**

3   **shirts.  But if it got hot, you know, we're all wearing**

4   **short-sleeved shirts, so you can see the tattoos of all**

5   **the Nazi swastikas.**

6        Q.   So even before you saw ==Exhibit I== in the

7   bathroom, there had been an atmosphere of white supremacy

8   on the jobsite at the Sphere in Las Vegas in late 2019,

9   early 2020?

10       **A.   Yes.**

11       Q.   And was -- do you know whether Mr. Gutierrez had

12  seen or heard the comments about white power on the

13  jobsite?

14       **A.   I don't know.**

15       Q.   Okay.  Did you know whether other M.J. Dean

16  leaders had heard those comments?

17       **A.   I'm not sure.**

18       Q.   Okay.  But you definitely brought to

19  management's attention, or supervision's attention,

20  ==Exhibit I==, which was the obviously the comments on the

21  bathroom?

22       **A.   Yes.**

23       Q.   Okay.  Counsel asked you why you didn't go

24  further in bringing to management's attention ==Exhibit J==

25  and ==Exhibit I==.  You know, the bathroom comments.  Could



1   you explain why you didn't go further in complaining?

2       A.   Well, I thought that when I notified Tony, who

3   was supervisor of safety, and safety is the one that

4   actually cleans the bathroom, station the bathrooms

5   around the jobsite, that I feel that they -- that was

6   sufficient enough at that time to let them know what was

7   going on and they would take any corrective measures from

8   that point on.

9       Q.   Now, after the -- after you brought to their --

10  Dean's attention Exhibit I and Exhibit J, as I understand

11  your testimony, there were no meetings where Dean

12  management told the employees, Hey, this is intolerable.

13  We can't have this kind of conduct.

14      A.   Correct.

15      Q.   There was no anti-discrimination talks or

16  training or anything of that nature.  Right?

17      A.   None.

18      Q.   There was no diversity discussion.  Correct?

19      A.   Correct.

20      Q.   So, basically, Dean took no action, even though

21  they were aware of the comments in Exhibit I and Exhibit

22  J?

23      A.   Correct.

24      Q.   And the pro-Trump White supremacy talk, in your

25  -- from your observation, was permeating through the Dean



1    worksite at the Sphere?

2        A.    Yes.

3        Q.    All right.   Now, counsel asked you a bunch of

4    questions about after COVID, whether the Sphere project

5    ended or continued.   And I think you believe the Sphere

6    project continued.   Correct?

7        A.    **Correct.**

8        Q.    And he asked you, Well, how did you know?

9            Could you explain how you know the Sphere

10   project continued?

11       A.    **First, I would drive around and see that work**

12   **was still going on.**

13           **And most important, I was still in contact with**

14   **numerous laborers on the jobsite that came after me, that**

15   **was still working there.   And I actually would say, What**

16   **do they got you doing?   They said, Well, we're doing your**

17   **job, buddy.   They said, You should have never got laid**

18   **off.   They said they brought back overtime.   And they**

19   **kept saying, Try and get ahold of Dave Muti.   Try and get**

20   **back.   I was, like, I'm trying.   They said from Dave**

21   **Muti, Kevin Gutierrez would not bring me back.**

22       Q.    Well, first of all, can you see the Sphere

23   project from this law firm's windows?

24       A.    **I'm not sure.**

25       Q.    Okay.   What was the condition of the Sphere



1    project at the time you were laid off in early 2020?

2        A.    I think -- if I'm remembering correct, I think

3    the Sphere project went to eight decks or nine decks.  I

4    think they was at deck seven, which you look at it now,

5    the beams are up.  Me being construction all my life,

6    there's no way that that job would have shut down this

7    far advanced with work.  I mean, there has to be at least

8    over a year worth of work continuously.

9            So when I left there, there was no structure on

10   top, and there was still, like, two decks that needed to

11   be poured.

12       Q.    Okay.  So you can physically see that there was

13   work done over the past year?

14       A.    Absolutely.

15       Q.    Okay.  Besides physically seeing it, you've had

16   comments with people that have continued on the job.

17   Correct?

18       A.    Correct.  Yes.

19       Q.    So when they talk about a shutdown, from your

20   information, either it was a very short shutdown or there

21   was no shutdown in the area you were working at all.

22   Correct?

23       A.    Yes.

24       Q.    All right.  And recalling back last year, there

25   was certain construction projects that were designated by



Parnell Colvin  -  7/15/2021
Parnell Colvin vs. M.J. Dean Construction, Inc.

1    the Governor Sisolak as essential to the community.  Do

2    you recall that?

3        **A.    Yes.**

4        Q.    Didn't Allegiant Stadium get built and finished

5    during the pandemic?

