1   LAW OFFICE OF DANIEL MARKS
    DANIEL  MARKS, ESQ.
2   Nevada State Bar No.: 002003
    NICOLE M. YOUNG, ESQ.
3   Nevada State Bar No. 12659
    610 South Ninth Street
4   Las Vegas, Nevada 89101
    Office@danielmarks.net
5   *Attorneys for Plaintiff*

6

7                  UNITED STATES DISTRICT COURT

8                      DISTRICT OF NEVADA

9   PARNELL COLVIN,                    Case No. 2:20-cv-01765-APG-EJY

10          Plaintiff,

11   v.                                **APPENDIX OF EXHIBITS IN SUPPORT**
                                        **OF PLAINTIFF'S PARTIAL MOTION FOR**
12   M.J. DEAN CONSTRUCTION, INC,       **SUMMARY JUDGMENT ON LIABILITY**
                                        **(Volume Two)**
13          Defendant,
     _____/
14

15

16   | Exhibit | Description | Page Numbers |
     |---------|-------------|--------------|
17   | 11 | Deposition of Kevin Gutierrez, taken on July 29, 2021 | APP 254-301 |
     | 12 | Deposition of John Thomason, taken on July 29, 2021 | APP 302-352 |
18   | 13 | Deposition of Paul Rosequist, taken on August 6, 2021 | APP 353-383 |

19

20          DATED this  8th____ day of October, 2021.

21                                     LAW OFFICE OF DANIEL MARKS

22
                                        /s/ Nicole M. Young
23                                     _____
                                       DANIEL MARKS, ESQ.
24                                     Nevada State Bar No. 002003
                                       NICOLE M. YOUNG, ESQ.
25                                     Nevada State Bar No. 12659
                                       610 South Ninth Street
26                                     Las Vegas, Nevada 89101
                                       Attorneys for Plaintiff
27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### CERTIFICATE OF SERVICE

I hereby certify that I am an employee of the LAW OFFICE OF DANIEL MARKS, and that on the ___8th___ day of October, 2021, I did serve a true and correct copy of the above and foregoing **APPENDIX OF EXHIBITS IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY (Volume Two)** by way of Notice of Electronic Filing provided by the court mandated ECF filing service, upon the Defendant at the following:

Robert Rosenthal
Howard & Howard Attorneys Pllc
3800 Howard Hughes Parkway, Suite 1000
Las Vegas, Nevada 89169
Attorneys for Defendant

/s/ Rayne Hall
An employee of the
LAW OFFICE OF DANIEL MARKS

Page 2 of 2

# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

PARNELL COLVIN,                    )
                                   )
          Plaintiff,               )
                                   )
          vs.                      )  CASE NO.:
                                   )  2:20-cv-01765-APG-EJY
M.J. DEAN CONSTRUCTION,            )
INC.,                              )
                                   )
          Defendant.               )
                                   )

**CERTIFIED TRANSCRIPT**

VIDEO CONFERENCE DEPOSITION OF KEVIN GUTIERREZ
LAS VEGAS, NEVADA
THURSDAY, JULY 29, 2021

REPORTED BY:  JACKIE JENNELLE, RPR, CCR #809
JOB #416110



COLVIN vs M.J. DEAN CONSTRUCTION, INC.                    Page 2
KEVIN GUTIERREZ, 07/29/2021

 1    APPEARANCES (ALL VIA VIDEO CONFERENCE):

 2   For the Plaintiff:

 3           LAW OFFICE OF DANIEL MARKS
             BY:  DANIEL MARKS, ESQ.
 4           BY:  NICOLE M. YOUNG, ESQ.
             610 South Ninth Street
 5           Las Vegas, Nevada  89101
             (702) 386-0536
 6           office@danielmarks.net

 7   For the Defendants:

 8           HOWARD & HOWARD ATTORNEYS PLLC
             BY:  ROBERT L. ROSENTHAL, ESQ.
 9           3800 Howard Hughes Parkway, Suite 100
             Las Vegas, Nevada  89169
10           (702) 257-1483
             rrosenthal@howardandhoward.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



COLVIN vs M.J. DEAN CONSTRUCTION, INC.                    Page 3
KEVIN GUTIERREZ, 07/29/2021

```
1                        I   N   D   E   X

2

   WITNESS:   KEVIN GUTIERREZ
3

4                         EXAMINATION
                                                  PAGE
5
   BY MR. MARKS                                    4
6

7                   EXHIBITS  INTRODUCED
   EXHIBIT                                         PAGE
8
   Exhibit 8    Graffiti                           34
9  Exhibit 9    Graffiti                           39

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                    LAS VEGAS, NEVADA
 2              THURSDAY, JULY 29, 2021; 10:00 a.m.
 3                         -o0o-
 4         MR. MARKS:  Rob, you've agreed due to the
 5   COVID uptick, we agreed to do these by Zoom so the
 6   witness could be unmasked and we could see him.
 7         Agreed?
 8         MR. ROSENTHAL:  Agreed.
 9   Thereupon--
10                  KEVIN GUTIERREZ,
11   was called as a witness, and having been first duly
12   sworn, was examined and testified as follows:
13                       EXAMINATION
14   BY MR. MARKS:
15      Q.    Could you state your name, please?
16      A.    Kevin Scott Gutierrez.
17      Q.    And spell your last name for the court
18   reporter.
19      A.    G-U-T-I-E-R-R-E-Z.
20      Q.    And where are you employed right now?
21      A.    M.J. Dean Construction.
22      Q.    Okay.  And what's the business address of
23   M.J. Dean?
24      A.    I don't know that offhand.
25      Q.    Okay.  Are you on a specific project right
```

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                          Page 5
KEVIN GUTIERREZ, 07/29/2021

1   now?

2        A.   Yes.

3        Q.   **What project?**

4        A.   MSG Sphere.

5        Q.   **Is that MSG Sphere?**

6        A.   Yes.

7        Q.   **And what's the nature of that project?**

8        A.   Theater.

9        Q.   **It's a theater?**

10       A.   Yes.

11       Q.   **And how long have you been on that project?**

12       A.   Two years-four months.

13       Q.   **So when did that project -- do you know**

14  **when that project started?**

15       A.   When I arrived, approximately March 20th of

16  2019.

17       Q.   **And was that the beginning of the project,**

18  **or was it already going?**

19       A.   That was the beginning.

20       Q.   **And what was the role of M.J. Dean in that**

21  **project?**

22       A.   Concrete, pour concrete.

23       Q.   **And how long do you think that project's**

24  **going to continue?**

25            **For how much longer?**

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                    Page 6
KEVIN GUTIERREZ, 07/29/2021

1    A.   Year and a half.
2    Q.   So the estimated completion date would not
3  be until the end of 2022?
4    A.   Actually, it's 2023.
5    Q.   The end?
6    A.   Yes.
7    Q.   So the end of 2023 would be two and a half
8  more years?
9    A.   Yes.
10   Q.   And approximately how many employees does
11 Dean have right now out at the Sphere project?
12   A.   Approximately 75.
13   Q.   And what types of employees do they have?
14   A.   We have a concrete division, and we have a
15 cleanup division, which would be on the general
16 contractor's side.
17   Q.   What do you mean by the general
18 contractor's side?
19   A.   M.J. Dean is the general contractor which
20 oversees all the subs.
21   Q.   I thought Hunt was the general contractor.
22   A.   Hunt was.  It's Hunt/M.J. Dean.
23   Q.   And has M.J. Dean -- Hunt/M.J. Dean always
24 been the general contractor?
25   A.   Yes.

1    Q.   And what is your title -- job title for the
2    MSG Sphere project?
3    A.   I'm a general foreman overseeing concrete.
4    Q.   Excuse me?
5    A.   A general foreman overseeing concrete.
6    Q.   And what does that mean?
7         What does a general foreman do?
8    A.   I'm in charge of pouring concrete, pouring
9    it in a timely manner, make sure it's ready,
10   cleanup, measuring, ordering pumps, ordering
11   concrete.
12   Q.   And had you been a general foreman before?
13   A.   I was a general foreman in 2009.
14   Q.   With which company?
15   A.   M.J. Dean.
16   Q.   So this is the second project you've been
17   the general foreman?
18   A.   Yes.
19   Q.   And who chose you as the general foreman?
20   A.   John Thomason.
21   Q.   Excuse me?
22   A.   John Thomason.
23   Q.   And what is his title with the company?
24   A.   General superintendent over the whole
25   company.

1    Q.   So by "general superintendent," meaning he
2  runs all the projects or supervises all the
3  projects?
4    A.   Yes.
5    Q.   And you supervise the one project with
6  Sphere?
7    A.   Yes.
8    Q.   And approximately how many projects does
9  M.J. Dean have going at any one time?
10        MR. ROSENTHAL:  Objection, vague and
11  ambiguous.
12  BY MR. MARKS:
13    Q.   At the present time, do you know how many
14  projects M.J. Dean has going?
15    A.   Three.
16    Q.   Do you know what those projects are?
17    A.   MSG Sphere, UNLV Medical Center, and the
18  FlyOver.
19    Q.   What's the FlyOver?
20    A.   I'm not quite sure.
21    Q.   Now, have you ever had your deposition
22  taken before?
23    A.   No.
24    Q.   Did you have an opportunity to talk to your
25  attorney about the nature of what a deposition is?

```
 1      A.   Yes.
 2      Q.   So I'll review those ground rules so we're
 3  on the same page.
 4           I'll be asking a series of questions.
 5  You'll be giving a series of answers.  And that will
 6  be typed up by the court reporter.
 7           You'll have an opportunity, if you want, to
 8  read the questions and the answers at a later date.
 9           Do you understand that?
10      A.   Yes.
11      Q.   You have an opportunity to read it and sign
12  it and also to make changes in your testimony.
13           Do you understand that?
14      A.   Yes.
15      Q.   If you made a change of a major nature and
16  the matter went to court, the attorneys could
17  comment on the change, and that could affect your
18  believability or credibility.
19           Do you understand?
20      A.   Yes.
21      Q.   I could read verbatim what you said today
22  and then show the court or the jury that you made a
23  change in your testimony.
24           Do you understand that?
25      A.   Yes.
```

1       Q.    The oath that the court reporter gave you,
2   even though we're in a Zoom setting, that's the
3   exact same oath as if we were all in court in front
4   of a judge in a black robe.
5           Do you understand that?
6       A.    Yes.
7       Q.    So although we're acting remotely, you have
8   the same obligation to tell the truth under the same
9   penalties for perjury if you fail to tell the truth.
10          Do you understand that?
11      A.    Yes.
12      Q.    Okay.  Now, what is your educational
13   background?
14      A.    High school.
15      Q.    And what year did you graduate?
16      A.    1998 -- 1988.  I'm sorry.
17      Q.    And what state?
18          Where did you graduate high school?
19      A.    Las Vegas, Nevada.
20      Q.    What high school did you go to?
21      A.    Las Vegas High School.
22      Q.    Did you get into the workforce after high
23   school?
24      A.    No.
25      Q.    What did you do?

1      Q.    When did you get into the construction
2    industry?
3      A.    2004.
4      Q.    At what company?
5      A.    M.J. Dean Construction.
6      Q.    Did you have to take any classes to get
7    into construction?
8      A.    Yes.
9      Q.    And what did you do to get into
10   construction?
11     A.    Took a general labor class through the
12   union.
13     Q.    What union?
14     A.    Laborers Union 872.
15     Q.    Okay.  And did you get certified as any --
16   did you go through an apprenticeship program, that
17   sort of thing?
18     A.    I did.
19     Q.    And how long was the program?
20     A.    Two years.
21     Q.    Okay.  And did you ultimately become a
22   journeyman?
23     A.    Yes.
24     Q.    And what year did you become a journeyman?
25     A.    2005.

1    Q.   And from 2005, have you worked for Dean
2    continuously?
3    A.   Off and on.
4    Q.   What do you mean "off and on"?
5    A.   I worked with Dean from 2004 to 2010.  We
6    were laid off for lack of work, came in back in
7    2011, worked with Dean until 2014.
8         I was laid off for lack of work, reduction
9    in force.  Came back to Dean in 2016 for eight
10   months and was laid off for lack of work.  Then came
11   back in March 6th of 2019 and currently employed.
12   Q.   So from March 6, 2019, you've worked
13   continuously for Dean?
14   A.   Yes.
15   Q.   When you were laid off for lack of work,
16   did you ever work for other companies?
17   A.   Yes.
18   Q.   And what other companies did you work for?
19   A.   When I got laid off in 2014, I worked for
20   Thor Construction.
21   Q.   And what about in '16?
22   A.   In '16, I went to work for Kiewit
23   Infrastructure.
24   Q.   As a general foreman, do you choose your
25   team of laborers that worked on the Sphere project?

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                      Page 16
KEVIN GUTIERREZ, 07/29/2021

```
 1      A.   No.
 2      Q.   Who chooses them?
 3      A.   John Thomason.
 4      Q.   So you had nothing to do with who was
 5   chosen to work on the project?
 6      A.   No.
 7      Q.   All right.  Now, in 2020, in March or April
 8   of 2020, there were layoffs because of COVID,
 9   correct?
10      A.   Yes.
11      Q.   Did you make the decision on who to lay
12   off?
13      A.   No.
14      Q.   Who made that decision?
15      A.   John Thomason.
16      Q.   Now, isn't it true the Sphere project never
17   totally shut down?
18      A.   Yes.
19      Q.   Isn't that true?
20      A.   It did shut down.
21           Answer the -- mention the question again.
22      Q.   Let's go back.
23           In 2019, you came to the beginning of the
24   Sphere project, correct?
25      A.   Yes.
```

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                    Page 17
KEVIN GUTIERREZ, 07/29/2021

1       Q.   Prior to COVID, do you know how many Dean
2   employees were there?
3       A.   I would have to say around 350.
4       Q.   And how many were laborers?
5       A.   80.
6       Q.   And you're saying they were all hired by
7   John Thomason?
8       A.   Yes.
9       Q.   You didn't have any decision-making on who
10  was hired?
11      A.   No.  He tells me the number.  I call the
12  hall.  I get the number that he wants.  Everything
13  has to go through him as far as hiring personnel on
14  the job.
15      Q.   But you don't have friends or family
16  members that you personally hire for the job?
17      A.   No.
18      Q.   All right.  When COVID -- you recall the
19  time COVID hit in March and April of 2020, correct?
20      A.   Yes.
21      Q.   And it was initially a two-week pause.
22           Do you recall that?
23      A.   Yes.
24      Q.   The governor -- it was a two-week pause at
25  the end of March, beginning of April of 2020,

AdvancedONE          (866) 715-7770
LEGAL                advancedONE.com

1  correct?

2     A.   Yes.

3          MR. ROSENTHAL:  Sorry.  Hold on.  You're

4  talking over the attorney.  So please let him ask

5  his questions first and then answer.

6          Okay?

7          THE WITNESS:  Yes.

8  BY MR. MARKS:

9     Q.   I think you're doing fine because there's a

10 delay, so it's coming through on my end.

11         Did the job actually stop all work in March

12 or April of 2020 for the two weeks?

13    A.   No.

14    Q.   The job continued because it was designated

15 a priority construction project by the governor,

16 correct?

17    A.   I don't know that part.

18    Q.   It never totally stopped?

19    A.   No.

20    Q.   Isn't that true?

21         "No," meaning it never totally stopped,

22 correct?

