LAW OFFICE OF DANIEL MARKS
DANIEL MARKS, ESQ.
Nevada State Bar No.: 002003
Office@danielmarks.net
NICOLE M. YOUNG, ESQ.
Nevada State Bar No. 12659
Nyoung@danielmarks.net
610 South Ninth Street
Las Vegas, Nevada 89101
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| PARNELL COLVIN, | Case No. 2:20-cv-01765-APG-EJY |
| Plaintiff, | |
| v. | **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| M.J. DEAN CONSTRUCTION, INC, | |
| Defendant, | *Oral Argument Requested* |

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  INTRODUCTION**

Plaintiff Parnell Colvin ("Colvin") filed a competing motion for summary judgment on liability ("Plaintiff's PMSJ") on October 8, 2021. (Doc. 44.) Plaintiff's PMSJ seeks summary judgment on liability for his claims of (1) Negligent Training and Supervision, and (2) Retaliation in violation of Title VII. Defendant MJ Dean Construction, Inc.'s ("MJ Dean") motion for summary judgment ("Defendant's MSJ") relates to all causes of action. (Doc. 43.)

Defendant's MSJ shows MJ Dean does not seriously consider complaints of its racially hostile work environment. MJ Dean ignores all evidence of race discrimination and harassment, including the testimony of its General Foreman, Kevin Gutierrez ("Gutierrez"). The Declarations of Theodore Logan (Defendant's Exhibit K), Julian Jeffers (Defendant's Exhibit L), and Antonio Jalomo-Rodriguez (Defendant's Exhibit M) directly contradict Gutierrez's deposition testimony

/ / / /

/ / / /

regarding the prevalence of racist bathroom graffiti at the MJ Dean job site[1]. By ignoring Gutierrez's testimony of the racist bathroom graffiti at the MJ Dean job site, MJ Dean creates a genuine issue of material fact regarding that graffiti.

## II.  FACTUAL BACKGROUND

Colvin incorporates by reference all facts in Plaintiff's PMSJ, as supported by the 13 exhibits attached to that motion. (Doc. 44, at pp. 2-13.)

## III.  STATEMENT OF DISPUTED FACTS

Colvin's Plaintiff's PMSJ argues this Court may grant partial summary judgment in Colvin's favor on his claims of (1) Negligent Training and Supervision and (2) Retaliation in violation of Title VII. (Doc. 44.) Colvin believes there are issues of fact regarding his Title VII claim of harassment based on a hostile work environment and discrimination based on disparate treatment. The following material facts are in dispute, necessitating findings of fact by a jury:

1. Whether Gutierrez called Colvin a "nigger" on November 14, 2019.
2. Whether MJ Dean conducted any trainings or meetings regarding the use of racial slurs on the job site after Colvin's November 14, 2019 complaint.
3. Whether MJ Dean took reasonable measures to remedy, prevent, and deter racist bathroom graffiti on its job site.
4. Whether MJ Dean conducted any trainings or meetings regarding the racist bathroom graffiti after Colvin complained on December 24, 2019, and January 3, 2020.
5. Whether MJ Dean directed Gutierrez, Colvin's harasser, to terminate Colvin's employment.
6. Whether Gutierrez was involved in the decision to terminate Colvin's employment.

////

---

[1] This Court should exclude those declarations because MJ Dean failed to list those individuals as witnesses in this case, in violation of FRCP 26(a)(1)(A)(i). (*See* Motion to Exclude Witnesses and Strike Exhibits, filed concurrently herewith.)

7. Whether MJ Dean actually eliminated Colvin's position or simply replaced Colvin.

8. Whether MJ Dean's failure to ensure a diverse workforce, by not bringing Colvin back to work, after the one-week construction pause is related to its tolerance of racism in the workplace.

9. Whether racist graffiti, such as "burn all NIGGERS... Trump 2020... White Power" and "BLACK LABORERS = LAZY!" creates a subjectively and objectively racially hostile work environment.

10. Whether Gutierrez is a management-level employee.

11. Whether Julian and Tony from Safety are management-level employees.

12. Whether MJ Dean, through Gutierrez, treated similarly situated individuals who are not African-American more favorably than Colvin.

