# EXHIBIT C

UNITED STATES DISTRICT COURT FOR

THE DISTRICT OF NEVADA


PARNELL COLVIN,                    )
                                  )
            Plaintiff,            )
                                  )
vs.                               )CASE NO. 2:14-CV-00761-JCM-PAL
                                  )
M.J. DEAN CONSTRUCTION,           )
INC.                              )
                                  )
            Defendant.            )
_____)


VIDEORECORDED DEPOSITION OF PARNELL COLVIN

Las Vegas, Nevada

July 15, 2021
10:00 a.m. (PST)


REPORTED BY:
MICHAEL A. BOULEY, RDR
NVCCR #960



```
1      Q.   So while you communicated with John Thomason,
2   you were still -- you were actually still working for
3   Clause Construction at that time.  Is that right?
4      A.   Yes.
5      Q.   Did you know Mr. Thomason from before?
6      A.   We met.  He called me in his office -- we met
7   prior to me going to that job.
8      Q.   When was the first time you met John Thomason?
9      A.   Rough guess, I would probably say --
10     Q.   Again, I don't want you to guess.  But you do
11  understand between an estimate and a guess.  Right?
12     A.   Yes.
13     Q.   Okay.  So can you give me an estimate as to when
14  you first met John Thomason?
15     A.   Probably -- I would say May.  May of 2019.
16     Q.   Now, I just want to go back for a second to all
17  of those lawsuits that we talked about.  Do you recall
18  those?
19     A.   Yes.
20     Q.   Did you ever testify in court for any of those?
21     A.   No.
22     Q.   So, never testified in court for any of the
23  eviction cases?
24     A.   Yes.
25     Q.   You did?
```



1      A.    **Yes.  Jan.**

2      Q.    When did you first contact Jan?

3      A.    **Late April.**

4      Q.    So, about working at M.J. Dean?

5      A.    **Yes.**

6      Q.    Had you sent Mr. Thomason any text messages

7  before June 10, 2019?

8      A.    **I don't recall.**

9      Q.    Had you ever talked to John Thomason before June

10  10, 2019, about working at M.J. Dean?

11     A.    **Yes.**

12     Q.    When was the first time you talked to John

13  Thomason about working at M.J. Dean?

14     A.    **May.  May of 2019.**

15     Q.    Did John Thomason tell you to apply to work

16  there?

17     A.    **No.**

18     Q.    What did he tell you?

19     A.    **Give him my name, last four of my social, and he**

20  **would set me up for orientation.**

21     Q.    So did Mr. Thomason say -- indicate to you that

22  you were going to be hired?

23     A.    **Yes.**

24     Q.    When did he tell you that?

25     A.    **When I had my first meeting with him.**



Parnell Colvin vs. M.J. Dean Construction, Inc.

```
1      Q.   Do you remember when that was?

2      A.   May.  May 2019.

3      Q.   Do you have anything in writing between you and

4   Mr. Thomason regarding the job other than these text

5   messages?

6      A.   No.

7      Q.   So did he ever offer you a job in writing in May

8   2019?

9      A.   No.

10     Q.   It was just a conversation between the two of

11  you?

12     A.   Yes.

13     Q.   So I'm looking at the second text message on the

14  first page of Exhibit B.  It says, Hello, John.  This is

15  Parnell.

16          Do you see that?

17     A.   Yes.

18     Q.   So that text message, that block there, that's

19  you.  Right?

20     A.   The blue one or --

21     Q.   No.

22     A.   -- the gray?

23     Q.   Yeah.

24     A.   Yes.

25     Q.   The one in gray is you.  Right?
```



 1     A.    It's a dispatch referral from the union hall.

 2     Q.    For what?

 3     A.    Employment with M.J. Dean.

 4     Q.    And it's dated July 23, 2019.  Correct?

 5     A.    Yes.

 6     Q.    So were you, in fact -- did you, in fact, go

 7     through your union hall to gain employment at M.J. Dean?

 8     A.    Yes.

 9     Q.    There's a number at the -- toward the top of the

10     page.  It says Number 6800.  Do you know what that is?

11     A.    No.

12     Q.    Do you have a union number?

13     A.    Yes.

14     Q.    Do you know what that number is?

15     A.    No.

16     Q.    And take a look at the block area about the

17     middle of the page.  It says, Dispatch Class.  It says,

18     Mud cutter.

19           Do you see that?

20     A.    Yes.

21     Q.    Do you know what a mud cutter is?

22     A.    Yes.

23     Q.    What is that?

24     A.    Somebody that cuts concrete.

25     Q.    And next to that, looks like either a G or a 6,



```
 1    Number 12 as part of D.

 2             Is the handwriting yours?

 3       A.   Yes.

 4       Q.   Let's go to the next page, Bates numbered 13.

 5    And the title of that page is Acknowledging Policy and

 6    Safety Manuals.

 7             Is the handwriting yours?

 8       A.   Yes.

 9       Q.   So on that page you were acknowledging that you

10    received M.J. Dean's policy and safety manual.  Correct?

11       A.   Yes.

12       Q.   And that was -- so the office policy manual --

13    just to be clear, you received copies of the office

14    policy manual and the safety manual.  Correct?

15       A.   Yes.

16       Q.   Let's go to the next page, marked DEF00014 as

17    part of Exhibit D.  And the title of the page is

18    Anti-harassment/Discrimination Policy Statement.

19             Is the handwriting yours?

20       A.   Yes.

21       Q.   And on that page, you were acknowledging that

22    you had been given a copy of M.J. Dean's policy on

23    harassment and discrimination; that you reviewed the

24    policy; understood all of the sections of the policy,

25    including what acts constituted violation of policy, and
```



Case 2:20-cv-01765-APG-EJY   Document 48-4   Filed 10/29/21   Page 8 of 50

Parnell Colvin 4/15/2021
Parnell Colvin vs. M.J. Dean Construction, Inc.

```
 1    what the consequences were.  Correct?

 2         A.   Yes.

 3         Q.   Next page is Bates Number 15, entitled Substance

 4    Abuse Policy.  Is the handwriting yours?

 5         A.   Yes.

 6         Q.   Next page is 17, entitled Training Session on

 7    MSDS sheets for Hazard Communications.

 8              Is the handwriting yours?

 9         A.   Yes.

10         Q.   And, finally, Bates Number 17, entitled

11    Acknowledging Receipt of Policy and Safety Manual.

12              Is the handwriting at the bottom of the page

13    yours?

14         A.   Yes.

15         Q.   And towards the -- well, the second-to-last

16    paragraph on that page, you were acknowledging that you

17    understood, as an employee, that you had a duty to comply

18    with the safety rules of M.J. Dean and assist in

19    maintaining the hazard-free environment, report any

20    accidents or injuries, including breaches of safety, and

21    to report any unsafe equipment, working conditions,

22    process or procedure at once to a supervisor.  Right?

23         A.   Yes.

24         Q.   So you understood that you had that obligation

25    -- those obligations.  Correct?
```



