Michael P. Balaban   State Bar No. 9370
LAW OFFICES OF MICHAEL P. BALABAN
10726 Del Rudini Street
Las Vegas, NV  89141
(702)586-2964
Fax: (702)586-3023
E-Mail: mbalaban@balaban-law.com

Attorney for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | | |
|---|---|---|
| PARNELL COLVIN, | ) | CASE NO. 2:20-cv-01765-APG-EJY |
| | ) | |
| Plaintiff, | ) | PLAINTIFF'S SEPARATE PROPOSED |
| | ) | JURY INSTRUCTIONS |
| vs. | ) | |
| | ) | |
| | ) | |
| M.J. DEAN CONSTRUCTION, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | Trial: March 27, 2023 |
| | ) | Time: 9;00 a.m. |
| | ) | Judge: Honorable Andrew Gordon |
| | ) | |

Plaintiff PARNELL COLVIN ("Plaintiff" or "Colvin") submits his separate proposed jury instructions that the parties were not able to agree to and arguments why they should be included as follows:

**<u>INTRODUCTION</u>**

The purpose of a jury instruction is to give the trier of fact (ie. jury) a concise, understandable and neutral statement of the law.  It is not the function of a jury instruction to limit what the jury may find or interject facts that favor one side or the other.  For that reason a jury instruction should be drafted broadly based on what the jury might conclude based on the evidence they hear.  The separate

jury instructions being submitted by Plaintiff are being submitted either because they are incorrect statements of the law or they try to limit what the jury might reasonably find based on the evidence that might be presented in the case.

### PLAINTIFF'S PROPOSED JURY INSTRUCTION NO. 1

#### Title VII—Hostile Work Environment – Single Incident/Occurrence

A hostile work environment can be found as a result of a single incident or occurrence whose severity is particularly pronounced.

#### Authority

*McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004).

*Fried v. Wynn Las Vegas*, LLC, 18 F.4th 643, 652 (9th Cir. 2021).

### PLAINTIFF'S ARGUMENTS FOR INCLUSION

Plaintiff is proposing the above jury instruction to avoid jury confusion on whether a single incident or occurrence is legally sufficient for the jury to find that a hostile environment existed.

A party has a right to have the jury instructed on its theory of recovery if that theory is supported by facts in evidence and the instruction is legally correct. *Williams v. Jader Fuel Co., Inc., 944 F.2d 1388, 1402* (7th Cir. 1991).[1]

While Defendant M.J. DEAN CONSTRUCTION, INC. ("Defendant" or "M.J. Dean Construction") is correct in their opposition to the instruction that the parties have stipulated to the Ninth Circuit Model Jury Instruction on the elements of Hostile Work Environment and while this mentions a single incident it does not clearly state that a single incident or occurrence alone can give rise to a hostile work environment.

Thus because it is a correct statement of the law, *see McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004) and *Fried v. Wynn Las Vegas*, LLC, 18 F.4th 643, 652 (9th Cir. 2021) among other cases which have held a single incident suffices as a matter of law in finding a hostile environment existed, Colvin should have the right to have this instruction given to the jury.

---

[1] Here Kevin Gutierrez' alleged use of the N-word toward Plaintiff alone is one theory that Colvin is advancing in this case.

Finally the Defendant's claim of undue prejudice is unfounded because the proposed instruction does not say that single incident is the most important factor but merely that the jury can find a hostile work environment existed on a single incident or occurrence alone.

## PLAINTIFF'S PROPOSED JURY INSTRUCTION NO. 2

### Title VII—Hostile Work Environment Caused by Non-Immediate Supervisor or by Co-Worker—Claim Based on Negligence

The plaintiff seeks damages from the defendant for a hostile work environment caused by racial harassment. The plaintiff has the burden of proving both of the following elements by a preponderance of the evidence:

1. the plaintiff was subjected to a racially hostile work environment by a non-immediate supervisor or co-worker; and

2. the defendant or a member of the defendant's management knew or should have known of the harassment and failed to take prompt, effective remedial action reasonably calculated to end the harassment.

A person is a member of management if the person has substantial authority and discretion to make decisions concerning the terms of the harasser's employment or the plaintiff's employment, such as authority to counsel, investigate, suspend, or fire the accused harasser, or to change the conditions of the plaintiff's employment. A person who lacks such authority is nevertheless part of management if he or she has an official or strong duty in fact to communicate to management complaints about work conditions. You should consider all the circumstances in this case in determining whether a person has such a duty.

The defendant's remedial action must be reasonable and adequate. Whether the defendant's remedial action is reasonable and adequate depends on the remedy's effectiveness in stopping the individual harasser from continuing to engage in such conduct and in discouraging other potential harassers from engaging in similar unlawful conduct. An effective remedy should

be proportionate to the seriousness of the offense.

If you find that the plaintiff has proved both of the elements on which the plaintiff has the burden of proof, your verdict should be for the plaintiff.  If, on the other hand, the plaintiff has failed to prove either of these elements, your verdict should be for the defendant.

**Authority**

Ninth Circuit Model Jury Instructions 10.7

## PLAINTIFF'S ARGUMENTS FOR INCLUSION

Plaintiff's is proposing this jury instruction based what the evidence might reasonably show the source of the harassment at the workplace was.

While there is already a jury instruction that addresses the racial harassment Colvin might have suffered at the hands of his supervisor Kevin Gutierrez, that instruction does not address the harassment that Plaintiff might have suffered from others (including by a non-immediate supervisor or by a co-worker) because of race-based graffiti or other race-based discrimination in the workplace which the jury might reasonably find existed based on the evidence presented at trial.

The inclusion of this instruction doesn't mean that the jury has to find that a non-immediate supervisor or co-worker was responsible for race-based graffiti or other race-based discrimination in the workplace, all it does is give the jury an instruction on how to deal with harassment they might find that wasn't caused by Kevin Gutierrez.

Parties are entitled to have the jury instructed on every theory advanced by them that finds support in the evidence. *See Mendez v. County of San Bernardino*, 540 F.3d 1109, 1117-1118 (9th Cir. 2008); *Trigg v. City & County of Denver*, 784 F.2d 1058, 1059 (10th Cir. 1986); *Bartak v. Bell-Galyardt & Wells, Inc.*, 629 F.2d 523, 528 (8th Cir. 1980).

Further this is a Ninth Circuit Model Jury Instruction so it has been approved for use for jury trials held in the Ninth Circuit.