6        **A.    Yes.**

7        Q.    Didn't that continue --

8        **A.    Yes.**

9        Q.    -- all through March, April, May, June to meet

10    the August Raiders necessity and UNLV?

11        **A.    Yes.**

12        Q.    And was Sphere -- MSG Sphere a similar project

13    that was a high priority in the community?

14        **A.    Yes.**

15        Q.    So that was never shut down?  The governor gave,

16    like, some executive order to allow those projects to

17    continue.  Isn't that correct?

18        **A.    Yes.  That and Resorts World.  They all**

19    **continued.**

20        Q.    And it never would have been completed to the

21    extent it was if they didn't have that.  Isn't that

22    right?

23        **A.    Correct.**

24        Q.    Allegiant never would have been completed?

25            MR. ROSENTHAL:  Objection.  Calls for



1    speculation.

2         MR. MARKS:  You can drive by, counsel.

3    BY MR. MARKS:

4         Q.   Regarding -- counsel asked you about your

5    symptoms.

6         A.   Yes.

7         Q.   The comments -- the N-word, the comments about

8    Blacks are lazy, did that affect your self esteem?

9         A.   Yes.

10        Q.   Was it humiliating?

11        A.   Yes.

12        Q.   The white power, you know, white supremacy talk,

13   pro-Trump 2020 white supremacy talk, was that

14   embarrassing, humiliating while you were working at M.J.

15   Dean during 2020?

16        A.   Yes.

17        Q.   And after you got terminated, did you have any

18   symptoms of -- you said depression.  Did you have

19   anything like sleepless nights?  Did your mood change?

20   Anything like that?

21        A.   Yes.

22        Q.   Were there any activities you and your family

23   couldn't do?

24        A.   Yes.

25        Q.   Could you tell us what they were?



1      A.   Well, we always usually plan trips.  And I

2  understand that COVID was ramping, a lot of things was

3  getting shut down.  But we still did activities at home

4  and park and just -- mentally just wasn't there.

5      Q.   But I'm saying, are there things you couldn't

6  have -- like activities you couldn't take your kids to

7  do, or trips you would have taken even in the summer to

8  parks or -- national parks or anything like that that you

9  couldn't do because of your termination?

10     A.   No.

11     Q.   Okay.  What about -- did you feel humiliated and

12  embarrassed that you were fired?

13     A.   Yes.

14     Q.   Did you have to tell your wife and kids?

15     A.   Yes.

16     Q.   And how did that make you feel?

17     A.   Well, they were shocked, because they -- they

18  know when I look for a job, which was rare, I actually

19  get up 2, 3 o'clock in the morning to go to some jobs.

20  It really hit me hard.  Because, like I say, it's hard

21  for black laborers to get a job.  Then when we get jobs,

22  they're like a two-week job, a three-week job.

23          So this job at M.J. Dean, I knew it was going to

24  last a few years.  So I felt this would really get me

25  going.  It would put me in a nice spot.  When I lost it



1    **-- it's one of the biggest jobs going.  There is really**

2    **probably no other big job going in Las Vegas now but the**

3    **Sphere.  When I lost it, it was very depressing.**

4         Q.   So based on your background and everything you

5    had gone through, you finally were making -- well, how

6    much money were you making working at the Sphere?

7         **A.   I mean, it fluctuated weekly.  1500 a week then**

8    **$2100 a week.**

9         Q.   So that's a good living.  Correct?

10        **A.   Yes.**

11        Q.   And were you supporting your family pretty well

12   on that?

13        **A.   Yes.**

14        Q.   And then when you got terminated and had to live

15   on unemployment, did that affect your lifestyle in a

16   negative way?

17        **A.   Yes.**

18        Q.   Also, having gone through everything you did to

19   finally become a journeyman laborer making over -- you

20   know, making close to hundred thousand a year, when you

21   lost that, was that kind of demoralizing to you?

22        **A.   Yes.**

23        Q.   All right.  Do you -- counsel made it seem that,

24   you know, you're very sue happy and always kind of using

25   the race card.  Is that really true?  Are you like that?



1    **A.    No.**

2    Q.    Isn't it true that you kind of look the other

3    way, you don't want to make waves, you just want to do

4    your job?

5    **A.    Yes.**

6    Q.    And it's only when this just absolutely

7    disgusting racist stuff was written in the bathroom and

8    the N-word was called to your face that you felt you had

9    to do something?

10   **A.    Yes.**

11   Q.    Okay.

12         MR. MARKS:   I will pass the witness.

13

14                       EXAMINATION

15   BY MR. ROSENTHAL:

16   Q.    You said that you intended to sue M.J. Dean at

17   or around the time that you filed your internal complaint

18   on November 14, 2019.  Right?