23    A.   Yes.

24    Q.   And the job was designated an essential

25 project, similar to Allegiant field for the Raiders

1    stadium, correct?

2         MR. ROSENTHAL:  Objection, asked and

3    answered.

4    BY MR. MARKS:

5         Q.   You can answer.

6         MR. ROSENTHAL:  If you know the answer, you

7    can go ahead.

8    BY MR. MARKS:

9         Q.   You can answer, correct?

10        A.   I would have to explain what happened.

11        Q.   You'll have a chance to explain.

12             You understood that this project was

13   designated an essential project; isn't that true?

14        MR. ROSENTHAL:  Objection, asked and

15   answered.

16   BY MR. MARKS:

17        Q.   You can still answer, sir.

18        A.   I didn't know nothing about the governor.

19        Q.   Okay.  Fine.

20             Did you have anything to do with the lay --

21   deciding who would be laid off?

22        A.   No.

23        Q.   Did you have anything to do with deciding

24   who would be rehired?

25        A.   No.

1    Q.   Was there a time that people were rehired
2  after the layoffs?

3    A.   Yes.

4    Q.   And what point in time was that?

5    A.   Approximately two weeks after we were told
6  they were going to shut down.

7    Q.   And was that in April of 2020?

8    A.   Yes.

9    Q.   And you're saying that you had nothing to
10  do with deciding who was actually rehired?

11    A.   No.

12    Q.   "No," meaning you had nothing to do with
13  it?

14    A.   I had nothing to do with it.

15    Q.   Okay.  Prior to the incident with
16  Mr. Colvin, were you ever accused of discrimination
17  against African-American employees before?

18    A.   No.

19         MR. ROSENTHAL:  Objection.

20         Slow down.

21         Objection, vague and ambiguous, lacks
22  foundation.

23         MR. MARKS:  All right.  He's answered.

24  BY MR. MARKS:

25    Q.   Were you ever accused of race

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                                    Page 21
KEVIN GUTIERREZ, 07/29/2021

```
 1   discrimination?

 2       A.    No.

 3       Q.    Now, you were familiar with the M.J. Dean

 4   anti-harassment policy?

 5       A.    Yes.

 6       Q.    Is that correct?

 7       A.    Yes.

 8       Q.    And M.J. Dean has various policies against

 9   discrimination on the basis of race, correct?

10       A.    Yes.

11       Q.    And as a foreman, part of your job is to

12   enforce those policies?

13       A.    Yes.

14       Q.    So if you saw or heard discriminatory

15   racial comments, what would you do?

16            MR. ROSENTHAL:  Objection, incomplete

17   hypothetical, vague and ambiguous, and lacks

18   foundation.

19            MR. MARKS:  You're only allowed to -- Rob,

20   you're only allowed --

21            MR. ROSENTHAL:  Yeah.

22            MR. MARKS:  -- to object to the form.  And

23   we're on Zoom, so I'd appreciate no speaking

24   objections.

25            MR. ROSENTHAL:  We've been down this road
```

```
 1  before.

 2            MR. MARKS:  We have --

 3            MR. ROSENTHAL:  -- and the last time --

 4  hold on.  Let me finish at least my comment, which

 5  is that that's precisely what you were doing

 6  previously, and we had both agreed to object only --

 7  that we could have -- state the basis for the

 8  objection, which is, by the way, what you were doing

 9  during my deposition for Mr. Colvin.

10            (Multiple parties speaking.)

11            MR. ROSENTHAL:  With respect to Mr. Colvin,

12  you did not state object as to form --

13   (Thereupon, an off-the-record discussion was had.)

14  BY MR. MARKS:

15     Q.   All right.  Next question:  Mr. Gutierrez,

16  what would you do if you heard racial epithets on

17  the job?

18            MR. ROSENTHAL:  Objection, vague and

19  ambiguous, incomplete hypothetical, lacks

20  foundation.

21  BY MR. MARKS:

22     Q.   Go ahead and answer.

23            MR. ROSENTHAL:  You can answer, if you

24  know.

25            THE WITNESS:  Report to safety.
```

1   BY MR. MARKS:

2        Q.   And who at safety would you report it to?

3             MR. ROSENTHAL:  Objection, vague and

4   ambiguous, overbroad, incomplete hypothetical.

5             MR. MARKS:  Are you going to object to

6   every question, Rob?

7             MR. ROSENTHAL:  If I have to.  I cannot

8   have a running objection, as you well know, because

9   they're not recognized.

10  BY MR. MARKS:

11       Q.   Who would you report this to at safety?

12            MR. ROSENTHAL:  Objection, vague and

13  ambiguous, incomplete hypothetical, lacks

14  foundation.

15  BY MR. MARKS:

16       Q.   You can answer.

17       A.   Paul Rosequist.

18       Q.   And what was his official -- what was his

19  title?

20       A.   Safety director.

21       Q.   During the time you worked at the Sphere

22  project from 2019 to the present, did you ever

23  report to Mr. Rosequist any racial comments or

24  discriminatory comments?

25       A.   No.

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

1      Q.   All right.  Have you personally ever used
2   the N-word?
3      A.   Yes.
4      Q.   And on what occasion have you used it?
5      A.   When I was younger.
6      Q.   Did you use it in prison?
7      A.   No.
8      Q.   When you say when you were younger, when's
9   the last time you used the N-word?
10     A.   20 years ago.
11     Q.   Did you ever use the N-word relating to
12   Mr. Colvin?
13     A.   Never.
14     Q.   Did you ever use the N-word on the Sphere
15   project to any African-American employee?
16     A.   Never.
17     Q.   Did you ever have to discipline Mr. Colvin?
18     A.   I'm not sure if it was a discipline.  I
19   moved him to certain -- a couple areas.
20     Q.   But did you ever have to discipline him?
21     A.   No.
22     Q.   All right.  Was Mr. Colvin a good employee?
23     A.   He was okay.
24     Q.   He was satisfactory?
25     A.   At times.

1    Q.    Did you ever have to write him up?

2    A.    No.

3    Q.    Where was he working on the Sphere project?

4    A.    He began in Area D.

5    Q.    And what is Area D?

6    A.    They're support areas:  Area A, Area B,

7    Area C, and Area D.

8    Q.    And how would you describe Area D?

9    A.    Area D, it was an area.  If the project was

10   broke up into four sections -- and basically, if you

11   look at a dome, split it into quarters.

12   Q.    And did Mr. Colvin ever work in the yard?

13   A.    Yes.

14   Q.    What is the yard?

15   A.    This would have been the saw yard where

16   they were making material for the building.

17   Q.    And what's the purpose of the person --

18   what does the person working in the yard do?

19   A.    Stacking material, cleaning up behind the

20   carpenters.

21   Q.    So during COVID, even during the weeks of

22   COVID, the first two weeks, employees had to

23   continue to work in the yard, correct, because you

24   had all the materials there?

25   A.    No.

1     Q.    "No," they didn't?

2     A.    No.

3     Q.    What happened to the yard during that two

4  weeks?

5     A.    That was the first position to go.

6     Q.    Okay.  But even during the two weeks, did

7  construction on Sphere continue the first two weeks

8  of COVID?

9     A.    Yes.

10     Q.    And after two weeks of COVID, a number of

11  employees were rehired, correct?

12     A.    Yes.

13     Q.    Do you know how many were rehired?

14     A.    100.

15     Q.    How many were let go during the two weeks,

16  the first two weeks, of COVID?

17     A.    300.

18     Q.    And then after two weeks, 100 were rehired?

19     A.    The rehire -- whoever was onsite at that

20  moment stayed.  And then the number that John

21  Thomason gave us, we met that number.

22     Q.    Right.

23           Do you know how many were onsite during the

24  two weeks?

25     A.    I don't recall total.

1     Q.   But there were M.J. Dean employees
2   onsite --
3     A.   Yes.
4     Q.   -- during the first two weeks of COVID?
5          And then after the two weeks, you're saying
6   another group of a hundred or more were rehired?
7     A.   I'm saying that the total would have been a
8   hundred with the people -- with the workers that
9   were still onsite.
10     Q.   Okay.  And did more people get rehired
11   later in 2020?
12     A.   Yes.
13     Q.   And when -- when -- at what point in time
14   later in 2020 did people get rehired?
15     A.   I don't recall the exact date.
16     Q.   Did there come a time when most of the
17   people that were there before COVID were rehired
18   during the 2020 period?
19          MR. ROSENTHAL:  Objection, vague and
20   ambiguous.
21   BY MR. MARKS:
22     Q.   You can answer.
23     A.   Yes.
24     Q.   And what point in time was that?
25     A.   July.

AdvancedONE LEGAL          (866) 715-7770
                           advancedONE.com

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                    Page 28
KEVIN GUTIERREZ, 07/29/2021

1      Q.   July of 2020?

2      A.   Yes.

3      Q.   All right.  During the year 2020, did you

4   ever have to run a night crew for this project?

5      A.   Yes.

6      Q.   Do you know when the night crew first

7   started?

8      A.   The -- I don't know.  I don't know.  I

9   don't recall.

10     Q.   But at some point in 2020?

11     A.   Yes.

12     Q.   Were workers getting overtime --

13     A.   Yes.

14     Q.   -- in --

15          And at what point in time were workers

16   getting overtime?

17          MR. ROSENTHAL:  Objection, vague and

18   ambiguous.

19   BY MR. MARKS:

20     Q.   In 2020.

21          MR. ROSENTHAL:  Objection, vague and

22   ambiguous.

23   BY MR. MARKS:

24     Q.   You can answer.

25     A.   Overtime came daily.

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

1    Q.    During all of 2020?

2    A.    There was periods when we worked overtime,

3  and there was periods when we didn't work overtime

4  depending on the scope of work.

5    Q.    In 2020?

6    A.    Yes.

7    Q.    Why is there overtime versus hiring other

8  people?  Explain that.

9          MR. ROSENTHAL:  Objection, calls for

10  speculation, vague and ambiguous.

11  BY MR. MARKS:

12    Q.    You can answer.

13    A.    If I'm pouring concrete, concrete pours

14  takes a little longer.  That would be considered to

15  be overtime.

16    Q.    And why would you use night crew?

17          Is that to speed up the project?

18          MR. ROSENTHAL:  Objection, incomplete

19  hypothetical, vague and ambiguous, calls for

20  speculation.

21  BY MR. MARKS:

22    Q.    You can answer.

23    A.    I believe night crew was so there wasn't so

24  many workers working on top of each other.

25    Q.    During the day?



```
 1      A.   Yes.  More production with two different
 2   crews.
 3      Q.   Now, the MSG Sphere, that's a Madison
 4   Square Garden project?
 5           "MSG" is Madison Square Garden?
 6      A.   Yes.
 7      Q.   And that's Dolan, the owner of the Knicks
 8   and Madison Square Garden?
 9           MR. ROSENTHAL:  Objection, calls for
10   speculation.
11   BY MR. MARKS:
12      Q.   Do you know who owns the MSG?
13      A.   I'm not sure exactly who the owner is.
14      Q.   Okay.  But this was going to be a concert
15   hall?
16      A.   Yes.
17      Q.   In -- so in terms of the completion, from
18   the window that you're -- in the offices you're at,
19   you can see MSG Sphere, correct?
20      A.   Yes.
21      Q.   And how far along would you estimate the
22   construction is?
23      A.   How far along?
24      Q.   Yeah.  Like what percentage of completion?
25      A.   I would say 40 percent.  I'm not
```

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                    Page 31
KEVIN GUTIERREZ, 07/29/2021

1  involved with -- I'm only involved with concrete.

2      Q.   But you estimate -- based on your

3  construction background, you think it's 40 percent

4  complete?

5      A.   Yes.

6      Q.   And you can see a Sphere, right?

7           You can see a Sphere coming out of the

8  ground from that law firm's offices, correct?

9      A.   Yes.

10     Q.   At what percent of completion was the MSG

11 Sphere project in April of 2020?

12          MR. ROSENTHAL:  Objection, calls for

13 speculation, vague and ambiguous.

14 BY MR. MARKS:

15     Q.   You can answer.  Go ahead.

16     A.   20 percent.

17     Q.   On the MSG Sphere project, did you ever see

18 racist graffiti in a bathroom?

19     A.   Yes.

20     Q.   And at what point in time did you see it?

21     A.   Throughout the job.

22     Q.   And did you take any steps to do anything

23 about that racist graffiti?

24     A.   I report that to safety.

25     Q.   So who did you report it to?

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                          Page 32
KEVIN GUTIERREZ, 07/29/2021

1        A.    I don't recall.
2        Q.    **Did you ever try to clean or take down the**
3   **graffiti?**
4        A.    No.
5        Q.    **Do you know if anybody tried to clean or**
6   **take down the graffiti?**
7        A.    Yes.
8        Q.    **Who did?**
9        A.    It would be the people that are in charge
10  of the restrooms.  It's reported to safety.  Safety
11  makes it an issue.  They bring the restroom people
12  out.  They get rid of the graffiti.
13       Q.    **So, from your knowledge, was the graffiti**
14  **cleaned up and then put back?**
15            MR. ROSENTHAL:  Objection, vague and
16  ambiguous, incomplete hypothetical, lacks
17  foundation.
18  BY MR. MARKS:
19       Q.    **You can answer.**
20       A.    Repeat the question, please.
21       Q.    **So your attorney can object.  Unless he**
22  **tells you, Don't answer, you're still going to**
23  **answer.**
24            **So I can re-ask the question.  He's going**
25  **to make his objection.  Keep the question in mind,**

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                          Page 33
KEVIN GUTIERREZ, 07/29/2021

1    and then I would expect you to answer.

2            Do you understand that?

3        A.    Yes.

4        Q.    Okay.  Just by way of background, you said

5    there had been racist graffiti at the Sphere project

6    throughout the project, correct?

7        A.    Yes.

8        Q.    So do you recall a time when there was

9    racist graffiti and then you noticed it was cleaned

10   up and then you noticed it was put back in?

11       A.    Yes.

12       Q.    And how many different occasions did that

13   happen?

14       A.    200.

15       Q.    So during the -- this is during the

16   one-year period from 2019 to 2020, this happened 200

17   times?

18       A.    It's an ongoing thing in construction.

19       Q.    I'm talking about at the Sphere project.

20            It happened 200 times during the year?

21       A.    It's an estimate.

22       Q.    Okay.  If we went to the Sphere project

23   today to the bathroom, would we see racist graffiti?

24            MR. ROSENTHAL:  Objection, calls for

25   speculation.