13. Whether MJ Dean's reliance on COVID-19 is a pretext for discrimination that is unworthy of credence.

## IV. LEGAL ARGUMENT

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact that would preclude summary judgment as a matter of law. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir.1996); Fed.R.Civ.P. 56(c). The materiality of a fact is based upon the substantive law of the underlying claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986). If the moving party does not provide evidence upon which "a reasonable jury could return a verdict for the nonmoving party," then genuine issues of material fact exist and summary judgment is denied. *Id.*

The moving party bears the burden of proving there is no genuine issue of material fact, through the use of authenticated evidence, to show that they are entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *See Orr v. Bank of America*, 285 F.3d 764 (9th Cir. 2002). Only after the moving party meets that burden must the nonmoving party
/ / / /

come forward to establish the specific material facts in dispute, through authenticated evidence, to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986); *see Orr*, 285 F.3d at 773.

In *Tolan v. Cotton,* the United States Supreme Court found that the Court of Appeals for the Fifth Circuit "failed to adhere to the axiom that in ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" 572 U.S. 650, 897, 134 S.Ct. 1863, 1868 (2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505 (1986)). In support of that axiom, the Court reiterated that "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Id.* at 1866 (citing *Anderson*, 477 U.S. at 249). Accordingly, a "judge's function" at summary judgment is to credit contradictory evidence against the moving party to the nonmoving party. *Id.* at 1866. The judge may <u>not</u> improperly weigh the evidence or resolve disputed issues in the moving parties favor. *Id.* The judge must adhere to the fundamental principle that all "reasonable inferences should be drawn in favor of the nonmoving party." *Id.* at 1868.

Each cause of action is discussed below.

### A. MJ Dean failed to properly train its management how to remedy and prevent a racially hostile work environment.

Colvin incorporates by reference all arguments regarding his claim of Negligent Training and Supervision from Plaintiff's PMSJ into this response (Doc. 44, at pp. 16-19 ) and supplements that argument as follows:

MJ Dean argues Colvin has no evidence to support his claims of Negligent Training and Supervision, relying on its assertion that Colvin was not supervised by Gutierrez. This cause of action, however, does not require Gutierrez be Colvin's supervisor.

From Defendant's MSJ, it is clear that MJ Dean still does not understand how to prevent a racially hostile work environment. Colvin's claim of Negligent Training and Supervision directly takes issue with MJ Dean's failure to conduct meetings or trainings regarding his

////

November 14, 2019, complaint of being called a "nigger" by his supervisor, Gutierrez. A meeting held after the November 14th incident could have prevented or deterred the racist bathroom graffiti Colvin found on December 24, 2019, and January 3, 2020.

Additionally, if MJ Dean had properly trained Gutierrez to report racist graffiti, then the approximate 200 instances of racist graffiti Gutierrez witnessed at the job site in his two years working there could have been prevented. (*See* Exhibit 11, at 33:8-18.) Based on the testimony of Gutierrez, Thomason, and Rosequist, it is clear that they do not follow MJ Dean's anti-discrimination policies and procedures. Both Thomason and Rosequist deny any racism issue at the job site, even though Gutierrez testified it is an ongoing issue. (*See* Exhibit 11, at 33:15-18, 42:18-21; *see* Exhibit 12, at 24:5 to 25:21; and *see* Exhibit 13, at 15:23 to 16:4, 17:23-25, & 18:12 to 19:18.)

The prevalence of the racist graffiti, including the fact that it has continued into 2021, shows MJ Dean does not enforce its anti-discrimination and harassment policies. (*See* Exhibit 11, at 42:18-21.) This lack of enforcement shows MJ Dean's training and supervision is negligent. The negligent supervision relates to MJ Dean's complete failure to train its supervisors, including Thomason, Rosequist, and Gutierrez, how to enforce the anti-discrimination and harassment policies and prevent a racially hostile work environment.

If Thomason was properly trained, then he would never have directed Gutierrez, Colvin's harasser, to terminate Colvin's employment. The company's termination policy even states a termination should come from the employee's supervisor, which was Dave Muti. (*See* Exhibit 4, at APP013.) MJ Dean failed to use reasonable care in training and supervising Thomason, Rosequist, and Gutierrez regarding how to remedy, prevent, and deter a racially hostile work environment. Because there is no genuine issue of material fact regarding MJ Dean's liability for its negligent training and supervision, this Court should grant Plaintiff's PMSJ as to this claim.