Case 2:20-cv-01765-APG-EJY   Document 48-4   Filed 10/29/21   Page 9 of 50

Parnell Colvin vs. M.J. Dean Construction, Inc.
Parnell Colvin - 7/15/2021

```
 1       A.    Yes.

 2             MR. ROSENTHAL:   I'd like to have this next

 3    document marked as Defense Exhibit E.

 4             (Exhibit E identified.)

 5    BY MR. ROSENTHAL:

 6       Q.    Mr. Colvin, I'm showing you what's been marked

 7    as Defense Exhibit E, which is entitled Code of Safe

 8    Practices and Anti-drug and Harassment Policies.  Do you

 9    see that?

10       A.    Yes.

11       Q.    And is this a copy of -- did you receive a copy

12    of these Code of Safe Practices and Anti-drug and

13    Harassment Policies when you began working at M.J. Dean?

14       A.    Yes.

15       Q.    I'd like you to take a look at Exhibit E.  Bates

16    Number DEF000176.

17             And do you see where it's marked, top of the

18    page, Anti-harrassment and Discrimination Policy?

19       A.    Yes.

20       Q.    You received a copy of this Anti-harrassment and

21    Discrimination Policy.  Correct?

22       A.    Yes.

23       Q.    And you understood that M.J. Dean would not

24    tolerate any type of harassment or discrimination to its

25    employees, applicants, or customers.  Correct?
```



```
 1        A.    Yes.

 2        Q.    And you also understood that Harassment

 3   included, but was not limited to, slurs, jokes, and other

 4   verbal or physical conduct relating to a person's gender,

 5   ethnicity, race, color, creed, religion, sexual

 6   orientation, national origin, age, disability, marital

 7   status, military status, or any other protected

 8   classification that unreasonably interferes with a

 9   person's work performance or creates an intimidating,

10   hostile work environment.  Correct?

11        A.    Yes.

12        Q.    You didn't have any questions about M.J. Dean's

13   anti-harassment discrimination policy at any time during

14   your employment.  Correct?

15        A.    No.

16        Q.    Take a look at the next page, Bates number

17   DEF00177, part of Exhibit E.  Do you see that page?

18        A.    Yes.

19        Q.    And at the top of page, it says, Avoiding

20   Harassment.

21              Do you see that?

22        A.    Yes.

23        Q.    First sentence says, Since the best way to stop

24   any effective -- offens- -- start over.

25              Since the best way to stop any offensive conduct
```



Parnell Colvin
7/15/2021
Parnell Colvin vs. M.J. Dean Construction, Inc.

```
1    is to simply tell the person of your objecting to it,

2    M.J. Dean Construction encourages you to do so.

3         Do you see that?

4    A.   Yes.

5    Q.   And so you understood that that was an

6    obligation of yours to let someone know if you sound --

7    if you found someone's conduct to be offensive.  Correct?

8    A.   Yes.

9    Q.   And let's go down to the third heading.  It

10   says, Complaint Procedures and Investigation.

11        Do you see that?

12   A.   Yes.

13   Q.   And so you understood, correct, that if you

14   believe you were the subject of any harassment or

15   discrimination or witnessed any harassment or

16   discrimination in the workplace, you should immediately

17   inform your supervisor.  Correct?

18   A.   Yes.

19   Q.   And you also knew that if your supervisor was

20   not available, didn't respond to your satisfaction, or

21   you didn't wish to contact your supervisor, you were to

22   contact the human resources department.  Right?

23   A.   Yes.

24   Q.   And, finally, you knew that if you had any

25   questions regarding harassment or discrimination, you
```



1   were encouraged to discuss those questions with your

2   supervisor or the human resources department.  Correct?

3        A.    Yes.

4        Q.    And let's go down two more paragraphs, where it

5   says, Any employee becomes aware.  Do you see that, that

6   paragraph?

7        A.    Yes.

8        Q.    So, you were aware at that time, throughout your

9   employment, actually, that -- at M.J. Dean, that any

10  employee who became aware of possible sexual harassment

11  or any other illegal discrimination had an obligation to

12  promptly advise a supervisor, human resources department,

13  or other appropriate member of management.  Correct?

14       A.    Yes.

15       Q.    And, finally, you knew that M.J. Dean would not

16  tolerate retaliation of any kind.  Correct?

17       A.    Yes.

18       Q.    Turn to page DEF00180, please, of Exhibit E.

19       A.    Read that again?

20       Q.    Yeah.  DEF00180.  Do you see that that page?

21       A.    Yes.

22       Q.    And it's entitled Housekeeping at the top of the

23  page.  Right?

24       A.    Yes.

25       Q.    You were aware, were you not, throughout your



1    superintendent, Dave McGrandy.  And some point later on

2    down the line, Mr. Gutierrez was -- appointed Juan to be

3    the foreman.  When I originally got that area, Juan was

4    not my foreman, nor did I report to him.

5        Q.   Be fair to say that Dave McGrandy was above

6    Mr. Gutierrez in the chain of command?

7        A.   As to that area, he was.

8        Q.   What area was that?

9        A.   I think he was in area D, I believe.

10       Q.   Were you assigned to area D throughout your

11   employment?

12       A.   No.

13       Q.   Were you assigned to a particular area at

14   various points during your employment?

15       A.   Yes.

16       Q.   Which areas?

17       A.   The yard.

18       Q.   And was it your understanding that your assigned

19   work area could change day to day, week to week?

20       A.   Yes.

21       Q.   And M.J. -- and that M.J. Dean had the right to

22   assign you to work in a particular area wherever it

23   wanted?

24       A.   Yes.

25       Q.   And M.J. Dean also had the right to change your



1   assigned work area throughout your employment.  Is that

2   correct?