///

## PLAINTIFF'S PROPOSED JURY INSTRUCTION NO. 3

### Title VII—Retaliation—Elements and Burden of Proof

The plaintiff seeks damages against the defendant for retaliation.  The plaintiff has the burden of proving each of the following elements by a preponderance of the evidence:

1. the plaintiff participated in an activity protected under federal law by submitting an internal workplace complaint(s); and

2. the employer subjected the plaintiff to an adverse employment action including but not limited to, terminating plaintiff's employment and/or not hiring him back after the COVID-19 shutdown; and

3. the plaintiff was subjected to the adverse employment action including but not limited to, terminating plaintiff's employment and/or not hiring him back after the COVID-19 shutdown because he participated in an activity protected under federal law by submitting an internal workplace complaint(s).

A plaintiff is "subjected to an adverse employment action" because of his participation in a protected activity (ie. submitting internal complaint(s)), if the adverse employment action would not have occurred but for that participation.

If you find that the plaintiff has proved all three of these elements, your verdict should be for the plaintiff.  If, on the other hand, the plaintiff has failed to prove any of these elements, your verdict should be for the defendant.

**Authority**

Ninth Circuit Model Jury Instructions 10.8

### PLAINTIFF'S ARGUMENTS FOR INCLUSION

Plaintiff main problem with the jury instruction drafted by Defendant is that it is drafted too narrow because it states the adverse employment action that Colvin suffered was *only* being terminated when one of Colvin's theory's on the case is that he was retaliated against *not only* by

271a1e50668ba808

being terminated by Kevin Gutierrez (which he filed the internal complaint against), but also that he was not rehired because he filed the internal complaint against Gutierrez', among other things.

Further this theory is supported by substantial evidence, making it reasonable for the jury to decide for Plaintiff on that basis.

Refusing a jury instruction that is in proper form and is supported by evidence is prejudicial error if it deprived the propounding party of an opportunity to have the jury consider a basic theory of his or her case. *See Dang v. Cross*, 422 F.3d 800, 810-811 (9th Cir. 2005); *Ford Motor Co. v. Dallas Power & Light Co.*, 499 F.2d 400, 412 (5th Cir. 1974)

Here the claim that Colvin was retaliated against by not being rehired is possibly a better theory than that he was terminated/laid off in the first place.

As set forth in Ninth Circuit Model Jury Instruction 10.10, "Adverse Employment Action" in Retaliation Cases[2], "[A]n action is an adverse employment action if a reasonable employee would have found the action materially adverse, which means it might have dissuaded a reasonable worker from making or supporting a charge of discrimination."

Circumstantially it is not usual for employers not to want to hire/rehired employees who have filed a complaint of discrimination or other complaint and in fact most employment law firms will tell employment law clients, "the best way to prevent employment claims/lawsuit is to not hire employees who have sued their employers in the past".

Further from a circumstantial standpoint, M.J. Dean Construction was not going to terminate Plaintiff right after he filed the complaint against Gutierrez (even though they probably wanted to) because they knew that would surely look like retaliation.  So instead they waited to they arguably had a legitimate business reason, ie., a layoff because of COVID-19, to terminate him.

---

[2] Which the parties have agreed to give in this case

Colvin indicated at his deposition that he wanted to get rehired after he was laid off, and there was a lot of work for Plaintiff to do, but Kevin Gutierrez wouldn't let Dave Muti bring Colvin back.[34]

Further when John Thomason was asked in his deposition about the prospects of rehiring Plaintiff he said it was up to the individual supervisor based on their needs but there was no restrictions because of seniority, etc.[5]

So while M.J. Dean Construction can argue that Colvin was not brought back because Defendant only brought back 200 of the 500 they laid off and Plaintiff was not one of the lucky 200, it is would at least be reasonable for a jury to conclude that the reason he was not one of the 200 rehired was because he filed an internal complaint against Gutierrez on November 14, 2019.

_____

[3] Colvin spoke to Dave Muti a couple of weeks after being let go about getting rehired but was told that Kevin Gutierrez wouldn't let him bring Plaintiff back [Colvin Depo. 190:3-19] and also talked to Dave Muti about two weeks after that about getting rehired and was told the same thing, that Kevin would not bring Colvin back. [Colvin Depo. 194:3-25]  he also tried to talk to John Thomason within a week of  being laid off about returning to work at M.J. Dean but Thomason never returned his call. [Colvin Depo. 195:5-196:1.]

[4] Colvin indicated in his deposition there was a continued need to maintain the yard he worked in and there was no lack of work so M.J. Dean Construction could have brought him back if they to. [Colvin Depo. 205:12-206:25.]

[5] Q: Was there -- do you know whether M.J. Dean used any sort of seniority system to recall the laid off laborers?
A: Seniority?
Q: Yes.
A: It's -- we don't -- we don't work by seniority.
Q: What you're saying is you let your superintendents decide which specific employees to recall, and you're saying you had nothing to do with it?
A: That is correct.  I picked the superintendents and I let the superintendents pick the employees that were brought back.
Q: But you didn't have any input on who they brought back?
A: No.
Q: And do you know why Parnell Colvin was not rehired?
A: No.
Q: Did you ever do an investigation or talk to any of the superintendents as to why he wasn't rehired?
A: Sir, Parnell was one of 500.  We brought 200 back 300 men were let go.  I did not talk to the superintendents about who they brought back and why they brought them back.
Q: When you got this -- you were aware of this lawsuit before today, correct?
A: Yes, sir.
Q: Did you ever do any investigation after the lawsuit was filed as to why Parnell was not brought back?
A: Again, sir, 300 men were not brought back.
Q: But 200 were brought back?
A: 200 out of 500.
Q: I'm asking a simple question.  Do you know why Parnell was not brought back?
A: The answer to your question is, no, I do not know. [Thomason Depo. 41:2-42:17.]

1      Finally Defendant contends in their opposition to the instruction that the record reflects that

2   Plaintiff's cause of action for retaliation is based solely on the April 20, 2020 layoff and thus the

3   language Colvin wants added to instruction should be excluded, but FRCP 15(b)(1) would allow

4   the evidence and issue to be presented at trial.

5      Rule 15 (b)(1) provides as follows:

6   "(b) AMENDMENTS DURING AND AFTER TRIAL.