19   **A.    Well, I don't know if it was sue.  I intended to**

20   **file a complaint.**

21   Q.    With the EEOC.  Right?

22   **A.    Yes.**

23   Q.    And at the time that you concluded that you

24   intended to pursue a charge of discrimination with the

25   EEOC, that was before you saw the photographs marked as



1   Exhibits I and J.  Correct?

2       A.   Yes.

3       Q.   Now, when you testified just a few moments ago

4   that -- that you found the workplace at M.J. Dean to be

5   pervasive with white supremacist comments --

6       A.   Yes.

7       Q.   Well, strike that.

8            Does that refresh your recollection that you

9   testified that the workplace at M.J. Dean, throughout

10  your employment, employees were making sort of white

11  supremacist comments?

12      A.   Correct.

13      Q.   Which employees?

14      A.   From all M.J. Dean's.

15      Q.   Can you give me any names of the M.J. Dean

16  employees who were making comments that you found to be

17  offensive, like white supremacist comments?

18      A.   They were carpenters.

19      Q.   What were their names?

20      A.   I don't know their names.

21      Q.   You can't give me a single name of somebody who

22  made comments that you found to be offensive based upon

23  race?

24      A.   No.

25      Q.   Okay.  Did you ever submit any written



1   complaints to anybody at M.J. Dean about any white

2   supremacist type comments that you found to be offensive?

3       **A.   No.**

4       Q.   And in your November 14, 2019, written complaint

5   that you submitted, you never mentioned anybody making

6   racist comments other than Kevin Gutierrez that you found

7   to be offensive.  Correct?

8       **A.   Correct.**

9       Q.   Did you ever complain to anybody at M.J. Dean

10  about people having tattoos that you found to be

11  offensive?

12      **A.   No.**

13      Q.   Did you ever complain to the union about any

14  white supremacist tattoo that you found to be offensive?

15      **A.   No.**

16      Q.   And when I say white supremacist, like comments

17  people made.  You didn't complain to the union about

18  white supremacist comments that you heard in the

19  workplace.  correct?

20      **A.   Correct.**

21      Q.   Did you ever complain to AECOM about any white

22  supremacist comments that you heard in the workplace at

23  M.J. Dean?

24      **A.   No.**

25          MR. ROSENTHAL:  I think that's it, Mr. Colvin.



 1          MR. MARKS:  All right.  I don't have anything

 2   further.

 3          THE VIDEOGRAPHER:  Okay.  This concludes the

 4   videorecorded deposition of Parnell Colvin.  We are now

 5   going off the record at 4:59 p.m.

 6          (Discussion off record.)

 7          MR. MARKS:  We will read and sign it.  I'll get

 8   a copy.  And then you would send it through my office.

 9   Right?

10          THE REPORTER:  Yes, sir.  Do you want the

11   signature page to you?  Signature page to you?

12          MR. MARKS:  Yes, sir.  And then what is normal

13   -- is a copy E-Tran?  Just send it to me.

14          MR. ROSENTHAL:  Regular E-Tran.  Condensed.

15          (Proceedings concluded at 4:59 p.m.)

16

17                      *    *    *    *    *

18

19

20

21

22

23

24

25



Parnell Colvin   -   7/15/2021
Parnell Colvin vs. M.J. Dean Construction, Inc.

1              I, PARNELL COLVIN, do hereby certify that I have

2       read the foregoing deposition and found the same to be

3       true and correct except as follows (noting the page and

4       line number of the change or addition as desired and the

5       reason why).

6

7       Page          Line              Correction

8       _____

9       _____

10      _____

11      _____

12      _____

13      _____

14      _____

15      _____

16      _____

17      _____

18      _____

19      _____

20      _____

21      _____

22      _____

23      _____

24      _____

25      _____



1 _____

2 _____

3 _____

4 _____

5 _____

6 _____

7 _____

8 _____

9 _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20        _____

21                  PARNELL COLVIN

22

23

24

25

APP252



1        BE IT KNOWN that the foregoing proceedings were

2   taken before me; that the witness before testifying was

3   duly sworn to testify to the whole truth; that the

4   foregoing pages are a full, true and accurate record of

5   the proceedings, all done to the best of my skill and

6   ability; that the proceedings were taken down by me in

7   stenographic shorthand and thereafter reduced to print

8   under my direction.

9        I CERTIFY that I am in no way related to any of

10  the parties hereto, nor am I in any way interested in the

11  outcome thereof.

12

13

14

15        (X)  Review and signature was requested.

16        ( )  Review and signature was waived.

17        ( )  Review and signature was not requested.

18

19                    *Michael A. Bouley*

20   _____
                     Michael A. Bouley, RDR
21                   Nevada Certified Reporter, #960

22

23

24

25