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                          Page 34
KEVIN GUTIERREZ, 07/29/2021

```
 1   BY MR. MARKS:
 2       Q.   Would we see racist graffiti?
 3            MR. ROSENTHAL:  Objection, calls for
 4   speculation.
 5   BY MR. MARKS:
 6       Q.   You can answer, sir.
 7            MR. ROSENTHAL:  If you know the answer, you
 8   can go ahead.
 9            THE WITNESS:  I don't -- I don't know.
10            MR. MARKS:  Right.  Rob, stop coaching the
11   witness.
12            MR. ROSENTHAL:  Go ahead.  You can ask your
13   questions.
14            MR. MARKS:  We can call the magistrate if
15   you coach the witness.
16    (Thereupon, an off-the-record discussion was had.)
17   BY MR. MARKS:
18       Q.   Mr. Gutierrez, you were at Mr. Colvin's
19   deposition, correct?
20       A.   Yes.
21       Q.   All right.  And you had an opportunity to
22   see exhibits that your attorney showed Mr. Colvin,
23   correct?
24       A.   Yes.
25              (Exhibit 8 Graffiti introduced.)
```

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                          Page 35
KEVIN GUTIERREZ, 07/29/2021

```
 1   BY MR. MARKS:
 2       Q.   This Exhibit 8 of this deposition was
 3   Exhibit I of Mr. Colvin's deposition.
 4           So you had an opportunity to see that at
 5   Mr. Colvin's deposition, correct?
 6       A.   Yes.
 7       Q.   And it says:  Burn all niggers, white
 8   power, Trump 2020.
 9           Had you ever seen this in the bathrooms at
10   the Sphere project in --
11       A.   I never seen this.
12       Q.   Excuse me?
13       A.   No.
14       Q.   What type of graffiti did you see?
15           MR. ROSENTHAL:  Objection, vague and
16   ambiguous.
17           THE WITNESS:  It could go between a range
18   from this -- it can go Hispanic.  It could be
19   something about whites.  Numerous.
20   BY MR. MARKS:
21       Q.   All right.  Let's talk about racial
22   anti-black graffiti.
23           What types of anti-black graffiti did you
24   see there?
25           MR. ROSENTHAL:  Objection, vague and
```

 1  ambiguous.

 2  BY MR. MARKS:

 3      Q.    In the bathrooms at the Sphere project.

 4          MR. ROSENTHAL:  Objection, vague and

 5  ambiguous, overbroad.

 6  BY MR. MARKS:

 7      Q.    You can answer.

 8      A.    There was all types.

 9      Q.    Just give me an example.

10          MR. ROSENTHAL:  Objection, vague and

11  ambiguous, overbroad.

12          THE WITNESS:  I assume it's something like

13  this.

14  BY MR. MARKS:

15      Q.    So something like you this you saw in the

16  bathrooms at the Sphere project in 2019/2020; is

17  that correct?

18      A.    Yes.

19      Q.    And you're saying you saw this

20  approximately -- very frequently on the Sphere

21  project; is that right?

22          MR. ROSENTHAL:  Objection, misstates

23  testimony.

24  BY MR. MARKS:

25      Q.    Sir, you can answer.

1        **You've see this type of anti-black comments**
2   **in the bathrooms at the Sphere project frequently?**
3            MR. ROSENTHAL:  Objection, misstates
4   testimony.
5   BY MR. MARKS:
6        **Q.   You can answer.**
7        A.   I wasn't referring to just black.  It's
8   black, Hispanic, Caucasian.
9            And, yes, it happens on and off.  It's
10  reported to safety.  When the people in charge of
11  the restrooms come, they take care of it.
12       **Q.   Okay.  What did they say -- we're going to**
13  **go through each group.**
14           **What type of comments did they make about**
15  **black people?**
16       A.   I don't --
17           MR. ROSENTHAL:  Objection.
18           THE WITNESS:  -- recall.
19           MR. ROSENTHAL:  Stop.  Let me state my
20  objection first and then you can speak.  Okay?
21           THE WITNESS:  All right.
22           MR. ROSENTHAL:  Objection, vague and
23  ambiguous, overbroad.
24  BY MR. MARKS:
25       **Q.   You can answer.**

```
 1        A.    I don't recall.
 2        Q.    Was it similar to this?
 3              MR. ROSENTHAL:  Objection, vague and
 4   ambiguous.
 5   BY MR. MARKS:
 6        Q.    You can answer.
 7        A.    No.
 8        Q.    You didn't see other comments similar to
 9   this?
10              MR. ROSENTHAL:  Objection, vague and
11   ambiguous.
12   BY MR. MARKS:
13        Q.    You can answer.
14        A.    I don't recall.
15        Q.    What about Hispanic people?
16              What did you recall?
17              MR. ROSENTHAL:  Objection, vague and
18   ambiguous.
19              THE WITNESS:  I don't recall.
20   BY MR. MARKS:
21        Q.    Negative comments about Hispanic people?
22              MR. ROSENTHAL:  Objection, vague and
23   ambiguous.
24   BY MR. MARKS:
25        Q.    You can answer.
```

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

1      A.   Yes.

2      Q.   **What did you recall seeing?**

3      A.   I don't recall.

4      Q.   **What were the comments about white people?**

5      A.   I don't recall.

6           MR. MARKS:  Let's put up Exhibit 9.

7             (Exhibit 9 Graffiti introduced.)

8   BY MR. MARKS:

9      Q.   **All right.  Did you ever see comments such**

10  **as Exhibit 9 anywhere at the Sphere project in 2019**

11  **and 2020?**

12     A.   Yes.

13     Q.   **On how many occasions?**

14     A.   I don't recall.

15     Q.   **Was it frequent?**

16          MR. ROSENTHAL:  Objection, vague and

17  ambiguous.

18  BY MR. MARKS:

19     Q.   **You can answer.**

20     A.   I'm going to say it's on and off.  It's

21  ongoing.

22     Q.   **And what did you -- when you saw it, what**

23  **did you do about it?**

24     A.   Report it to safety.

25     Q.   **Do you know what safety did about it?**

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                          Page 40
KEVIN GUTIERREZ, 07/29/2021

1      A.   They would get ahold -- they would -- M.J.
2  Dean has a policy.   They don't deal with any type of
3  discrimination.
4      Q.   So what did they do?
5      A.   So there would be meetings about it, and
6  they would get it -- they would have it cleaned up.
7      Q.   Was there ever a discussion regarding
8  anti-discrimination policies?
9           Did the company ever call a meeting to
10  discuss this type of graffiti on the job?
11      A.   There has been.
12      Q.   When was the last one?
13      A.   I don't recall.
14      Q.   Do you know how many meetings they ever
15  had?
16           MR. ROSENTHAL:   Objection, vague and
17  ambiguous.
18  BY MR. MARKS:
19      Q.   You can answer.
20      A.   No.
21      Q.   During 2020, was there white supremacy talk
22  relating to Trump's reelection?
23           MR. ROSENTHAL:   Objection, vague and
24  ambiguous.
25           THE WITNESS:   Yes.

 1  BY MR. MARKS:
 2      Q.   Were there people having swastikas tattooed
 3  on themselves?
 4           MR. ROSENTHAL:  Objection --
 5           THE WITNESS:  No.
 6           MR. ROSENTHAL:  -- vague and ambiguous.
 7  BY MR. MARKS:
 8      Q.   What was the nature of the white supremacy
 9  talk on the Sphere project in 2020?
10      A.   Trump supporters.
11      Q.   Right.  But what did they say regarding
12  white supremacy?
13           MR. ROSENTHAL:  Objection, vague and
14  ambiguous.
15           THE WITNESS:  I don't recall.
16  BY MR. MARKS:
17      Q.   But you did hear comments?
18      A.   Yes.
19      Q.   What did you do when you heard those
20  comments?
21           MR. ROSENTHAL:  Objection, vague and
22  ambiguous.
23  BY MR. MARKS:
24      Q.   You can answer.
25      A.   The comments --

1    Q.   I didn't hear your answer.

2    A.   It went in one ear and out the other.

3    Q.   So you didn't do anything about the

4  comments?

5    A.   Comments from people?

6    Q.   Yeah.   Comments?   White supremacist's

7  comments?

8         MR. ROSENTHAL:   Objection, vague and

9  ambiguous.

10 BY MR. MARKS:

11   Q.   Did you do anything when you heard

12 employees of M.J. Dean making white supremacy

13 comments?

14        MR. ROSENTHAL:   Objection, lacks

15 foundation, misstates testimony.

16        THE WITNESS:   No.   No.

17 BY MR. MARKS:

18   Q.   When's the last time you saw anti-black

19 graffiti at the Sphere project?

20        How long ago?

21   A.   Two months.

22   Q.   And what was the nature of the graffiti?

23        What did it say?

24   A.   I don't recall.

25   Q.   Was it similar to what I showed you?

```
 1            MR. ROSENTHAL:  Objection, vague and
 2   ambiguous.
 3            THE WITNESS:  I don't recall.
 4   BY MR. MARKS:
 5       Q.   You can answer.
 6       A.   I don't recall.
 7       Q.   You don't recall what you saw?
 8       A.   No.
 9       Q.   You're aware that in November of 2019,
10   Parnell Colvin accused you of using the N-word
11   directed to him; isn't that correct?
12       A.   Yes.
13       Q.   And you denied using it, correct?
14       A.   Yes.
15       Q.   And were you and Mr. Colvin separated after
16   that point in time?
17       A.   Yes.
18            MR. ROSENTHAL:  Objection, vague and
19   ambiguous.
20   BY MR. MARKS:
21       Q.   You can answer.
22       A.   Yes.
23       Q.   And he was transferred to another area,
24   correct?
25       A.   Yes.
```

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                    Page 44
KEVIN GUTIERREZ, 07/29/2021

```
 1        Q.    And that was the yard, correct?
 2        A.    Yes.
 3        Q.    And was that done by Mr. Thomason?
 4        A.    Yes.
 5        Q.    And when Mr. Colvin was laid off, did you
 6   tell him he was laid off?
 7        A.    I'm the one that brought the checks.
 8        Q.    Did you specifically tell him, You're laid
 9   off?
10        A.    Yes.
11        Q.    Even though you're saying you had nothing
12   to do with the decision to lay him off?
13        A.    It was not my decision.
14        Q.    And you're saying you had nothing to do
15   with the decision to not bring him back?
16        A.    I did not.
17        Q.    Okay.
18              MR. MARKS:   Rob, I think this would be a
19   good time to take a ten-minute break so I can
20   communicate with my client, and then we'll come back
21   and finish up.
22              (Thereupon, a break was taken.)
23   BY MR. MARKS:
24        Q.    Mr. Gutierrez, isn't it true you told
25   Mr. Colvin that he was terminated and then he got
```

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                    Page 45
KEVIN GUTIERREZ, 07/29/2021

1   his paycheck the next day?

2      A.   I don't recall.

3      Q.   You testified before the break you recall

4   he got terminated and you gave him the paycheck the

5   same date.

6           Now you don't recall?

7      A.   I gave him the checks the day he was laid

8   off.  You stated the next day.

9      Q.   Wasn't he laid off on one day and he got

10  his check the next day?

11     A.   He should have received the checks the same

12  day.

13     Q.   Did you ever complain about the graffiti in

14  the bathrooms to safety?

15          Did you personally ever complain?

16     A.   Yes.

17     Q.   And do you know whether safety ever

18  investigated?

19     A.   Yes.

20     Q.   And did they ever find out who did the

21  graffiti?

22     A.   I don't know.

23     Q.   Do you know who at the safety department

24  investigated?

25     A.   Paul Rosequist.

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                    Page 46
KEVIN GUTIERREZ, 07/29/2021

1     Q.   Is he still employed there?

2     A.   Yes.

3     Q.   After the graffiti and the white supremacy

4  talk, were there actually meetings with the

5  employees of Dean, meaning the laborers, to discuss

6  what had happened?

7          MR. ROSENTHAL:  Objection, vague and

8  ambiguous.

9  BY MR. MARKS:

10     Q.   You can answer.

11     A.   Yes.

12          MR. ROSENTHAL:  Hold on.  And calls for

13  speculation.

14  BY MR. MARKS:

15     Q.   And when were -- do you recall the dates of

16  those meetings?

17     A.   I don't know.

18     Q.   Who conducted those meetings?

19     A.   Safety director.

20     Q.   And do you recall what he said?

21     A.   We have weekly safety meetings.  If

22  discrimination of any type arises, they bring it up

23  in a safety meeting and say it's not tolerated.  And

24  if it's found out who, they would be terminated.

25     Q.   Are these safety meetings with the actual

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                          Page 47
KEVIN GUTIERREZ, 07/29/2021

```
 1   laborers or just with supervisors?
 2       A.   These are with laborers, employees of the
 3   company.
 4       Q.   Do you recall the safety manager actually
 5   stating -- discussing the graffiti incidents and
 6   indicating employees would be terminated?
 7       A.   When --
 8            MR. ROSENTHAL:  Objection, vague and
 9   ambiguous, calls for speculation.
10   BY MR. MARKS:
11       Q.   You can answer.
12       A.   When?
13       Q.   At any point in time in 2019 or 2020.
14       A.   Yes.
15       Q.   And have those safety meetings regrading
16   graffiti continued in 2021?
17       A.   Yes.
18       Q.   Now, were any memos or notices sent to the
19   actual laborers about the graffiti?
20       A.   There's a safety sheet that comes out.  And
21   when they do the meeting, it's spoke upon and
22   everybody signs the sheet, the safety sheet.
23       Q.   So why do you think that safety is
24   discussing the graffiti that continues to be
25   discriminatory graffiti on the jobsite at Sphere?
```

1           **Why do you think that's happening?**

2           MR. ROSENTHAL:  Objection, calls for

3   speculation, vague and ambiguous.

4   BY MR. MARKS:

5      **Q.   You can answer.**

6           MR. MARKS:  All right.  I'll pass the

7   witness.

8           MR. ROSENTHAL:  Witness said, "no."

9           I don't have any questions.

10          MR. MARKS:  All right.  And you'll take

11  care of the reading and signing with this witness?

12          MR. ROSENTHAL:  Yes.

13                      - - - - -

14

15          (Proceedings concluded at 11:17 a.m.)

16

17

18

19

20

21

22

23

24

25

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                         Page 49
KEVIN GUTIERREZ, 07/29/2021

```
1                    CERTIFICATE OF DEPONENT

2   PAGE    LINE    CHANGE                        REASON

3   _____

4   _____

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17                  *   *   *   *   *

18        I, KEVIN GUTIERREZ, deponent herein, do
    hereby certify and declare the within and foregoing
19  transcription to be my deposition in said action;
    under penalty of perjury; that I have read,
20  corrected and do hereby affix my signature to said
    deposition.
21
                    _____
22                  KEVIN GUTIERREZ, Deponent

23

24

25
```



(866) 715-7770
advancedONE.com

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                           Page 50
KEVIN GUTIERREZ, 07/29/2021

1                    CERTIFICATE OF REPORTER

2     STATE OF NEVADA    )
                         )   SS:
3     COUNTY OF CLARK    )

4              I, Jackie Jennelle, RPR, CCR #809, Clark

5     County, State of Nevada, do hereby certify:  That I

6     reported the video conference deposition of KEVIN

7     GUTIERREZ, commencing on THURSDAY, JULY 29, 2021, at

8     10:00 a.m.

9              That prior to being deposed, the witness

10    was duly sworn by me to testify to the truth.  That

11    I thereafter transcribed my said shorthand notes

12    into typewriting and that the typewritten transcript

13    is a complete, true and accurate transcription of my

14    said shorthand notes.

15             I further certify that I am not a relative

16    or employee of counsel, of any of the parties, nor a

17    relative or employee of the parties involved in said

18    action, nor a person financially interested in the

19    action.

20             IN WITNESS WHEREOF, I have set my hand in my

21    office in the County of Clark, State of Nevada, this

22    9th day of August, 2021.