////
////
////
////

**B. MJ Dean retaliated against Colvin after he complained of being called a "nigger" by his supervisor and saw racist graffiti in the bathroom.**

Colvin incorporates by reference all arguments regarding his claim of Retaliation in violation of Title VII from Plaintiff's PMSJ into this response (Document 44, at pp. 19-21 ) and supplements that argument as follows:

Here, MJ Dean concedes that Colvin engaged in a protected activity and suffered an adverse employment action thereafter. The only element MJ Dean disputes is the causation element. What MJ Dean fails to take into consideration is that Colvin's employment was terminated by the same person that called him a "nigger," Gutierrez. MJ Dean claims Guterrez did not make the decision to terminate Colvin, yet Gutierrez signed Colvin's Termination Notice and MJ Dean defied its Termination Policy. (*See* Exhibit 4, at APP013; and *see* Exhibit 9, at APP035.) That policy directs that Colvin should have been terminated by his supervisor, Dave Muti, or Human Resources. (*See* Exhibit 4, at APP013.) Gutierrez's involvement in Colvin's termination was punitive. To say that Gutierrez "had no part in the decision" to fire Colvin ignores the fact that Gutierrez signed Colvin's Termination Notice. (*See* Exhibit 9, at APP035.) At the very least, a genuine issue of material fact exists regarding Gutierrez's involvement in the decision-making process for Colvin's termination.

A genuine issue of material fact also exists regarding whether MJ Dean actually eliminated Colvin's position or simply replaced him in favor of employees who do not oppose racial discrimination/harassment. When Colvin picked up his final check the day following his termination, he noticed other laborers were assigned to do his work. (*See* Exhibit 10, at 186:3-7 & 188:4-6.) Colvin's work area was not affected by the one-week-long shutdown because the yard is where the trucks bring in all the materials for the project and requires constant maintenance. (*See* Exhibit 10, at 205:12-19.) The other laborers assigned to the yard shows Colvin was replaced. (*See* Exhibit 10, at 186:3-7 & 188:4-6.) Thomason further concedes that even though they were directed to haul and store everything stored in the yard (Colvin's former assigned work area) offsite, MJ Dean never did. (*See* Exhibit 12, at 37:7-18.)

////

1 | Thomason concedes the project was only paused for one-week and then approximately
2 | 200 laborers were brought back. (*See* Exhibit 12, at 35:3-17.) Thomason also concedes MJ Dean
3 | made zero effort to ensure a diverse workforce was brought back after the one-week pause. (*See*
4 | Exhibit 12, at 47:15-18.) Bringing Colvin back to work after the pause would have helped ensure
5 | a diverse workforce was returned to work.
6 | A reasonable jury could find these facts show Colvin's termination was based on MJ
7 | Dean wanting to get rid of laborers who oppose its racially hostile work environment. COVID-19
8 | was simply a convenient way to terminate laborers who opposed MJ Dean's racially hostile work
9 | environment and replace those laborers one week later with a non-diverse group of laborers who
10 | tolerate and/or perpetuate the racially hostile environment. Gutierrez admitted that racism on the
11 | job site continues to remain an issue, including the racist bathroom graffiti. (*See* Exhibit 11, at
12 | 42:18-21.)
13 | Colvin believes, based on the above facts, that he was terminated because he made
14 | multiple complaints of racial harassment. (*See* Exhibit 10, at 205:12-19.)The testimony of
15 | Thomason and Rosequist shows they prefer to remain in the dark regarding the ongoing racism
16 | on the jobsite that Gutierrez admits is a problem. MJ Dean's solution to the racism issue was to
17 | get ride of the laborers who complain and keep the ones who "let it go in one ear and out the
18 | other." (*See* Exhibit 11, at 41:9 to 42:2.) This conduct violates Title VII.
19 | Based on the foregoing, this Court should find Colvin has established MJ Dean's liability
20 | for Retaliation in violation of Title VII. If this Court feels liability has not been established as a
21 | matter of law, then this Court should find there are genuine issues of material fact regarding (1)
22 | Gutierrez's role in Colvin's termination, (2) the affect of the one-week construction pause on
23 | Colvin's formerly assigned area, (3) whether MJ Dean's failure to ensure a diverse work force
24 | was related to its tolerance of racism in the work place, and (4) whether Colvin's former position
25 | was replaced and not actually eliminated.
26 | / / / /
27 | / / / /
28 | / / / /

     **C.**    **MJ Dean has tolerated a racially hostile work environment at the Sphere jobsite since 2019.**

Title VII prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . race." 42 U.S.C. § 2000e-2(a)(1). When Congress enacted Title VII, its objective was "to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an indentifiable group of white employees over other employees." *Griggs v. Duke Power Co.*, 401 U.S. 424, 429-30, 91 S.Ct. 849, 853 (1971).

"This prohibition encompasses the creation of a hostile work environment, which violates Title VII's guarantee of 'the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399 (1986)). "Courts have long recognized that a workplace in which racial hostility is pervasive constitutes a form of discrimination." *Id.* (quoting *Woods v. Graphic Communications*, 925 F.2d 1195, 1200 (9th Cir. 1991).)