3       **A.   Yes.**

4       Q.   You didn't have a problem with that, did you?

5       **A.   None.**

6       Q.   Were you ever given a raise during the time that

7   you worked at M.J. Dean?

8       **A.   I believe so, yes.**

9       Q.   Do you remember when that was?

10      **A.   I want to say June or July.**

11      Q.   You started working in July 2019?

12      **A.   Yes.**

13      Q.   So you got a raise immediately?

14      **A.   Well, we get a yearly raise.  And I'm not sure,**

15  **in fact, if it came in June or July.  But we have a**

16  **five-year contract, so we get the raise.**

17      Q.   And that's my error.

18          So that raise was assigned through your union.

19  Correct?

20      **A.   Yes.**

21      Q.   Okay.  So that wasn't a raise given arbitrarily,

22  I guess, by M.J. Dean.  That was through the union?

23      **A.   Yes.**

24          MR. ROSENTHAL:  Okay.  I think it's a natural

25  break point for lunch, so why don't we take an hour.



Parnell Colvin   7/15/2021
Parnell Colvin vs. M.J. Dean Construction, Inc.

```
 1        A.   Yes.

 2        Q.   And when you began working at M.J. Dean, you

 3   reported directly to Kevin Gutierrez.  Is that right?

 4        A.   Yes.

 5        Q.   You had never worked directly with Kevin before

 6   that time.  Had you?

 7        A.   No.

 8        Q.   And your communications or contact with Kevin

 9   Gutierrez prior to your first day of work at M.J. Dean

10   was limited to one telephone conversation and one

11   telephone message.  Right?

12        A.   No -- yes, that's correct.

13        Q.   Let me just make sure I -- we got it correctly.

14        A.   Okay.

15        Q.   So your communication or contact with Kevin

16   Gutierrez before you actually began working at M.J. Dean

17   was limited to one telephone conversation with him and

18   one telephone message which you left for him.  Right?

19        A.   No, two.

20        Q.   Two telephone messages?

21        A.   Or two -- two phone calls.

22        Q.   Okay.  One of those phone calls, he actually

23   picked up the phone, and you spoke for about five

24   minutes.  Right?

25        A.   Yes.
```



1    him, would always say, Parnell, you want to work

2    overtime?  I said, Yeah, man, you know I want overtime.

3    He'd says, Okay. Come in in the morning.

4           (Reporter interruption)

5    BY MR. ROSENTHAL:

6       Q.   Let me just ask this:  Do you know for a fact

7    Ricky ever worked overtime?

8       A.   Yes.

9       Q.   How do you know that?

10      A.   Because I talked to him, and he would tell me he

11   worked overtime.

12      Q.   Okay.  Were you ever assigned overtime during

13   the time that you worked at M.J. Dean?

14      A.   Yes.

15      Q.   When did that start?

16      A.   Maybe my fourth week there.

17      Q.   And when you were assigned overtime, it was

18   Kevin that assigned you to work overtime.  Correct?

19      A.   No.

20      Q.   Who assigned you to work overtime?

21      A.   Dave McGrandy.

22      Q.   But you worked under Kevin Gutierrez' authority,

23   too.  Correct?

24      A.   Yes.

25      Q.   Was Kevin aware -- do you know whether Kevin was



Parnell Colvin   7/15/2021
Parnell Colvin vs. M.J. Dean Construction, Inc.

```
1   answered.

2       A.   No.

3   BY MR. ROSENTHAL:

4       Q.   Did you ever complain in writing to anybody at

5   M.J. Dean about not getting overtime that you thought you

6   deserved?

7       A.   No.

8       Q.   Did you ever complain in writing to anybody at

9   M.J. Dean, at any point during your employment, regarding

10  overtime any in any way, anything having to do with

11  overtime?

12      A.   No.

13      Q.   Did you ever complain to your union about

14  overtime?

15      A.   No.

16      Q.   Did you ever complain to anybody at AECOM about

17  overtime?

18      A.   No.

19      Q.   So you said that you began working overtime

20  after about the fourth week of work at M.J. Dean.  Right?

21      A.   Yes.

22      Q.   Were you assigned overtime periodically

23  throughout the rest of your employment at M.J. Dean?

24      A.   Yes.

25      Q.   Were -- was that overtime pretty regular?
```



Parnell Colvin    7/15/2021
Parnell Colvin vs. M.J. Dean Construction, Inc.

```
 1              MR. ROSENTHAL:  Yes.
 2              MR. MARKS:  So give him a moment to kind of
 3    collect his thoughts.
 4    BY MR. ROSENTHAL:
 5         Q.   Do you understand the question?
 6         A.   Can you repeat it, please?
 7         Q.   Yeah.  So I'm just trying to get an
 8    understanding of your list of issues that you had with
 9    Mr. Gutierrez from the time you started work until the
10    time you submitted your internal complaint on November
11    14, 2019.  Okay?
12         A.   Okay.
13         Q.   Do you understand that?
14         A.   Yes.
15         Q.   So that's the only time period I'm looking at
16    right now.
17         A.   Yes.
18         Q.   So you said you had the issue with the overtime.
19         A.   Correct.
20         Q.   What else?
21         A.   Him calling me a nigger.
22         Q.   Okay.  When was that?
23         A.   November 4, 2019.  Excuse me.  14th, I believe
24    it is.
25         Q.   Okay.  We'll get to that in a moment.
```



1          Did you have any other complaints or issues

2     concerning Kevin Gutierrez before that time?

3     A.    No.

4     Q.    Okay.  So let's move to November 14th.

5     A.    Okay.

6     Q.    Are you sure that Mr. Gutierrez called you the

7     N-word on the 14th, or was it the day before?

8     A.    Possibly could have been the day before.

9          MR. ROSENTHAL:  Let's mark this next document as

10    Defendant's Exhibit H.

11          (Exhibit H identified.)

12    BY MR. ROSENTHAL:

13    Q.    Do you recognize what's been marked as

14    Defendant's Exhibit H?

15    A.    Yes.

16    Q.    Is that a copy of the internal complaint that

17    you submitted to M.J. Dean?

18    A.    Yes.

19    Q.    Take a look at the top left-hand corner, and the

20    date says 11-14-2019.  Do you see that?