7      (1) *Based on an Objection at Trial.* If, at trial, a party objects that evidence is not within

8   the issues raised in the pleadings, the court may permit the pleadings to be amended. The court
    should freely permit an amendment when doing so will aid in presenting the merits and the

9   objecting party fails to satisfy the court that the evidence would prejudice that party's action or
    defense on the merits. The court may grant a continuance to enable the objecting party to meet

10  the evidence."

11     Here the rule says that the "court should freely permit an amendment when doing so will

12  aid in presenting the merits and the objecting party fails to satisfy the court that the evidence

13  would prejudice that party's action or defense on the merits."

14     As set forth above the amendment to first amended complaint would aid Plaintiff in

15  presenting the merits of his case and the defense will not be prejudiced because they fully had

16  the opportunity and did questioned Plaintiff on the issue and evidence at his deposition and John

17  Thomason was also questioned on the issue and evidence.  Further this was even listed as one of

18  Plaintiff's issues of fact [pg. 5, no. 8] in the joint pretrial order filed in the case.  Accordingly, the

19  language about not rehiring Plaintiff after the COVID-19 shutdown should be added to the jury

20  instruction on retaliation.[6]

21

22  ///

23  ///

24  ///

25  ///

26  ///

27

28  _____

[6] In addition to what is mentioned above, Defendant's attorney questioned Colvin about whether M.J. Dean had any
obligation to rehire Colvin making it clear that he thought it was an issue. [Colvin Depo. 210:6-211:22.]

## PLAINTIFF'S PROPOSED JURY INSTRUCTION NO. 4

### NEGLIGENT TRAINING AND SUPERVISION
### ELEMENTS AND BURDEN OF PROOF

The plaintiff seeks damages against the defendant for negligent training and supervision. In order for the plaintiff to prevail on his claim for negligent training and supervision, the plaintiff has the burden of proving each of the following elements by a preponderance of the evidence:

1. the defendant knew or should have known about race-based graffiti or other race-based discrimination or harassment in the workplace and acted in a negligent manner; and

2. the defendant failed to train or supervise its employees adequately with respect to race-based graffiti or other race-based discrimination or harassment in the workplace; and

3. the defendant's negligence proximately caused the plaintiff to suffer injuries.

## Authority

*Helle v. Home Health Servs. of Nev.*, No. 48427, 2008 WL 6101984, at *3 (Nev. 2008) (citing *Hall v. SFF, Inc.*, 930 P.2d 94, 98 (Nev. 1996)); *Oehler v. Humana, Inc.*, 775 P.2d 1271, 1272 (Nev. 1989); and ECF No. 55 at p. 10:1-20; CACI 426; *Doe v. Capital Cities*, 50 Cal.App.4th 1038, 1054 [58 Cal.Rptr.2d 122] (1996); *Phillips v. TLC Plumbing, Inc.,* 172 Cal.App.4th 1133, 1139 [91 Cal.Rptr.3d 864] (2009); *Lopez v. Watchtower Bible & Tract Society of New York, Inc.*, 246 Cal. App. 4th566, 591 [201 Cal.Rptr.3d 156] (2016).

## PLAINTIFF'S ARGUMENTS FOR INCLUSION

Defendant argues that the jury instruction submitted by them "perfect mirrors" the Court's Order [on summary judgment], which might be the case, but this is not the prevailing rule on negligent training and supervision.  In fact in the case the rule was taken from, ie., *Hall v. SFF, Inc.*, 930 P.2d 94, 98 (Nev. 1996), the court there does not say that only knowledge will suffice for the

1    defendant to be liable.  In fact when discussing negligent hiring the court holds, "[A]n employer

2    breaches this duty when it hires an employee even though the employer *knew, or should have*

3    *known* of that employee's dangerous propensities." *Kelley v. Baker Protective Services, Inc.*, 198

4    Ga.App. 378, 401 S.E.2d 585, 586 (1991)."

5         Then when addressing negligent training and supervision, the court holds, "[A]s is the case

6    in hiring an employee, the employer has a duty to use reasonable care in the training, supervision,

7    and retention of his or her employees to make sure that the employees are fit for their positions.

8    *See 27 Am.Jur.2d Employment Relationship* §§ 475-76 (1996)."

9         Thus since the court first referenced hiring, it seems fairly clear that they were applying

10   the same standard "knew or should have known" to training, supervision.

11        Further a reasonable care standard in negligence cases usually means that the party

12   "knew or should have known".  In a supervision context for example if an employer didn't know

13   or have knowledge what an employee was doing when they should have known if they were

14   properly supervising an employee, liability should arguably attach.

15        Further most if not all other jurisdictions use a "knew or should have known" standard

16   for negligent hiring, training and supervision.

17        For example in California, negligence liability will be imposed on an employer if it

18   'knew or should have known that hiring the employee created a particular risk or hazard and that

19   particular harm materializes.' " *Doe v. Capital Cities*, 50 Cal.App.4th 1038, 1054 [58

20   Cal.Rptr.2d 122] (1996); *Phillips v. TLC Plumbing, Inc.*, 172 Cal.App.4th 1133, 1139 [91

21   Cal.Rptr.3d 864] (2009).  "[Plaintiff] brought several claims against [defendant employer],

22   including negligent hiring, supervising, and retaining [employee], and failure to warn.  To

23   prevail on his negligent hiring/retention claim, [plaintiff] will be required to prove [employee]

24   was [defendant employer]'s agent and [defendant employer] knew or had reason to believe

25   [employee] was likely to engage in sexual abuse.  On the negligent supervision and failure to

26   warn claims, [plaintiff] will be required to show [defendant employer] knew or should have

27

28

known of [employee]'s alleged misconduct and did not act in a reasonable manner when it allegedly recommended him to serve as [plaintiff]'s Bible instructor." *Lopez v. Watchtower Bible & Tract Society of New York, Inc.,* 246 Cal. App. 4th 566, 591 [201 Cal.Rptr.3d 156] (2016). Also the California Jury instruction for Negligent Hiring, Supervision, or Retention of Employee uses a "knew or should have known" standard. *See* CACI 426 (prong 3).

Finally the jury instruction drafted by M.D. Dean Construction only addresses "graffiti in the workplace" where the proposed jury instruction of Colvin also addresses "other race-based discrimination or harassment in the workplace".

This would cover the discrimination and harassment Plaintiff allegedly faces at the hand of Kevin Gutierrez and any other race-based discrimination or harassment in the workplace presented at trial.