23

24    _____

25             JACKIE JENNELLE, RPR, CCR #809

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

# EXHIBIT 12

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA


PARNELL COLVIN,              )
                            )
        Plaintiff,          )
                            )
        vs.                 ) CASE NO.:
                            ) 2:20-cv-01765-APG-EJY
M.J. DEAN CONSTRUCTION,      )
INC.,                        )
                            )
        Defendant.          )
                            )

**CERTIFIED TRANSCRIPT**


VIDEO CONFERENCE DEPOSITION OF JOHN THOMASON
LAS VEGAS, NEVADA
THURSDAY, JULY 29, 2021


REPORTED BY:  JACKIE JENNELLE, RPR, CCR #809
JOB #416110



COLVIN vs M.J. DEAN CONSTRUCTION, INC.                          Page 2
JOHN THOMASON, 07/29/2021

```
 1    APPEARANCES (ALL VIA VIDEO CONFERENCE):

 2   For the Plaintiff:

 3          LAW OFFICE OF DANIEL MARKS
            BY:  DANIEL MARKS, ESQ.
 4          BY:  NICOLE M. YOUNG, ESQ.
            610 South Ninth Street
 5          Las Vegas, Nevada  89101
            (702) 386-0536
 6          office@danielmarks.net

 7   For the Defendants:

 8          HOWARD & HOWARD ATTORNEYS PLLC
            BY:  ROBERT L. ROSENTHAL, ESQ.
 9          3800 Howard Hughes Parkway, Suite 100
            Las Vegas, Nevada  89169
10          (702) 257-1483
            rrosenthal@howardandhoward.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



COLVIN vs M.J. DEAN CONSTRUCTION, INC.                    Page 3
JOHN THOMASON, 07/29/2021

```
 1                    I   N   D   E   X

 2
     WITNESS:   JOHN THOMASON
 3

 4                       EXAMINATION
                                                    PAGE
 5
      BY MR. MARKS                                  4
 6

 7               EXHIBITS INTRODUCED
     EXHIBIT                                        PAGE
 8
      Exhibit 6    Employee Incident Form           19
 9    Exhibit 7    E-Mail                            22
      Exhibit 8    Graffiti                          24
10    Exhibit 9    Graffiti                          26

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

```
 1                    LAS VEGAS, NEVADA

 2              THURSDAY, JULY 29, 2021; 2:00 p.m.

 3                          -o0o-

 4    Thereupon--

 5                    JOHN THOMASON,

 6    was called as a witness, and having been first duly

 7    sworn, was examined and testified as follows:

 8                         EXAMINATION

 9    BY MR. MARKS:

10        Q.    Could you state your name, please?

11        A.    John Wesley Thomason.

12              MR. MARKS:  And, Rob, we're agreeing to do

13    this by Zoom based on the uptick in COVID; is that

14    correct?

15              MR. ROSENTHAL:  That's correct.

16              MR. MARKS:  And I wasn't aware that

17    Mr. Thomason had any issues.  If he can't hear me at

18    some point, you can either tell me or he can raise

19    his hand or something.

20              We'll see what we can do; is that okay?

21              MR. ROSENTHAL:  Do you understand that,

22    Mr. Thomason?

23              THE WITNESS:  Yes, sir.

24    BY MR. MARKS:

25        Q.    All right.  What's your business address,
```

AdvancedONE LEGAL

(866) 715-7770
advancedONE.com

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                          Page 5
JOHN THOMASON, 07/29/2021

1    sir?

2        A.    5055 West Patrick Lane, Suite 101.

3        Q.    **And who do you work for?**

4        A.    M.J. Dean Construction.

5        Q.    **How long have you worked there?**

6        A.    Since 1995.

7        Q.    **And what is your current title?**

8        A.    Director of field of operations.

9        Q.    **And could you tell me what that entails,**

10   **what your job entails?**

11       A.    I am to create schedules, work with the

12   owners, manage the construction sites, manage the

13   superintendents and the supervision.

14       Q.    **And how long have you had that title,**

15   **director of field operations?**

16       A.    Four years.

17       Q.    **And prior to that job, did you have another**

18   **job at Dean Construction?**

19       A.    Yes, sir.

20       Q.    **And what was that?**

21       A.    Superintendent.

22       Q.    **And what was the job of superintendent?**

23       A.    To manage specific jobs.

24       Q.    **Is it fair to say that you worked your way**

25   **up to more responsible positions during the 26 years**

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

1   you've worked for Dean Construction?

2       A.   Yes, sir.

3       Q.   What was -- what did you start at in 1995?

4       A.   As a union carpenter.

5       Q.   And how long were you a union carpenter

6   before you got into management?

7       A.   With M.J. Dean, sir?

8       Q.   Yes.

9       A.   One year.

10      Q.   Prior to Dean, did you work at other

11  construction companies?

12      A.   Yes, sir.

13      Q.   And where did you work prior to Dean?

14      A.   What year, sir, are you looking for?

15      Q.   Before 1995.

16           What other companies did you work for?

17      A.   I worked for Sequoia Construction.  I

18  worked for Marnell Corrao and I worked for Grove

19  Construction.  And I've worked for Sletten

20  Construction.

21      Q.   So how long have you been in the

22  construction industry?

23      A.   Since 1986.

24      Q.   Prior to starting in the construction

25  industry, what was your educational background?

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                    Page 7
JOHN THOMASON, 07/29/2021

1     A.   High school.  I didn't finish high school,
2  but 12th grade.
3     Q.   And what -- where did you go to high
4  school?
5     A.   El Dorado High School.
6     Q.   Okay.  And that's in the Las Vegas area?
7     A.   Yes, sir.
8     Q.   And were you in management at any company
9  prior to Dean?
10     A.   No, sir.
11     Q.   So you mentioned Sequoia, Marnell, Grove,
12  and Sletten, I think.
13          Were you a union carpenter for those
14  companies?
15     A.   Yes, sir.
16     Q.   So when you got into management at Dean,
17  after which would have been around 1996, did you
18  hold any positions prior to your position of
19  superintendent?
20     A.   Yes, sir.  General foreman.
21     Q.   Okay.  And do you recall how many years you
22  were a general foreman?
23     A.   Less than a year.
24     Q.   So after general foreman, were you promoted
25  to superintendent?

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                          Page 8
JOHN THOMASON, 07/29/2021

1      A.   Yes, sir.
2      Q.   As I understand it in layman's terms, a
3   superintendent essentially runs one project?
4      A.   Yes, sir.
5      Q.   And your current job of director of field
6   operations, you're in charge of all the projects
7   that Dean has; is that right?
8      A.   Right now I'm in charge of one project.
9      Q.   What project is that?
10     A.   The Madison Square Garden Sphere.
11     Q.   Okay.  But I thought you said as director
12   of field operations, I thought you said you were in
13   charge of all the projects?
14     A.   Before the Madison Square Garden Sphere I
15   was in charge of all projects.  Once the Sphere
16   started, I was asked to be the superintendent for
17   that particular project.
18     Q.   And is that because this is a big project,
19   the MSG Sphere?
20     A.   Yes, sir.
21     Q.   All right.  And when did that project
22   start?
23     A.   November, December 2018.
24     Q.   And that project is -- the owner of that
25   Dolan, who owns Madison Square Garden?

```
 1            MR. ROSENTHAL:  Objection, calls for
 2    speculation.
 3    BY MR. MARKS:
 4        Q.   Sir, you can answer even though there's
 5    objections, unless he instructs you not to answer.
 6            Do you understand that?
 7        A.   Yes, sir.
 8        Q.   Do you know who the owner is of the Sphere
 9    project?
10        A.   I believe the owner is Mr. James Dolan.
11        Q.   Okay.  And MSG stands for Madison Square
12    Garden, the same Madison Square Garden as in New
13    York City, correct?
14        A.   Yes, sir.
15        Q.   All right.  This could be a good time to go
16    over the ground rules.
17            Did you have a chance to talk to your
18    attorney about the rules of the road in a
19    deposition?
20        A.   Yes, sir.
21        Q.   In addition to what he told you, I'll
22    summarize the rules.  The oath that the court
23    reporter gave you is the same oath as if we were in
24    court.
25            Do you understand that?
```

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                    Page 10
JOHN THOMASON, 07/29/2021

```
 1      A.   Yes, sir.
 2      Q.   So even though we're on a Zoom setting,
 3   you're under the same obligation to tell the truth
 4   and the same penalties of perjury if you fail to
 5   tell the truth here today.
 6           Do you understand?
 7      A.   Yes, sir.
 8      Q.   The questions and answers and any comments
 9   by your attorney will be typed up in a booklet form
10   in the next two to three weeks.
11           You'll have an opportunity to read and sign
12   the booklet if you choose.
13           Do you understand?
14      A.   Yes, sir.
15      Q.   And if you want to make changes, you're
16   allowed under the rules to make changes.  However,
17   if you made a change of a major nature and the
18   matter went to trial, the attorneys could comment on
19   your change.
20           Do you understand?
21      A.   Yes, sir.
22      Q.   So if it was a car accident and today you
23   said the traffic light was green and you change your
24   testimony later to yellow, the attorneys could
25   comment and that could affect your credibility or
```

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                    Page 11
JOHN THOMASON, 07/29/2021

1    believability.

2            Do you understand?

3       A.   Yes, sir.

4       Q.   Your attorney is allowed to object, so let

5    him object.  If he doesn't say anything beyond that,

6    you would be obligated to still answer.

7            Do you understand?

8       A.   Yes, sir.

9       Q.   And that's because there's no judge.  It's

10   just the attorneys, my client, and you.  And any

11   objections would have to be discussed at a later

12   date.  So we're going to try to move it along by

13   just letting him object and continuing your answer.

14           Do you understand?

15      A.   Yes, sir.

16      Q.   Okay.  Did you review anything in

17   preparation for the deposition?

18      A.   It's been -- yes.

19      Q.   What did you review?

20      A.   Earlier this week.

21      Q.   What?

22           What documents did you review?

23      A.   Just daily reports and witness statements,

24   just to refresh my memory.

25      Q.   Daily reports?

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

1     A.   Well, layoff sheets, witness statements,
2  just trying to refresh my memory.
3     Q.   What witness statements did you review?
4     A.   M.J. Dean employee witness statements.
5     Q.   Do you know how many witness statements?
6     A.   I believe three.
7     Q.   Who were they of?
8     A.   Parnell Colvin, Kevin Gutierrez, David
9  McGrandy [phonetic].  And I'm sorry, there was a
10  fourth one, Ricky Flores.
11     Q.   And were those witness statements relating
12  to the N-word incident?
13     A.   Yes.
14     Q.   And what layoff sheets did you review?
15     A.   The Madison Square Garden Sphere layoffs
16  due to the shutdown.
17     Q.   And are these documents you kept at your
18  office?
19     A.   Yes, sir.
20     Q.   Do you know whether those have been
21  produced in this case through the attorneys?
22     A.   I do not.
23     Q.   Did you review any other documents?
24     A.   No.
25     Q.   Have you ever had a deposition taken

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                          Page 13
JOHN THOMASON, 07/29/2021

1   before?

2        A.   Yes, sir.

3        Q.   How long ago?

4        A.   Probably 2003, 2004, somewhere around

5   there, approximately.

6        Q.   And was that in connection with your job at

7   Dean?

8        A.   I'm sorry, sir.  I don't understand your

9   question.

10       Q.   What type of case was it that you had your

11   deposition taken?

12       A.   A crane operator got hurt on a weekend.

13       Q.   So it was in connection with your

14   responsibilities for Dean?

15       A.   No, sir.

16       Q.   It was at another company?

17       A.   No.  I was still with Dean.

18       Q.   Were you a witness to it?

19       A.   No, sir.

20       Q.   Why was your deposition taken?

21       A.   I believe it was taken because I was the

22   superintendent on the project.

23       Q.   So why was that not related to your

24   employment with Dean?

25            MR. ROSENTHAL:  I'm going to object that it

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

1   misrepresents testimony.

2   BY MR. MARKS:

3        Q.    There was an accident -- okay.  Maybe I'm

4   not understanding.  Maybe you're not understanding

5   me or I'm not understanding you.

6             You -- apparently there was an accident on

7   the job where Dean was the contractor, correct?

8        A.    Yes.

9        Q.    And you were the superintendent?

10       A.    Yes.

11       Q.    So because you were the superintendent,

12   somebody -- one of the attorneys wanted to depose

13   you and get information; is that right?

14       A.    I believe so, yes, sir.

15       Q.    Okay.  Is that your last deposition?

16       A.    Yes, sir.  My one and only.

17       Q.    Okay.  Have you ever testified in court?

18       A.    No, sir.

19       Q.    Okay.  So let's come back to the Sphere

20   project.

21             How long was the Sphere project planned?

22             How long was the construction timetable for

23   the Sphere?

24       A.    What part of the construction?

25       Q.    The whole construction.

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                    Page 15
JOHN THOMASON, 07/29/2021

```
 1              MR. ROSENTHAL:  Objection, vague and
 2    ambiguous.
 3    BY MR. MARKS:
 4        Q.   How long from the beginning of the project
 5    to completion?
 6        A.   From start to turnkey?
 7        Q.   Yeah.
 8        A.   2019 to 2023.
 9        Q.   And what role was Dean?
10             Were you the general contractor?
11             MR. ROSENTHAL:  Objection, vague and
12    ambiguous.
13    BY MR. MARKS:
14        Q.   You can answer.
15        A.   M.J. Dean Construction was the concrete
16    subcontractor, and they were a joint venture with
17    AECOM Hunt as a minority partner.
18        Q.   As a general?
19        A.   As a -- we -- yes.  We loan a component,
20    some of our project management.
21        Q.   Okay.  And what role did you play in the
22    project management?
23        A.   I was the concrete superintendent.
24        Q.   Okay.  Now, prior to the Sphere project,
25    did you know Parnell Colvin?
```

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                    Page 16
JOHN THOMASON, 07/29/2021

```
 1      A.   No, sir.
 2      Q.   Okay.  When did you first meet him?
 3      A.   I met him when he was hired on the job.
 4      Q.   And do you recall what year that was?
 5      A.   2019.
 6      Q.   All right.  Did you choose Kevin Gutierrez
 7  to be the general foreman of the project?
 8      A.   Yes, I did, for the laborers.
 9      Q.   Okay.  By the way, do you have any
10  ownership interest in M.J. Dean Construction?
11      A.   I don't know how to answer that.  I am --
12  I've been with Mike basically since I got out of
13  high school.  So I am -- yes.
14      Q.   Do you own stock in the company?
15      A.   Yes, sir.
16      Q.   And are you on the board of directors?
17      A.   No, sir.
18      Q.   What percent of the company -- what percent
19  of the stock do you own?
20      A.   Four percent.
21      Q.   Are you the highest non-Dean family member
22  shareholder of the company?
23      A.   No, sir.
24      Q.   Do you report to Mike Dean?
25      A.   I report to Mike, yes, sir, and two others.
```

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                    Page 17
JOHN THOMASON, 07/29/2021

1      Q.    Who are the two others?

2      A.    Perry Eiman and Todd Leitel.

3      Q.    Are they owners of the company?

4      A.    Yes.

5      Q.    Are you the highest ranking non- -- well,

6    you own shares.

7            Are you the highest ranking day-to-day

8    manager of the company?

9            MR. ROSENTHAL:  Objection, vague and

10   ambiguous.

11   BY MR. MARKS:

12     Q.    In the hierarchy of the company, is Mike

13   Dean the president?

14     A.    Yes, sir.

15     Q.    And under Mike Dean in the hierarchy, who

16   is next under Mike Dean?