To survive summary judgment the plaintiff need only show a genuine issue of material fact exists regarding "(1) whether a reasonable African-American man would find the workplace so objectively and subjectively racially hostile as to create an abusive working environment; and (2) whether [the employer] failed to take adequate remedial and disciplinary action." *Id.*

Each of these elements are discussed below.

     **1.**    ***Racial hostility toward African-Americans pollutes the MJ Dean workplace.***

The determination of whether a hostile work environment exists considers whether the harassment is "sufficiently severe and pervasive to alter the conditions of the victim's employment and create an abusive work environment" in light of "all the circumstances." *McGinest*, 360 F.3d at 1112-13 (internal citations omitted). If the hostile conduct "pollutes the victim's workplace, making it more difficult for [him] to do [his] job, to take pride in [his] work, and to desire to stay on in [his] position," then a hostile work environment exists. *Id.* at 1113.

"The omnipresence of race-based attitudes and experiences in the lives of black Americans [may cause] even nonviolent events to be interpreted as degrading, threatening, and offensive." *Id.* at 1116. This is why "Title VII tolerates no racial discrimination, subtle or otherwise." *Id.* The Ninth Circuit has analyzed the use of the word "nigger" in relation to a hostile work environment, stating:

> It is beyond question that the use of the word 'nigger' is highly offensive and demeaning, evoking a history of racial violence, brutality, and subordination. This word is 'perhaps the most offensive and inflammatory racial slur in English...a word expressive of racial hatred and bigotry.

*Id.* "No word in the English language is as odious or loaded with a terrible history." *Id.* (quoting *Daso v. The Grafton School, Inc.*, 181 F.Supp.2d 485, 493 (D. Md. 2002).

The Plaintiff must show the work environment is both subjectively and objectively hostile. *Id.* at 1113. Subjective hostility is determined by the plaintiff's testimony and complaints. *Id.* Objective hostility is determined by considering the following factors:

> Frequency of discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

Here, Colvin was called a "nigger" by his supervisor and was witness to disturbing racist graffiti. (*See* Exhibit 10, at 127:13-15; and *see* Exhibit 8.) Being called the "most offensive and inflammatory racial slur in [the] English" language is severe and pervasive. Gutierrez single-handedly altered the conditions of Colvin's employment by calling Colvin a "nigger." Not only was that comment offensive, but it also degraded Colvin as a human, threatened his ability to take pride in his work, and destroyed his desire to remain employed by MJ Dean. Gutierrez wanted to make it more difficult for Colvin to do his job. (*See* Exhibit 10, at 95:10-16, 98:17 to 99:11, & 158:3-5.) Because Gutierrez denies calling Colvin a "nigger," a genuine issue of material fact exists. (*See* Exhibit 11, at 43:9-14.)

A little over a month after Gutierrez called Colvin a "nigger," Colvin was subjected to racist graffiti in the bathrooms near his work area. The first instance was the "BLACK LABORERS=LAZY!" graffiti. (*See* Exhibit 8, at APP033.) That graffiti was reminiscent of Gutierrez's treatment of Colvin prior to the "nigger" comment. Gutierrez's open hostility toward

Colvin began Colvin's first day of work. (*See* Exhibit 10, at 94:10-13.) That hostility resulted in Gutierrez putting Colvin in various situations that were designed to ensure Colvin's failure. (*See* Exhibit 10, at 95:5-9.) Gutierrez would assign Colvin various tasks throughout a shift that did not allow for the completion of those tasks. (*See* Exhibit 10, at 95:19-21.) Colvin complained to Safety regarding this graffiti. (*See* Exhibit 10, at 174:13-15 and 175:8-13.)

A little over a week after the "BLACK LABORERS=LAZY!" graffiti, Colvin was subjected to an even more degrading, offensive, and threatening instance of graffiti. On January 3, 2020, Colvin witnessed the "burn all NIGGERS... Trump 2020... White Power" graffiti. (*See* Exhibit 8, at APP032.) It is undisputed that this graffiti is exceptionally offensive on top of threatening all African-Americans lives with a horrible death.

The "burn all NIGGERS" graffiti coupled with the "White Power" comment and Nazi insignia shocks the conscious. On top of its demeaning affect, it evokes the history of racial violence, brutality, and subordination that the white supremacy movement subjected on African-Americans. It shows that this racial hatred and bigotry is not just confined to the past, but rather remains a current threat. This graffiti shows the harassment of African-Americans on the MJ Dean jobsite is severe and pervasive, altering those employees conditions of employment, and creating an abusive work environment.