21    A.    Yes.

22    Q.    And just for the record, Exhibit H is -- has

23    Bates numbers DEF0024 and 0025.

24          And let's look at again at the top of -- the top

25    left-hand side of the page, underneath the date says,



```
 1    November 14, 2019, between you and Kevin Gutierrez?

 2        A.    No.

 3        Q.    So have you told me everything about the

 4    incident?

 5        A.    Yes.

 6        Q.    And so after the incident with Kevin Gutierrez

 7    on November 14, 2019, around 6:30 in the morning, you

 8    went over to complain at M.J. Dean's trailer.  Right?

 9        A.    Correct.

10        Q.    And eventually you, at some point, submitted a

11    written complaint.  Right?

12        A.    Yes.

13        Q.    Did -- who did you end up meeting with on behalf

14    of M.J. Dean to complain to?

15        A.    John Thomason.

16        Q.    Was he in the trailer when you got there?

17        A.    Yes.

18        Q.    Did either George or Jim Lampley remain in the

19    trailer with you while you complained?

20        A.    Yes.

21        Q.    Throughout the entire complaint?

22        A.    Yes.

23        Q.    Did you personally type up what's been marked as

24    Exhibit H, the Employee Incident Investigation Report?

25        A.    Yes.
```



1  H, did Mr. Thomason tell you that you were to report to

2  Dave Muti and not have to report to Kevin Gutierrez

3  anymore?

4      A.   No.

5      Q.   So when did that happen?

6      A.   As I told the story and George was there, and

7  since AECOM Hunt is the general superintendant, the

8  contractor, they are over M.J. Dean.  So it was George

9  that told John Thomason that Parnell and Kevin can never

10 work together, and Kevin is to have no dealings with

11 Mr. Colvin.  And you guys are going to put him in a

12 different area.  And that's when John Thomason's, like,

13 Okay.  No problem.  That's what I'm going to do.

14     Q.   So he moved you over to work directly under Dave

15 Muti?

16     A.   Correct.

17     Q.   Muti is spelled M-U-T-I.  Correct?

18     A.   It's possible.

19     Q.   To the best of your knowledge?

20     A.   Yes.

21     Q.   Okay.  When Mr. Thomason told you that you would

22 now be reporting to Dave Muti, had you typed out the

23 incident report at that point?

24     A.   No.

25     Q.   Did you have any problems with reporting to Dave



1    Muti instead of Kevin Gutierrez?

2        **A.    Did I have a problem?**

3        Q.    Yeah.

4        **A.    No.**

5        Q.    Did you tell anybody that you didn't want to

6    report to Dave Muti?

7        **A.    No.**

8        Q.    Had you ever worked with Dave Muti before that

9    time?

10       **A.    No.**

11       Q.    Did you know who he was?

12       **A.    No.**

13       Q.    Did you ever have any complaints or concerns

14   about Dave Muti after you submitted the Employee Incident

15   Investigation Report?

16       **A.    None.**

17       Q.    After -- did you return to work after submitting

18   the incident report and actually, in fact, report to Dave

19   Muti?

20       **A.    Yes.**

21       Q.    And you reported to Dave Muti through the

22   remainder of your employment at M.J. Dean.  Right?

23       **A.    Yes.**

24       Q.    Did Dave Muti ever threaten your employment in

25   any way?



Parnell Colvin vs. M.J. Dean Construction, Inc.

1      A.    No.

2      Q.    Did Mr. Muti ever threaten you physically in any

3  way?

4      A.    No.

5      Q.    Did Mr. Muti ever swear at you?

6      A.    No.

7      Q.    Did Mr. Muti ever say anything to you that you

8  found to be racially discriminatory?

9      A.    No.

10      Q.    Did Mr. Thomason ever say anything to you that

11  you found to be offensive or discriminatory?

12      A.    No.

13      Q.    Did Mr. Muti ever say anything to you you found

14  to be offensive?

15      A.    No.

16      Q.    Did you return to work that day after submitting

17  the incident report?

18      A.    Yes.

19      Q.    Did you work a complete shift?

20      A.    Yes.

21      Q.    Were you pleased with the resolution that you

22  would no longer have to report directly to Kevin

23  Gutierrez?

24      A.    Yes.

25      Q.    What kind of work did you do for Mr. Muti?



1      A.    I maintained the yard, which consists of when

2   the trucks come in to unload materials and load up, I

3   stage, organize, clean, band.  That was pretty -- just my

4   area to take care of.

5      Q.    What do you mean by stage?

6      A.    Things like when a truck would come in, just say

7   with 20, 30 pallets -- Julian was another laborer.  He

8   was a forklift driver.  So he would unload the pallets.

9   And he would come over, say, Parnell, where do want to

10  stage at?  I would direct him, Let's put this material

11  over here.  Put the other material in a different

12  location.

13     Q.    I've heard the expression packing and stacking.

14  Have you?

15     A.    Yes.

16     Q.    So were you packing and stacking when you worked

17  with Dave Muti?

18     A.    Yes.

19     Q.    When you worked with Dave Muti, did you ever

20  have to get down on your knees and clean?

21     A.    No.

22     Q.    You did before that, though.  Right?

23     A.    Yes.

24     Q.    Were there any aspects of the job that you had

25  an issue with when you worked with Dave Muti?



1    Q.   You didn't complain to the union about that

2    second telephone conversation with Mr. Gutierrez.  Did

3    you?

4    **A.   No.**

5    Q.   Did you believe that Mr. Gutierrez' comment to

6    you in that second telephone conversation that he didn't

7    like people he didn't hire directly and you better walk

8    fucking lightly around the jobsite or he will get rid of

9    your ass in heartbeat was racially motivated?

10   **A.   I don't know what his intentions was.**

11   Q.   Okay.  So you didn't know whether that comment

12   was racially motivated or not.  Correct?

13   **A.   Can you repeat that question again?**

14   Q.   You didn't know whether Kevin Gutierrez' comment

15   to you that he didn't like people that he didn't hire

16   directly and you had better walk fucking lightly on the

17   jobsite or he'd get rid of your ass, you don't know if

18   that was racially motivated, do you?

19   **A.   No.**

20   Q.   He didn't say anything to you that was racially

21   discriminatory or offensive to you during that

22   conversation, did he?