DATED: 3/21/2023                     LAW OFFICES OF MICHAEL P. BALABAN

BY: /s/ Michael P. Balaban
    Michael P. Balaban, Esq.
    LAW OFFICES OF MICHAEL P. BALABAN
    10726 Del Rudini Street
    Las Vegas, NV  89141

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I hereby certify that pursuant to FRCP Rule 5(b)(3) and LR IC 4-1(a), a true and correct copy of the foregoing document was electronically served via the Court's CM/ECF electronic filing system to the following persons on March 21, 2023:

Martin A. Little, Esq.
Robert L. Rosenthal, Esq.
HOWARD & HOWARD ATTORNEYS PLLC
*Attorneys for Defendant*

/s/ Michael P. Balaban
Michael P. Balaban

# EXHIBIT

# "1"

# EXCERPTS FROM PARNELL COLVIN'S DEPOSITION

UNITED STATES DISTRICT COURT FOR

THE DISTRICT OF NEVADA

PARNELL COLVIN,                    )
                                   )
            Plaintiff,             )
                                   )
vs.                                ) CASE NO. 2:14-CV-00761-JCM-PAL
                                   )
M.J. DEAN CONSTRUCTION,            )
INC.                               )
                                   )
            Defendant.             )
_____)

VIDEORECORDED DEPOSITION OF PARNELL COLVIN

Las Vegas, Nevada

July 15, 2021
10:00 a.m. (PST)

REPORTED BY:
MICHAEL A. BOULEY, RDR
NVCCR #960



1    A.  Well –
2    Q.  – other than Gilbert and Lilow?  Ycu mentioned
3  a bunch of names.
4    A.  Well, let me rephrase that.  I probably wouldn't
5  say they were hired to replace me.  They ware taken from
6  other areas to replace me.
7    Q.  So let me ask you again:  Do you know whether
8  any employees were hired by M.J. Dean to replace you?
9    A.  I don't.
10   Q.  You were not brcught back to the Sphere project
11  after being terminated.  Correct?
12   A.  Correct.
13   Q.  And do you have any facts or documents to show
14  that Kevin Gutierrez was responsible for you not being
15  hired back?
16   A.  Yes.
17   Q.  What facts or documents do you have to show that
18  Kevin made that decision not to hire you back?
19   A.  Phone call that I had with Dave Muti.
20   Q.  When was that?
21   A.  I got laid off – probably April, shortly after
22  I got laid off.
23   Q.  You had a telephone conversation with him?
24   A.  Yes.
25   Q.  Do you remember the date?
                                        Page 188

1    A.  No.
2    Q.  Would your phone hava a record of when you spoke
3  to Dave Muti?
4    A.  No.  It's over a year ago.
5    Q.  What did Dave Muti say during that telephone
6  call?
7       Let me back up, actually.
8       Did ycu call Dave Muti or did he call you at
9  that time?
10   A.  I called.
11   Q.  What was the purpose of your call?
12   A.  To gat amploymant again.
13   Q.  And at the time you called Dave Muti, had you
14  already decided to file a claim with the EEOC?
15   A.  Yes.
16   Q.  And yet you still wanted to go back to work at
17  M.J. Dean?
18   A.  Yes.
19   Q.  Why?
20   A.  I mean, it happens all the time.  I got tc still
21  live.  And, I mean, there's racism all over.  I mesn, I
22  can't quit evary job bacause of racism, so –
23   Q.  But you wanted to go back to the place that you
24  say acted in a discriminatory mannar toward you?
25   A.  But I'm working for somsbody that's not a raoist
                                        Page 189

1  like Kevin.  So I wouldn't be dealing with Kevin.  I'd be
2  dealing with Dave Muti.  So that's a good fit for me.
3    Q.  So when you spoke to Dave Muti a couple of weeks
4  after you were let go in April 2020, did you ask him if
5  you could be rehired by M.J. Dean?
6    A.  Yes.
7    Q.  What was his response?
8    A.  He said I was never supposed to get hired –
9  firad.  He said because when ha left that day to go to
10  the other yard, he said, Parnell, you're going to be hsre
11  working for yourself for the rest of the week.  Me,
12  Julian, and Gilbert are going to the other yard.
13       So that's my supsrvisor.  So if I wasn't going
14  to gat laid off because of COVID or any other thing, I'm
15  quita sure my direct supervisor would have told me that.
16  So when I contacted David Muti, he said, Parnell, I'm
17  trying to get you back.  He said, But Kavin won't let me
18  bring you back.  It's Kevin that's keeping you from
19  getting hired.
20   Q.  And how did you respond to that?
21   A.  I wasn't surprised.
22   Q.  Did Dave Muti say anything to you at any point
23  In time that Kevin didn't want to hire you baok because
24  of your race?
25   A.  No.
                                        Page 190

1    Q.  Did anybody at M.J. Dean ever tell you, at any
2  point in time, thet they didn't want you back at M.J.
3  Dean because of your race?
4    A.  No.
5    Q.  Did anybody ever tell you at M.J. Dean, at any
6  point in time, that you were terminated on April 6, 2020,
7  because of your race?
8    A.  No.
9    Q.  Did you tell me everything about the
10  conversation that you had with Dave Muti a couple of
11  weeks after you were let go?
12   A.  Well, I had several follow-up calls with Dave,
13  hecause he is like -- he was my supervisor, so –
14   Q.  So let's stcp there.
15       So was lhe first conversation after you were let
16  go a couple of weeks after your termination?
17   A.  Yes.
18   Q.  That was the first?
19   A.  Yes.
20   Q.  And are you saying that you had several?
21   A.  Lat me back up.
22       I actually contacted Dave Muti the same time
23  Kevin came to tell me he wss laying ma off.
24   Q.  Qkay.  So you spoke to him by phone that day?
25   A.  Yes.
                                        Page 191

1  Q.  On April 6, 2020.  Is that correct?
2  A.  Yes.
3  Q.  The day you were let go?
4  A.  Yes.
5  Q.  And had you already been terminated at the time
6  that you spoke to Dave Muti on April 6, 2020?
7  A.  No.
8  Q.  What was the purpose of your cell, then, to Dave
9  Muti if you didn't know that you were being let go?
10  A.  Well, I knew I was being let go, because a
11  couple hours after Mr. Muti went to another project,
12  Kevin cama over to me and told me, so I had advance
13  notice that Kevin was going to lay me off.  And that's
14  what generated me to make a call to Dave Muti and find
15  out what was going on.
16  Q.  You say you had advance notice?
17  A.  Yes.
18  Q.  From whom?
19  A.  Kevin.
20  Q.  So he told you a couple hours before you were
21  actually let go that you were going to be let go.  Is
22  thet correct?
23  A.  Yes.
24  Q.  All right.  Did Kevin Gutierrez say anything
25  else at the time that he gave you that two-hours advance