17     A.    Perry Eiman.

18     Q.    And what about below him?

19     A.    Todd Leitel.

20     Q.    And then you?

21     A.    Yes, sir.

22     Q.    Okay.

23     A.    Only -- sorry --

24           MR. ROSENTHAL:  Go ahead.

25           THE WITNESS:  Only over the field.

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                    Page 18
JOHN THOMASON, 07/29/2021

```
 1   BY MR. MARKS:
 2        Q.   Field?
 3        A.   Yes, sir.
 4        Q.   Okay.  Now, on the Sphere project, did you
 5   hire Parnell Colvin?
 6        A.   Yes, sir.
 7        Q.   Okay.  And you're saying you hired him but
 8   didn't know him prior?
 9        A.   Yes.
10        Q.   Did you have a way of checking his
11   experience and what projects he had been on?
12        A.   No.
13        Q.   Okay.  Now, was it brought to your
14   attention by Parnell that he was called the N-word
15   by Kevin Gutierrez?
16        A.   I'm sorry.  Could you please repeat that?
17        Q.   At some point in time on the project, was
18   it brought to your attention by Parnell Colvin that
19   he was called the N-word by Kevin Gutierrez?
20        A.   Parnell and AECOM Hunt George brought it to
21   my attention.  But -- that's it.
22        Q.   And who is George from Hunt?
23        A.   He's a safety director.
24        Q.   Okay.  And is there a policy at Dean, an
25   anti-discrimination policy at Dean?
```

AdvancedONE LEGAL
(866) 715-7770
advancedONE.com

APP320

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                    Page 19
JOHN THOMASON, 07/29/2021

1     A.   Yes.

2     Q.   **And that's contained in the code of safe**

3  **practices and anti-drug and harassment policies?**

4     A.   It's in the handbook, sir.  I can't quote

5  exactly where it's at.

6     Q.   **Okay.  It's in the employee handbook,**

7  **correct?**

8     A.   Yes, sir.

9     Q.   **Okay.  And Dean strives to maintain an**

10 **environment free from discrimination and harassment,**

11 **correct?**

12    A.   Zero tolerance.

13    Q.   **And that includes zero tolerance for race**

14 **discrimination, correct?**

15    A.   If it's proven correct or proven that it

16 happened, then, yes, sir.

17    Q.   **Okay.  So isn't it true that Parnell did do**

18 **a report in which he claimed that Kevin Gutierrez**

19 **had called him the N-word, correct?**

20    A.   Parnell did do a statement with our safety

21 director, site safety director, as well as the

22 witness statements.

23         MR. MARKS:  Let's -- Nicole, if you could

24 put up Exhibit 6.

25    (Exhibit 6 Employee Incident Form introduced.)

1    BY MR. MARKS:

2        Q.   So this is an employee incident

3    investigation report that Parnell did on

4    November 14th of 2019 where he accused Kevin

5    Gutierrez of calling him the N-word.

6             You received a copy of this?

7        A.   I was shown a copy, yes, sir.

8        Q.   Who showed it to you?

9        A.   Our site safety director, Paul.

10       Q.   What is Paul's last name?

11       A.   Paul Rosequist.

12       Q.   When an employee makes a claim of race

13   discrimination, how is that handled in M.J. Dean

14   Construction company?

15            MR. ROSENTHAL:  Objection, vague and

16   ambiguous, incomplete hypothetical, calls for

17   speculation.

18            MR. MARKS:  Again, you can just say object

19   to the form, Counsel.  That's all you're allowed to

20   do.

21   BY MR. MARKS:

22       Q.   You're allowed to answer the question.

23       A.   I'm sorry.  Could you please repeat the

24   question?

25       Q.   The question is simply:  When an employee

1   such as Parnell Colvin makes a claim of race

2   discrimination in 2019 or 2020 while working for

3   M.J. Dean Construction, how is that complaint of

4   discrimination handled?

5        A.   An investigation is done.  The witnesses

6   that Parnell told us or told Paul heard the

7   confrontation, witness statements were taken from

8   them.

9        Q.   Who did the investigation?

10       A.   I'm sorry.  Mr. Marks, can you repeat that?

11       Q.   Who for M.J. Dean did the investigation?

12       A.   Our site safety director, as I said

13   earlier.

14       Q.   And that's Mr. Rosequist?

15       A.   Yes, sir.

16       Q.   Did he ever reach -- write a report

17   reaching conclusions regarding the investigation?

18       A.   I don't recall.

19       Q.   So you don't know what the outcome of the

20   investigation was?

21       A.   Verbally I talked to Paul.  I don't recall

22   seeing his report, but I did see the witness

23   statements.

24       Q.   What did Paul tell you verbally?

25       A.   Verbally Paul said that the witness

```
 1  statements do not go with what Mr. Colvin said.
 2      Q.   Didn't Mr. Colvin say it was one-on-one,
 3  there were no witnesses to the N-word other than
 4  him?
 5      A.   I don't recall that.
 6      Q.   Okay.
 7           MR. MARKS:  Nicole, could you please put up
 8  Exhibit 7?
 9           (Exhibit 7 E-Mail introduced.)
10  BY MR. MARKS:
11      Q.   Have you ever seen Exhibit 7 before?
12      A.   No, sir.
13      Q.   No?
14      A.   I have not actually seen this, no, sir.
15      Q.   And who is Tommy Glidewell?
16      A.   He's our HR/IT.  Tommy wears a lot of hats
17  in our company.
18      Q.   So he does HR?
19      A.   Yes, sir.
20      Q.   Did you ever see a report responding to
21  this complaint by Parnell Colvin of April 24, 2020?
22      A.   I don't recall ever seeing the report.
23      Q.   Okay.  Now, during the years 2019 through
24  April of 2020, how many days a week were you at the
25  Sphere project?
```

1      A.    Who was at the Sphere project?

2      **Q.    I'm asking you how many days a week**

3  **generally in 2019 through April of 2020 -- how many**

4  **days a week were you personally at the Sphere?**

5      A.    Five days a week, six days a week.

6      **Q.    And was there an average number of hours**

7  **per day you were there?**

8      A.    Ten.  Ten hours a day.

9      **Q.    Okay.  And you were in the area where Dean**

10  **employees were working, correct?**

11      A.    I spent most of my time in the GC trailer

12  and M.J. Dean's trailer.

13      **Q.    What is the GC trailer?**

14      A.    The general contractor's trailer.

15            MR. ROSENTHAL:  Dan, could we get a full

16  screen back so we can see you?

17            MR. MARKS:  Yes.

18            Nicole, can you take down the exhibit.

19            THE WITNESS:  Thank you, Mr. Marks.  I

20  appreciate that.

21  BY MR. MARKS:

22      **Q.    Okay.  All right.  I was asking GC, that**

23  **the general was the Hunt trailer?**

24      A.    Yes, sir.

25      **Q.    Okay.  But my question is broader.  I**

1   assume you went out and actually walked the site and

2   saw the progress of construction at some points

3   during the day, correct?

4        A.   Yes, sir.

5        Q.   Okay.  While you were out on the jobsite

6   itself, did you ever hear white supremacist

7   comments?

8        A.   No, sir, I did not.

9        Q.   Did you ever hear anti-African-American,

10  negative comments about black employees?

11       A.   No, sir.

12       Q.   Okay.  Did you ever hear the N-word being

13  used?

14       A.   No, sir.

15       Q.   Did you ever hear negative comments about

16  Hispanic employees?

17       A.   No, sir.

18       Q.   All right.  Now, were you -- did you ever

19  become aware of racial discriminatory comments about

20  African-Americans in the bathrooms of the worksite

21  at the Sphere project?

22       A.   No, sir.

23            MR. MARKS:  All right.  Let's put up

24  Exhibit 8.

25            (Exhibit 8 Graffiti introduced.)

1   BY MR. MARKS:

2          Have you ever seen that graffiti in a

3   bathroom at the Sphere project in an area that Dean

4   employees were using the bathroom?

5       A.   No, sir.

6       **Q.   Were you ever advised that that graffiti**

7   **was in the bathroom?**

8       A.   No, sir.

9       **Q.   So I take it you never had any meetings**

10  **with the employees telling them not to use the**

11  **N-word, correct?**

12      A.   Our supervision has weekly safety meetings.

13  We call them toolbox meetings.  And our company

14  policies, whatever the topic may be, all kinds of

15  items including racial slurs, comments, all that is

16  brought up.  But I personally do not attend those

17  meetings.

18      **Q.   So you don't know whether or not the use of**

19  **racial slurs was ever discussed at the safety**

20  **meetings of your own personal knowledge, correct?**

21      A.   Correct.

22      **Q.   And you said you never heard any comments**

23  **of white power, white supremacy, the N-word during**

24  **the time you were out at the project?**

25      A.   Sir, I've already answered that question.

AdvancedONE
LEGAL                      (866) 715-7770
                           advancedONE.com

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                    Page 26
JOHN THOMASON, 07/29/2021

1   I have not.

2       Q.   Okay.  And no one ever told you there was

3   anti-African-American employee graffiti in the

4   bathrooms?

5            You've never heard that until today?

6       A.   That is correct.

7       Q.   So no one ever brought that to your

8   attention in the Dean company at all until I'm

9   asking you about it today?

10      A.   Sir, there's multiple subcontractors on

11  that jobsite, not just M.J. Dean.  So it's a --

12  there's 800 men that work on that job and a portion

13  of that is M.J. Dean.

14      Q.   Right.  I'm just asking if it was brought

15  to your attention --

16      A.   I've already answered that, no.

17      Q.   -- that the graffiti in Exhibit 8 was in a

18  bathroom that was used by Dean employees, yes or no?

19      A.   No.

20           MR. MARKS:  All right.  Could we put up

21  Exhibit 9?

22           (Exhibit 9 Graffiti introduced.)

23  BY MR. MARKS:

24      Q.   Did you ever see graffiti depicted in

25  Exhibit 9 at the Sphere worksite?

AdvancedONE
LEGAL                          (866) 715-7770
                               advancedONE.com

APP328

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                    Page 27
JOHN THOMASON, 07/29/2021

1       A.   No, sir.

2       Q.   Now, if you had seen graffiti like this,

3   would you have had any sort of meeting where you

4   personally addressed the Dean employees and/or the

5   other subcontractors?

6            MR. ROSENTHAL:   Objection, incomplete

7   hypothetical, calls for speculation, vague and

8   ambiguous.

9   BY MR. MARKS:

10      Q.   You can answer.

11      A.   If I heard of anything like this or seen

12  anything like that, would I address it?

13      Q.   Yeah.

14      A.   Immediately.

15      Q.   Okay.  And you didn't address it because no

16  one ever told you about it?

17      A.   I've never seen this or heard of this.

18      Q.   So Mr. Rosequist never told you about it?

19      A.   I don't know if Mr. Rosequist knew about

20  this.

21      Q.   Well, nobody ever told you about it,

22  correct?

23      A.   No.

24      Q.   This violates the Dean anti-discrimination

25  policy, doesn't it?

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                    Page 28
JOHN THOMASON, 07/29/2021

```
 1      A.   I'm sorry, sir?
 2      Q.   These comments violate Dean's
 3   anti-discrimination policy, correct?
 4      A.   Yes, sir.
 5      Q.   Now, do you know a guy named Dave Muti,
 6   M-U-T-I is the spelling?
 7      A.   Yes.
 8      Q.   And what was his position in -- relating to
 9   the Sphere project?
10      A.   Dave Muti was my acting site
11   superintendent.
12           MR. ROSENTHAL:  Could we get you back on
13   full screen again, please?
14           Thank you.
15   BY MR. MARKS:
16      Q.   And my understanding is he has health
17   problems now?
18      A.   Yes, sir.
19      Q.   And is he not working?
20      A.   No, sir.
21      Q.   And as your site superintendent, he would
22   be closer to the actual employees working in the
23   field than you would be?
24           MR. ROSENTHAL:  Objection, vague and
25   ambiguous.
```

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

1  BY MR. MARKS:

2      Q.   You can answer.

3      A.   For that job duty, site civil work, yes,

4  Dave Muti would be closer to the men in the field

5  for that.

6      Q.   In the hierarchy, it would be Kevin

7  Gutierrez as the foreman, then Dave Muti, and then

8  you in the chain of command?

9      A.   No, sir.

10     Q.   All right.  What would be the chain of

11  command?

12     A.   I'm sorry.  Mr. Marks, did you start at the

13  bottom and go up?

14     Q.   Yes.

15     A.   Yes, sir.  Well, it would be -- it would be

16  myself, our site superintendents, whether -- wait --

17  this -- this -- yes, that would be the pecking

18  order.

19     Q.   And as -- again, your title, you were the

20  general superintendent for this project, this Sphere

21  project, correct?

22     A.   Yes.

23     Q.   So you were the top Dean employee on the

24  site for the Sphere project?

25     A.   Yes.

```
 1        Q.   Okay.  So essentially, all major decisions
 2   had to go through you; is that right?
 3             MR. ROSENTHAL:  Objection, vague and
 4   ambiguous.
 5   BY MR. MARKS:
 6        Q.   Isn't that true?
 7        A.   Yes.
 8        Q.   And Dean as a co -- you said you were
 9   co-general contractor with AECOM Hunt, correct?
10        A.   Our men were loaned to AECOM Hunt to help
11   manage the project.
12        Q.   But I think you said you were in a joint
13   venture with AECOM Hunt earlier.
14             As co-general contractors you/Dean/AECOM
15   Hunt would have authority over the other subs,
16   correct?
17        A.   No, sir.
18        Q.   Who would have authority over the other
19   subs?
20        A.   AECOM Hunt.
21        Q.   Okay.  But if you saw graffiti in an area
22   where another sub was working, racial discriminatory
23   statements, the use of the N-word, you would
24   immediately bring it to AECOM Hunt's attention,
25   wouldn't you?
```

1          MR. ROSENTHAL:  Objection, incomplete
2   hypothetical, calls for speculation.
3          You can answer.
4          THE WITNESS:  We are talking about the
5   Madison Square Garden Sphere?
6   BY MR. MARKS:
7      Q.   Correct, yes.
8      A.   Okay.  If I seen anything in the site or on
9   the site, I would take it to AECOM Hunt's safety
10  personnel.
11     Q.   All right.  But since you didn't see
12  anything, you did not take any relating to
13  Mr. Colvin to AECOM Hunt's personnel, correct?
14         MR. ROSENTHAL:  Objection, vague and
15  ambiguous.
16         THE WITNESS:  I'm not sure what you're
17  talking about, sir.
18  BY MR. MARKS:
19     Q.   You never brought to AECOM Hunt's attention
20  any -- the presence of any racially discriminatory
21  graffiti, correct?
22     A.   I never seen any.
23     Q.   Okay.  Now, you had conversations with
24  Parnell one-on-one?
25     A.   No, sir.

AdvancedONE LEGAL   (866) 715-7770   advancedONE.com

1    Q.   You never had a conversation with Parnell
2  Colvin one-on-one?

3    A.   No, sir.

4    Q.   Did you ever have a conversation with
5  Parnell where you said, I'm not a racist?

6         MR. ROSENTHAL:  Dan, you faded out there.
7  Can you repeat that?

8  BY MR. MARKS:

9    Q.   I'll repeat it.  Can you hear me?  I'll
10  repeat it.

11    A.   Yes, sir.

12    Q.   Did you ever have a conversation with
13  Parnell Colvin where you told him, I'm not a racist.
14  BB King is a good friend of mine?