Further, there is no question that the above conduct is both subjectively and objectively hostile. Colvin's testimony unequivocally shows the "nigger" comment and accompanying racist graffiti was subjectively hostile. (*See* Exhibit 10, at 128:2-7, 168:11-15, 169:7-25, & 175:8-13.) On an objective level, it should be undisputed that calling an African-American employee a "nigger," and then subjecting that same employee to graffiti that demands to "burn all NIGGERS" is objectively hostile because it threatens severe, life-ending, physical violence.

Colvin has shown, as a reasonable African-American man, that the MJ Dean workplace was both objectively and subjectively racially hostile, creating an abusive work environment. This Court may find that Colvin has set forth sufficient facts to show there is a genuine issue of material fact regarding whether racial hostility pollutes the MJ Dean workplace.

////

> 2. ***MJ Dean's refusal to take any action to remedy or prevent racial hostility in the workplace shows it is willfully blind to racism against African-Americans.***

"Employers are liable for failing to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known." *McGinest*, 360 F.3d at 1119. To avoid liability, the employer must take "remedial measures reasonably calculated to end the harassment." *Id.* at 1120 (internal quotations omitted). "Inaction constitutes a ratification of past harassment, even if such harassment independently ceases." *Id.* "[R]emedial actions must be designed not only to prevent future conduct by the harasser, but also by other potential harassers." *Id.* at 1121.

An employer's liability for harassment depends on whether the harasser is a supervisor or a co-worker. MJ Dean's liability for its failure to take any remedial measures is discussed below based on both theories of liability.

> a. **MJ Dean has failed to set forth any facts as an affirmative defense to contest its vicarious liability for Gutierrez's "nigger" slur toward Colvin.**

An employer may set forth an affirmative defense for vicarious liability by showing "(1) it exercised reasonable care to prevent and correct promptly any invidious harassment, and (2) that the Plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or avoid harm otherwise." *McGinest*, 360 F.3d at 1119 fn 12. An employer is liable for a supervisor's actions when that supervisor has "immediate (or successively higher) authority over the employee." *Id.* fn 13. "[T]his distinction is not dependent upon job titles or formal structures within the workplace, but rather upon whether a supervisor has the authority to demand obedience from an employee." *Id.*

Here, MJ Dean claims it conducted an investigation regarding Gutierrez's "nigger" slur, but it never took the necessary next step of using reasonable care to prevent the future use of the "nigger" slur through trainings or meetings with all employees and supervisors. (*See* Exhibit 10, at 172:6-14 & 231:9 to 232:2.) Colvin did what he was supposed to do when he notified MJ

////

////

1 | Dean of this issue. (*See* Exhibit 6.) MJ Dean however, did not take Colvin's complaint seriously
2 | by conducting training to prevent future use of the slur. (*See* Exhibit 10, at 172:6-10; *see* Exhibit
3 | 12, at 25:18-21; and *see* Exhibit 13, at 19:5-18.)

Because there is a genuine issue of material fact regarding Gutierrez's use of the "nigger" slur, summary judgment cannot be granted on this issue; however, if a jury finds Colvin more credible than Gutierrez, vicarious liability attaches because Gutierrez was Colvin's immediate supervisor and MJ Dean is unable to establish a credible affirmative defense.

### b. The racist graffiti may be considered hostile actions by coworkers for which MJ Dean may be held liable.

"Employers are liable for failing to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known." *McGinest*, 360 F.3d at 1119. Supervisors who use bathrooms where racist graffiti is prevalent imputes knowledge to the employer. *Id.* at 1120. An employer may avoid liability for racist bathroom graffiti if it "undertak[es] remedial measures reasonably calculated to the end of harassment." *Id.* (Internal quotations omitted). "The reasonableness of the remedy depends on its ability to (1) stop harassment by the person who engaged in the harassment; and (2) persuade potential harassers to refrain from unlawful conduct." *Id.* (internal quotations omitted.)

The adequacy of the employer's response depends on if the employer promptly intervened. *Id.* Any remedial measures "must include some form of disciplinary action" and "must be proportionate to the seriousness of the offense." *Id.* (internal quotations omitted). This is because "Title VII requires more than a mere request to refrain from discriminatory conduct." *Id.* "Inaction constitutes a ratification of past harassment." *Id.* Liability attaches to past and future harassment when an employer takes no action to remedy or if the remedy fails to end current harassment and deter future harassment. *Id.*