23   **A.   No.**

24   Q.   Other than Mr. Gutierrez calling you N-word one

25   time on November 14, 2019, he didn't ever say anything



```
 1   else to you that you found to be racially discriminatory

 2   or offensive.  Correct?

 3       A.   Correct.

 4       Q.   Let's look at the second sentence.  And it says:

 5   I knew from my conversation with Kevin, general foreman,

 6   I would be working under a very stressful environment,

 7   but my attitude is positive and I work.

 8            Do you see that?

 9       A.   Yes.

10       Q.   How did you know that the working environment

11   would be very stressful?

12       A.   This was for the -- my complaint, just for the

13   comment he made prior to that; that I don't like to hire

14   -- I don't like people working for me that I don't hire.

15   That's pretty common in union.  Employers like to hire

16   their own people.

17            So I knew from the tone of his voice that I'm

18   probably going to be walking into a hostile work

19   environment.

20       Q.   Not based upon your race, though.  Right?

21       A.   No.

22       Q.   Okay.  Just a stressful work environment?

23       A.   Correct.

24       Q.   Did you have any reason to believe that you

25   would be harassed based upon your race based upon your
```



Parnell Colvin  7/15/2021
Parnell Colvin vs. M.J. Dean Construction, Inc.

```
1   anyone else in management about Kevin picking on you?

2       A.   No.

3       Q.   That was a horribly-worded question.  Let me ask

4   it again to make it clear.  Okay?

5            So other than complaining twice orally to

6   Mr. McGrandy in August and September 2019 about

7   Mr. Gutierrez picking on you, did you ever complain to

8   anybody else, a manager or a supervisor, at M.J. Dean

9   prior to November 14, 2019, about Mr. Gutierrez picking

10  on you?

11      A.   No.

12      Q.   Did you ever complain to anybody at the union,

13  at any point during your employment at M.J. Dean, about

14  Mr. Gutierrez?

15      A.   No.

16      Q.   You knew that you could.  Right?

17      A.   Yes.

18      Q.   Did there come a point where Mr. Gutierrez

19  accused you of spending too much time in the restroom?

20      A.   Yes.

21      Q.   When was that?

22      A.   August 2000 -- no.  Excuse me.  November 2019.

23      Q.   So within the two-week period before you filed

24  your investigative report --

25      A.   Yes.
```



1    Q.    Did Mr. Gutierrez ever threaten you at any time

2    ever?  That would include after the time you were

3    employed.

4    A.    No.

5    Q.    Did Mr. Gutierrez ever threaten to fire you at

6    any time after you submitted your Employee Incident

7    Investigation Report, which is marked as Exhibit H?

8    A.    No.

9    Q.    And nobody else threatened to fire you or

10   discipline you after you submitted your Employee Incident

11   Investigation Report.  Correct?

12   A.    Yes.

13   Q.    That's true.  Correct?

14   A.    Yeah, correct.  That's true.

15   Q.    Did you meet with Paul -- do you know who Paul

16   Rosequist is?

17   A.    Yes.

18   Q.    Did you ever meet with Paul Rosequist regarding

19   your Employee Incident Investigation Report?

20   A.    Yes.

21   Q.    Was that on November 14, 2019?

22   A.    Yes.

23   Q.    What was the purpose of you meeting with

24   Mr. Rosequist?

25   A.    Mr. Thomason said he was going to call his



Parnell Colvin
7/15/2021

Parnell Colvin vs. M.J. Dean Construction, Inc.

```
 1     Q.   Yeah.

 2     A.   Actually, no, but they said they did.  Through

 3  an email.

 4     Q.   Do you have any reason to doubt that?

 5     A.   Yes.

 6     Q.   Why?

 7     A.   Because like John Thomason said after this

 8  incident happened, he said, basically, I don't care about

 9  you, Parnell, or Kevin Gutierrez.  My loyalty is to

10  protect the owner of the company.

11          So that kind of let me know right then that he

12  -- his position is that he is going to do whatever he has

13  to do to protect the company.  So if saying that they did

14  an internal investigation to make me go away is something

15  they need to do, then they're going to tell you that.

16  But factually, I don't know if they actually did one.

17     Q.   Did you ever ask anybody in management at M.J.

18  Dean whether the company conducted an internal

19  investigation?

20     A.   No.

21     Q.   Why not?

22     A.   Because I was going to file my complaint and

23  pursue another avenue anyway.

24     Q.   What complaint was that?

25     A.   Through the EEOC.
```



1    Q.    So you had always intended to file a complaint

2    with the EEOC right away?

3    A.    Yes.

4    Q.    So on November 14th, no matter what happened,

5    you had always intended to complain to the EEOC, file a

6    complaint?

7    A.    Yes.

8    Q.    Why?

9    A.    Because I felt that when John Thomason said he

10   was going to fire Kevin's ass, and it didn't happen,

11   again, the statement he gave to me where he said, My

12   loyalty is not with you or Kevin.  Basically I could care

13   less.  My loyalty is with the company and protect the

14   owner.  So I know I would never get no justice for a

15   hearing.  Any investigation they did was going to be --

16   it's like the police investigating themselves.  You can

17   have no faith and trust in that.  So I was always going

18   to file an EEOC complaint.

19   Q.    Did anybody ever prevent you from doing your job

20   after you submitted your complaint on November 14, 2019?

21   A.    No.

22   Q.    You were able to do your job without any issues.

23   Right?

24   A.    Correct.

25   Q.    And you had no problem doing your job duties for



```
 1    the remainder of your employment following November 14,

 2    2019.  Right?

 3         A.   Correct.

 4         Q.   No one ever harassed you after that point?

 5         A.   What point are you speaking of?

 6         Q.   November one ever harassed after November 14,

 7    2019?

 8         A.   Correct.

 9         Q.   After you were assigned to work under Mr. Muti,

10    was your job title the same?

11         A.   Yes.

12         Q.   And after you were assigned to Mr. Muti, your

13    job duties changed, but you were a -- you were packing

14    and stacking then.  Right?

15         A.   Yes.

16         Q.   And you didn't have any complaints or problems

17    being a packer and stacker.  Right?

18         A.   No.

19         Q.   Did you feel that that was a demotion at all?

20         A.   No.

21         Q.   You had the same job benefits after moving to

22    Mr. Muti.  Right?

23         A.   Yes.

24         Q.   Did you continue to work the same general hours

25    of work every week after moving to Mr. Muti?
```



1     A.    I mean, they fluctuate.  Little time here,

2   little time there.  But I would at least get my 40 hours

3   a week.

4     Q.    Generally the same hours after moving to

5   Mr. Muti.  Right?

6     A.    Yes.

7     Q.    And you had no interaction with Mr. Gutierrez

8   after moving under Mr. Muti's supervision.  Right?