Page 192

1  Right?
2  A.  Yes.
3  Q.  Did you have any other telephone cells or
4  discussions with Dave Muti other than the two that you've
5  talked about regarding your termination?
6  A.  Yes.
7  Q.  When was the next one?
8  A.  About two weeks after the second phone cell.
9  Q.  So about a month after you had been let go.
10  Right?
11  A.  Yes.
12  Q.  Did you call Mr. Muti or did he cell you?
13  A.  I called him.
14  Q.  What was the purpose of your cell?
15  A.  To seek employment again.
16  Q.  And what did you say to him?
17  A.  I said, Dave, I know that laborers has been
18  brought back.  And he again said, I know, Parnell.  He
19  said, I'm trying to get you back on the job.  He said,
20  but Kevin won't let me bring you hack.
21       And basically Gilbert, who was another laborer,
22  he actually got on the phone with rne and said, Yeah,
23  Parnsll.  He said, I witnessed Dave call Kevin and ask
24  Kevin to bring you back, and Kavin's response was, I'm
25  not bringing that guy back.

Page 194

1  notice?
2  A.  No.
3  Q.  And so between the time that Mr. Gutierrez gave
4  you that advance notice and the time that he formally
5  gave you notice that you were being let go, that's the
6  time you spoke te Dave Muti.  Is that correct?
7  A.  Correct.
8  Q.  What did you say to Dave Muti during that
9  telephone oall?
10  A.  I say – I asked Dave, What's going on?  I'm
11  getting laid off.  He said, What do you mean you're
12  getting laid off?  I said, Yeah, Kevin just came over –
13       (Reporter interruption for clarification.)
14  A.  Qkay.  I talked to Dave, and I told him, I said,
15  Dave, what's going on?  I said, Kevin just laid me off.
16  And he said, No, Parnell, you're not supposed to get laid
17  off.  You're working there by yourself for the rest of
18  the week, and the you only guy that's for the yard.  And
19  the yard needs someone to always manage it, so I don't
20  know why Kevin is laying you off.  And that was pretty
21  much the eonversation.
22  Q.  So that was the first conversation you had with
23  Mr. Muti about being terminated.  Correct?
24  A.  Yes.
25  Q.  And you had another one about two weeks later.

Page 193

1  Q.  Do you know whether or not it was Kevin's
2  ultimate deoision who to bring back to the jobsite or was
3  it somebody else?
4  A.  I don't know.
5  Q.  Did you ever communicate with anybody other than
6  Mr. Muti about returning to work at M.J. Dean after you
7  had been let go on April 6, 2020?
8  A.  Yes.
9  Q.  Who?
10  A.  John Thomeson.
11  Q.  And hefore we get to your discussion with John
12  Thomason, did you have any other telephone calls or
13  meetings with Dave Muti other than the three you've told
14  ma about?
15  A.  No.
16  Q.  When did you speak to John Thomason about
17  returning to work at M.J. Dean?
18  A.  Within a wesk of me heing laid off.
19  Q.  Did you call him?
20  A.  Yes.
21  Q.  Tell me about that conversation.  What did you
22  say?  What did he say in response?
23  A.  He didn't answer his phone.  I just got the
24  voice mail.
25  Q.  Did he return your call?

Page 195



1    A.  No.

2    Q.  Did you ever talk to anybody other – or leave a

3  voice mail to anybody other than Dave Muti and John

4  Thomason at M.J. Dean after you were laid off or

5  terminated?

6    A.  No.

7    Q.  Did you ever submit another application or

8  anything like that to M.J. Dean for employment after

9  April 6, 2020?

10   A.  No.

11   Q.  Was – do you know whether your name was on the

12  list with the laborers so that you were eligible to be

13  hired?

14   A.  No.

15   Q.  Did you ever follow up with the union to see if

16  you could return to work at M.J. Dean?

17   A.  No.

18   Q.  Why not?

19   A.  Because when you're like me, most of our work

20  comes from – use the word hustling or soliciting work.

21  So the job I got at M.J. Dean myself.  The union didn't

22  refer me to that job.  That was my consistently going to

23  their office three or four times a week for months.

24  That's how I got the job.

25       So normally, it'd be word of mouth.  I'd call

Page 196

1  the laborer that's working there and say, Hey, Mike –

2  for example – you guys willing to hire me?  They say,

3  Yeah.  Call the superintendent.

4       I get my work by soliciting.  I don't really get

5  too much work from sitting at home waiting for a dispatch

6  call from the union.  I go out to look for work.

7    Q.  Or you would be waiting forever.  Right?

8    A.  There you go.  You got 4-, 560 people out of

9  work, might be sitting on the list two, three years.

10   Q.  Do you know – well, you said you didn't know

11  whether anybody else was terminated from M.J. Dean other

12  than yourself.  Is that correct?

13   A.  Yes.

14   Q.  Did you talk to anybody at AECOM Hunt about

15  returning to work at M.J. Dean after you were terminated

16  on April 6, 2020?

17   A.  Yes.

18   Q.  Who did you talk to?

19   A.  AECOM Nunt safety director, Jack.  I don't know

20  his last name, though.

21   Q.  What did you say to Jack?

22   A.  I said, Jack, I got laid off from M.J. Dean, end

23  I know AECOM Hunt is the general contractor, and so they

24  do have laborers that work for tham.  So I wae trying to

25  ccme abcard witb -- with him thrcugh AECOM Hunt to get

Page 197

1  back at the Sphere project.

2    Q.  Was your communication with AECQM Hunt just

3  limited to the one conversation?

4    A.  I had several phone calls with Jack.

5    Q  Several?

6    A.  Yes.

7    Q.  When was tha first time you spoke to Jaok?

8    A.  i want to say the end of April 2020.

9    Q.  When was the next time you spoke to Jack?

10   A.  May 2020.

11   Q.  And was the sum and substance of the

12  conversation the same as it was in April?