15    A.   No.

16    Q.   Anything like that?

17    A.   No.

18    Q.   And you're saying you never had any
19  conversations one-on-one with Parnell?

20    A.   No, I have not.

21    Q.   Okay.  Now, is it true that the Sphere
22  project never totally stopped construction even
23  during COVID?

24    A.   That is not true.

25    Q.   For how long did the Sphere project stop?

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

```
1        A.    Probably a week.
2        Q.    Okay.  And after the week, the Sphere
3   project started up again, correct?
4        A.    Not exactly.
5        Q.    Did construction continue?
6        A.    A portion of construction continued.
7        Q.    Did the Dean portion continue?
8        A.    Not all of Dean's work continued.
9        Q.    Did some of Dean's work continue?
10       A.    Yes, sir.
11       Q.    Now, what percentage of completion was the
12   project in April of 2020?
13       A.    Of Dean's portion?
14       Q.    No.  Of the whole project.
15       A.    Five percent.
16       Q.    What percentages of completion is the
17   project right now?
18       A.    Approximately 20 percent.
19       Q.    So four times has happened since April of
20   2020, correct?
21       A.    I'm sorry, sir, more time?
22       Q.    No.  I'm saying four times the completion
23   has gone on from April of 2020 to July of '21,
24   correct?
25       A.    All trades?
```

1      Q.    Yes.

2      A.    Yes.

3      Q.    You can see the Sphere project from the law

4    offices that you're in, correct?

5      A.    Yes, sir.  I'm down there every day.

6      Q.    And you believe that the project is going

7    to be completed by mid-'23?

8      A.    Third quarter of '23, yes, sir.

9      Q.    And by mid quarter of '23, Dean will have

10   completed all of the work they were contracted to

11   do, correct?

12     A.    Dean will complete what they are contracted

13   to do the first quarter of next year, 2022.

14     Q.    So regarding the pandemic, while the

15   pandemic slowed construction for a time, obviously

16   Dean was still going to complete all the work to

17   complete the Sphere project that they contracted to

18   complete, correct?

19     A.    No, sir.

20     Q.    So there was work that Dean was going to do

21   that went to other construction companies?

22     A.    The project was redesigned, so a lot of

23   Dean's work was taken from M.J. Dean.

24     Q.    And who did it go to?

25     A.    To W&W Steel.

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

1    Q.    To who?

2    A.    W&W Steel.

3    Q.    Okay.  But the week pause was in April --

4  was the week pause in March or April of 2020?

5        Do you recall?

6    A.    Due to the COVID shutdown?

7    Q.    Yeah.

8    A.    It was in mid-April.

9    Q.    Okay.  After the week, Dean rehired people,

10  correct?

11   A.    We were given direction by Madison Square

12  Garden and AECOM Hunt on what we could finish and

13  what we could do.  And we had to bring some of the

14  guys back, yes, sir.

15   Q.    And do you know how many employees you

16  brought back?

17   A.    Approximately 200.

18   Q.    And are you still doing construction, as we

19  speak, right now in July of '21?

20   A.    M.J. Dean?

21   Q.    Yes.

22   A.    Yes, sir.

23   Q.    So after the week pause in April of '20,

24  Dean continued to do construction for the rest of

25  '20.  You were planning on doing construction for

1   all of 2021 and into the first quarter of 2022,

2   correct?

3        A.   Yes.

4        Q.   So that means that from April of 2020 to

5   the end of the first quarter of 2022, there would be

6   approximately two years of construction, correct?

7        A.   For M.J. Dean Construction?

8        Q.   Is that right?

9        A.   For M.J. Dean concrete construction?

10       Q.   Yeah.

11       A.   Yes, sir.

12       Q.   So how -- and how many employees does Dean

13   have out there right now?

14       A.   35.

15       Q.   Okay.  And what type of employees are they?

16       A.   Carpenters, laborers, and finishers.

17       Q.   Now, in April of 2020, who made the

18   decision for that week who to lay off?

19       A.   I did.

20       Q.   And are you saying everybody was laid off

21   or a skeleton staff stayed?

22       A.   May I explain?

23       Q.   Yeah.

24       A.   Okay.  We were given direction on April 1st

25   that the jobsite would be shut down by April 15th,

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                    Page 37
JOHN THOMASON, 07/29/2021

1  and at that time we had to finish a couple concrete
2  pours, safe everything off, and remove all employees
3  from the site.
4         So April 2nd, we started the layoffs.  We
5  could not send 500 layoffs to our office in one day,
6  so we phased it out over the next ten days.
7      Q.   And -- but didn't you keep materials in the
8  yard?
9      A.   I'm sorry, sir, what yard?
10     Q.   The yard at the Sphere where you keep
11  materials and equipment.
12     A.   We had to -- we were directed to haul
13  everything off the site.
14     Q.   Did you actually do it?
15     A.   No, sir.
16     Q.   Did you leave equipment and materials in
17  the yard?
18     A.   Yes.
19     Q.   And wasn't -- isn't there the necessity for
20  an employee to be in the yard to make sure those
21  materials aren't tampered with?
22     A.   No, sir.
23     Q.   So you had nobody watching the materials in
24  the yard?
25     A.   Besides MSG Sphere security.  There was no

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

1  reason for M.J. Dean employees to be out in the

2  yard.

3     **Q.   After the week, did you start rehiring**

4  **employees for M.J. Dean?**

5     A.   Yes.

6     **Q.   And you rehired laborers, correct?**

7     A.   We rehired carpenters and laborers, yes,

8  sir.

9     **Q.   And you said you rehired up to 200**

10 **employees, correct?**

11        MR. ROSENTHAL:  Objection, misstates

12 testimony.

13        MR. MARKS:  No, it doesn't.

14 BY MR. MARKS:

15    **Q.   But you can answer.**

16         **Isn't that correct?**

17    A.   I'm sorry.  Could you please repeat that?

18    **Q.   After the week was over, you obviously went**

19 **back to work and you hired laborers and carpenters,**

20 **correct?**

21    A.   Yes.

22    **Q.   And did you make the decision who to**

23 **rehire?**

24    A.   I made the decision on how many employees

25 to rehire.

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                          Page 39
JOHN THOMASON, 07/29/2021

1    Q.   Did you make the decision on which of the
2  employees to rehire?
3    A.   I did not make the decision on which.  I
4  left that up to my superintendents.
5    Q.   And who made the decision on which
6  employees to rehire?
7    A.   For which area, sir?
8    Q.   The laborers.
9    A.   The laborers was done by my
10 superintendents.
11   Q.   I don't know who they are.
12        Could you give me a name of who they are?
13   A.   The job was -- it was five jobs in one job.
14 I had David McGrandy on Core D.  I had Fernando
15 Gerrirez [phonetic] on Core B.  I had Scott Holander
16 on Core C.  I had Stephan Taylor on the in board.  I
17 had Tony -- I don't remember Tony's last name -- on
18 Area B.
19        Those were the superintendents that made
20 the decision.  I just told them how many carpenters
21 and how many laborers they could bring back.
22   Q.   Okay.  And how did they decide on how to
23 rehire?
24        MR. ROSENTHAL:  Objection, calls for
25 speculation.

1  BY MR. MARKS:

2      Q.   You can answer.

3           You're the head guy there.

4      A.   How did they decide?  I can't answer that,

5  sir.

6      Q.   You didn't give them any guidelines?

7      A.   I told them how many carpenters they could

8  have for each area and how many laborers.

9      Q.   So if they wanted to hire their friends who

10 were laborers, they could hire their friends?

11          MR. ROSENTHAL:  Objection, calls for

12 speculation.

13 BY MR. MARKS:

14     Q.   You didn't tell them which of the laborers

15 they had to rehire, correct?

16     A.   I did not tell them by name which laborers

17 they had or carpenters that they had to rehire, no,

18 sir.

19     Q.   Did you ever tell them by name which

20 laborers they would not rehire?

21     A.   No, sir.  We -- sorry.

22     Q.   Go ahead.

23     A.   We can't do that.  We're union.  We're a

24 signatory with the carpenters, laborers, and

25 finishers and we'd have grievances filed on us every

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                    Page 41
JOHN THOMASON, 07/29/2021

1  day if we did that.
2      Q.   Was there -- do you know whether M.J. Dean
3  used any sort of seniority system to recall the laid
4  off laborers?
5      A.   Seniority?
6      Q.   Yes.
7      A.   It's -- we don't -- we don't work by
8  seniority.
9      Q.   What you're saying is you let your
10  superintendents decide which specific employees to
11  recall, and you're saying you had nothing to do with
12  it?
13      A.   That is correct.  I picked the
14  superintendents and I let the superintendents pick
15  the employees that were brought back.
16      Q.   But you didn't have any input on who they
17  brought back?
18      A.   No.
19      Q.   And do you know why Parnell Colvin was not
20  rehired?
21      A.   No.
22      Q.   Did you ever do an investigation or talk to
23  any of the superintendents as to why he wasn't
24  rehired?
25      A.   Sir, Parnell was one of 500.  We brought

1  | 200 back.  300 men were let go.  I did not talk to
2  | the superintendents about who they brought back and
3  | why they brought them back.
4  | **Q.   When you got this -- you were aware of this**
5  | **lawsuit before today, correct?**
6  | A.   Yes, sir.
7  | **Q.   Did you ever do any investigation after the**
8  | **lawsuit was filed as to why Parnell was not brought**
9  | **back?**
10 | A.   Again, sir, 300 men were not brought back.
11 | **Q.   But 200 were brought back?**
12 | A.   200 out of 500.
13 | **Q.   I'm asking a simple question.**
14 | **Do you know why Parnell was not brought**
15 | **back?**
16 | A.   The answer to your question is, no, I do
17 | not know.
18 | **Q.   Was Dave Muti one of the superintendents?**
19 | A.   Dave Muti was -- during the shutdown.
20 | **Q.   After the shutdown?**
21 | A.   After the shutdown, yes, sir.
22 | **Q.   Was he involved in deciding who should be**
23 | **rehired?**
24 | A.   No, sir.
25 | **Q.   Why not?**

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                    Page 43
JOHN THOMASON, 07/29/2021

1     A.   Again, like I said earlier, the job was
2  five jobs in one job.  I had five superintendents.
3  The guys that were actually doing the work, taking
4  down the scaffold, they were the ones who decided
5  who was brought back.
6          Dave Muti was just a --
7          MR. ROSENTHAL:  Go ahead and finish.
8          THE WITNESS:  Dave Muti was a
9  superintendent that I was keeping around to do the
10  site work when the job eventually started back up.
11         Dave Muti has been a superintendent for
12  M.J. Dean for a lot of years.  Dave Muti is one of
13  my best friends and he's dying of cancer right now.
14  BY MR. MARKS:
15     Q.   I'm sorry to hear that.
16     A.   Yeah, me too.
17     Q.   Are you -- you're at the jobsite still
18  day-to-day now in July of 2021, correct?
19     A.   Am I still at the Madison Square Garden
20  project?
21     Q.   Yeah.
22     A.   Yes, sir.
23     Q.   And Kevin Gutierrez is still there as a
24  general foreman?
25     A.   Yes, sir.

1      Q.    Did Kevin Gutierrez ever tell you that he

2    heard on a regular basis white supremacy talk among

3    the employees of Dean in the field?

4      A.    No, sir.

5      Q.    If he had told you, would you have taken

6    some action?

7      A.    Absolutely, yes, sir.

8      Q.    Did Kevin Gutierrez ever express any

9    negative comments to you about Parnell Colvin?

10     A.    No, sir.

11     Q.    Let me just be clear, I'm not trying to ask

12    you the same question.

13          When you let the superintendents rehire,

14    there was no seniority, there was no based on who

15    was the best employees, it was simply you left it to

16    the superintendents to decide who they wanted to

17    rehire?

18     A.    Can I explain?

19     Q.    Yes.

20     A.    Okay.  Each area had about 80 employees

21    working per quad.  When we did the -- when Madison

22    Square Garden and AECOM Hunt told us what we could

23    redo once they restarted, that number went from 80

24    to 32.

25          It was different tasks.  It was pulling

1  down the scaffold, which is a very dangerous job.

2  And I left it up to the superintendents to tell me

3  who the best men were for that job.

4      Q.   Okay.  But it wasn't necessarily -- they

5  didn't rate each employee and go through any

6  numerical system of, These are the employees I'm

7  rehiring.

8           They just gave you the names?

9      A.   Yes, sir.

10     Q.   And no seniority was used?

11     A.   No, sir.

12     Q.   And no, like, experience in construction

13  was used?

14     A.   Yes, sir.  Experience in construction in

15  dismantling the shoring that high up, yes, sir, I'm

16  sure all of that was thought before --

17     Q.   I'm saying they didn't go through with you

18  and say, Hey, this guy had 20 years experience in

19  doing it or this guy had ten.

20           They just gave you the names?

21     A.   No offense, Mr. Marks.  But I have a lot

22  going on on my plate.  I can't micromanage these

23  guys.  I've got to let them do their jobs and earn

24  their money.

25     Q.   Okay.  That's all I'm asking you.  I'm not

1   suggesting -- I'm just asking what you did.

2          So you let the superintendents choose who

3   they wanted to bring back after the shutdown ended

4   on the Sphere project.

5          And this would have been in April of 2020;

6   is that right?

7       A.   Yes, sir.

8       Q.   Okay.

9          MR. MARKS:  Hey, Rob, I want to talk to

10  Nicole.  Why don't we take five?

11          MR. ROSENTHAL:  Okay.

12          MR. MARKS:  And we'll come back and we'll

13  try to wrap this up.  Okay.

14            (Thereupon, a break was taken.)

15  BY MR. MARKS:

16      Q.   Mr. Thomason, do you recall meeting Parnell

17  Colvin at the Patrick Lane office, not at the job

18  site?

19      A.   No, sir, I do not.

20      Q.   Did you have a secretary named Jane?

21      A.   M.J. Dean has a secretary named Jeanette.

22      Q.   Okay.  Do you expect to be on the project

23  until it's completed -- until the Dean Construction

24  work is completed?

25      A.   Me personally, sir, or M.J. Dean?

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                          Page 47
JOHN THOMASON, 07/29/2021

1       Q.    You personally.

2       A.    Yes, sir.

3       Q.    Do you know how many African-American

4    employees Dean had prior to the pandemic working on

5    the Sphere project?

6       A.    Did we have any African-American?

7       Q.    Do you know how many African-American

8    employees you had working on the Sphere project pre

9    the pandemic layoffs?

10      A.    I do not, sir.

11      Q.    And do you know how many African-American

12   employees Dean had working on the Sphere project

13   after the pandemic layoffs, the rehires?

14      A.    I don't know the actual count, sir.

15      Q.    Was any effort made to ensure there was a

16   diverse workforce including African-American

17   employees as part of the rehire after the pandemic?

18      A.    No, I don't believe so.

19            MR. MARKS:  All right.  That's all I have.

20   I'll pass the witness.

21            MR. ROSENTHAL:  I have no questions.

22            MR. MARKS:  All right.  Will you take care

23   of the reading and signing?