Here, it is undisputed MJ Dean took no action to stop or prevent the racist bathroom graffiti issue. (*See* Exhibit 10, at 172:11-14 & 231:9 to 232:2; *see* Exhibit 12, at 25:18-21; and *see* Exhibit 13, at 18:12 to 19:18.) Gutierrez's testimony shows that a management-level

employee knew there was an issue regarding racist bathroom graffiti dating back to 2019. (*See* Exhibit 11, at 31:17 to 32:1 & 33:8-18.) Gutierrez's testimony shows MJ Dean has done absolutely nothing to remedy this issue because Gutierrez admits it's an ongoing issue. (*See* Exhibit 11, at 33:15-18.) Additionally, Thomason and Rosequist's testimony confirms MJ Dean has taken no action to correct, prevent, and deter this ongoing issue because they claim no knowledge of the racist bathroom graffiti that Gutierrez claims has occurred over 200 times since 2019. (*See* Exhibit 12, at 26:2-6; and *see* Exhibit 13, at 15:10-15 & 20:10-13.) MJ Dean's inaction to remedy and deter such harassment shows it affirmatively allows racial harassment in its workplace. This directly violates Title VII.

MJ Dean will likely claim Gutierrez is not management-level to impute knowledge to MJ Dean. If this Court has any question of Gutierrez's management status, then that issue of fact should be resolved by a jury.

MJ Dean has also creates an issue of fact regarding this issue by attaching the Declarations of Julian Jeffers and Antonio Jalomo-Rodriguez.[2] (*See* Defendant's Exhibits L & M.) Those affidavits directly contradict Gutierrez's testimony because Julian and Tony both claim they "never heard anybody make any discriminatory or offensive remarks based on someone's race or ethnicity." That statement contradict's Gutierrez's testimony that he did hear such remarks. (*See* Exhibit 11, at 40:21-25 & 41:8-10.) It is interesting that those declarations avoid whether anyone complained of racist graffiti because Gutierrez testified he reported those issues to Safety, as did Colvin. (See Exhibit 11, at 31:22 to 32:1.)

Based on the above, a jury would have to determine whether Gutierrez, Julian, and Tony are management-level employees to impute knowledge regarding the racist bathroom graffiti to MJ Dean. With the exception of that issue, a reasonable jury could find that MJ Dean took no action to remedy, prevent, and/or deter racial harassment in its workplace.

////

---

[2] This Court should exclude these witnesses and strike these exhibits, as argued in Plaintiff's Motion to Exclude Witnesses and Strike Exhibits, filed concurrently herewith.

**D.    Colvin was subjected to unlawful disparate treatment under Title VII.**

A person suffers disparate treatment in his employment "when he or she is singled out and treated less favorably than others similarly situated on account of race." *McGinest*, 360 F.3d at 1121 (internal citations omitted). The law has long recognized that employers will usually not admit to engaging in discriminatory conduct. As a result, a Title VII Plaintiff can set forth a *prima facie* case through direct evidence showing a discriminatory motive or through circumstantial evidence using the *McDonnell Douglas* formula. *Washington v. Garrett*, 10 F.3d 1421, 1431-32 (9th Cir. 1993); and see *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

Each method is discussed below.

       1.    *Colvin's direct evidence of race discrimination, based on disparate treatment, survives summary judgment.*

Direct evidence is evidence which, if believed, proves the fact of discriminatory animus. *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998.) It is defined as:

> evidence of conduct or statements by persons that may be viewed as directly reflecting the alleged discriminatory attitude sufficient to permit the fact-finder to infer that attitude was more likely than not a motivating factor in the employer's decision.

*Enlow v. Salem-Keizer Yellow Cab Co., Inc.*, 389 F.3d 802, 812 (9th Cir. 2004.) Direct evidence standing alone can defeat summary judgment. *France v. Johnson*, 795 F.3d 1170, 1173 (9th Cir. 2015).

Gutierrez singled Colvin out at the beginning of Colvin's employment by being openly hostile to Colvin when he greeted Gutierrez in the morning. (*See* Exhibit 10, at 95:2-4.) On approximately eight occasions, Gutierrez assigned Colvin multiple tasks throughout the day that did not allow for the completion of those tasks. (*See* Exhibit 10, at 95:10-26 and 158:3-5.) Gutierrez would have Colvin go work with other crews only to have the laborers on those crews ask why he was sent over because all the work was already covered. (*See* Exhibit 10, at 95:19-21.)

////

Colvin confronted Gutierrez regarding this disparate treatment, asking, "Why am I the only laborer that you constantly pick on and send to work with other departments? And then when I get there, they don't even know why you send me there." (*See* Exhibit 10, 145:16-19 & 146:1-13.) Gutierrez had no response. (*See* Exhibit 10, at 148:1-5.) Colvin complained about this disparate treatment to Superintendent McGrandy. (*See* Exhibit 10, at 148:6-10.)