9     A.    Correct.

10    Q.    Have we gone over all of your complaints and

11  issues that you had with Mr. Gutierrez at any point

12  during your employment?

13    A.    Yes.

14          MR. ROSENTHAL:  I'd like to have this next

15  document marked as Defendant's Exhibit I.

16          (Exhibit I identified.)

17  BY MR. ROSENTHAL:

18    Q.    Do you recognize what's been marked as

19  Defendant's Exhibit I?

20    A.    Yes.

21    Q.    Is that a picture you took?

22    A.    Yes.

23    Q.    When did you take this picture?

24    A.    I don't know the exact date.

25    Q.    Can you give me an approximation?



```
 1      A.    Possibly -- I'm not sure when I took that

 2  picture.

 3      Q.    So you don't know if you took this picture

 4  marked as Exhibit I -- strike that.

 5            Do you know whether you took the picture marked

 6  as Exhibit I during your employment at M.J. Dean?

 7      A.    Yes.

 8      Q.    How do you know that?

 9      A.    Because I used my phone to take the picture.

10      Q.    Is that the same phone that you have currently?

11      A.    Yes.

12      Q.    Do you still have it on your phone?

13      A.    Yes.

14      Q.    Can you see the picture on your phone directly?

15      A.    Yes.

16      Q.    And it will show a date?

17      A.    Sorry.  I got a lot of pictures.

18      Q.    That's okay.  Take your time.

19      A.    There you go, sir.

20      Q.    May I?

21      A.    Yes.

22      Q.    Okay.  So, at the top of the screen, it says

23  January 3, 2020 at 7:14 a.m.  Is that correct?  Can you

24  confirm that?

25      A.    Yes.
```



1    Q.   I'd ask that you not delete that picture.   Okay?

2    **A.   Yes.**

3    Q.   Where did you take the picture?

4    **A.   Jobsite.**

5    Q.   Which jobsite?

6    **A.   Sphere.**

7    Q.   Where at the Sphere?

8    **A.   This is the restroom adjacent to the yard where**

9    **I was working at.   So this would be the restroom that I**

10   **would use.**

11   Q.   Did you complain about this picture to anybody

12   at M.J. Dean?

13   **A.   Yes.**

14   Q.   Who?

15   **A.   Safety; Tony and Julian.**

16   Q.   Do you know if there's a record of your

17   complaining about this picture to anybody at M.J. Dean?

18       MR. MARKS:   Object to the form.

19   **A.   I'm not sure.**

20   BY MR. ROSENTHAL:

21   Q.   Did you observe either Tony or Julian take any

22   handwritten notes about the picture that you took on

23   January 3, 2020?

24   **A.   No.**

25   Q.   Did you give either Tony or Julian a copy of



1    this picture that you took on January 3, 2020?

2        A.    No.

3        Q.    Why not?

4        A.    I figured they were safety, so they walk around

5    with cameras.  So I feel that when they went in there,

6    they was free to take their own picture.

7        Q.    Did you show either Tony or Julian where you

8    took this picture?

9        A.    Yes.

10       Q.    You took them to the restroom?

11       A.    Yes.

12       Q.    And what time was that at?

13       A.    Believe -- I don't recall the time.

14       Q.    Did you show Julian the picture marked as

15    Exhibit I on January 3, 2020?

16       A.    Are you saying did I show him the picture in my

17    phone?

18       Q.    Yes.

19       A.    No.

20       Q.    Did you show Julian what's marked as Exhibit I,

21    did you take him to the restroom where you saw this on

22    January 3, 2020?

23       A.    Yes.

24       Q.    So you showed him the same day?

25       A.    Yes.



```
 1       Q.   Did you show Tony what you saw on the restroom
 2   on January 3, 2020?
 3       A.   No.
 4       Q.   When did you show Tony what you saw in the
 5   restroom?
 6       A.   I never showed Tony.
 7       Q.   So you only showed Julian?
 8       A.   Yes.
 9       Q.   Why didn't you show Tony?
10       A.   Because Tony was just walking by, and I just
11   said, You need to go look at what was -- what's in the
12   restroom.  And they did that, and they -- Carson taped it
13   off.
14       Q.   How do you know that Tony went to look at what
15   was in the restroom?
16       A.   Because he came back to me and said, That's some
17   fucked up shit.
18       Q.   Do you know if anything was done about it?
19       A.   Yes.
20       Q.   What was done?
21       A.   They was cleaning it.
22       Q.   Who is they?
23       A.   Me and Ricky.
24       Q.   Do you know if the person or persons who wrote
25   what's contained on Exhibit I that was in the restroom
```



```
1    area, if the people or person who did this was an M.J.

2    Dean employee?

3         A.   I don't know.

4         Q.   So it could have been an AECOM employee or

5    somebody else from a different company.  Right?

6         A.   Possible.

7         Q.   There were other employees on the jobsite other

8    than M.J. Dean employees.  Correct?

9         A.   Yes.

10        Q.   Again, you don't know who wrote these things on

11   Exhibit I.  Right?

12        A.   Right.  I don't know.

13        Q.   Do you know if, as a result of your complaints

14   to Tony and Julian about what was written in the restroom

15   that's marked as Exhibit I, that it was -- this was

16   resolved to your satisfaction?

17        A.   I don't know.

18        Q.   You don't know whether it was resolved to your

19   satisfaction?

20        A.   I just reported it.

21        Q.   Okay.  Do you feel it was resolved -- were you

22   happy with the result that it was removed?

23        A.   Yes.

24             MR. MARKS:  Object to the form.

25   BY MR. ROSENTHAL:
```



1    Q.   Do you believe that M.J. Dean should have done

2    something else as a -- in response to you bringing what's

3    marked as Exhibit I to the attention of Julian and Tony?

4    A.   Yes.

5    Q.   What should they have done?

6    A.   Well, usually when things like this occur on

7    jobsites -- we have usually weekly meetings.  And usually

8    superintendents or anybody got any issues to bring up.  I

9    think this should have been brought out that this racism

10   slur, stuff like this won't be tolerated.

11        So I think they should have got up like they do

12   on the Monday mornings when we have our meetings, and all

13   employees are required to be there, I think this should

14   have been the subject of that meeting, and it wasn't.