13   A.  Yes.

14   Q.  What was Jack's response?

15   A.  He's – Parnell, he said, we're going to – if I

16  can't get you back at the Sphere, he said, I just hired

17  aoma laborers, but I will keep in you mind.

18       But at that time, AECOM Hunt also was doing the

19  Drew.  Formerly known as the Fontainebleau.  They did

20  have that project.  So he said, You can possibly get on

21  that job if that job picks back up again.

22       So periodically I would call Jack, just touch

23  base with him, see if he has any work available.

24   Q.  Did Jaok ever have any work available for you?

25   A.  No.

Page 198

1       MR. ROSENTHAL:  I'd like to have this next

2  document marked as Defendant's Exhibit K.

3       MR. MARKS:  Exhibit K, kid?

4       (Exhibit K identified.)

5  BY MR. ROSENTHAL:

6    Q.  Mr. Colvin, I went to show you what's marked as

7  Defense Exhibit K, and there's an email about helfwey

8  down the page, and it's sent to Mike Dean.  Do you see

9  that?

10   A.  Yes.

11   Q.  And the date on that email is April 21, 2020, at

12  2:40 p.m.  Correct?

13   A.  Yes.

14   Q.  It says it's from mikebrownpc681@yahoo.com.  Do

15  you see that?

16   A.  Yes.

17   Q.  Who is Mike Brown?

18   A.  That's my email, but – just the name that's on

19  the email.  But PC681 is my email.  And somehow Mike

20  Brown is just the name that comes up when I send an email

21  out.  But it's my email.

22   Q.  Are you known as Mike?

23   A.  Nope.

24   Q.  You're not known as Mr. Brown?

25   A.  Nope.  It'a been like this for years.

Page 199



Case 2:20-cv-01765-APG-EJY Document 112 Filed 03/21/23 Page 18 of 23

Parnell Colvin vs. M.J. Dean Construction, Inc.

1 BY MR. ROSENTHAL:

2 Q. Do you recognize what's been marked as

3 Defendant's Exhibit L?

4 A. Yes.

5 Q. So were you given this termination notice, which

6 is Exhibit L, on April 6, 2020?

7 A. No.

8 Q. When were -- when did you receive Exhibit L?

9 A. I personally never received this.

10 Q. Okay. By the way, take a look at the third line

11 down where it says Employee Number. Do you see that?

12 A. Yes.

13 Q. There's a 8800 there.

14 A. Yes.

15 Q. Do you see that?

16 A. Yes.

17 Q. Do you think that answers my question to you

18 from earlier this number when I asked what that number

19 was?

20 A. Very well could be. Okay.

21 Q. Right?

22 A. Yes.

23 Q. Do you have any reason to believe that number,

24 6800, was not your employee number?

25 A. I'm not sure.

Page 204

1 Q. Okay. That's fine.

2 And do you see the fifth line down where it says

3 Reason for termination?

4 A. Yes.

5 Q. Then underneath that it says, Laid off,

6 reduction in force, with an X?

7 A. Yes.

8 Q. Do you have any reason to believe that the

9 reason listed on Exhibit L wasn't true?

10 A. Yes. It's not true.

11 Q. Why?

12 A. Because the day I came back, the next day, to --

13 and let's just be clear. You might have had a shutdown,

14 but every area on the jobsite didn't shut down. The job

15 never shut down completely. Certain areas were affected.

16 But what I did, work maintaining the yard, the yard is a

17 position that has to be maintained at all times, because

18 that's where the trucks bringing all the material. So it

19 was never a lack of work for what I was doing.

20 Q. So you don't know whether or not -- well, let me

21 back up.

22 Do you recall M.J. Dean having about 90 laborers

23 working on the Sphere project?

24 A. Yes.

25 Q. Does that sound right?

Page 205

1 A. Yes.

2 Q. And do you recall whether or not about 80 of

3 those 90 laborers were let go in March, April, and May of

4 2020?

5 A. No.

6 Q. Do you know whether any of the approximately 90

7 laborers were let go by M.J. Dean in March, April, or May

8 of 2020?

9 A. No.

10 Q. Do you believe that you were the only laborer

11 who was terminated in April 2020?

12 A. I can only speak to my particular situation. I

13 can't speak for -- all I'm saying to you today is that

14 for what I was doing prior to Mr. Gutierrez calling me a

15 nigger, there was no lack of work for my area. So if you

16 want to continue to say that 88, 90 laborers left, that

17 might have been true.

18 But what I'm trying to get clear is that had no

19 bearing for area and the work I was assigned to. The

20 work I was assigned to required somebody to be there at

21 all times. So lack of work for people working on the

22 deck, yes. Lack of people -- labors working overnight,

23 yes. But for what I was doing, Parnell Colvin was doing,

24 the yard, there was no -- no lack of work for that,

25 because the yard requires maintaining at all times.

Page 206

1 Q. Bear with me one moment.

2 A. Okay.

3 Q. Too many pieces of paper.

4 There we go.

5 MR. ROSENTHAL. All right. Mark this next

6 document as Exhibit M.

7 (Exhibit M identified.)

8 BY MR. ROSENTHAL:

9 Q. Do you recognize what's been marked as Exhibit

10 M?

11 A. Yes.

12 Q. And is Exhibit M an email that was sent by Tommy

13 Glidewell to you on April 29, 2020, in response to your

14 email that you had sent Mr. Dean a week earlier?

15 A. Correct.

16 Q. And I'd like you to take a look at the second

17 paragraph. And it says there that, As referenced in your

18 termination notice, you were terminated due to lack of

19 work as a result of the MSG Sphere project being shut

20 down by the project's owner as a response to the COVID-19

21 pandemic, along with over 300 employees. No other

22 factors were considered in your termination of

23 employment, and M.J. Dean denies the allegations

24 described in your email.

25 Do you see that?

Page 207

Case 2:20-cv-01765-APG-EJY   Document 112   Filed 03/21/23   Page 19 of 23

Parnell Colvin 11/15/2021
Parnell Colvin vs. M.J. Dean Construction, Inc.