24            MR. ROSENTHAL:  Yes.

25            MR. MARKS:  Okay.  Thank you.

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                    Page 48
JOHN THOMASON, 07/29/2021

1                    - - - - -

2

3    (Proceedings concluded at 3:15 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                    Page 49
JOHN THOMASON, 07/29/2021

```
 1                    CERTIFICATE OF DEPONENT

 2     PAGE     LINE      CHANGE                    REASON

 3     _____

 4     _____

 5     _____

 6     _____

 7     _____

 8     _____

 9     _____

10     _____

11     _____

12     _____

13     _____

14     _____

15     _____

16     _____

17                    *   *   *   *   *

18          I, JOHN THOMASON, deponent herein, do hereby
       certify and declare the within and foregoing
19     transcription to be my deposition in said action;
       under penalty of perjury; that I have read,
20     corrected and do hereby affix my signature to said
       deposition.
21
                       _____
22                     JOHN THOMASON, Deponent

23

24

25
```



COLVIN vs M.J. DEAN CONSTRUCTION, INC.                          Page 50
JOHN THOMASON, 07/29/2021

```
1                    CERTIFICATE OF REPORTER
2    STATE OF NEVADA   )
                       )  SS:
3    COUNTY OF CLARK   )
4            I, Jackie Jennelle, RPR, CCR #809, Clark
5    County, State of Nevada, do hereby certify:  That I
6    reported the video conference deposition of JOHN
7    THOMASON, commencing on THURSDAY, JULY 29, 2021, at
8    2:00 p.m.
9            That prior to being deposed, the witness
10   was duly sworn by me to testify to the truth.  That
11   I thereafter transcribed my said shorthand notes
12   into typewriting and that the typewritten transcript
13   is a complete, true and accurate transcription of my
14   said shorthand notes.
15           I further certify that I am not a relative
16   or employee of counsel, of any of the parties, nor a
17   relative or employee of the parties involved in said
18   action, nor a person financially interested in the
19   action.
20           IN WITNESS WHEREOF, I have set my hand in my
21   office in the County of Clark, State of Nevada, this
22   9th day of August, 2021.
23
24   _____
25           JACKIE JENNELLE, RPR, CCR #809
```

# EXHIBIT 13

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA


PARNELL COLVIN,                    )
                                   )
        Plaintiff,                 )
                                   )
        vs.                        ) CASE NO.:
                                   ) 2:20-cv-01765-APG-EJY
M.J. DEAN CONSTRUCTION,            )
INC.,                              )
                                   )
        Defendant.                 )
                                   )


VIDEO CONFERENCE DEPOSITION OF PAUL ROSEQUIST
LAS VEGAS, NEVADA
FRIDAY, AUGUST 6, 2021


**CERTIFIED TRANSCRIPT**


REPORTED BY:  JACKIE JENNELLE, RPR, CCR #809
JOB #416567


AdvancedONE
LEGAL
(866) 715-7770
advancedONE.com

COLVIN vs M.J.DEAN CONSTRUCTION,INC.                          Page 2
PAUL ROSEQUIST, 08/06/2021

```
 1    APPEARANCES (ALL VIA VIDEO CONFERENCE):

 2   For the Plaintiff:

 3           LAW OFFICE OF DANIEL MARKS
             BY:   DANIEL MARKS, ESQ.
 4           BY:   NICOLE M. YOUNG, ESQ.
             610 South Ninth Street
 5           Las Vegas, Nevada  89101
             (702) 386-0536
 6           office@danielmarks.net

 7   For the Defendants:

 8           HOWARD & HOWARD ATTORNEYS PLLC
             BY:   ROBERT L. ROSENTHAL, ESQ.
 9           3800 Howard Hughes Parkway, Suite 100
             Las Vegas, Nevada  89169
10           (702) 257-1483
             rrosenthal@howardandhoward.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



COLVIN vs M.J.DEAN CONSTRUCTION,INC.                                Page 3
PAUL ROSEQUIST, 08/06/2021

```
 1                        I  N  D  E  X

 2
     WITNESS:  PAUL ROSEQUIST
 3

 4                       EXAMINATION
                                                       PAGE
 5
     BY MR. MARKS                                       4
 6

 7                   EXHIBITS  INTRODUCED
     EXHIBIT                                            PAGE
 8
     Exhibit 6    Employee  Incident  Form              10
 9   Exhibit 8    Graffiti                              16
     Exhibit 9    Graffiti                              17
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

```
 1                     LAS VEGAS, NEVADA
 2              FRIDAY, AUGUST 6, 2021; 10:00 a.m.
 3                          -oOo-
 4    Thereupon--
 5                     PAUL ROSEQUIST,
 6    was called as a witness, and having been first duly
 7    sworn, was examined and testified as follows:
 8                        EXAMINATION
 9    BY MR. MARKS:
10        Q.    Could you state your name, please?
11        A.    Paul Rosequist.
12    BY MR. MARKS:
13        Q.    What's your business address?
14        A.    5055 West Patrick Avenue.
15        Q.    Okay.  And is that the M.J. Dean
16    Construction company?
17        A.    Yes, it is.
18        Q.    Okay.
19            MR. MARKS:  And, Rob, the record should
20    reflect that we're conducting this deposition by
21    agreement via Zoom.
22            Is that correct?
23            MR. ROSENTHAL:  That's correct.
24    BY MR. MARKS:
25        Q.    Mr. Rosequist, have you had your deposition
```

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

COLVIN vs M.J.DEAN CONSTRUCTION,INC.                              Page 5
PAUL ROSEQUIST, 08/06/2021

1   taken before?

2       A.   I have not.

3       Q.   You had an opportunity to talk about what a

4   deposition is with your attorney, Mr. Rosenthal?

5       A.   Yes, sir.

6       Q.   In addition to what he told you, I'll go

7   over a couple of the basic ground rules.

8            Even though we're by Zoom, the oath the

9   court reporter gave you is the exact same oath as if

10  we were in court and it carries the same obligation

11  to tell the truth and the same penalties of perjury

12  for failure to tell the truth.

13           Do you understand that?

14      A.   Yes, I do.

15      Q.   That is the way this works.  Even though

16  we're in informal surroundings and there's no judge

17  with black robes on.

18           Do you understand?

19      A.   Understood.

20      Q.   You'll have an opportunity to read the

21  transcript at a later date, and if there's a mistake

22  or you want to make a correction, you'll be able to

23  do that.

24           If you made a major correction, I could

25  comment if the matter went to trial and that could

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

1   affect your credibility.

2             Do you understand that?

3      A.   Yes, sir.

4      Q.   Okay.  Let's say it was a car accident and

5   today you thought the light was red and later you

6   thought the light was yellow, obviously that would

7   be a difference and we could argue that you

8   shouldn't be believed because you made a change in

9   your testimony.

10            Do you understand?

11     A.   Yes, sir.

12     Q.   Your attorney may object from time to time.

13  There is no judge to rule on the objections, so

14  we'll let him finish and then you would normally

15  answer.

16            I don't expect him to instruct you not to

17  answer, but you're obligated to answer unless he

18  instructs you not to answer, which I don't expect to

19  occur.

20            Do you understand?

21     A.   Yes, sir.

22     Q.   So he would go -- I might say something.

23  Then I would say, Answer please, and unless he tells

24  you otherwise, you would answer.

25     A.   Yes, sir.

1    Q.    Okay.   You're doing a good job of letting

2    me finish and I'll try to let you finish because the

3    court reporter can only take down one person at a

4    time.

5         What's your educational background?

6    A.    High school degree, high school diploma and

7    a four-year apprenticeship through Carpenters Local

8    1977.

9    Q.    Was that Carpenters Local here in Las

10   Vegas?

11   A.    Yes, sir.

12   Q.    What do you mean by a four-year

13   apprenticeship?

14   A.    It's in classroom and on-the-job training

15   for carpentry.

16   Q.    And then you became a journeyman after the

17   four years?

18   A.    Yes, sir.

19   Q.    And you were a -- you sent over a resumé.

20   It said you were a journeyman carpenter from 1988 to

21   2008.

22        Is that correct?

23   A.    Yes, sir.

24   Q.    What did you do from 2008 to the present?

25   A.    I changed local to Laborers Local 872 and

1   got into management with M.J. Dean.

2        Q.   So are you still in the union?

3        A.   Yes, sir.

4        Q.   What local is that?

5        A.   Laborers Local 872.

6        Q.   Why did you switch locals?

7        A.   To draw my retirement from the Carpenters

8   Local.

9        Q.   Is the new local a Laborers Local?

10       A.   Yes, sir.

11       Q.   Okay.  Tell me what management jobs you've

12  had with Dean.

13       A.   Starting -- they've been safety management.

14       Q.   What's your present title?

15       A.   Project safety manager.

16       Q.   And are you working on the MSG Sphere

17  project?

18       A.   Yes, I am.

19       Q.   Okay.  And for how long have you worked on

20  that?

21       A.   Approximately two years.

22       Q.   Did you start in 2019?

23       A.   Yes, sir.

24       Q.   Is that when Dean's part of the project

25  started?

1      A.   Yes, sir.  They started just a little
2   before I did.
3      Q.   Okay.  What are your duties as project
4   safety manager?
5      A.   I am there to oversee the site that it is
6   within OSHA compliance, the site itself in safety.
7   I also oversee the men to make sure they're
8   compliant with all safety, all the safety rules and
9   regulations put forth by M.J. Dean and by OSHA.  And
10  I investigate all accidents, incidents.
11          I also interface with OSHA and the
12  insurance companies when they come on the job to
13  audit.  And I am the point of contact for safety on
14  the job and I work with the general contractor.
15     Q.   And you've been doing that on the Sphere
16  project since 2019?
17     A.   Yes.
18     Q.   So your duties have remained the same for
19  the last two years?
20     A.   On the MSG Sphere project, yes.
21     Q.   Do you know Parnell Colvin?
22     A.   I do.
23     Q.   How did you first meet him?
24     A.   Generally on the job on my walks I saw
25  Colvin working.

COLVIN vs M.J.DEAN CONSTRUCTION,INC.                    Page 10
PAUL ROSEQUIST, 08/06/2021

```
 1      Q.   Did there come a time when he reported the
 2   use of the N-word to you?
 3      A.   Yes.
 4      Q.   And do you recall when that was?
 5      A.   That was November 14th.
 6      Q.   Did you review any documents before this
 7   deposition in the last day or two?
 8      A.   Yes.
 9   (Exhibit 6 Employee Incident Form introduced.)
10   BY MR. MARKS:
11      Q.   Let me show you what we've previously
12   marked, so we'll use the same numbering as
13   Exhibit 6.  We're going to put that up on the
14   screen.
15          You had an opportunity to review Exhibit 6
16   before the deposition, correct?
17      A.   Yes, sir.
18      Q.   And is this a report -- did you have
19   anything to do with having this report filled out by
20   Parnell Colvin?
21          MR. ROSENTHAL:  Objection, vague and
22   ambiguous.
23          You can answer.
24   BY MR. MARKS:
25      Q.   You can answer.
```

```
 1      A.   When Parnell Colvin was brought to me by
 2   AECOM Hunt safety.  They came together.  He told me
 3   I had a situation that I needed to look into.
 4           I brought Parnell Colvin into my office,
 5   talked to him, asked him the problem.  He started
 6   telling me about it, and I asked him to fill out a
 7   witness statement on the iPad.
 8           So I opened the iPad, got to the proper
 9   documentation and had him fill that out.
10      Q.   Did you ever try to convince Mr. Colvin not
11   to file a report about the use of the N-word?
12      A.   No, sir.
13      Q.   Did you ever tell him that he could affect
14   his future job prospects if he filled out this
15   report?
16      A.   No, sir.
17      Q.   Did you ever use words to the effect that
18   it would come back and haunt Mr. Colvin?
19      A.   No, sir.
20      Q.   Did you ever say he should think hard about
21   filing this complaint?
22      A.   No, sir.
23      Q.   Okay.  After -- so did Mr. Colvin type
24   Exhibit 6?
25      A.   Yes.
```

1     Q.    And what happened after he typed it?

2           Did he give it to you?

3     A.    He handed me back the iPad and I reviewed

4  it and then submitted it through the AP.

5     Q.    And who did you submit it to?

6     A.    It goes to M.J. Dean, my team, safety, M.J.

7  Dean safety team.

8     Q.    Are you head of that safety team?

9     A.    I am the head of the safety team on the MSG

10 Sphere project, yes, sir.

11    Q.    And who did this Exhibit 6 go to?  Did it

12 go to an office?  Did it go to a person?

13          Who did it go to?

14    A.    It went to myself, my team that's on this

15 project and Jeff Kent, my immediate supervisor.

16    Q.    Jeff who?

17    A.    Jeff Kent.

18    Q.    Could you spell it?

19    A.    J-E-F-F, K-E-N-T.

20    Q.    Kent?

21          What's his title?

22    A.    He's safety director.

23    Q.    Okay.  Did you ever investigate the

24 allegations contained in Exhibit 6?

25    A.    Yes, I did.

1    Q.    Tell me about your investigation.

2          MR. ROSENTHAL:  Objection, overbroad, vague

3    and ambiguous.

4    BY MR. MARKS:

5    Q.    Tell me what you did to investigate the

6    allegations contained in Exhibit 6.

7    A.    I -- when it first started, as I've stated

8    prior, is I had Parnell Colvin fill out his report.

9    I submitted that report.

10         I asked him if there was any other

11   witnesses or anyone else he would like for me to

12   interview, and he told me he wanted me to interview

13   Ricky Flores, which is one of the foremen on the MSG

14   Sphere project.

15         I then contacted Kevin Gutierrez to take

16   his testimony, his incident investigation, his

17   statement.  I called him on the phone, asked him to

18   come to my office.

19         When he got to my office, I gave him some

20   general information on what was happening at the

21   time and I had him fill out a statement like I did

22   with Mr. Colvin.

23   Q.    Okay.  Did Mr. Gutierrez deny using the

24   N-word?

25   A.    Yes.

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

1    Q.    And --

2    A.    Adamantly denied that.

3    Q.    Did Mr. Flores hear anything about the

4  N-word on the job?

5    A.    Not that he has ever told me about.

6    Q.    Okay.  So after that, did anything else

7  ever happen regarding your investigation?

8    A.    Yes.

9    Q.    What did you do?

10    A.    I then called Ricky Flores, had him come to

11  my office, gave him the same basic rundown, had him

12  fill out the forms in the same manner as previously

13  and then I submitted his.

14          I then called in Dave McGrandy (phonetic)

15  who was the area superintendent for Area D which

16  Colvin was a part of.  And I had him also fill out a

17  witness statement.

18          Then when I got all the witness statements

19  and after I had reviewed them, I called John

20  Thomason and went over these with John Thomason and

21  seeked his counsel from that point forward.

22    Q.    What did John Thomason say?

23    A.    I wouldn't want to misquote Mr. Thomason.

24  He spoke about the possibilities of moving somebody

25  around to make this work for everybody.