On top of trying to have Colvin live up to the MJ Dean racial stereotype that "BLACK LABORERS=LAZY!", Gutierrez prevented Colvin from working overtime in favor of Hispanic laborers that started after Colvin. (*See* Exhibit 10, at 110:3 to 111:4.)

To humiliate Colvin, Gutierrez singled him out by telling him he would be fired for using the magnetic wand tool to clean-up items such as nails, screws, and bolts. (*See* Exhibit 10, 98:17 to 99:8.) Gutierrez ordered Colvin to get down on his hands and knees to do that clean-up even though no other laborer was required to do it on their hands and knees. (*See* Exhibit 10, at 98:24 to 99:11.)

MJ Dean eventually moved Colvin to another work area after Gutierrez called Colvin a "nigger." (*See* Exhibit 10, at 132:1-13.) On December 24, 2019, Colvin found the "BLACK LABORERS=LAZY!" graffiti, which was followed by the "Burn all NIGGERS... Trump 2020... White Power" graffiti on January 3, 2020. (*See* Exhibit 8.)

Colvin's employment was then terminated by Gutierrez in early-April of 2020. (*See* Exhibit 9.) The direct evidence of racial hostility by Gutierrez toward Colvin, on top of the racist bathroom graffiti, shows a direct racial animus against Colvin to survive summary judgment on disparate treatement.

    **2.**    ***This case also survives summary judgment under the McDonnell Douglas formula.***

Under the *McDonnell Douglas* formula, the plaintiff first bears the burden of establishing a *prima facie* case of discrimination based on race. *Id*. at 802. Once the plaintiff establishes its *prima facie* case, the burden of production then shifts to the defendant to "articulate a legitimate, nondiscriminatory reason" for the adverse employment action. *Aragon v. Republic Silver State*

/ / / /

*Disposal*, 292 F.3d 654, 658 (2002). If the Defendant articulates such a reason, then the burden shifts back to the plaintiff to "demonstrate that [the] articulated reason is a pretext for unlawful discrimination." *Id*.

Colvin's *prima facie* case and MJ Dean's pretextual termination are discussed below.

### a. Colvin has established a *prima facie* case of unlawful discrimination based on disparate treatment.

The Supreme Court has emphasized that "the burden of establishing a *prima facie* case of disparate treatment is not onerous." *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S. Ct. 1089, 67 L. Ed. 2d. 207 (1981). The Title VII plaintiff must offer evidence that "give[s] rise to an inference of unlawful discrimination" in order to establish a *prima facie* case to survive summary judgment. *Palmer v. Pioneer Inn Associates, Ltd.*, 338 F.3d 981, 984 (9th Cir. 2003) (citing *Burdine*, 450 U.S. at 253). This burden only requires "minimal proof and does not even need to rise to the level of a preponderance of the evidence." *Id*. (internal citations omitted). To establish the *prima facie* case, the plaintiff must show that (1) he belongs to a protected class; (2) he was qualified for the position he held and/or performed his job satisfactorily; (3) he suffered an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably. *Nicolson v. Hyannis Air Service, Inc.*, 580 F.3d 1116, 1123 (9th Cir. 2009).

Here, it is undisputed that Colvin, an African-American man, belongs to a protected class. It is also undisputed that he was qualified for his position and performed his job satisfactorily. MJ Dean also does not dispute that Colvin suffered an adverse employment action by virtue of his termination.

Colvin has sufficient evidence to survive summary judgment regarding the fourth element because he is able to show that similarly situated individuals outside his protected class were treated more favorably. Gutierrez singled Colvin out in the beginning months of Colvin's employment by sending Colvin to work on crews that did not need help so that Colvin would live up to the MJ Dean racial stereotype that "BLACK LABORERS=LAZY!" (*See* Exhibit 10, at 95:5-21; and *see* Exhibit 8, at APP033.) Colvin was the only laborer that Gutierrez treated this

way. (*See* Exhibit 10, at 145:16-19 & 146:1-13.) Gutierrez also prevented Colvin from working overtime in favor of Hispanic laborers that started after Colvin. (*See* Exhibit 10, at 110:3 to 111:4.) On other occasions, Gutierrez forced Colvin to do clean-up on his hands and knees, unlike all other laborers. (*See* Exhibit 10, at 98:24 to 99:11.) These other laborers were outside of Colvin's protected class.

As such, Colvin has established a *prima facie* case of discrimination based on disparate treatment.