15   Q.   Do you know whether the contents of what was the

16   picture that you took, which is marked as Exhibit I, was

17   ever discussed between supervisors and managers at M.J.

18   Dean?

19   A.   I don't know.

20   Q.   Do you know whether or not the contents of

21   Exhibit I was ever brought to the owner of M.J. Dean's

22   attention?

23   A.   I don't know.

24   Q.   Let's take a look at --

25        MR. ROSENTHAL:  Let's have this next document



```
 1    marked as Defendant's Exhibit J.

 2              (Exhibit J identified.)

 3    BY MR. ROSENTHAL:

 4        Q.    Do you recognize what's been marked as Exhibit

 5    J?

 6        A.    Yes.

 7        Q.    Is that a picture you took?

 8        A.    Yes.

 9        Q.    Is that on your phone?

10        A.    Yes.

11        Q.    Could you haul out your phone again?

12        A.    Yes.

13        Q.    Thank you.

14        A.    You're welcome.

15              There you go, sir.

16        Q.    Thank you,

17        A.    You're welcome.

18        Q.    And the photo that I see on your phone, which is

19    a copy of Exhibit J, indicates that picture was taken on

20    December 24, 2019.  Is that correct?

21        A.    Yes.

22        Q.    Where did you take this picture?

23        A.    Sphere project.

24        Q.    Where?

25        A.    Restroom.
```

1       Q.   Same restroom as Exhibit I?

2       A.   No.

3       Q.   Where was this restroom?

4       A.   Possibly 50 yards away from the first restroom

5    incident.

6       Q.   Did you complain to anybody on December 24,

7    2019, about what you saw in the restroom?

8       A.   Yes.

9       Q.   When did you complain to anybody?

10       A.   Same day.

11       Q.   Okay.  December 24th?

12       A.   Yes.

13       Q.   Who did you complain to?

14       A.   Julian, Tony -- and Tony.  I don't know their

15    last names.  Safety personnel from M.J. Dean.

16       Q.   Do you know if Julian or Tony ever took a report

17    or made a report in writing to anybody about the picture

18    which is marked as Exhibit J?

19       A.   I don't know.

20       Q.   Did you ever submit anything in writing

21    complaining about the pictures that you took on January

22    3, 2020, and December 24, 2019?

23       A.   No.

24       Q.   Why not?

25       A.   I reported it to safety.



1    Q.    Why didn't you submit anything in writing to

2  anybody?

3    A.    I didn't -- just didn't submit any.

4    Q.    But you knew you could submit something in

5  writing because you did so earlier on November 14, 2019.

6  Right?

7    A.    Yes.

8    Q.    And, so why didn't you submit anything in

9  writing about the pictures that you took at -- on

10  December 24, 2019, and January 3, 2020?

11    A.    I feel my job was to notify management, and I

12  did.  And from that point, it's up to them to take

13  corrective action.

14    Q.    Do you know if the writing, the handwriting,

15  marked on Exhibit J was ever removed from the restroom?

16    A.    I don't know.

17    Q.    Did you ever go back to that restroom?

18    A.    No.

19    Q.    Why not?

20    A.    Because the restroom that I use is one where it

21  says, Burn all niggers.  White power Trump 2020.

22    Q.    So why did you go to that restroom -- different

23  restroom on December 24, 2019?

24    A.    Because sometimes when you in one area, you

25  might have to go to another area to get materials or to



Parnell Colvin   7/15/2021
Parnell Colvin vs. M.J. Dean Construction, Inc.

1    get something.  So it's the closest restroom.  So you go

2    into the closest restroom.  At that time, that was the

3    closest restroom.

4        Q.    So you never went back to that restroom for the

5    next four months of your employment.  Is that correct?

6        A.    Correct.

7        Q.    And so you don't know if M.J. Dean took any

8    action in response to your oral complaints to Julian and

9    Tony about Exhibit J.  Right?

10       A.    Correct.

11       Q.    You don't know who wrote the contents of what's

12   in Exhibit J.  Right?

13       A.    I don't know.

14       Q.    You don't know if the person who wrote Black

15   laborers equals lazy with an exclamation mark was an M.J.

16   Dean employee or somebody else.  Right?

17       A.    Correct.

18       Q.    Now, the photographs marked as Exhibits I and J

19   were only disclosed during this litigation to me on May

20   21st, 2021.  Do you know why that -- why that is?

21       A.    Well, prior counsel, I think you like know this,

22   but they informed me that -- well, actually, I read your

23   pleading online, so I was able to see that you guys had

24   requested that you were -- it would be photos at the last

25   minute.



1      A.    No.

2      Q.    Did you ever talk to an investigator?

3      A.    Yes.

4      Q.    Did -- do you know who that investigator was?

5      A.    No.

6      Q.    Did you ever talk to the investigator about the

7   photos that you took, which are marked as Exhibits I and

8   J?

9      A.    I don't recall.

10     Q.    But you believe that these pictures that you

11  took were important.   Right?

12     A.    Yes.

13     Q.    Were you laid off from M.J. Dean on April 6,

14  2020?

15     A.    5.   April 6.

16     Q.    By whom?

17     A.    Kevin Gutierrez.

18     Q.    He fired you personally?

19     A.    Yes.

20     Q.    Did he say anything to you on April 6, 2020?

21     A.    Yes.

22     Q.    What did he say to you?

23     A.    He said he's laying me off and giving me my

24  check.   And he said I would be -- he said he was getting

25  my check today.   So he got rid of me today, but I guess



Parnell Colvin vs. M.J. Dean Construction, Inc.

1   the office that processes checks was unavailable to get

2   the check out to me.  So he said, I'm laying you off now.

3   Come tomorrow and get your check.

4        Q.   Did you say anything in response to

5   Mr. Gutierrez?

6        A.   Yes.

7        Q.   What did you say?

8        A.   I said, Kevin, I know what you're doing.  You're

9   laying me off, and you know there's work in my area.  My

10  area was never affected by COVID.  And all you're going

11  to do is bring somebody -- your other laborers from other

12  areas to do my work.

13       Q.   So were you aware on April 6th, and before that

14  time, that there were layoffs due to COVID on the Sphere

15  project?

16       A.   Yes.

17       Q.   So you knew that M.J. Dean employees were being

18  laid off because of COVID.  Right?

19       A.   Yes.

20       Q.   And weren't quite a few other employees laid off

21  the same time as you on April 6, 2020?