1    A.  Yes.
2    Q.  So, looking at that first sentence of that
3  paragraph, you were aware, were you not, that M.J. Dean
4  had told you that the project had been shut down due to
5  the COVID-19 pandemic.  Right?
6    A.  I don't agree with that.
7    O.  Well, when I asked you before did anybody ever
8  tell you that the project had been shut down, and you
9  said no. --
10    A.  Well, I said --
11    Q.  -- that wasn't true.  Right?
12    A.  Are you -- are you saying I'm aware of this
13  because the alleged claim in here is that it's on my
14  termination notice?
15    Q.  No.  I'm just saying, asking you, when I asked
16  you earlier did anybody at M.J. Dean ever tell you that
17  you had been let go because the project, the Sphere
18  project, had been shut down, you said no.
19    A.  Correct.
20    Q.  That wasn't true?
21    A.  Correct.  Correct.
22    Q.  Okay.  And here Mr. Glidewell told you that it
23  was shut down to the COVID-19 pandemic, along with 300
24  other employees.  Right?
25    A.  Correct. --

Page 208

1    Q.  Did you respond in any way to Mr. Glidewell's
2  email marked as Exhibit M?
3    A.  I don't believe so.
4    Q.  Why not?
5    A.  Because I was going to file my EEOC complaint.
6    Q.  Did you perform any investigation of your own as
7  to whether or not Mr. Glidewell's comments about the
8  project being shut down due to COVID-19, as to whether or
9  not that was true or not?
10    A.  Yes.
11    Q.  And what kind of investigation did you perform?
12    A.  Well, I spoke with Jack, who was AECGM safety
13  director, who informed me that the project was not going
14  to shut down.  And other laborers that I stay in
15  communication to this day has informed me that they --
16  the project never completely shut down.  So --
17    Q.  Did -- the other employees that you've talked
18  to, did they ever tell you that the project partially
19  shut down?
20    A.  Yes.
21    Q.  Did any employees that you've ever talked to
22  tell you that hundreds of employees had been let go
23  because of the partial shut down?
24    A.  Well, just from this email from Mr. Gliddale --
25  or Glidewell -- sorry about that.  Other than that, no.

Page 209

1    Q.  So did you ever perform any investigation on
2  your own as to whether or not hundreds of employees had
3  been terminated because the project was partially shut
4  down?
5    A.  No.
6    Q.  Do you know whether or not M.J. Dean had any
7  sort of obligation to rehire you after you had been
8  terminated?
9    A.  No.
10    Q.  Do you know whether there's any sort of
11  agreement between the union and M.J. Dean which would
12  have put you about at the top of the list or made you
13  get rehired at M.J. Dean?
14    A.  Well, let me back up again.
15       The same day that Mr. Gutierrez fired me, I was
16  unable to get to John Thomason, but I did run into
17  general superintendent Brian Long.  And he said, Parnell,
18  the whole job is shutting down.  I'm only going to be
19  here, out here for a week.  The 15th will be my last day,
20  and then the whole job is shutting down.
21       That never happened.
22       But he says -- he shook my hand, he says, I
23  promise you, once this job is manning up again, I bring
24  you back on the board, so just stay in touch.
25    Q.  Did anybody ever at -- from M.J. Dean ever give

Page 210

1  you anything in writing promising you that you would have
2  a job upon the job reopening?
3    A.  No.
4    Q.  Did anybody, at any point in time, ever premise
5  you employment at M.J. Dean?
6    A.  Yes.
7    Q.  What did you receive in writing promising you
8  employment?
9    A.  Gh, no.  Nothing in writing.
10    Q.  Okay.  Do you know of any written documents,
11  written documents between the union and M.J. Dean, which
12  would have required M.J. Dean to rehire you after you'd
13  been let go?
14    A.  No.
15    Q.  Do you know whether or not M.J. Dean was
16  required to rehire laborers that had been let go based
17  upon seniority?
18    A.  I don't know.
19    Q.  Do you know if there are any union documents
20  that would have required M.J. Dean to rehire laborers
21  based upon their seniority?
22    A.  I don't.
23       MR. ROSENTHAL:  I think we've been going over an
24  hour, so let's take a -- a last break and --
25       MR. MARKS:  Are you about to wrap up?

Page 211



# EXHIBIT

# "2"

# EXCERPTS FROM JOHN THOMASON'S DEPOSITION

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

PARNELL COLVIN,                )
                               )
          Plaintiff,           )
                               )
     vs.                       )   CASE NO.:
                               )   2:20-cv-01765-APG-EJY
M.J. DEAN CONSTRUCTION,        )
INC.,                          )
                               )   **CERTIFIED**
          Defendant.           )   **TRANSCRIPT**
                               )

VIDEO CONFERENCE DEPOSITION OF JOHN THOMASON
LAS VEGAS, NEVADA
THURSDAY, JULY 29, 2021

REPORTED BY:   JACKIE JENNELLE, RPR, CCR #809
JOB #416110



AdvancedONE
LEGAL

**(866) 715-7770**
**advancedONE.cam**

COLVIN vs M.J. DEAN CONSTRUCTION, INC.
JOHN THOMASON, 07/29/2021

Pages 38..41

**Page 38**

1  reason for M.J. Dean employees to be out in the
2  yard.
3      Q.   After the week, did you start rehiring
4  employees for M.J. Dean?
5      A.   Yes.
6      Q.   And you rehired laborers, correct?
7      A.   We rehired carpenters and laborers, yes,
8  sir.
9      Q.   And you said you rehired up to 200
10 employees, correct?
11          MR. ROSENTHAL:  Objection, misstates
12 testimony.
13          MR. MARKS:  No, it doesn't.
14 BY MR. MARKS:
15     Q.   But you can answer.
16          Isn't that correct?
17     A.   I'm sorry.  Could you please repeat that?
18     Q.   After the week was over, you obviously went
19 back to work and you hired laborers and carpenters,
20 correct?
21     A.   Yes.
22     Q.   And did you make the decision who to
23 rehire?
24     A.   I made the decision on how many employees
25 to rehire.

**Page 39**

1      Q.   Did you make the decision on which of the
2  employees to rehire?
3      A.   I did not make the decision on which.  I
4  left that up to my superintendents.
5      Q.   And who made the decision on which
6  employees to rehire?
7      A.   For which area, sir?
8      Q.   The laborers.
9      A.   The laborers was done by my
10 superintendents.
11     Q.   I don't know who they are.
12          Could you give me a name of who they are?
13     A.   The job was -- it was five jobs in one job.
14 I had David McGrandy on Core D.  I had Fernando
15 Gerrirez [phonetic] on Core B.  I had Scott Holander
16 on Core C.  I had Stephan Taylor on the in board.  I
17 had Tony -- I don't remember Tony's last name -- on
18 Area B.
19          Those were the superintendents that made
20 the decision.  I just told them how many carpenters
21 and how many laborers they could bring back.
22     Q.   Okay.  And how did they decide on how to
23 rehire?
24          MR. ROSENTHAL:  Objection, calls for
25 speculation.