COLVIN vs M.J.DEAN CONSTRUCTION,INC.                    Page 15
PAUL ROSEQUIST, 08/06/2021

```
 1      Q.   Okay.  Did you ever -- okay.  Let's back
 2  up.
 3           Did any other witnesses -- did any other
 4  witnesses report to you they heard the N-word on the
 5  job at the Sphere project?
 6      A.   No, sir.
 7      Q.   Had you in walking the project ever heard
 8  racial slurs?
 9      A.   No, sir.
10      Q.   Had you seen racial slurs, graffiti, in the
11  bathroom at the project?
12      A.   No, sir.
13      Q.   You never saw racial slurs in a bathroom?
14      A.   I don't typically use the restrooms that
15  are on the site.  I use an office restroom.
16      Q.   Okay.  So on the N-word incident which is
17  depicted in Exhibit 6, a decision was made to move
18  Parnell away from Kevin Gutierrez; is that right?
19      A.   That decision was made without my -- I
20  presented the evidence that I had to John Thomason
21  and he with counsel with other superintendents on
22  the project did what they did.
23      Q.   Okay.  But have you ever seen or heard
24  white supremacist comments on the Sphere project in
25  the last two years?
```

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

```
 1       A.    No, sir.
 2       Q.    And have you ever heard the use of the
 3   N-word on the Sphere project?
 4       A.    No, sir.
 5       Q.    Do you have a social relationship with
 6   Kevin Gutierrez?
 7       A.    Not beyond work relationship.
 8             (Exhibit 8 Graffiti introduced.)
 9   BY MR. MARKS:
10       Q.    Okay.  Let's go to Exhibit 8.
11             Had you ever seen this type of graffiti
12   depicted in Exhibit 8 in a restroom at the MSG
13   Sphere project during 2019, 2020, or 2021?
14       A.    No.
15       Q.    If you had seen this, would you have taken
16   any steps?  What steps would you have taken if you
17   had seen this?
18             MR. ROSENTHAL:  Objection, incomplete
19   hypothetical, calls for speculation, vague and
20   ambiguous.
21   BY MR. MARKS:
22       Q.    You can answer.
23       A.    Any time any graffiti was brought to me on
24   any project, including this project, I will
25   immediately take that information to those who
```

 1 | control the restrooms or those who control the area
 2 | where the graffiti is and have it removed by those
 3 | who remove the graffiti.
 4 |     **Q.   But you never saw any white supremacist or**
 5 | **anti-African-American graffiti?**
 6 |     A.   Not that I recall, no.
 7 |     **Q.   Did you ever see any graffiti that was**
 8 | **discriminatory against any other ethnic group, such**
 9 | **as Hispanic-Americans?**
10 |     A.   Not that I can recall.
11 |       (Exhibit 9 Graffiti introduced.)
12 | BY MR. MARKS:
13 |     **Q.   Let's go to Exhibit 9.**
14 |     **Did you ever see the graffiti depicted in**
15 | **Exhibit 9 in the restrooms at the MSG Sphere job**
16 | **site?**
17 |     A.   No, I have not seen that.
18 |     **Q.   Regarding the use of the N-word and**
19 | **Exhibit 6, did you ever send that report to human**
20 | **resources?**
21 |     A.   That is sent to Jeff Kent who is my
22 | immediate supervisor in the M.J. Dean main office.
23 |     **Q.   But you never sent it to HR, human**
24 | **resources?**
25 |     A.   Myself, I did not.

```
 1        Q.   Did you conduct weekly safety meetings?

 2        A.   My team, yes, they conduct weekly safety

 3   meetings.

 4             MR. ROSENTHAL:  Could we get your picture

 5   as the main so we can see you instead of the

 6   exhibit?

 7             MS. YOUNG:  Do you have any more questions

 8   on this exhibit, Dan?

 9             MR. MARKS:  No.  You can take it down.

10             MR. ROSENTHAL:  Thank you.

11   BY MR. MARKS:

12        Q.   I'm asking you if you conduct the weekly

13   safety meetings?

14        A.   I do not conduct them.  I give the

15   information out to my team who conducts them.  I'm

16   the one who comes up with the weekly topic.

17        Q.   Did you ever as part of the weekly safety

18   meetings talk about anti-African-American graffiti

19   in restrooms?

20        A.   Not specifically graffiti in restrooms, no.

21        Q.   Did you ever talk about use of the N-word

22   on a job site?

23        A.   Yes.

24        Q.   What specifically did you discuss at the

25   safety meetings about that topic?
```

 1            MR. ROSENTHAL:  Objection, assumes facts
 2   not in evidence, lacks foundation.
 3   BY MR. MARKS:
 4        **Q.   Go ahead.**
 5        A.   So -- as I do weekly safety meetings, we
 6   come up with different topics, and
 7   anti--discrimination, harassment, bulling, those
 8   things, and I have a template for those and I will
 9   go over those as well as I go over fall protection,
10   I go over housekeeping, generally these general
11   topics I have a website that I can bring these
12   topics up.
13        **Q.   When did you go over anti--discrimination?**
14   **Do you know when you did it?**
15        A.   I don't know.
16        **Q.   Did you ever do an anti-discrimination**
17   **topic after the report of the N-word by Mr. Colvin?**
18        A.   I don't recall if it was before or after.
19        **Q.   Since you never saw any**
20   **anti-African-American graffiti, you didn't**
21   **necessarily do any anti-discrimination training**
22   **after the time of the graffiti, correct?**
23        A.   As I stated before, I'm not sure if I did
24   it before or after.
25        **Q.   So you have anti-discrimination,**

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

COLVIN vs M.J.DEAN CONSTRUCTION,INC.                          Page 20
PAUL ROSEQUIST, 08/06/2021

1   anti-bullying as a general topic, but you never did
2   it in reaction to anything that happened on the job
3   site, correct?
4        A.   I don't recall.
5        Q.   You don't recall if you did or didn't?
6        A.   After this situation, I don't recall if I
7   specifically went over it with this one.
8        Q.   With this incident of graffiti in the
9   restrooms or use of the N-word, correct?
10       A.   The graffiti in the restrooms, as I stated
11  before, the first I saw it is what you showed me
12  with the attorneys.  So, no, I didn't, I did not
13  have a meeting on that.  I did not know about that.
14       Q.   On the issue -- during 2020, do you recall
15  in the spring of 2020 before any COVID issue there
16  was -- we had the 2020 -- it was an election year.
17            Was there ever a lot of pro Trump graffiti
18  or signs on the job site?
19            MR. ROSENTHAL:  Objection, vague and
20  ambiguous.
21            THE WITNESS:  What you mean by that, I'm
22  not exactly sure.  Yes, there are people that
23  support Trump on the job site.
24  BY MR. MARKS:
25       Q.   Right.

COLVIN vs M.J.DEAN CONSTRUCTION,INC.                              Page 21
PAUL ROSEQUIST, 08/06/2021

```
 1            But the people that supported Trump, were
 2       they saying, We support Trump because of white
 3       power?
 4            A.   No, sir.
 5            Q.   Were they white supremacists?
 6                 MR. ROSENTHAL:  Objection, calls for
 7       speculation.
 8                 THE WITNESS:  I don't know the answer to
 9       that question.
10       BY MR. MARKS:
11            Q.   Did you ever see swastikas on the job site?
12            A.   No, sir.
13            Q.   Did you ever see Confederate flags on the
14       job site?
15            A.   No, sir.
16            Q.   Again, did you ever see any
17       anti-African-American signs, comments on the job
18       site?
19            A.   No.
20            Q.   All right.  You recall the COVID, when
21       COVID hit Clark County and the rest of America in
22       March to April 2020 period?
23            A.   Yes, sir.
24            Q.   That was in March of 2020?
25            A.   Yes, sir.
```

AdvancedONE LEGAL                    (866) 715-7770
                                     advancedONE.com

1    Q.   Okay.  Isn't it true the MSG Sphere project
2  was -- construction was never totally shut down?
3    A.   Construction was shut down.
4    Q.   How long do you think construction was shut
5  down for?
6    A.   I don't know the answer to that for sure.
7    Q.   Were you ever laid off?
8    A.   I was never laid off, no.
9    Q.   Did you always report to the Sphere
10  project?
11    A.   Yes, sir.
12    Q.   What is called the -- that was during the
13  whole COVID period, correct?
14    A.   Yes, sir.
15    Q.   And when you reported to the Sphere
16  project, what were you doing?
17    A.   We were preparing for a shutdown.  During
18  those times, I was retrieving badges, I was
19  retrieving safety equipment from employees who were
20  being laid off.  I was preparing my own team.  I
21  transferred parts of my own team.
22    Q.   Then do you recall a time when construction
23  started up again, correct?
24    A.   Yes, sir.
25    Q.   And you never left the job site, meaning

1   through the whole COVID period you always reported

2   to MSG Sphere, correct?

3        A.   If you're talking about myself, that's

4   correct.

5        Q.   And you recall that people were rehired?

6        A.   Yes.

7        Q.   And do you know for how long people were

8   laid off?  Can you recall?

9             MR. ROSENTHAL:  Objection, overbroad, vague

10  and ambiguous.

11  BY MR. MARKS:

12       Q.   Do you recall?

13       A.   I don't.

14       Q.   Were you involved in the decision of who to

15  lay off?

16       A.   Beyond my team, no.

17       Q.   Were you involved in the decision who to

18  rehire?

19       A.   No, sir.

20       Q.   When people talk about use of the term

21  "yard" on a job site, what are they referring to?

22       A.   That would be referring to where materials

23  are stacked, stored.

24       Q.   And sitting here today, you don't recall

25  for how long the Dean phase of construction was

1    stopped during the COVID period?

2         A.   No, sir, I don't.

3         Q.   If Mr. Thomason testified it was stopped

4    for approximately a week, would you disagree with

5    that?

6         A.   I would not because I don't know how long

7    it was stopped for exactly.

8         Q.   Okay.  But you kept getting your paycheck

9    and kept reporting to the MSG Sphere project,

10   correct?

11        A.   Yes, sir.

12        Q.   And wouldn't the yard be in use as long as

13   construction was going on because materials had to

14   be stored there for use in construction?

15             MR. ROSENTHAL:  Objection, vague and

16   ambiguous, calls for speculation.

17   BY MR. MARKS:

18        Q.   Isn't that true, sir?

19        A.   No, that's not true.  At the time when the

20   construction was stopping everything was stopping.

21        Q.   Right.

22             But then when it restarts, you use the yard

23   again, correct?

24        A.   Yes, sir.

25        Q.   And, in fact, you're using the yard right

1  now, aren't you?

2          MR. ROSENTHAL:  Objection, vague and

3  ambiguous, overbroad.

4          THE WITNESS:  There are portions that we

5  have materials stacked and they've been shipped out,

6  yes.

7  BY MR. MARKS:

8      Q.   Okay.  Do Dean personnel work in the yard

9  area?

10     A.   I don't know if there's anyone in the yard

11  area at this time or not.

12     Q.   But in 2019 and 2020 Dean employees were

13  working in the yard area, correct?

14     A.   I don't know.  Again, I'm not in control of

15  the manpower or the placement of men.

16     Q.   Have you heard any white supremacy

17  anti-African-American comments in the year 2021 at

18  the M.J. Dean Construction site at the Sphere

19  project?

20          MR. ROSENTHAL:  Objection, asked and

21  answered.

22          Go ahead.

23          THE WITNESS:  Again, no, I have not.

24  BY MR. MARKS:

25     Q.   You said that you sent Exhibit 6 to

AdvancedONE LEGAL

(866) 715-7770
advancedONE.com

COLVIN vs M.J.DEAN CONSTRUCTION,INC.                    Page 26
PAUL ROSEQUIST, 08/06/2021

1   Mr. Kent.

2           You don't know whether or not Mr. Kent

3   forwarded Exhibit 6 to human resources, correct?

4       A.   I don't.

5       Q.   And it's true that no memos or any other

6   written material was ever submitted to the laborers

7   about any of the use of the N-word or any

8   anti-discrimination materials were never

9   disseminated, correct?

10      A.   I'm going to have to ask you to --

11  BY MR. MARKS:

12      Q.   I'll repeat it.

13          Were you involved in any memos about

14  anti-discrimination being given to the workmen at

15  the Sphere job site?

16      A.   Yes.  I was a part of that during the

17  anti-discrimination portion of the safety meetings

18  which I spoke to you about earlier.

19      Q.   What do you disseminate during those

20  meetings?

21      A.   What do you mean by that?

22      Q.   Do you give handouts to the actual

23  laborers?

24      A.   Yes.  We do handouts and they sign that

25  they've gotten the meetings.

1    Q.   And is that similar to what's in the

2   employee handbook that Dean has a policy of

3   non-discrimination?

4    A.   Yes.  It follows the same guidelines as

5   M.J. Dean.

6    Q.   But was anything specifically discussed in

7   the handouts about the use of the N-word on the job

8   site?

9    A.   Again, I don't know if it was before or

10   after.  It's a broad statement on discrimination of

11   any kind.  It's a zero tolerance with M.J. Dean for

12   discrimination of any kind.

13    Q.   So it's a broad statement, but it wasn't

14   specifically brought up that we had a report of the

15   use of the N-word on the job site?

16        You don't recall that ever being discussed

17   at a safety meeting with the laborers on the Sphere

18   project?

19    A.   I don't recall if it was covered

20   specifically on this situation, no.

21    Q.   Since you never knew about racist graffiti,

22   you never brought to the attention of the workers at

23   the Sphere project that there had been reports of

24   racist graffiti; is that correct?

25        MR. ROSENTHAL:  Objection, assumes facts

 1   not in evidence, calls for speculation.

 2            You can still answer.

 3            THE WITNESS:  Can you repeat the question?

 4   BY MR. MARKS:

 5        Q.   **You never discussed the use of racist**

 6   **graffiti in restrooms with the laborers on the**

 7   **Sphere project in 2019 or 2020?**

 8        A.   On graffiti in the restrooms?  No.

 9        Q.   **Okay.**

10            MR. MARKS:  I don't have anything further.

11            6789 I have no questions.

12            MR. MARKS:  All right.  Thank you.

13            You'll take care of the signature and

14   signing if he's going to read and sign?

15            MR. ROSENTHAL:  Yes, sir.

16                         - - - - -

17

18            (Proceedings concluded at 10:37 a.m.)

19

20

21

22

23

24

25

AdvancedONE
LEGAL
(866) 715-7770
advancedONE.com

COLVIN vs M.J.DEAN CONSTRUCTION,INC.                    Page 29
PAUL ROSEQUIST, 08/06/2021

```
1                    CERTIFICATE OF DEPONENT

2     PAGE     LINE     CHANGE                    REASON

3     _____

4     _____

5     _____

6     _____

7     _____

8     _____

9     _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17                     *   *   *   *   *

18         I, PAUL ROSEQUIST, deponent herein, do
      hereby certify and declare the within and foregoing
19    transcription to be my deposition in said action;
      under penalty of perjury; that I have read,
20    corrected and do hereby affix my signature to said
      deposition.

21
                      _____
22                    PAUL ROSEQUIST, Deponent

23

24

25
```



AdvancedONE
LEGAL
(866) 715-7770
advancedONE.com

COLVIN vs M.J.DEAN CONSTRUCTION,INC.                          Page 30
PAUL ROSEQUIST, 08/06/2021

```
 1               CERTIFICATE OF REPORTER

 2   STATE OF NEVADA   )
                       )  SS:
 3   COUNTY OF CLARK   )

 4         I, Jackie Jennelle, RPR, CCR #809, Clark

 5   County, State of Nevada, do hereby certify:  That I

 6   reported the video conference deposition of PAUL

 7   ROSEQUIST, commencing on FRIDAY, AUGUST 6, 2021, at

 8   10:00 a.m.

 9         That prior to being deposed, the witness

10   was duly sworn by me to testify to the truth.  That

11   I thereafter transcribed my said shorthand notes

12   into typewriting and that the typewritten transcript

13   is a complete, true and accurate transcription of my

14   said shorthand notes.

15         I further certify that I am not a relative

16   or employee of counsel, of any of the parties, nor a

17   relative or employee of the parties involved in said

18   action, nor a person financially interested in the

19   action.

20         IN WITNESS WHEREOF, I have set my hand in my

21   office in the County of Clark, State of Nevada, this

22   19th day of August, 2021.

23

24   _____

25         JACKIE JENNELLE, RPR, CCR #809
```

AdvancedONE LEGAL          (866) 715-7770
                          advancedONE.com

APP383