### b. MJ Dean's reliance on COVID-19 is simply a pretext for its unlawful termination of Colvin.

After the plaintiff establishes a *prima facie* case, the burden of production shifts to the employer to provide the Court with sufficient evidence that would "permit the fact finder to conclude that the employer had a legitimate, nondiscriminatory reason for the adverse employment action." *Coghlan v. Am. Seafoods Co., LLC,* 413 F.3d 1090, 1094 (9th Cir. 2005).

If, and only if, the defendant provides admissible evidence of a legitimate, nondiscriminatory reason, then the burden shifts back to the plaintiff to show that the reason offered by the defendant is pretextual, meaning the employer's motives are unbelievable or inconsistent. *See Coghlan,* 413 F.3d at 1094; *See also Cornwell v. Electra Central Credit Union,* 439 F.3d 1018, 1028 (9th Cir. 2006). The plaintiff may establish pretext through direct and/or circumstantial evidence. *Id.* at 1094-95. *Id.* This can be done in the affirmative by showing that the employer is biased or in the negative "by showing that the employer's proffered explanation for the adverse action is "unworthy of credence." *Id.*; *See Burdine*, 450 U.S. at 256. The U.S. Supreme Court has explained:

> Proof that the Defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147, 120 S.Ct 2097 (2000).

The plaintiff need only demonstrate that there is a genuine issue of material fact regarding pretext to survive summary judgment. *Nicholson,* 580 F.3d at 1127. In *Nicholson*, the Ninth Circuit Court of Appeals affirmed its earlier ruling in *McGinest*, stating:

> [W]e have held that very little evidence is necessary to raise a genuine issue of fact regarding an employer's motive, any indication of discriminatory motive may suffice to raise a question that can only be resolved by a fact finder. When the evidence, direct or circumstantial, consists of more than the *McDonnell Douglas* presumption, a factual question will almost always exist with respect to any claim of a nondiscriminatory reason.

*Nicholson,* 580 F.3d at 1127.

The reason why the Court requires "very little evidence to survive summary judgment [is] precisely because the ultimate question is one that can only be resolved through a searching inquiry- one that is most appropriately conducted by the fact finder, upon a full record." *Id.* at 1128 (internal quotation marks omitted).

Here, MJ Dean claims the job site shutdown due to COVID-19 and it had to fire numerous laborers as a result. During Thomason's deposition, however, he admitted the job site only actually shut down or one week. (*See* Exhibit 12, at 33:2-10.) Thomason admitted that despite being directed to haul the materials in the yard (Colvin's work area) offsite, they never did. (*See* Exhibit 12, at 37:7-18.) Finally, Thomason admits that MJ Dean made no effort to ensure a diverse workforce, including African-Americans, was brought back to work after the one-week pause. (*See* Exhibit 12, at 42:14-17 & 47:15-18.) The failure to ensure a diverse workforce was brought back, including bringing Colvin back to work, shows MJ Dean maintained its racial animus and shows COVID-19 was simply a pretext for discrimination and unworthy of credence.

The above shows there are genuine issues of material fact regarding the treatment of similarly situated individuals and whether MJ Dean is using COVID-19 as a pretext for discrimination.

/ / / /
/ / / /
/ / / /
/ / / /
/ / / /
/ / / /

## V.   CONCLUSION

Defendant's MSJ is a bare bones attempt to dismiss this case ignoring all material facts at issue. MJ Dean's racially hostile work environment has violated Title VII since 2019 and continues into 2021. Based on the evidence of this case, this Court is able to grant Plaintiff's PMSJ regarding Negligent Training and Supervision and Retaliation in violation of Title VII. The remaining Title VII claims, harassment based on a hostile work environment and discrimination based on disparate treatment contain genuine issues of material fact that may only be resolved by a jury.

DATED this 28th day of October, 2021.

LAW OFFICE OF DANIEL MARKS

_____
DANIEL MARKS, ESQ.
Nevada State Bar No. 002003
NICOLE M. YOUNG, ESQ.
Nevada State Bar No. 12659
610 South Ninth Street
Las Vegas, Nevada 89101
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that I am an employee of the LAW OFFICE OF DANIEL MARKS, and that on the 28 day of October, 2021, I did serve a true and correct copy of the above and foregoing **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** by way of Notice of Electronic Filing provided by the court mandated ECF filing service, upon the Defendant at the following:

Robert Rosenthal
Howard & Howard Attorneys Pllc
3800 Howard Hughes Parkway, Suite 1000
Las Vegas, Nevada 89169
Attorneys for Defendant

_____
An employee of the
LAW OFFICE OF DANIEL MARKS