22       A.   Well, let me backtrack that.

23            I don't want to say for certain.  I know people

24  were laid off with COVID, but people was quitting anyway

25  because hours got cut.  People were -- didn't want to



1    Q.    So did you ever perform any investigation on

2    your own as to whether or not hundreds of employees had

3    been terminated because the project was partially shut

4    down?

5    A.    No.

6    Q.    Do you know whether or not M.J. Dean had any

7    sort of obligation to rehire you after you had been

8    terminated?

9    A.    No.

10   Q.    Do you know whether there's any sort of

11   agreement between the union and M.J. Dean which would

12   have put you sort of at the top of the list or made you

13   get rehired at M.J. Dean?

14   **A.    Well, let me back up again.**

15   **        The same day that Mr. Gutierrez fired me, I was**

16   **unable to get to John Thomason, but I did run into**

17   **general superintendent Brian Long.  And he said, Parnell,**

18   **the whole job is shutting down.  I'm only going to be**

19   **here, out here for a week.  The 15th will be my last day,**

20   **and then the whole job is shutting down.**

21   **        That never happened.**

22   **        But he says -- he shook my hand, he says, I**

23   **promise you, once this job is manning up again, I bring**

24   **you back on the board, so just stay in touch.**

25   Q.    Did anybody ever at -- from M.J. Dean ever give



1           MR. ROSENTHAL:  You don't even give me a chance,

2     Mr. Marks.  So -- no, I'm almost done

3       **A.    No worries.  No worries.**

4           MR. ROSENTHAL:  Really, and when I say that,

5     hopefully Mr. Marks knows it's true, unlike some other

6     lawyers.

7           Let's take a 5, 10-minute break.

8           THE VIDEOGRAPHER:  We're going off the record at

9     4:05 p.m.

10          (Recess.)

11          THE VIDEOGRAPHER:  We're back on the record at

12    4:23 p.m.

13    BY MR. ROSENTHAL:

14      Q.    All right.  Mr. Colvin, we're in the home

15    stretch.

16      **A.    Yes, sir.**

17      Q.    No more documents, as you see.  No more

18    documents for you today.

19      **A.    Okay.**

20      Q.    All right.  Do you know if Kevin Gutierrez ever

21    received any training for his job from M.J. Dean?

22      **A.    No, I don't.**

23      Q.    Do you know of any facts or documents that would

24    show that Mr. Gutierrez did not receive proper training

25    from M.J. Dean to be a general foreman?



1       **A.   I don't know.**

2       Q.   Do you know whether or not Mr. Gutierrez was

3   supervised by any higher-ups at M.J. Dean?

4       **A.   Yes.**

5       Q.   Who supervised Kevin Gutierrez during the time

6   that you worked at M.J. Dean?  Do you know?

7       **A.   Yes.**

8       Q.   Who?

9       **A.   Brian Long.**

10      Q.   Could you give me the name again?

11      **A.   Yes.  Brian Long.  General superintendent, M.J.**

12  **Dean.**

13      Q.   Do you know if anybody else supervised

14  Mr. Gutierrez during the time that you worked at M.J.

15  Dean?

16      **A.   Yes.**

17      Q.   Who else?

18      **A.   John Thomason.**

19      Q.   I know you told me earlier, but remind me.  What

20  was John Thomason's job title during the time that you

21  worked at M.J. Dean?

22      **A.   Director -- I'd be speculating, but I know it's**

23  **-- the title director is somewhere in the -- his**

24  **description.**

25      Q.   The best guess.  I know I'm asking you to guess.



Parnell Colvin — 7/15/2021
Parnell Colvin vs. M.J. Dean Construction, Inc.

```
1    Exhibits I and J.  Correct?

2        A.    Yes.

3        Q.    Now, when you testified just a few moments ago

4    that -- that you found the workplace at M.J. Dean to be

5    pervasive with white supremacist comments --

6        A.    Yes.

7        Q.    Well, strike that.

8              Does that refresh your recollection that you

9    testified that the workplace at M.J. Dean, throughout

10   your employment, employees were making sort of white

11   supremacist comments?

12       A.    Correct.

13       Q.    Which employees?

14       A.    From all M.J. Dean's.

15       Q.    Can you give me any names of the M.J. Dean

16   employees who were making comments that you found to be

17   offensive, like white supremacist comments?

18       A.    They were carpenters.

19       Q.    What were their names?

20       A.    I don't know their names.

21       Q.    You can't give me a single name of somebody who

22   made comments that you found to be offensive based upon

23   race?

24       A.    No.

25       Q.    Okay.  Did you ever submit any written
```



1    complaints to anybody at M.J. Dean about any white

2    supremacist type comments that you found to be offensive?

3        A.   No.

4        Q.   And in your November 14, 2019, written complaint

5    that you submitted, you never mentioned anybody making

6    racist comments other than Kevin Gutierrez that you found

7    to be offensive.  Correct?

8        A.   Correct.

9        Q.   Did you ever complain to anybody at M.J. Dean

10   about people having tattoos that you found to be

11   offensive?

12       A.   No.

13       Q.   Did you ever complain to the union about any

14   white supremacist tattoo that you found to be offensive?

15       A.   No.

16       Q.   And when I say white supremacist, like comments

17   people made.  You didn't complain to the union about

18   white supremacist comments that you heard in the

19   workplace.  correct?

20       A.   Correct.

21       Q.   Did you ever complain to AECOM about any white

22   supremacist comments that you heard in the workplace at

23   M.J. Dean?

24       A.   No.

25            MR. ROSENTHAL:  I think that's it, Mr. Colvin.



```
 1          BE IT KNOWN that the foregoing proceedings were
 2    taken before me; that the witness before testifying was
 3    duly sworn to testify to the whole truth; that the
 4    foregoing pages are a full, true and accurate record of
 5    the proceedings, all done to the best of my skill and
 6    ability; that the proceedings were taken down by me in
 7    stenographic shorthand and thereafter reduced to print
 8    under my direction.
 9          I CERTIFY that I am in no way related to any of
10    the parties hereto, nor am I in any way interested in the
11    outcome thereof.
12
13
14
15          (X)  Review and signature was requested.
16          ( )  Review and signature was waived.
17          ( )  Review and signature was not requested.
18
19              Michael A. Bouley
20              _____
21              Michael A. Bouley, RDR
                Nevada Certified Reporter, #960
22
23
24
25
```