**Page 40**

1  BY MR. MARKS:
2      Q.   You can answer.
3          You're the head guy there.
4      A.   How did they decide?  I can't answer that,
5  sir.
6      Q.   You didn't give them any guidelines?
7      A.   I told them how many carpenters they could
8  have for each area and how many laborers.
9      Q.   So if they wanted to hire their friends who
10 were laborers, they could hire their friends?
11          MR. ROSENTHAL:  Objection, calls for
12 speculation.
13 BY MR. MARKS:
14     Q.   You didn't tell them which of the laborers
15 they had to rehire, correct?
16     A.   I did not tell them by name which laborers
17 they had or carpenters that they had to rehire, no,
18 sir.
19     Q.   Did you ever tell them by name which
20 laborers they would not rehire?
21     A.   No, sir.  We -- sorry.
22     Q.   Go ahead.
23     A.   We can't do that.  We're union.  We're a
24 signatory with the carpenters, laborers, and
25 finishers and we'd have grievances filed on us every

**Page 41**

1  day if we did that.
2      Q.   Was there -- do you know whether M.J. Dean
3  used any sort of seniority system to recall the laid
4  off laborers?
5      A.   Seniority?
6      Q.   Yes.
7      A.   It's -- we don't -- we don't work by
8  seniority.
9      Q.   What you're saying is you let your
10 superintendents decide which specific employees to
11 recall, and you're saying you had nothing to do with
12 it?
13     A.   That is correct.  I picked the
14 superintendents and I let the superintendents pick
15 the employees that were brought back.
16     Q.   But you didn't have any input on who they
17 brought back?
18     A.   No.
19     Q.   And do you know why Parnell Colvin was not
20 rehired?
21     A.   No.
22     Q.   Did you ever do an investigation or talk to
23 any of the superintendents as to why he wasn't
24 rehired?
25     A.   Sir, Parnell was one of 500.  We brought

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

COLVIN vs M.J. DEAN CONSTRUCTION, INC.                    Pages 42..45
JOHN THOMASON, 07/29/2021

Page 42

1   200 back. 300 men were let go. I did not talk to
2   the superintendents about who they brought back and
3   why they brought them back.
4       Q.   When you got this -- you were aware of this
5   lawsuit before today, correct?
6       A.   Yes, sir.
7       Q.   Did you ever do any investigation after the
8   lawsuit was filed as to why Parnell was not brought
9   back?
10      A.   Again, sir, 300 men were not brought back.
11      Q.   But 200 were brought back?
12      A.   200 out of 500.
13      Q.   I'm asking a simple question.
14           Do you know why Parnell was not brought
15  back?
16      A.   The answer to your question is, no, I do
17  not know.
18      Q.   Was Dave Muti one of the superintendents?
19      A.   Dave Muti was -- during the shutdown.
20      Q.   After the shutdown?
21      A.   After the shutdown, yes, sir.
22      Q.   Was he involved in deciding who should be
23  rehired?
24      A.   No, sir.
25      Q.   Why not?

Page 43

1       A.   Again, like I said earlier, the job was
2   five jobs in one job. I had five superintendents.
3   The guys that were actually doing the work, taking
4   down the scaffold, they were the ones who decided
5   who was brought back.
6            Dave Muti was just a --
7            MR. ROSENTHAL:   Go ahead and finish.
8            THE WITNESS:   Dave Muti was a
9   superintendent that I was keeping around to do the
10  site work when the job eventually started back up.
11           Dave Muti has been a superintendent for
12  M.J. Dean for a lot of years. Dave Muti is one of
13  my best friends and he's dying of cancer right now.
14  BY MR. MARKS:
15      Q.   I'm sorry to hear that.
16      A.   Yeah, me too.
17      Q.   Are you -- you're at the jobsite still
18  day-to-day now in July of 2021, correct?
19      A.   Am I still at the Madison Square Garden
20  project?
21      Q.   Yeah.
22      A.   Yes, sir.
23      Q.   And Kevin Gutierrez is still there as a
24  general foreman?
25      A.   Yes, sir.

Page 44

1       Q.   Did Kevin Gutierrez ever tell you that he
2   heard on a regular basis white supremacy talk among
3   the employees of Dean in the field?
4       A.   No, sir.
5       Q.   If he had told you, would you have taken
6   some action?
7       A.   Absolutely, yes, sir.
8       Q.   Did Kevin Gutierrez ever express any
9   negative comments to you about Parnell Colvin?
10      A.   No, sir.
11      Q.   Let me just be clear, I'm not trying to ask
12  you this same question.
13           When you let the superintendents rehire,
14  there was no seniority, there was no based on who
15  was the best employees, it was simply you left it to
16  the superintendents to decide who they wanted to
17  rehire?
18      A.   Can I explain?
19      Q.   Yes.
20      A.   Okay. Each area had about 80 employees
21  working per quad. When we did the -- when Madison
22  Square Garden and AECOM Hunt told us what we could
23  redo once they restarted, that number went from 80
24  to 32.
25           It was different tasks. It was pulling

Page 45

1   down the scaffold, which is a very dangerous job.
2   And I left it up to the superintendents to tell me
3   who the best men were for that job.
4       Q.   Okay. But it wasn't necessarily -- they
5   didn't rate each employee and go through any
6   numerical system of, These are the employees I'm
7   rehiring.
8            They just gave you the names?
9       A.   Yes, sir.
10      Q.   And no seniority was used?
11      A.   No, sir.
12      Q.   And no, like, experience in construction
13  was used?
14      A.   Yes, sir. Experience in construction in
15  dismantling the shoring that high up, yes, sir, I'm
16  sure all of that was thought before --
17      Q.   I'm saying they didn't go through with you
18  and say, Hey, this guy had 20 years experience in
19  doing it or this guy had tan.
20           They just gave you the names?
21      A.   No offense, Mr. Marks. But I have a lot
22  going on on my plate. I can't micromanage these
23  guys. I've got to let them do their jobs and earn
24  their money.
25      Q.   Okay. That's all I'm asking you. I'm not